## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SAYDEI G. BARLEE and BARRY D. BROOME, individually and on behalf of all others similarly situated, | ) Civil Action No.: )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) **CLASS ACTION COMPLAINT**<br>)<br>) |
| FIRST HORIZON NATIONAL CORPORATION, FIRST TENNESSEE BANK, N.A., FIRST HORIZON HOME LOAN CORPORATION, FT REINSURANCE COMPANY, UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY, REPUBLIC MORTGAGE INSURANCE COMPANY, RADIAN GUARANTY INC., and GENWORTH MORTGAGE INSURANCE CORPORATION, | ) JURY TRIAL DEMANDED<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## INTRODUCTION

1.      Defendants First Horizon National Corporation. ("FHNC"), First Tennessee Bank, N.A. ("First Tennessee Bank") and First Horizon Home Loan Corporation ("First Horizon Home Loan"), together with their affiliated reinsurer, FT Reinsurance (USA), Inc. ("FT Reinsurance") (collectively, "First Horizon"), have acted in concert with Defendants United Guaranty Residential Insurance Co., Genworth Mortgage Insurance Corp., Republic Mortgage Insurance Co., and Radian Guaranty Inc. (collectively, the "Private Mortgage Insurers") (together with First Horizon, "Defendants") to effectuate a captive reinsurance scheme whereby, in violation of the Real Estate Settlement Procedures Act of 1974 ("RESPA"): (1) illegal payments for the referral of private mortgage insurance business from the Private Mortgage Insurers to FT Reinsurance, a wholly owned subsidiary First Horizon Home Loan Corporation.;

and (b) FT Reinsurance received an unlawful split of private mortgage insurance premiums paid by the Private Mortgage Insurers' customers referred by First Horizon entities.

2.      This is a proposed nationwide action brought by Plaintiffs Saydei G. Barlee and Barry D. Broome ("Plaintiffs") on behalf of themselves and a class of all other similarly situated persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by First Tennessee Bank and/or First Horizon Home Loan or any of their subsidiaries and/or affiliates between January 1, 2004 and the present (the "Class Period") and, in connection therewith, purchased private mortgage insurance and whose residential mortgage loans were included within First Horizon's captive mortgage reinsurance arrangements (hereinafter, the "Class").

3.      Captive reinsurance schemes, such as the scheme involving Defendants described herein, have been widespread throughout the mortgage lending marketplace.  As American Banker magazine recently reported in connection with an investigation by the Inspector General of the Department of Housing and Urban Development ("HUD"), "beginning in the late 1990s major U.S. banks began coercing [private mortgage] insurers into cutting them in on what would ultimately amount to $6 billion of insurance premiums in exchange for assuming little or no risk."  *See* Jeff Horwitz, Bank Mortgage Kickback Scheme Thrived Amid Regulatory Inaction, American Banker (Sept. 16, 2011, 7:45 PM), http://www.americanbanker.com/issues/176_181/ mortgages-reinsurance-deals-kickbacks-HUD-1042277-1.html, attached as Exhibit 1 (hereinafter referred to as "Mortgage Kickback Scheme"); *see also* Jeff Horwitz, Banks Took $6B in Reinsurance Kickbacks, Investigators Say, American Banker (Sept. 6, 2011, 4:55 PM), http://www.americanbanker.com/.../176_173/mortgage-reinsurance-respa-kickbacks-hud-investigation-doj-1041928-1.html, attached as Exhibit 2 (hereinafter referred to as "Reinsurance

Kickbacks").[1]

4.      As described in greater detail below, this was accomplished through a secretive "pay-to-play scheme"[2] that utilized carefully crafted excess-of-loss or "purported" quota-share reinsurance contracts that minimized risk exposure to bands of losses unlikely to be pierced. Further, as described below, even with regard to the purported band of exposure, certain lenders, including First Tennessee Bank and First Horizon Home Loans, insulated themselves from providing any real reinsurance by: (a) making their captive reinsurance arrangements "self-capitalizing," in that they were required to put only "nominal initial capital" into the trusts supporting the reinsurance contracts and (b) providing no recourse for the failure to adequately fund the trusts.  *See* Mortgage Kickback Scheme.

5.      As *American Banker* described such arrangements:

> The banks were supposedly providing catastrophic reinsurance, but the policies appeared to render it impossible that they'd ever suffer significant losses.  In the event of catastrophic losses, a bank could simply walk away from its nominal initial investment and leave the insurer to bear the other costs . . . .

*See* Mortgage Kickback Scheme.

6.      In other words, these lenders—including First Tennessee Bank and First Horizon Home Loans—were "playing with the house's money" with no risk of meaningful losses.  As *American Banker* aptly explained:

> If defaults remained low, banks would pocket large premiums without paying any claims; if defaults were high, banks' losses would be capped at the amount of their small initial investments, plus the premiums paid by homeowners and passed along to them

---

[1]     In fact, "Bank of America recently spent $34 million to settle a RESPA class action suit accusing Countrywide of taking the same mortgage insurance kickbacks alleged by HUD investigators."  *See* Reinsurance Kickbacks.  *See also* Final Approval Order in *Alston v. Countrywide Fin. Corp.*, No. 07-cv-03508 (E.D. Pa. July 29, 2011) at ECF No. 149.

[2]     *Id.*

by their mortgage insurance partners.  In other words, it appeared to be a no-lose proposition for the banks.

*See* Mortgage Kickback Scheme.

7.     In this action, Plaintiffs challenge Defendants' hidden scheme to circumvent RESPA's strict prohibition against kickbacks, referral payments and unearned fee splits and seek statutory damages and/or restitution for Defendants' unjust enrichment.   Each Defendant participated in the scheme.

8.     Homeowners who buy a home with less than a 20% down payment are typically required to pay for private mortgage insurance.   *See* http://www.privatemi.com.   Private mortgage insurance protects the lender in the event of a default by the borrower.  *Id.  See also* Exhibit 3 hereto at 1, Proposed EITF Issue titled "Risk Transfer in Mortgage Reinsurance Captive Arrangements," discussing the purpose of private mortgage insurance.   Although the premium is paid by the borrower (either directly or indirectly, as further described below), borrowers typically have no opportunity to comparison-shop or select the provider of the private mortgage insurance.  *See* Reinsurance Kickbacks ("Banks typically choose the insurance carrier . . . .).

9.     Section 2607(a) of RESPA prohibits lenders from accepting kickbacks or referral fees from any person providing a real estate settlement service, including providers of private mortgage insurance.   Thus, a lender cannot legally accept a referral fee from the insurer issuing the private mortgage insurance policy on the borrower's home.   Similarly, Section 2607(a) of RESPA prohibits providers of private mortgage insurance from giving kickbacks or referrals fees to providers of real estate settlement services, including lenders and their affiliates.   Accordingly, it is unlawful for providers of private mortgage insurance to pay referral fees to lenders and their affiliates.

4

10.     Section 2607(b) of RESPA prohibits lenders from accepting any portion of a settlement service fee—including amounts paid by borrowers for private mortgage insurance—from any person providing a real estate settlement service, including providers of private mortgage insurance, other than for services actually performed.  Thus, a lender cannot legally accept an unearned fee split from the insurer issuing the private mortgage insurance policy on the borrower's home.  Similarly, Section 2607(b) of RESPA prohibits providers of private mortgage insurance from giving any portion of a settlement service fee—including amounts paid by borrowers for private mortgage insurance—to providers of real estate settlement services, including lenders and their affiliates, other than for services actually performed.  Accordingly, it is unlawful for providers of private mortgage insurance to pay unearned fee splits to lenders and their affiliates.

11.     Defendants have engaged in a single, coordinated scheme designed to circumvent RESPA's prohibition against kickbacks, referral payments and unearned fee splits.  Pursuant to the scheme, each Private Mortgage Insurer pays a portion of borrowers' private mortgage insurance premiums to FT Reinsurance in the form of purported "reinsurance" premiums.

12.     While these payments to FT Reinsurance are purportedly for "reinsurance" services, FT Reinsurance receives these payments while assuming very little or no actual risk under its contracts with the Private Mortgage Insurers.  From the beginning of 2004 through the end of 2011, FT Reinsurance collected from the Private Mortgage Insurers at least $46.3 million as its "share" of borrower's private mortgage insurance premiums.  In contrast, FT Reinsurance's "share" of paid claims during this time period was $4.3 million.  *See* Schedule F – Part 3 from the 2004-2011 Annual Statements filed with the National Association of Insurance Commissioners ("NAIC") by each of the Defendant Private Mortgage Insurers (showing the

reinsurance premiums ceded to and the "losses" paid by FT Reinsurance).

13.     In this action, Plaintiffs contend that, due to the *structure* of Defendants' captive reinsurance arrangements, and the essential terms missing therein, such arrangements were a sham and in violation of RESPA.

14.     This unitary scheme was effectuated over time, with all Defendants acting in concert.  First Horizon entered into virtually identical contracts with each and every one of the defendant Private Mortgage Insurers.  FHNC, First Tennessee Bank, First Horizon Home Loan, and FT Reinsurance, along with the Private Mortgage Insurers, all actively participated in this single scheme.  Upon information and belief, the Private Mortgage Insurers effectively had no choice but to enter into virtually identical reinsurance contracts with FT Reinsurance or risk losing business.   First Horizon had sole control over the contours of the reinsurance arrangements at issue and replicated the same arrangement with each and every Private Mortgage Insurer.  Each of the Private Mortgage Insurers chose to participate in the scheme and to pay kickbacks and/or referral fees to First Horizon because it was in their own best interest.

15.     Defendants' coordinated actions resulted in a reduction of competition in the mortgage insurance market and resulted in increased premiums for Plaintiffs and the class.  *See generally*, 12 U.S.C. § 2601(b).

16.     This scheme constitutes disguised, unlawful referral fees in violation of RESPA's anti-kickback provisions, as well as a violation of RESPA's ban on accepting a percentage of settlement-service fees other than for services actually performed.

**JURISDICTION AND VENUE**

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. § 2614.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because the real property involved in one or more of the Plaintiffs' mortgage loan transaction are located in this district, and/or a substantial part of the events giving rise to the claims occurred in this district.

**PARTIES**

**Plaintiffs**

19.     Plaintiff Saydei G. Barlee ("Barlee") obtained a mortgage loan from First Horizon Loan Corporation on or about April 30, 2007, for the purchase of her home located in Philadelphia, Pennsylvania.  *See* Exhibit 4 hereto (Plaintiff Barlee's Mortgage).  In connection with this loan, Plaintiff Barlee was required to pay for private mortgage insurance in the amount of $226.42 per month.  *See* Exhibit 5 hereto (Plaintiff Barlee's "Payment Letter").  Her private mortgage insurer, PMI Mortgage Insurance Company, was selected by her lender and was a provider with whom First Horizon had a captive reinsurance arrangement and was included within First Horizon's captive reinsurance program.

20.     Plaintiff Barry D. Broome ("Broome") obtained a mortgage loan from First Horizon Loan Corporation on or about April 10, 2008, for the purchase of his home located in Atlanta, Georgia.  *See* Exhibit 6 hereto (Plaintiff Broome's Mortgage).  In connection with this loan, Plaintiff Broome was required to pay for private mortgage insurance in the amount of $55.19 per month.   His private mortgage insurer, United Guaranty Residential Mortgage Insurance Company, was selected by his lender and, upon information and belief, was a provider with whom First Horizon had a captive reinsurance arrangement and was included within First Horizon's captive reinsurance program.

**Defendants**

**First Horizon Defendants**

21.     Defendant First Horizon National Corporation, a Tennessee corporation headquartered in Memphis Tennessee, provides financial services through its principal subsidiary, First Tennessee National Association and its subsidiaries.  *See* Exhibit 7 hereto (excerpts from First Horizon National Corporation's 2011 Form 10-K and Ex. 21 thereto), at 1.

22.     Defendant First Tennessee Bank, N.A, a wholly owned subsidiary of First Horizon National Corporation, is the principal U.S. subsidiary of First Horizon National Corporation and is a national banking association.  As of 2012, First Tennessee held assets amounting to approximately $26 billion.  *See* Exhibit 8 hereto (Company Information), available at https://www.firsttennessee.com/Corp-Resources/Company-Info.  First Tennessee Bank's main offices are located in Memphis, Tennessee.

23.     Defendant First Horizon Home Loan Corporation, a Kansas Corporation, with its principal office in Irving, Texas, was a wholly owned subsidiary of First Tennessee Bank through February 7, 2007 at which time First Tennessee Bank, N.A. and First Horizon Home Loan Corporation merged with the First Tennessee Bank emerging as the surviving corporation. *See* Agreement of Merger between First Tennessee Bank National Association and First Horizon Home Loan Corporation, attached hereto as Exhibit 9.[3]  First Horizon Home Loan Corporation did business under the following names: "First Horizon Home Loans," "First Tennessee Home Loans," and "First Horizon Home Loan Corporation d/b/a First Tennessee Home Loans."  Since the merger in February 2007 with First Tennessee Bank, First Horizon Home Loan Corporation also did business as "First Horizon Home Loans, a division of First Tennessee National Bank

---

[3]     Any reference herein to First Horizon Loan Corporation includes its successors and assigns.

Association" and "First Tennessee Home Loans, a division of First Tennessee National Bank Association."  *See* Exhibit 10 hereto ("Important Information about Your Loan Documents" provided to Plaintiff Broome at the time he took out his mortgage loan).  Any reference herein to First Horizon Home Loan or First Horizon Home Loan Corporation or First Horizon should be understood to include each and every entity or name under which First Horizon did business during Class Period, both before and after the merger of First Horizon Home Loan Corporation and First Tennessee Bank, N.A.

24.     FHNC and its affiliates provided mortgage banking services in 45 states and was at one time ranked in the top 25 nationally in mortgage loan originations.  *See* excerpt from First Horizon National Corporation's 2006 Form 10-K and Ex. 21 thereto, attached hereto as Exhibit 11; *see also* excerpts from First Horizon National Corporation's 2007 Form 10-K and Ex. 21 thereto, attached as Exhibit 12 (stating that as of December 31, 2007, it and its affiliates "provided mortgage banking services through 250 retail production cost centers and 30 wholesale production centers in 41 states" and "ranked in the top twenty nationally in mortgage loan originations").[4]

25.     Defendant FT Reinsurance Company has been and continues to be a direct subsidiary of FHNC.  *See* Exhibits 7, 11 and 12 (listing FT Reinsurance Company as a subsidiary of FHNC).  FT Reinsurance is a South Carolina Corporation in good standing and is regulated by the South Carolina Department of Insurance.  *See* Exhibit 14 (South Carolina Corporate Listing) *See also* S.C. Code Ann. § 38-90-10 *et seq*.

---

[4]     On August 31, 2008 First Horizon National Corporation sold its mortgage production offices and its mortgage origination and servicing platform outside Tennessee to MetLife Bank, N.A., so it could refocus on regional banking. *See* Press Release, First Horizon National Corporation, First Horizon Completes Sale of Mortgage Business Outside Tennessee and Revises Credit Expectations for 2008 (Sept. 3, 2008), attached hereto as Exhibit 13.

### The Private Mortgage Insurer Defendants

26.     Defendant United Guaranty Residential Insurance Co. ("UGI") is a North Carolina corporation headquartered in Greensboro, NC, and, during the Class Period, conducted business throughout the United States.  According to the Annual Statements filed by UGI with the NAIC, UGI ceded premiums to Defendant FT Reinsurance each and every year from and including 2004 up to and through at least 2009.

27.     Defendant Genworth Mortgage Insurance Corp. ("Genworth") is a North Carolina corporation headquartered in Raleigh, NC, and, during the Class Period, conducted business throughout the United States.  According to the Annual Statements filed by Genworth with the NAIC, Genworth ceded premiums to Defendant FT Reinsurance each and every year from and including 2004 up to and through 2011.

28.     Defendant Republic Mortgage Insurance Co. ("Republic") is a North Carolina corporation headquartered in Winston-Salem, NC, and, during the Class Period, conducted business throughout the United States.  According to the Annual Statements filed by Republic with the NAIC, Republic ceded premiums to Defendant FT Reinsurance each and every year from and including 2004 up to and through at least 2009.

29.     Defendant Radian Guaranty Inc. ("Radian") is a Pennsylvania corporation headquartered in Philadelphia, PA, and, during the Class Period, conducted business throughout the United States. According to the Annual Statements filed by Radian with the NAIC, Radian ceded premiums to Defendant FT Reinsurance, each and every year from and including 2004 up to and through at least 2009.

30.     Each Defendant is a proper party to this action as each Defendant participated in the same coordinated, unitary scheme alleged herein and was a provider or recipient of the

unlawful kickbacks and unearned fees described herein.  Under RESPA Sections 8(a) and 8(b), 12 U.S.C. §§ 2607(a) and (b), it is unlawful for any person to give or accept any fee, kickback, or thing of value for the referral of private mortgage insurance or any portion of an unearned fee and, further, Section 8(d) of RESPA, 12 U.S.C. § 2607(d), provides that a violator is jointly and severally liable for three times the amount paid for the settlement service.

## FACTUAL ALLEGATIONS

### FHNC's Operations

31.     FHNC has provided and continues to provide, through First Tennessee Bank, its principal subsidiary, diversified financial services in its four business segments: Retail/Commercial Banking, Mortgage Banking and Capital Markets. First Tennessee Bank is a federally chartered national bank and did business in Pennsylvania and throughout the United States, and, during the Class Period, has originated and serviced, residential real estate loans throughout the United States through, *inter alia,* its subsidiaries, Defendants, First Horizon Home Loan and First Tennessee Bank.  *See generally* Exhibit 7.

32.     At the apex of its mortgage origination business, First Horizon Home Loans achieved the 17th (2007) and 18th (2008) rank in the top 40 Mortgage originators and was one of the top 25 mortgage providers from 2004-2008.  *See* 2011 Mortgage Market Statistical Annual, Vol. I, at 62, 64, 66, 68, 70, attached as Exhibit 15.

33.     According to its last Annual Report before it sold its mortgage lending business (*see* fn.4 above), First Tennessee Bank, through First Horizon Loan, operated offices in 41 states and was one of the top 20 loan mortgage loan servicers and originators.  *See* First Horizon National Corporation 2007 Annual Report at 3, attached hereto as Exhibit 16.  First Horizon Home Loan's mortgage business consisted primarily of the origination or purchase of single-

family residential mortgage loans through retail and wholesale lending for sale to secondary market investors and servicing, resulting in significant revenue streams from the origination and servicing of the loan portfolio. *Id.* at 13.

34.     As of December 31, 2011, FHNC's consumer real estate portfolio was $5.3 billion, comprising mostly home equity lines of credit and installment loans. *See* FHCN 2011 Annual Report at 32 attached as Exhibit 17.

### Private Mortgage Insurance Industry

35.     Each of the Defendant Private Mortgage Insurers provides or provided mortgage insurance for the protection of residential mortgage lenders such as First Tennessee Bank and First Horizon Home Loans and was a party to a captive reinsurance agreement with FT Reinsurance.

36.     The private mortgage insurance industry began with the founding of Defendant Mortgage Guaranty Insurance Corp. ("MGIC") in 1957 and grew to become dominated by MGIC and the other Defendant Private Mortgage Insurers, including United Guaranty Residential Insurance Co., PMI Mortgage Insurance Co., Genworth Mortgage Insurance Corp., Republic Mortgage Insurance Co., and Radian Guaranty Inc.  Generally, the industry is represented by a trade association known as Mortgage Insurance Companies of America ("MICA"). *See* http://www.privatemi.com/news/ index.cfm.  According to its website, MICA's members include each of the foregoing insurers, with the exception of United Guaranty Residential Insurance Co. *See* http://www.privatemi.com/about.cfm.

37.     According to MICA, new private mortgage insurance contracts for its member firms consistently exceeded $200 billion between 1998 and 2006 and topped $300 billion in 2007. *See* http://www.privatemi.com/about.cfm.

38.     In order to lessen the risk of default, lenders typically prefer to finance no more than eighty percent (80%) of the value of a home, with the remaining twenty percent (20%) being paid as a down payment by the borrower.  In the event of a default, the lender is then more likely to completely recover its investment.

39.     Many potential homebuyers cannot afford to pay 20% of the purchase price as a down payment on a home.  Private mortgage insurance allows the lender to make loans in excess of 80% of the home's value by providing a guarantee from a dependable third party—the provider of private mortgage insurance—to protect the lender in the event of a default by the borrower.  *See* http://www.privatemi.com/news/factsheets/2010-2011.pdf.  *See also* Exhibit 3 at 1-2, discussing the purpose of mortgage insurance.

40.     Providers of private mortgage insurance are typically unaffiliated third-party companies who agree to cover the first twenty percent (20%) to thirty percent (30%) of the amount of the potential claim for private mortgage insurance coverage, including unpaid principal, interest and certain expenses.  *Id*.

41.     The amount of private mortgage insurance coverage required varies according to the perceived risk of default.  The lower the percentage of the borrower's down payment, the greater the amount of mortgage insurance required.  *See* http://www.privatemi.com/tools resources/faqs.cfm.  For example, more private mortgage insurance is required with a five percent (5%) down payment than with a fifteen percent (15%) down payment.

42.     While the lender is the beneficiary of the private mortgage insurance, the borrower pays for the insurance, either (a) directly through the addition of monthly premiums to the borrower's monthly mortgage payment, or (b) indirectly through a higher interest rate on the loan (the lender pays the initial private mortgage insurance premium as a lump sum and then

passes this cost on the borrower in the form of a higher interest rate for the life of the loan).

43.     Borrowers generally have no opportunity to comparison-shop for private mortgage insurance, as the private mortgage insurance is arranged by the lender.  The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the lender and the provider of private mortgage insurance, rather than negotiated between the borrower and the provider of private mortgage insurance.  *See, e.g.,* http://www.privatemi.com/toolsresources/faqs.cfm.  *See also* Reinsurance Kickbacks ("Banks typically choose the insurance carrier . . . .").

44.     Private mortgage insurance is limited to the conventional home loan market. Mortgage loans directly insured by the federal government via mortgage guaranty programs, such as those maintained by the Federal Housing Administration, the Department of Veterans Affairs and the Department of Agriculture maintain their own form of mortgage default insurance.  *See* http://www.privatemi.com/news/factsheets/2010-2011.pdf.

### RESPA Prohibits Kickbacks for Referrals and Fee-Splitting Related to Private Mortgage Insurance Policies

45.     RESPA is the primary federal law regulating residential mortgage settlement services and/or business incident to real estate settlement services.  For most of the Class Period, the United States Department of Housing and Urban Development ("HUD") was charged with enforcing RESPA.  HUD has promulgated the implementing rules for RESPA.  *See* Regulation X, 24 C.F.R. § 3500.

46.     As of July 21, 2011, RESPA is now administered and enforced by the Consumer Financial Protection Bureau ("CFPB").  The CFPB was established by the Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act).  *See* Dodd-Frank Act §§ 1002(12)(M), 1024(b)-(c), and 1025(b)-(c); 12 U.S.C. §§ 5481(12)(M), 5514(b)-(c), and 5515(b)-(c).

47.     RESPA was enacted, in part, to curb the problem of kickbacks between real estate

agents, lenders and other real estate settlement service providers and/or providers of business

incident to real estate settlement services.  "It is the purpose of this chapter to effect certain

changes in the settlement process for residential real estate that will result . . . in the elimination

of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement

services."  12 U.S.C. § 2601(b).

48.    A key component of RESPA is its dual prohibition of referral fees and fee-

splitting between persons involved in real estate settlement services.

49.    RESPA Section 8(a), 12 U.S.C. § 2607(a), provides:

> No person shall give and no person shall accept any fee, kickback,
> or thing of value pursuant to any contract or understanding, oral or
> otherwise, that business incident to or a part of a real estate
> settlement service involving a federally related mortgage loan shall
> be referred to any person.

50.    RESPA Section 8(b), 12 U.S.C. § 2607(b), provides:

> No person shall give and no person shall accept any portion, split,
> or percentage of any charge made or received for the rendering of a
> real estate settlement service in connection with a transaction
> involving a federally related mortgage loan other than for services
> actually performed.

51.    Regulation X further explains, "A charge by a person for which no or nominal

services are performed or for which duplicative fees are charged is an unearned fee and violates

this section."  24 C.F.R. § 3500.14(c).

52.    The term "thing of value" is broadly defined in RESPA and further described in

Regulation X as including:

> [W]ithout limitation, monies, things, discounts, salaries,
> commissions, fees, duplicate payments of a charge, stock,
> dividends, distributions of partnership profits, franchise royalties,
> credits representing monies that may be paid at a future date, the
> opportunity to participate in a money-making program, retained or
> increased earnings, increased equity in a parent or subsidiary entity
> . . . . The term payment is used as synonymous with the giving or

receiving any "thing of value" and does not require transfer of money.

24. C.F.R. § 3500.14(d).

53.     Private mortgage insurance business referred to private mortgage insurers by a lender constitutes "business incident to or a part of a real estate settlement service" within the meaning of RESPA, 12 U.S.C. § 2607(a).  The term "settlement service" is liberally defined in RESPA and Regulation X and includes the "provision of services involving mortgage insurance."  24 C.F.R. § 3500.2(b).

54.     Under RESPA, therefore: (a) First Horizon  is prohibited from accepting referral fees from a Private Mortgage Insurer or from splitting private mortgage insurance premiums with the Private Mortgage Insurer other than for services actually performed by the captive reinsurer; and (b) the Private Mortgage Insurers are prohibited from paying referral fees to First Horizon or from paying to First Horizon any split of private mortgage insurance premiums other than for services actually performed by the captive reinsurer.

**Mortgage Reinsurance**

55.     Beginning in the mid to late 1990s, mortgage companies began looking for ways to capitalize on the booming profitability of the private mortgage insurance market.  *See* Exhibit 18 hereto (Timothy J. Cremin, *Using a Bank Captive Subsidiary to Reinsure Mortgage Insurance,* (Mar. 23, 1998), http://www.captive.com/service/milliman/article3_mortgage.shtml).

56.     In order to "share in these profits," large lenders typically created reinsurance subsidiaries to enter into contracts with providers of private mortgage insurance, whereby the reinsurer typically agreed to assume a portion of the private mortgage insurer's risk with respect to a given pool of loans.  *Id*.  In return for guaranteeing a steady stream of business, the private mortgage insurer ceded to the reinsurer a portion of the premiums it received from borrowers

with respect to the loans involved.

57.     Mortgage reinsurance arrangements can generally take one of two forms: (a) "quota share," or (b) "excess-of-loss."

58.     In a typical quota share reinsurance arrangement, the reinsurer agrees to assume a fixed percentage of all the private mortgage insurer's insured losses.  Thus, if the private mortgage insurer experiences losses, the reinsurer is expected to experience losses in the percentage agreed upon in the reinsurance contract.  However, quota share arrangements do not constitute real or commensurately priced reinsurance if provisions in the reinsurance contract limit the reinsurer's liability to pay claims to the assets held in the trust accounts established for each mortgage insurer into which the mortgage insurer deposits the contractually-determined ceded portion of the premiums that it collects from borrowers, and the Private Mortgage Insurers have no recourse against the reinsurer.[5]

59.     In contrast to the typical quota share arrangement, where the private mortgage insurer and reinsurer are *expected* to share losses beginning with the first dollar of loss paid, in an excess-of-loss arrangement, the reinsurer is liable only for a specified corridor or "band" of loss, with the losses below and above the band being covered by the private mortgage insurer.  In other words, the reinsurer is liable only for claims, or a percentage thereof, above a particular point, commonly known as an attachment or entry point, and subject to a ceiling, commonly

---

[5]        As noted by the American Academy of Actuaries:

> Straight quota share contracts are typically exempted from risk transfer requirements under the paragraph 11 exception of FAS 113.  However, the **introduction of risk limiting features to a quota share contract, such as a loss ratio cap** . . . a loss retention corridor, or a sliding scale commission, often prevents the contract from qualifying for the exception.

*See* Exhibit 19 hereto, January 2007 Reinsurance Attestation Supplement 20-1, at 14 (emphasis added).

known as a detachment or exit point.  Under this structure, then, the reinsurer's liability begins, if ever, only when the private mortgage insurer's incurred losses reach the attachment point and ends when such losses reach the detachment point.

60.     An excess-of-loss arrangement does not, however, necessarily result in any actual "losses" being shifted to the reinsurer, even if the reinsurer begins paying claims.  Paid claims, as discussed herein, do not establish that the reinsurance agreements provide for true, and commensurately priced, risk transfer as required by RESPA.  Risk/liability/recourse limiting features such as those described herein make any claim of "loss" illusory and purposefully inaccurate.

61.     Under accepted accounting principles, and actuarial principles, for a contract to be treated as "real," risk-transferring reinsurance, the reinsurer must assume significant insurance risk and it must be "reasonably possible that the reinsurer may realize a significant loss."  *See* CAS Research Working Party on Risk Transfer Testing, Risk Transfer Testing of Reinsurance Contracts: Analysis and Recommendations, Casualty Actuarial Society *Forum,* Winter 2006, at 282-283, attached as Exhibit 20; *see generally* Statement of Financial Accounting Standards No. 113, "Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts," (December 1992) at 7, attached hereto as Exhibit 21.

62.     The likelihood of the reinsurer experiencing any real losses (as opposed to merely paying "claims" from reinsurance premiums/illegal referral payments) under the arrangement depends not only on the amount of losses paid by the private mortgage insurer (*i.e.,* whether the amount of claims paid by the insurer ever reaches the band where the reinsurer's responsibility to pay claims attaches) but also on whether the reinsurance agreement between the reinsurer and the private mortgage insurer exposes the reinsurer to any real possibility that it may be *required* to

contribute its *own* money when called upon by the primary private mortgage insurer to pay for its share of losses.  The absence of any likelihood that the reinsurer will experience any real losses, in turn, reveals the reinsurance agreement between the reinsurer and primary private mortgage insurer to be a sham.  Such an arrangement does not constitute real, risk-transferring or commensurately priced reinsurance.

**Captive Mortgage Reinsurance Arrangements**

63.    Lenders produce customers for private mortgage insurers.  In the early years of the private mortgage insurance industry, there were no financial ties between lenders and the private mortgage insurers.  *See* Reinsurance Kickbacks.

64.    However, mortgage lenders such as First Tennessee Bank and First Horizon Home Loan, seeking to capitalize on the hundreds of millions of dollars their borrowers pay to private mortgage insurers in premiums each year, entered into a scheme with the Defendant Private Mortgage Insurers to establish an affiliated or "captive" reinsurer and, "[i]n exchange for steering home buyers to the [Defendant Private Mortgage] [I]nsurers, [] demand[ed] unjustifiably lucrative [captive] reinsurance deals" with such Private Mortgage Insurers (whose business was dependent upon referrals from the lenders and who initially used reinsurance deals as marketing tools).  *See* Mortgage Kickback Scheme; *see also* Michael C. Schmitz, *Investigating Captive Mortgage Reinsurance,* Mortgage Banking, February 1, 1998, attached as Exhibit 23.

65.    Lender captive reinsurers provide reinsurance primarily or exclusively for loans the lender originates, funds and/or originates through correspondent lending and which include private mortgage insurance.  Under captive reinsurance arrangements, the lender refers its borrowers to a private mortgage insurer who agrees to reinsure with the lender's captive reinsurer.  These arrangements require the private mortgage insurer to cede a percentage of the borrowers' premiums to the lender's captive reinsurer for the "reinsurance" purportedly

19

provided.

66.     Notably, after investigating mortgage lenders' captive reinsurance arrangements with private mortgage insurers, the Office of the Inspector General of HUD concluded that "banks and insurance companies had created elaborate financial structures that had the appearance of reinsurance but failed to transfer significant amounts of risk to their bank underwriters."  *See* Reinsurance Kickbacks.

67.     This is because some lenders, including First Tennessee Bank and First Horizon Home Loan, collaborated with private mortgage insurers to create lucrative excess-of-loss and/or quota share reinsurance deals and purposefully designed their reinsurance contracts in such a manner as to receive hundreds of millions of dollars in purported reinsurance premiums, while assuming little or no actual risk.  As American *Banker* reported, "[w]hile designed to look like reinsurance, the deals weren't built to perform like it.  The problem was how they split up the risks and rewards of insuring homeowners' mortgages."  *See* Reinsurance Kickbacks.

68.     Typically, pursuant to the terms of the reinsurance contracts, the premiums ceded by the private mortgage insurers are deposited directly into trust accounts supporting the reinsurance contracts—that is, accounts which hold the funds that are to be used under the reinsurance contracts to pay claims.  *See, e.g.*, Exhibit 3 at 4, discussing the use of a trust fund.

69.     Premiums are ceded into the supporting trusts on a "book year" basis, as described by an American Institute of CPAs ("AICPA") Task Force addressing issues regarding risk transfer in mortgage reinsurance captive arrangements.

> A contract functions at the book year level and is typically for a 10 year term. For example, 1999 is a book year and all mortgage insurance policies written during 1999 would be considered "book year 1" and reinsurance premium and reinsurance losses related to that book year would be ceded to the captive reinsurer for 10 years . . . . Trust funds for all book years for the particular MI cross-

collateralize the entire reinsured obligation to the MI.

*See* Exhibit 3 at 3.

70.    Thus, all claims under a reinsurance contract with a particular private mortgage insurer can be satisfied from all the funds in the trust created to support that reinsurance contract, rather than only from premiums ceded for a given book year.  *See* Exhibit 3 at 3.  Moreover, upon information and belief, when certain trust reserve requirements are met, the funds in the trust can also typically be released as dividends to the captive reinsurer.  Thus, the ceded premiums which are deposited into the trusts remain there until they are paid out to cover claims, paid out to cover administrative expenses incurred by the captive reinsurer, or released as a dividend to the captive reinsurer.

71.    Typically, by design, lenders' captive reinsurance contracts with private mortgage insurers, such as First Horizon's contracts with the Private Mortgage Insurers, limit the lenders' liability/payment responsibilities under the contracts through provisions that permit the captive reinsurer to effectively opt out of the contracts at will by simply failing to adequately capitalize the trust supporting the reinsurance contract.  *See* Reinsurance Kickbacks.

72.    While the captive reinsurer is facially required to maintain the trust fund's net assets at a level required by state law (typically, upon information and belief, 10% of the current cumulative loss exposure for all book years or 100% of loss reserves, including a contingency reserve) through, *inter alia*, capital infusions, this requirement is a chimera as the private mortgage insurers have no monetary recourse against the captive reinsurer or the lender to ensure that the trusts are sufficiently funded on an ongoing basis in order to cover actual or expected losses under the reinsurance contract.  *See* Reinsurance Kickbacks.

73.    Thus, the captive reinsurer's potential exposure for payment of reinsurance claims is commonly limited to the amount held in the trust account established for the mortgage

insurer—no matter what state law or regulation, or even other portions of the reinsurance contracts, require.   This is accomplished either through concurrent contractual provisions expressly providing that the captive reinsurer and its affiliates have no exposure for the failure to adequately fund the trusts or through an unwritten understanding of the parties.[6]

74.     As *American Banker* aptly described such arrangements:

> And the deals were "self-capitalizing," meaning that a bank could fund its stake with incoming premiums.  If the deal went bad, the bank could walk away and leave the insurer to cover its losses. Conceptually, such arrangements are analogous to letting a gambler with $10 in casino chips place a $100 bet at a blackjack table on the assumption that he'll win.

*See* Reinsurance Kickbacks.

75.     In other words, should the captive reinsurer choose not to maintain the required funds in the trust (as, upon information and belief, First Horizon decided here), once the trust is depleted, the captive reinsurer bears no further risk and the mortgage insurer assumes any remaining obligations—no matter if the funds available in the trusts were not enough to cover the amount of risk or "losses" the captive reinsurer contracted and paid to cover.  The absence of such recourse distinguishes the challenged captive reinsurance contracts from true mortgage reinsurance contracts.

76.     Typically, lenders' captive reinsurance arrangements provide yet another layer of protection from true reinsurance losses, in that:

> Each of a bank's reinsurance vehicles was legally separate not only from the bank's main reinsurance subsidiary but also from all the other funds.  If a reinsurance deal didn't have enough money to pay its obligations, the bank could abandon it and leave the

---

[6]     *See* Exhibit 23 attached hereto, OCC Corporate Decision #97-97, November 1997, at 3 (affirming that First Tennessee Bank's "potential liability for Subsidiary's [*i.e.,* FT Reinsurance] reinsurance activities will be limited, therefore, to the amount of its capital investment."  *See also* fn.6, stating "The Bank's [FT Reinsurance] total exposure to the mortgage reinsurance activities will be limited, therefore, to the amount of its capital investment."

mortgage insurer with the unpaid bill.

> To carry on the casino analogy above, it would be as if the gambler with $10 in chips were allowed to make that same $100 bet at ten different blackjack tables, collecting on the winning bets and renouncing the losers.

*See* Reinsurance Kickbacks.

77.     Lenders aggressively pursued such arrangements with private mortgage insurers. As *American Banker* recently reported, "[e]ven as insurers complained they couldn't afford the escalating cost of the reinsurance payments, banks threatened or punished companies that balked at providing them."  *See* Reinsurance Kickbacks.

78.     *American Banker* reported that GE Capital Mortgage Insurance (a predecessor of Genworth) described the lenders' aggressive pursuit as "feeding the beast" in a 1999 Power Point presentation to Citibank obtained by HUD investigators.  *See* Reinsurance Kickbacks.  In the presentation, Genworth warned that "the MI industry and lenders won't be able to defend/sustain these structures." *Id*.

79.     Captive mortgage reinsurance arrangements such as First Horizon's arrangements with the Private Mortgage Insurers raise obvious RESPA kickback/fee-splitting problems. Private mortgage insurers are dependent on the lender to obtain business, while the lender is collaborating with the insurer to obtain a share of the premium revenue generated by referral of its borrowers to the private mortgage insurers.   The private mortgage insurer stimulates/guarantees its business by providing a lucrative stream of revenue for the lender via the lender's captive reinsurer.

80.     The Private Mortgage Insurers understood that in order to receive referrals of private mortgage insurance business, and, thus, a steady stream of business from mortgage lenders such as First Tennessee Bank and First Horizon Home Loan, they would have to agree to

higher premium cessions and/or kickbacks through reinsurance premiums ceded.  As Genworth

noted in its 2004 Form 10-K filing:

> Starting in late 2003, we generally sought to exit or restructure a
> portion of our excess-of-loss risk sharing arrangements with
> premium cessions in excess of 25% to improve profitability. This
> resulted in a significant reduction in business from several of these
> lenders and a reduction in the percentage of primary new risk
> written that is subject to captive reinsurance arrangements. ***We
> then re-evaluated these relationships*** on a case-by-case basis,
> assessing various factors, including ceding terms, attachment
> points and quality of portfolios. As a result, we reinstated or
> restructured some of these arrangements.

*See* Exhibit 24 hereto at 34-35 (excerpts from Genworth Financial Inc.'s 2004 Form 10-K)

(emphasis added).  These "reinsurance" premiums and/or kickbacks paid to mortgage lenders for

their referral of business to the Private Mortgage Insurers are kickbacks and/or referral fees in

violation of RESPA—pure and simple.

81.     Thus, the Private Mortgage Insurers knew that they had to participate and

perpetuate this hidden scheme in order to get more of First Horizon's business, and, as evidenced

above, they did.  The Private Mortgage Insurers chose to pay illegal kickbacks and/or referral

fees to mortgage lenders such as First Tennessee Bank and/or First Horizon Home Loan in order

to ensure the receipt of ongoing referrals of mortgage insurance business.  *See, e.g.,* Exhibit 25

hereto at 139 (excerpts from Genworth Financial Inc.'s 2005 Form 10-K, indicating a "decreased

demand for mortgage insurance . . . as a reduction in business from some mortgage lenders

following our actions to restructure our captive reinsurance arrangements with premium risk

cessions in excess of 25%).  *See also* Exhibit 26 hereto at 66 (excerpts from Radian Group Inc.'s

2005 Form 10-K, noting that, with respect to its ability to participate in and profit from the

mortgage insurance business, Radian's competitors include "mortgage lenders that demand

increased participation in revenue-sharing arrangements such as captive reinsurance

arrangements").

82.    By not reporting the scheme to the appropriate authorities, each of the Private Mortgage Insurers herein participated in the scheme alleged and as such their conduct is traceable to Plaintiffs' injury.  Furthermore, none of the seven mortgage insurance providers, including the Private Mortgage Insurers herein, chose to do anything to upset the operation of the scheme (*e.g.,* reporting it to authorities) as each was, upon information and belief, involved in similar captive reinsurance arrangements with other mortgage lenders and could not risk losing that business.[7]  The Private Mortgage Insurers, therefore, had every motive ***not*** to report the scheme alleged here in order to protect their overall interests as well as to ensure the ongoing referral of business to them by First Horizon (as well as other lenders with whom they had similar "arrangements").  Reporting the illegal schemes or refusing to take part in any unlawful "captive reinsurance" scheme with any large lender, would inevitably adversely impact and affect their relations with other lenders.

83.    The Private Mortgage Insurers acceded to and willingly participated in First Horizon's captive reinsurance arrangements because it would have been economically self-defeating for them not to do so, as noted above.  Each was aware that it was in active competition with the other Private Mortgage Insurers and if each did not act similarly to the others, it would risk losing business.  Participation ensured business and, presumably, a profit stream. In order to be included in the rotating allocation of referrals of mortgage insurance

---

[7]      *See, e.g., Samp v. JPMorgan Chase Bank, N.A.*, No. 11-cv-01950 (C.D. Cal.); *Menichino v. Citibank, N.A.*, No. 12-cv-00058 (W.D. Pa.); *Riddle v. Bank of America Corp.* (E.D. Pa.); *White v. PNC Fin. Servs. Grp., Inc.*, No. 11-cv-07928 (E.D. Pa.); *Manners v. Fifth Third Bank*, No. 12-cv-00442 (W.D. Pa.); *McCarn v. HSBC USA, Inc.*, No. 12-cv-00375 (E.D. Cal.); and *Hill v. Flagstar Bank,* No. 12-cv-02770 (E.D. Pa), in which claims like those here have been brought against each of the seven  mortgage insurers, alleging that they participated in a scheme like that alleged here.

business, the Private Mortgage Insurers acted in concert with each other as well as with the lender and captive, where all "kickbacks" from all the mortgage insurance providers flowed.

84.     As opposed to receiving direct payments for referring its customers to a certain private mortgage insurer, lenders have utilized carefully crafted reinsurance contracts, as described above, to funnel such unlawful kickbacks from private mortgage insurers to the lenders' captive reinsurance subsidiaries.

85.     Each and every premium already ceded to First Horizon by the Private Mortgage Insurers, as well as each and every premium that they will continue to cede to First Horizon in the future, constitutes an illegal kickback and/or referral fee "incident to or part of a real estate settlement service involving a federally related mortgage loan" in violation of RESPA, 12 U.S.C. § 2607(a).  Each such payment—past, present and future—represents a violation of RESPA on the part of each of the Private Mortgage Insurers in furtherance of the scheme.

86.     As actuarial firm Milliman, Inc. acknowledged, if everything went as planned, the scheme would operate as a perfect kickback: "[i]f actual losses develop to the expected level, the above arrangement, from the lender's perspective, is financially equivalent to *receiving a commission or profit sharing equal to a percentage of premium*."  *See* Exhibit 18 (emphasis added).

### HUD's Concern About RESPA Anti-kickback Violations Under Captive Reinsurance Arrangements

87.     Concerned that captive reinsurance arrangements would be designed to disguise a funneling of referral fees back to the lender who arranged for the private mortgage insurer to obtain the business, HUD issued a letter dated August 6, 1997 ("HUD letter") addressing the problem of captive reinsurers and RESPA's anti-kickback violations.  *See* HUD Letter, attached as Exhibit 27.

88.     The HUD letter concluded that captive reinsurance arrangements were permissible under RESPA only "if the payments to the affiliated reinsurer: (1) are for reinsurance services 'actually furnished or for services performed' and (2) are bona fide compensation that does not exceed the value of such services" (emphasis in original).  *See* Exhibit 27 at 3.

89.     The HUD letter focuses the RESPA anti-kickback analysis on whether the arrangement between the lender's captive reinsurer and the private mortgage insurer represents "a real transfer of risk."  In determining whether there is a real transfer of risk, HUD warned that "The reinsurance transaction cannot be a sham under which premium payments . . . are given to the reinsurer even though there is no reasonable expectation that the reinsurer will ever have to pay claims."  *See* Exhibit 28 at 3.

90.     The HUD letter also states that "[t]his requirement for a real transfer of risk would clearly be satisfied by a quota share arrangement, under which the reinsurer is bound to participate pro rata in every claim" (emphasis in original).  *See* Exhibit 27 at 3.[8]

91.     The HUD letter contrasts the excess-of-loss method of captive mortgage reinsurance, stating that excess-of-loss reinsurance contracts can escape characterization as an unlawful referral fee or fee-split only:

> [I]f the band of the reinsurer's potential exposure is such that a reasonable business justification would motivate a decision to reinsure that band.  Unless there is a real transfer of risk, no real reinsurance services are actually being provided.  In either case, the premiums paid . . . must be commensurate with the risk.

*See* Exhibit 27 at 3.  In other words, even if there is some transfer of risk, the reinsurance

---

[8]     As noted above, even quota share arrangements do not constitute real or commensurately priced reinsurance if provisions in the reinsurance contract limit the reinsurer's liability to pay claims to the assets held in the trust accounts established for each mortgage insurer into which the mortgage insurer deposits the contractually-determined ceded portion of the premiums that it collects from borrowers, and the Private Mortgage Insurers have no recourse against the reinsurer.  *See* Exhibit 19 at 14.

arrangement will still violate RESPA unless the amount paid (*e.g.,* the premiums ceded) is commensurate with the risk transferred.[9]

**Industrywide Captive Reinsurance Scheme**

92.    Since the mid-1990s, most, if not all, of the country's major mortgage lenders created its own captive reinsurance subsidiary and required each of the nation's major private mortgage insurers to whom it funneled business to enter into virtually identical reinsurance contracts with the lender's captive reinsurer.  Lenders only funneled business to those private mortgage insurers who agreed to participate in the captive reinsurance scheme.  *See* Mortgage Kickback Scheme.  This process was referred to by one beleaguered private mortgage insurer as "feeding the beast."  *See* Reinsurance Kickbacks.  That same provider even noted that these structures were indefensible.  *Id*.  Yet, it, and each of the other private mortgage insurers, participated in the scheme, failed to challenge the scheme and failed to bring the scheme to the attention of regulatory authorities.

93.    The charts below reflect the top ten captive reinsurers in the country based on the premiums ceded to the lenders' captive reinsurance subsidiaries and the hundreds upon hundreds of millions of dollars of private mortgage insurance premiums which private mortgage insurers ceded to them from 2004-2010[10]:

---

[9]    As explained above, RESPA is now administered and enforced by the CFPB.  *American Banker* recently reported that the CFPB has launched an investigation into "private mortgage lender and servicer" PHH Corporation's alleged kickback scheme—the same type of scheme described herein.  The investigation is the CFPB's first known formal investigation.  *See* Jeff Horwitz, *PHH Targeted by CFPB in Reinsurance Kickback Probe,* American Banker (Jan. 10, 2012, 4:31 PM), http://www.americanbanker.com/issues/177_7/phh-cfpb-reinsurance-1045593-1.html, attached as Exhibit 28.

[10]    *See* Schedule F – Part 3 from the 2004-2010 Annual Statements filed with the NAIC by each of the captive reinsurers.



94.    As is noted above, the following chart illustrates that these captive reinsurers received 82.8% of the total reinsurance premiums ceded by private mortgage insurers from 2004 through 2010:



95.    Each and every one of the top ten reinsurers (and/or their lender sponsor/parents) identified in the chart above to serve as repositories for ceded premiums have now been sued by consumers who have alleged that captive reinsurance entities were merely vehicles through which the lenders were able to funnel profits in the form of kickbacks while taking on little or no

risk.  *See Alston v. Countrywide Fin. Corp.*, No. 07-cv-03508 (E.D. Pa.) (created Balboa); *Munoz v. PHH Corp.*, No. 08-cv-00759 (E.D. Cal.) (created Atrium); *Alexander v. Washington Mut., Inc.*, No. 07-cv-04426 (E.D. Pa.) (created WM Mortgage RE); *Liguori v. Wells Fargo & Co.*, No. 08-cv-00479 (E.D. Pa.) (created North Star); *Moore v. GMAC Mortg., LLC*, No. 07-cv-04296 (E.D. Pa.) (created Cap Re); *White v. PNC Fin. Servs. Grp., Inc.*, No. 11-cv-07928 (E.D. Pa.) (created National City); *Menichino v. Citibank, N.A.*, No. 12-cv-00058 (W.D. Pa.) (created AAMBG Reinsurance)[11]; *Thurmond v. SunTrust Banks, Inc.*, No. 11-cv-01352 (E.D. Pa.) (created Twin Rivers).[12]

96.    Milliman, Inc. ("Milliman"), an actuarial company which, upon information and belief, provided actuarial services to each (or most) of the top ten lenders and their captive reinsurers with regards to these captive arrangements, provided a diagram as part of a handout during a 2008 seminar for actuaries, the relevant portions of which are summarized below.  For example, the following chart represents the basic and identical nature of the captive arrangements between and among the lenders, their reinsurance subsidiaries, and the private

---

[11]    *See* http://www.secinfo.com/d14D5a.t13Yy.7.htm#1stPage   (identifying AAMBG Reinsurance Inc. as a subsidiary of Citigroup Inc.); http://www.riskandinsurance.com/userpdfs/090101_IRR_Chart.pdf (identifying AAMBG Reinsurance as the captive reinsurer of Citigroup Inc.).

[12]    Indeed, beginning in 1999, several of the nation's major private mortgage insurance providers were sued separately for analogous allegations involving RESPA violations.  *See Moore v. Radian Grp. Inc.*, No. 01-cv-00023 (E.D. Tex.); *Mullinax v. Radian Guar. Inc.*, No. 00-cv-01247 (M.D.N.C.); *Patton v. Triad Guar. Ins. Corp.*, No. 00-cv-00132 (S.D. Ga.); *Downey v. Mortg. Guar. Ins. Corp.*, No. 00-cv-00108 (S.D. Ga.); *Baynham v. PMI Mortg. Ins. Co.*, No. 99-cv-00241; *Pedraza v. United Guar. Corp.*, No. 99-cv-00239 (S.D. Ga.).  Despite being named in separate actions, several of the private mortgage insurance providers joined together in a "Joint Defense Committee."  *See* http://www.analysisgroup.com/cases.aspx?id=279.  While some of the cases settled and others were dismissed, those that did settle, settled together and inexplicably included a release for the lenders despite the fact that the lenders had not been named as defendants in the actions.  *See* Exhibit 29 attached hereto (Injunction entered in *Baynham* as part of the settlements); Exhibit 30 attached hereto (Preliminary Approval Motion in *Baynham* attaching Settlement).

mortgage insurers:



*See* Private Mortgage Insurance: Beyond Carriers and Actuarial Opinions at 13, Prepared for 2008 Casualty Loss Reserve Seminar ("CLRS") by Milliman, available at: http://www.casact.org /education/clrs/2008/handouts/mrotek.pdf.   *See also* http://www.casact.org/education/clrs/2008/ index.cfm?fa=consess (regarding the 2008 CLRS).

97.    In fact, Milliman actively promoted the establishment of lender captive mortgage reinsurance entities as a money-making enterprise for mortgage lenders.  *See* Exhibit 18.

98.    Upon information and belief, under the terms of the virtually identical reinsurance contracts entered into between private mortgage insurers and each of the top ten lender captive reinsurers in the country, the lenders were protected from any liability beyond their initial capital infusion and bore no real risk.  Most significantly, each of these reinsurance contracts contained "termination clauses" and "trust caps" which, without a counter-balancing "recourse" provision

vis-à-vis the parent lender to ensure that the PMI reinsured through termination would indeed continue to be reinsured—effectively allowed the reinsurer to opt out of the scheme at its choosing and without suffering adverse consequences.  For instance, in a suit involving the same claims as those raised here against Wells Fargo & Company, Wells Fargo Bank, N.A. and North Star Mortgage Guaranty Reinsurance Company (collectively, "Wells Fargo"), Wells Fargo provided the court with copies of contracts that its captive reinsurer entered into with two of the nation's seven major private mortgage insurers, each of which includes provisions limiting Wells Fargo's exposure to risk.  *See* Revised Reinsurance Agreement (Excess Layer) between Republic Mortgage Insurance Company and North Star Mortgage Guaranty Reinsurance Company, dated Mar. 12, 2001, attached hereto as Exhibit 31, at Section 9.03 and Section 12.07; Reinsurance Agreement (Excess Layer) between Radian Guaranty, Inc. and North Star Mortgage Guaranty Reinsurance Company, dated Mar. 1, 2000, attached hereto as Exhibit 32, at Section 9.03, Section 12.06; Amendment Dated March 29, 2000 to Reinsurance Agreement (Excess Layer) between Radian Guaranty Inc. and North Star Mortgage Guaranty Reinsurance Company at Section 12.11, attached hereto as Exhibit 33.

99.    When asked to opine on contracts like those cited above with non-recourse and liability-limiting provisions in the analogous *Moore v. GMAC Mortgage, LLC*, No. 07-cv-04296 (E.D. Pa.) action, Andrew Barile, a noted reinsurance industry expert, stated that he had never, "in all [his] years of experience," seen reinsurance agreements with similar non-recourse/trust cap terms to those in the reinsurance agreements between the lender captive reinsurer and the Private Mortgage Insurers.  *See Moore v. GMAC Mortgage, LLC*, ECF No. 144 at 7 (Defendants' Reply In Support of Motion to Compel Plaintiffs' Experts to Produce Documents).

100.    Upon information and belief, the private mortgage insurers were selected by the

lenders for each borrower on a rotating or modified rotating basis, without regard for generally

recognized and legitimate business reasons such as price or better service.  In cases challenging

the same scheme as alleged herein against HSBC, lenders have conceded that a consumer's

private mortgage insurer is selected on a rotating or modified rotating basis.  For instance, in a

similar case brought against Countrywide Fin. Corp., its mortgage lender and its captive

reinsurer, the Third Circuit noted:

> Countrywide generally requires borrowers who do not put twenty
> percent down when buying a home to purchase PMI from one of
> seven (now six) PMI providers.  The borrower pays the PMI
> premiums, even though the mortgage lender is the beneficiary of
> the policy, and generally has no opportunity to comparison-shop
> for PMI lenders.  Instead, the PMI provider is selected by the
> lender, here on a rotating basis among the seven providers, all of
> whom had allegedly agreed with Countrywide to reinsure with
> Balboa.

*Alston v. Countrywide Fin. Corp.*, 585 F.3d 753 at n.3 (3d Cir. 2009).  *See also* Exhibit 34

attached hereto, excerpts from the March 2, 2010 class certification hearing transcript in *Moore*

*v. GMAC Mortg., LLC*, No. 07-cv-04296, at 11-13 (acknowledging that the assignment of

borrowers to the private mortgage insurers was done on a rotating basis); *Munoz v. PHH Corp.*,

No. 08-cv-00759 (E.D. Cal.) (Defendants' Reply Memorandum of Points and Authorities in

Support of Motion to Stay) (ECF No. 164) at 2 (stating that the *Munoz* action is "identical" to the

*Moore* action); *Moore v. GMAC Mortgage, LLC*, No. 07-cv-04296 (E.D. Pa.) (Defendants'

Reply in Support of Motion to Compel Plaintiffs' Experts to Produce Documents) (ECF No.

144) at 1-2 (noting that all of the captive reinsurance cases are "nearly identical" and that the

*Liguori v. Wells Fargo & Co.*, No. 08-cv-000479 (E.D. Pa.) action is "virtually identical" to the

*Moore* action).

101.    The lenders, their captive reinsurers, and the private mortgage insurers continued

these schemes through at least 2008 in the midst of the unprecedented mortgage crisis.  The

"brakes" were only applied to this ongoing scheme after Freddie Mac's announcement that, effective June 1, 2008, it would limit the percentage of premiums a mortgage insurance provider could cede to a lender captive reinsurer to 25%.  *See* Exhibit 35 attached hereto (Freddie Mac Private Mortgage Insurer Eligibility Requirements, dated January 2008).  *See also* http://www. freddiemac.com/news/archives/corporate/2008/20080214_capture.html.   This limitation clearly contributed to the decline in profits for lenders and their captives, who, upon information and belief, were receiving a much higher percentage of ceded premiums until that point in time.

102.    These schemes have come under increasing scrutiny in recent years and have been the subject of subpoenas from states, including Minnesota and New York, as well as the Consumer Financial Protection Bureau and HUD.  *See, e.g.*, Exhibit 36 attached hereto (excerpt from Genworth Financial, Inc.'s 2008 Annual Report at 54, explaining that its various U.S. mortgage insurance subsidiaries received information requests from the State of New York Insurance Department, the Minnesota Department of Commerce, and HUD); Exhibit 37 attached hereto (excerpts from Radian Group Inc.'s 2009 10-K at 60-61, explaining that Radian and other mortgage insurers have been subject to multiple inquiries from the Minnesota Department of Commerce relating to their captive reinsurance arrangements, and Radian has also received a subpoena from the Office of the Inspector General of HUD, requesting information relating to captive reinsurance); Exhibit 28 (American Banker recently reported that the CFPB, which now administers and enforces RESPA, has launched an investigation into "private mortgage lender and servicer" PHH Corporation's alleged kickback scheme).

103.    As a result of the participation of the lenders, their captives, the Private Mortgage Insurers and third-parties such as Milliman, in this singular scheme, mortgage insurance premiums increased as the entire market was severely impacted.   Consumers paid more for

mortgage insurance because the price included the kickbacks to lenders.

### First Horizon's Captive Reinsurance Arrangements with the Defendant Private Mortgage Insurers

104.    During the Class Period, in connection with the billions of dollars in home loans originated, funded and/or originated through correspondent lending by First Tennessee Bank and/or First Horizon Home Loans, *see* Exhibit 7 at 24, many of their borrowers paid for private mortgage insurance.

105.    Also during the Class Period, Defendant FT Reinsurance was a party to captive reinsurance arrangements with each of the Defendant Private Mortgage Insurers.  Pursuant to these arrangements, First Tennessee Bank and First Horizon Home Loan referred their borrowers to, and, upon information and belief, allocated referrals on a rotating or other systematic basis having nothing to do with quality of service, price, reputation, performance or other appropriate metric among, the Defendant Private Mortgage Insurers who, for their part, agreed to reinsure with FT Reinsurance under carefully crafted reinsurance contracts that provided for no true transfer of risk of reinsurance losses to FT Reinsurance.  First Tennessee Bank, First Horizon Home Loans, and FT Reinsurance, in coordination with the Private Mortgage Insurers, acted together over time to effectuate this single scheme which caused harm to Plaintiffs and each and every Class member.  Upon information and belief, the Private Mortgage Insurers participated in the scheme simply because the lenders produced business for them and they would not have access to the significant lenders if they did not agree to participate in the reinsurance arrangements.  Notably, upon information and belief, each of the Private Mortgage Insurers participated without demur and not one attempted to put an end to the lenders' activities by reporting the conduct to the authorities.  Defendants' coordinated actions resulted in a reduction of competition in the mortgage insurance market and resulted in increased premiums for

Plaintiffs and the Class.  *See generally*, 12 U.S.C. § 2601(b).  Graphically, this unified scheme is depicted as follows:[13]

---

[13]      The PMI Mortgage Insurance Company depicted in the above diagram was part of First Horizon's captive reinsurance scheme. However, it is not currently included as a defendant in this action for the following reasons. On August 19, 2011 the Director of the Arizona Department of Insurance issued an order placing PMI Mortgage Insurance Co. under supervision pursuant to § 20-169 of the Arizona Revised Statutes, requiring PMI Mortgage Insurance Co. to cease writing new commitments for insurance effective as of the close of business on August 19, 2011.  *See*  http://phx.corporate-ir.net/phoenix.zhtml?c=63356&p=irol-news&nyo=0  (Aug.  19, 2011 Press Release). On October 20, 2011, the Director of the Arizona Department of Insurance obtained an interim "Order Directing Full and Exclusive Possession and Control of Insurer" with respect to PMI Mortgage Insurance Co. pursuant to § 20-172 of the Arizona Revised Statutes and, under the Order, now has full possession, management and control of PMI Mortgage Ins. Co.  *See*  http://www.id.state.az.us/announcements.html (Oct. 20, 2011 Announcement). The parent company of PMI Mortgage Ins. Co. filed for Chapter 11 bankruptcy protection in Delaware on November 23, 2011. *See* http://phx.corporate-ir.net/phoenix.zhtml?c=63356&p= irol-news&nyo=0 (Nov. 23, 2011 Press Release). As such, because Plaintiffs cannot currently bring claims against PMI Mortgage Insurance Company, their failure to do so now does not in any way constitute a representation or belief on Plaintiffs' part that it was not part of the scheme alleged herein.



106.    Upon information and belief, FT Reinsurance entered into reinsurance contracts solely with respect to loans originated, funded, and/or originated through correspondent lending by First Tennessee Bank and/or First Horizon Home Loans during the Class Period.  Further, such agreements were in the form of aggregate excess-of-loss reinsurance contracts or "purported" quota share reinsurance contacts.  *See* Exhibit 23 (OCC Corporate Decision 97-97 at

3-4).[14]

107.     According to the 2011 Mortgage Market Statistical Annual, Volume I, FT Reinsurance was one of the top lender captives from at least 2004 – 2099 (ranked 14 in 2007-2009; ranked 15 in 2005-2006.  Exhibit 15 at 394-398.

108.     Under each of First Horizon's excess-of-loss captive reinsurance arrangements, the Defendant Private Mortgage Insurer pays FT Reinsurance a percentage of the premiums paid by borrowers on a particular pool of loans; in return, FT Reinsurance purportedly agrees to assume a portion of the insurer's risk of loss with respect to the loans involved.  *See* Exhibit 23, at 3.

109.     In fact, each of Defendants' carefully-crafted reinsurance contracts does not provide for "real transfer of risk" and, under any analysis, are not "commensurately" priced.

110.     Upon information and belief, under its reinsurance contracts, FT Reinsurance established a separate trust fund for each Private Mortgage Insurer into which the Private Mortgage Insurer deposited the contractually-determined ceded portions of the premiums that it collected from borrowers.  Upon information and belief, FT Reinsurance  is facially required, pursuant to its contracts with the Private Mortgage Insurers, to maintain through, *inter alia,* capital infusions and ceded premiums, each trust fund's net assets at a level required by state law to fund claims made under the reinsurance contracts.

111.     Upon information and belief, for the reasons described above, FT Reinsurance's potential exposure for payment of reinsurance claims is limited to the amount held in the trust account established for the mortgage insurer—effectively insulating First Horizon from liability

---

[14]     On November 10, 1997, the Office of the Comptroller of the Currency ("OCC") approved the application of First Tennessee Bank, N.A. to establish an operating subsidiary to reinsure a portion of the mortgage insurance on loans originated or purchased by First Tennessee Bank, N.A. or its lending affiliates.

for failing to maintain the trusts adequately to pay claims and leaving the Private Mortgage Insurers with no recourse.[15]

112.    Consequently, First Horizon's captive reinsurance arrangements do not constitute real, risk-transferring reinsurance between FT Reinsurance and the Defendant Private Mortgage Insurers.

113.    As HUD noted during testimony by Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing, Gary M. Cunningham, before the United States Congress (referring to analogous captive reinsurance arrangements in the title insurance industry):

> [W]hen there is a history of little or no claims being paid, or the premium payments to the captive reinsurer far exceed the risk borne by the reinsurer, there is strong evidence that there is an arrangement constructed for the purpose of payment of referral fees or other things of value in violation of Section 8 of RESPA.

*See* Exhibit 38 hereto (April 26, 2006 testimony of Gary M. Cunningham).

114.    Such is the case with First Horizon.  As reflected in the table below, from the beginning of 2004 through the end of 2011, FT Reinsurance collected from the Private Mortgage Insurers at least **$46.3** million as its "share" of borrower's private mortgage insurance premiums. In contrast, its "share" of paid claims from the trust accounts supporting its captive reinsurance arrangements during this time period was only approximately $4.3 million, as depicted in the chart below:[16]

---

[15]    *See* Exhibit 23, at fn.6 (regarding FHNC and First Tennessee Bank's commitments made in its application to establish a mortgage reinsurance subsidiary to reinsure mortgage insurance on originated or purchased by the bank or its lending affiliates and noting that "neither [FHNC] nor any of its subsidiaries including [First Tennessee Bank], will guarantee the activities or obligations of [FT Reinsurance] or provide [FT Reinsurance] with any other credit enhancement. [First Tennessee Bank]'s total exposure to the mortgage reinsurance activities will be limited, therefore, to the amount of its capital investment."

[16]    These figures were obtained from a review of the Schedule F – Part 3 of the Annual Statements for the Private Mortgage Insurers filed with the NAIC for the years 2004 through



115.   As *American Banker* observed with respect to lenders' captive reinsurance arrangements, "[s]ome of the deals were designed to return a 400% profit on a bank's investment during good years and remain profitable even in the event of a real estate collapse." *See* Reinsurance Kickbacks.

116.   Beginning in 2007, the United States experienced one of the worst mortgage meltdowns in recent history. *See, e.g.,* Katalina M. Bianco, *The Subprime Lending Crisis: Causes and Effects of the Mortgage Meltdown,* CCH Mortgage Compliance Guide and Bank Digest (2008), attached as Exhibit 39.  Thus, it is not at all surprising that relatively small amounts of claims were paid from the trusts during 2009 and 2010. Indeed, to the best of Plaintiffs' knowledge, on Genworth paid any claims at all.

117.   Further, such paid "claims," as discussed herein, do not establish that the reinsurance contracts at issue constitute real, risk-transferring and commensurately priced reinsurance as required by RESPA.  Upon information and belief, even after paying some claims during 2009 and 2010, due to the *structure* of the reimsurance agreements, Defendants continued to carry no true risk of loss and the premiums received by FT Reinsurnace far exceeded any risk that FT Reinsurance purportedly assumed.

2011. Plaintiff's investigation is ongoing.

118.     Payments from the reinsurance trusts to the Private Mortgage Insurers do not constitute "losses" to the reinsurer.  The reinsurer will either: (1) receive more in premiums from the Private Mortgage Insurers than the trusts will ever transfer to the Private Mortgage Insurers in "reinsurance claims," or (2) have the option to "walk-away" from its reinsurance obligations if it is called upon to pay more in reinsurance claims than is available in the trust accounts.  The premiums received and deposited into the trust accounts effectively cover all "losses" or reinsurance claims payments.

119.     Under accepted accounting and actuarial principles, in order for a contract to be treated as real reinsurance, the reinsurer must assume significant insurance risk and it must be "reasonably possible that the reinsurer may realize a significant loss."  *See* Exhibit 20 at 282-83; *see generally* Exhibit 21 at 7.

120.     Insurers and reinsurers are subject to two sets of accounting standards in the United States: "(1) statutory accounting principles (SAP) and (2) generally accepted accounting principles (GAAP)."  *See* Exhibit 40 hereto (Robert W. Klein & Shaun Wang, *Catastrophe Risk* Financing *in the US and the EU:A Comparative Analysis of Alternative Regulatory Approaches,* The Journal of Risk and Insurance, 2009, Vol. 76, No. 3, 609).  SAP rules are determined by state insurance regulators through the NAIC, and insurers are required to file detailed financial statements and other reports in accordance with SAP.  *Id.*  GAAP rules are "determined by the Financial Accounting Standards Board (FASB), and insurers are required to follow GAAP in their non-regulatory financial statements and Securities and Exchange Commission (SEC) reports."  *Id.*

121.     FASB 113 or "FAS 113" was "implemented in 1993 to prevent, among other things, abuses in GAAP accounting for contracts (such as the ones at issue in this litigation) that

have the formal appearance of reinsurance but do not transfer significant insurance risk and this should not be eligible for reinsurance accounting.  SSAP 62 [or SAP 62, now SAP 62R], which largely incorporates the same language as FAS 113, was implemented shortly thereafter to address the same issues with respect to statutory accounting."  *See* Exhibit 20 at 282-83.

122.    Under FAS 113, "in order for a contract to qualify for reinsurance accounting treatment [as real, risk-transferring reinsurance] . . . it must transfer insurance risk from an insurer to a reinsurer.  To meet the risk transfer requirement, a reinsurance contract must satisfy one of two conditions:

> 1.    It must be evident that 'the reinsurer has assumed substantially all of the insurance risk relating to the reinsured portion of the underlying insurance contracts' (paragraph 11), or
>
> 2.    The reinsurer must 'assume significant insurancr risk under the reinsured portions of the underlying insurance contracts' (paragraph 9a) and it must be 'reasonably possible that the reinsurer may realize a significant loss from the transaction' (paragraph 9b).

*Id*. at 283; *see generally* Exhibit 21 at 7.   Given the trust cap limitation and other risk/liability/recourse limiting features in each of Defendants' reinsurance contracts, only the second test identified by FAS 113 is relevant here.   Indeed, the first test is viewed as an exception to the second.  *See* Exhibit 20 at 283.  The "primary" test can be more fully and formally stated as mandating that real transfer of insurance risk is passed to a reinsurer only if:

> a.    The reinsurer assumes ***significant*** insurance risk under the reinsured portions of the underlying reinsurance contracts, and
>
> b.    It is reasonably possible that the reinsurer may realize a significant loss from the transaction.

*See* Exhibit 21 at 7.

123.    Further, FAS 113 provides the blueprint for how to structure a "real risk transfer"

analysis:

> The ceding enterprises' evaluation of whether it is reasonably
> possible for a reinsurer to realize a significant loss from the
> transaction shall be based on the present value of all cash flows
> between the ceding and assuming enterprises under reasonably
> possible outcomes, without regard to how the individual cash flows
> are characterized.  The same interest rate shall be used to compute
> the present value of cash flows for each reasonably possible
> outcome tested.
>
> Significance of loss shall be evaluated by comparing the present
> value of all cash flows . . . with the present value of the amounts
> paid . . . to the reinsurer.

*Id.* at 7.

124.    SSAP 62R's test for whether real risk transfer is found in a reinsurance contract is substantively identical:[17]

> 1.    The reinsurer assumes significant insurance risk under the
>        reinsured portions of the underlying insurance agreements;
>        and
>
> 2.    It is reasonably possible that the reinsurer may realize a
>        significant loss from the transaction.

*See* Exhibit 41 ¶ 13 hereto, SAP 62R-6 (NAIC Accounting Practices & Procedures Manual, March 2010, Statement of Statutory Accounting Principles No. 62R, Property and Casualty Reinsurance, Exhibit A "Implementation Questions and Answers).[18]

125.    Reinsurance "[c]ontracts that do not result in the reasonable possibility that the

---

[17]    "The above provisions of SSAP 62 are essentially the same as those in FAS 113."  *See* American Academy of Actuaries, Committee on Property and Liability Financial Reporting, Risk Transfer in P&C Reinsurance: Report to the Casualty Actuarial Task Force of the National Association of Insurance Commissioners, August 2005 at 6, available at http://www.actuary.org/pdf/casualty/risk_transfer.pdf.

[18]    *See also id.* ¶ 15, 62R-6 ("The ceding entity's evaluation of whether it is reasonably possible for a reinsurer to realize a significant loss from the transaction shall be based on the present value of all cash flows between the ceding and assuming companies under reasonably possible outcomes . . . .  An outcome is reasonably possible if its probability is more than remote.").

reinsurer may realize a significant loss from the insurance risk assumed generally do not meet the conditions for reinsurance accounting and are to be accounted for as deposits." *See* Exhibit 21 at 4; *see generally* Exhibit 42 hereto (Section AICPA Technical Practice Aids, Section 10,760, Statement of Position 98-7 Deposit Accounting: Accounting for Insurance and Reinsurance Contracts that Do Not Transfer Insurance Risk, October 19, 1998).

126.    In a deposit accounting/no risk transfer arrangement, loss to the Private Mortgage Insurer is not equivalent to loss to the reinsurer—payment from a reinsurance trust to a Private Mortgage Insurer under a deposit accounting/no risk transfer arrangement is a "loss" to the Private Mortgage Insurer, not the reinsurer.  Risk transfer does not equate "loss" to the reinsurer with "loss" to the Private Mortgage Insurers in a deposit/no risk transfer arrangement—payment from a reinsurance trust to a Private Mortgage Insurer under a deposit/no risk transfer arrangement is a "loss" to the Private Mortgage Insurer, not the reinsurer.  Payment of "claims" under a "deposit accounting"/reinsurance contract is not an infrequent or unusual event.  Rather, it is specifically anticipated, and accounting of such payments (versus payments made under "real," risk-transferring reinsurance contracts) is subject to a different set of rules.  *See* Exhibit CC at paragraph 35, SAP 62R-11 at b (referencing "disbursements"); e (referencing "settlement of losses"); and f (referencing loss and loss adjustment expense in these types of "non" risk transfer contracts); *see also* Exhibit 43 hereto (superseding SSAP No. 75, amending SSAP No. 62R, paragraph 3, at 75-3 (paragraph b, referencing "disbursements"; paragraph d, referencing "settlement of losses"; and paragraph e, referencing loss and loss adjustment expense)).

127.    As set forth above, the risk transfer evaluation does not end at the first "claim" payment from each reinsurance trust to a Private Mortgage Insurer.  The HUD Letter phrase that "there is no reasonable expectation that the *reinsurer* will ever have to pay claims" does not

mean that when the *first claim* is paid out of a reinsurance trust, real risk is transferred.  *See* Exhibit 27 at 6 (emphasis added).  That *first claim*, by definition, would be paid out of the premiums placed into the trust by the ceding Private Mortgage Insurer.  The *reinsurer* only pays after ceded premiums are exhausted.  The "reinsurer" does not pay "claims," or suffer "losses" under a reinsurance arrangement in a risk transfer sense, until its own capital is utilized, and not "repaid" through dividends or otherwise.  Until then, the reinsurance trusts are just returning ceded premiums paid by the Private Mortgage Insurers.

128.    To the extent, then, that claims have been made from the reinsurance trusts under FT Reinsurance's arrangements with the Private Mortgage Insurers, the payment of such claims does not establish a *bona fide* risk-transferring reinsurance arrangement nor does it establish that Defendants have suffered a true reinsurance "loss."  In fact, the structure and missing essential terms of the reinsurance contracts themselves negate any exposure to reinsurance losses rendering the arrangements a sham.

129.    Indeed, at least one state regulator explicitly concluded, that no real transfer of risk exists where reinsurance agreements include liability limiting provisions or lack sufficient recourse pursuant to the contract to ensure that the reinsurer lives up to its commitments.  The State of Arizona Department of Insurance, in a statement (E-MG.CEDE–Rev. 12/09) discussing the filing by mortgage insurers of certain schedules with the state, made clear its view that mortgage reinsurance arrangements:

- that had unusual termination provisions, such as provisions for automatic termination and recapture by the ceding mortgage insurer with no further liability to the reinsurer, in the event the reinsurer fails to adequately fund the reinsurance treaty trust account;

- where the reinsurer shall have no liability to the ceding insurer in the event the assets in the trust account are insufficient to pay any amounts then due and payable by the reinsurer; and

- where the ceding company shall have no recourse against the reinsurer or its assets other than the trust funds, result in "insufficient risk transfer" and should be accounted for under "deposit accounting guidelines."

*See* Exhibit 44 hereto (Department of Insurance, State of Arizona, Supplemental Schedule F-5 for Mortgage Guaranty Insurers that Cede to Captive and/or Unauthorized Reinsurers).

130.    As *American Banker* observed, "the fact that captive reinsurers paid claims does not mean the structures were unprofitable for the banks."  *See* Reinsurance Kickbacks.

131.    The over $46 million dollars paid by the Defendant Private Mortgage Insurers and collected by First Horizon through its captive reinsurer from the beginning of 2004 through the end of 2011 have clearly not been commensurate to its actual risk exposure.  The Defendant Private Mortgage Insurers have paid, and First Horizon has received, over $46 million dollars in ceded premiums, while First Horizon has borne little or no risk of loss.

132.    In reality, Defendants' captive reinsurance arrangements were and are sham transactions providing for the transfer of kickbacks and unearned fees in violation of RESPA.

133.    The money which First Horizon collected from the Defendant Private Mortgage Insurers through FT Reinsurance far exceeded the value of the services, if any, it performed. There was no real transfer of risk or, at least, not a commensurate transfer of risk given the "price paid" by, or the sheer amount of premium ceded to, the reinsurer.  The amounts paid were simply disguised kickbacks to First Horizon for the referral of borrowers to the Defendant Private Mortgage Insurers.

134.    These arrangements tend to keep premiums for private mortgage insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks to lenders.  In other words, because the money collected by a lender through its captive reinsurer comes from

borrowers' mortgage insurance premiums, borrowers are essentially required to pay for *both* actual private mortgage insurance coverage and private mortgage insurers' unlawful kickbacks to lenders.[19]

135.    Amounts paid to lenders as unlawful kickbacks have become a part of the cost of doing business for private mortgage insurers.  As a result, private mortgage insurance premiums incorporate the payment of such kickbacks—to the detriment of consumers and in contravention of the stated purpose of RESPA.

## CLASS ACTION ALLEGATIONS

136.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1) and/or (b)(3) on behalf of themselves and a class of all other similarly situated persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by First Tennessee Bank and/or  First Horizon Home Loans or any of its subsidiaries and/or affiliates between January 1, 2004 and the present and, in connection therewith, purchased private mortgage insurance and whose residential mortgage loans were included within First Horizon's captive mortgage reinsurance arrangements (the "Class").

137.    The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

138.    The Class is so numerous that joinder of all members is impracticable.

139.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

---

[19]    Indeed, the Reinsurance Kickbacks article by *American Banker* states that according to the Office of the Inspector General of HUD's presentation to the Department of Justice, banks forced borrowers to buy more expensive policies than they needed. "Nearly all loan files reviewed show borrowers with excessive coverage placed on their loan," the presentation concluded. *See* Reinsurance Kickbacks.

140.     Plaintiffs' claims are typical of the claims of the Class.

141.     There are questions of law and fact common to the Class, the answers to which will advance the resolution of the claims of all Class members, including but not limited to:

a.     Whether Defendants' captive reinsurance arrangements involved sufficient transfer of risk;

b.     Whether payments to FT Reinsurance were bona fide compensation and solely for services actually performed;

c.     Whether payments to FT Reinsurance exceeded the value of any services actually performed;

d.     Whether Defendants' captive reinsurance arrangements constituted unlawful kickbacks from the Private Mortgage Insurers;

e.     Whether First Horizon accepted referral fees from the Private Mortgage Insurers or a portion, split or percentage of borrowers' private mortgage insurance premiums from the Private Mortgage Insurers other than for services actually performed;

f.     Whether the Private Mortgage Insurers paid or gave referral fees to First Horizon or a portion, split or percentage of borrowers' private mortgage insurance premiums to First Horizon other than for services actually performed; and

g.     Whether Defendants are liable to Plaintiffs and the Class for statutory damages pursuant to RESPA § 2607(d)(2).

142.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.  The basic terms and contours of Defendants' challenged captive reinsurance arrangements are not tied to any specific, individual consumer loan.  Rather, the captive reinsurance arrangements apply to groups or pools

48

of loans.  Further, each and every Class member that Plaintiffs seek to represent was required, as part and parcel of obtaining their First Tennessee Bank and/or First Horizon Home Loans, to pay for private mortgage insurance.  Each and every Class member was directed to obtain private mortgage insurance from one of the Defendant Private Mortgage Insurers—each of whom had reinsurance contracts with FT Reinsurance, structured as challenged here, to purchase "reinsurance" on that private mortgage insurance.  The essential and basic terms of each of those "reinsurance" contracts between FT Reinsurance and the Defendant Private Mortgage Insurers were, for all intents and purposes, materially the same—and each of the Class members, no matter the Private Mortgage Insurer to whom they were referred, suffered the same harm, entitling them to demand the same statutory damages.  Accordingly, this is the quintessential consumer class action lawsuit.

143.    The same common issues predominate with respect to all members of the Class, regardless of whether their loans were originated or funded by First Tennessee Bank or First Horizon Home Loan or originated through correspondent lending.  Regardless of whether First Tennessee Bank, First Horizon Home Loans or a third-party lender made the initial referral to the Private Mortgage Insurer, Defendants' conduct violates Sections 8(a) and (b) of RESPA, as described herein.

144.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have no claims antagonistic to those of the Class.  Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation.  Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

145.    Class action status is warranted under Rule 23(b)(1)(A) because the prosecution

of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

146.   Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

147.   Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## TOLLING OF STATUTE OF LIMITATIONS

148.   Applicable statutes of limitation may be tolled based upon principles of equitable tolling, fraudulent concealment and/or the discovery rule.  For Plaintiffs and putative Class members whose claims accrued prior to one year preceding the commencement of this action, equitable tolling is available under RESPA and clearly should apply.  Plaintiffs and members of the putative Class could not, despite the exercise of due diligence, have discovered the underlying basis for their claims.  Further, Defendants knowingly and actively concealed the basis for Plaintiffs' claims by engaging in a scheme that was, by its very nature and purposeful design, self-concealing.  For these reasons, any delay by the members of the putative Class whose claims accrued prior to one year preceding the commencement of this action was excusable.

149.    Due to the complex, undisclosed and self-concealing nature of Defendants' scheme to provide for the payment of illegal kickbacks from the Private Mortgage Insurers to First Horizon, Plaintiffs and putative Class members whose claims accrued prior to one year preceding the commencement of this action did not possess sufficient information or possess the requisite expertise in order to enable them to discover the true nature of Defendants' captive reinsurance arrangements.

150.    As *American Banker* reported, "making matters worse, banks allegedly forced unknowing consumers to buy more insurance than they needed *and failed to properly disclose the reinsurance contracts*, another RESPA violation."  *See* Reinsurance Kickbacks (emphasis added).  In fact, HUD investigators reported to the DOJ that "[m]ost of the time, lenders did not tell borrowers in advance that their captives were reinsuring the deals . . . [i]n some cases, banks allegedly told customers that the charge for the reinsurance was 'none.'" *Id*.

151.    This complex action is dissimilar to a simple type of RESPA case where, for example, an attentive borrower may determine—from a careful examination of his HUD-1 settlement statement—that he or she was overcharged for a settlement service or that too much money is being paid to his or her lender, real estate agent, title insurer or other settlement service provider.  Rather, the conduct described herein occurs behind closed doors, with a wispy trail virtually impossible for the average homeowner to follow that is intentionally concealed through affirmative misrepresentations about the nature and *bona fides* of Defendants' reinsurance arrangements.

152.    Plaintiffs were able to discover the underlying basis for the claims alleged herein only with the assistance of counsel.  Plaintiffs and the putative Class members had no basis upon which to investigate the validity of the undisclosed payments from the Defendant Private

Mortgage Insurers to FT Reinsurance for purported reinsurance.  Plaintiffs' and the putative Class members' "purported" delay was excusable because they did not discover, and reasonably could not have discovered, Defendants' conduct as alleged herein absent specialized knowledge and/or assistance of counsel.

153.    Once Plaintiffs discovered the underlying basis for the claims alleged herein with the assistance of counsel, they contacted First Horizon in an effort to obtain to obtain information about the reinsurance of their private mortgage insurance and to ask that their loans be removed from Defendants' captive reinsurance program.  None of the employees with whom Plaintiffs spoke had any specific knowledge of Defendants' reinsurance program.

154.    Plaintiff Barlee was only able to confirm that her loan had been part of First Horizon's captive reinsurance arrangement with the assistance of counsel.

155.    On or about May 2, 2012, Plaintiff Barlee called the servicer of her mortgage who informed her that "the PMI Company" was her mortgage insurance provider.

156.    On May 11, 2012, Plaintiff Barlee contacted PMI Mortgage Insurance Company and spoke to customer service representative named Gwen Pope and asked her if the mortgage insurance on her loan was part of a captive reinsurance program.  Ms. Pope told Plaintiff Barlee that she did not understand her question.  Indeed, Plaintiffs' Counsel was only able to ascertain that her loan was part of First Horizon's captive reinsurance arrangements after a series of emails and telephone calls with counsel for the PMI Mortgage Insurance Company, the provider of Plaintiff Barlee's mortgage insurance, at the end of which counsel for PMI Mortgage Insurance Company did confirm that her loan was part of First Horizon's captive reinsurance arrangements. Indeed, when Plaintiff Barlee contacted the servicer of her loan, she was told by a representative of her loan servicer, Nina Chandler, that her loan was not part of a reinsurance arrangement who

did not provide the information that her loan had been part of such an arrangement.

157.    Plaintiff Broome was only able to confirm that his loan was included in First Horizon's captive reinsurance program with Plaintiffs' counsel's assistance.

158.    Plaintiff Broome contacted First Horizon in early May 2012 to find out if his loan was included in First Horizon's captive reinsurance arrangements.  The customer service representative he spoke to was not willing to speak to him about reinsurance.  On May 14, 2012, Plaintiff Broome again contacted First Horizon about the reinsurance of his mortgage insurance. After waiting on hold and several transfers, he was connected with a customer service representative named Corey.  He asked her if his loan was part of First Horizon's captive reinsurance arrangements.  She was hesitant to speak to Plaintiff Broome about reinsurance and was unable to confirm if his loan was part of First Horizon's captive reinsurance arrangements.

159.    Plaintiffs' counsel was only able to confirm that Plaintiff Broome's that the mortgage insurance on his mortgage was included in First Horizon's captive reinsurance program after a series of emails and telephone calls to counsel that United Guaranty has utilized in defending a number of directly analogous actions involving captive reinsurance schemes with other lenders/lender captives.

160.    Further, Defendants engaged in affirmative acts and/or purposeful non-disclosure to conceal the facts and circumstances giving rise to the claims asserted herein and made false representations about the nature of its reinsurance arrangements.  Such acts are separate and distinct from the conduct violative of RESPA.

161.    First Horizon used its form mortgage documents, disclosures of affiliated business arrangements, and the entire artifice of a seemingly legitimate business arrangement, to affirmatively mislead Class members about the relationship between the reinsurer, FT

Reinsurance, and the lender, First Tennessee Bank and/or First Horizon Home Loans, and to represent that, rather than a kickback or unearned fee, any payments exchanged between the affiliated businesses, or given to them from the Private Mortgage Insurer Defendants through referral, were for actual services rendered.

162.    Indeed, both of the Plaintiffs' mortgages contain the following language which does not disclose the nature of the scheme alleged, or that First Horizon's captive reinsurance arrangements resulted in a financial benefit or kickback to First Horizon, but rather give the arrangement an outward, though incorrect, appearance of legitimacy:

> Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements.
>
> ***
>
> As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses.  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed 'captive reinsurance.'

*See* Exhibits 4 ¶ 10 and 6 ¶ 10.

163.    Moreover, FHNC did not disclose the relationship between its mortgage lending subsidiaries and FT Reinsurance in its own form disclosures.   First Horizon's "Affiliated Business Arrangement Disclosure Statement" does not even list FT Reinsurance.  *See* Affiliated Business Arrangement Disclosure Statement received by Plaintiff Broome attached as Exhibit 45.

54

164.    Even when some industry analyst and ratings agencies questioned the captive reinsurance deals, banks *and* insurers publicly maintained that they met the standards set forth in the HUD letter.  *See* Reinsurance Kickbacks.

165.    Upon information and belief, Defendants also actively concealed their conduct by providing incomplete and/or inaccurate information to state regulators.  As *American Banker* reported:

> All the same, banks persuaded state insurance regulators to sign off on the structures.  To judge whether the reinsurance agreements were fair, state officials relied in part on actuarial analyses submitted by the banks and insurers.
>
> Review of these opinions has found them to frequently contain significant defects and omissions which render them inapplicable to the actual reinsurance agreements executed," HUD investigators later concluded.

*See* Reinsurance Kickbacks.

166.    Putative Class members thus did not, and could not, possess sufficient information to even put them on notice of the true nature of First Horizon's captive reinsurance arrangements.  The average homebuyer is neither an insurance expert nor a reinsurance expert.  Clearly, a mortgage provision stating that First Horizon *may* enter into captive reinsurance relationships (*see* Exhibits 4 ¶ 10 and 6 ¶ 10) attached hereto is insufficient to put the average homebuyer on notice that anything improper or actionable may have occurred with respect to that reinsurance or that his rights under RESPA may be violated.  Similarly, a notice that states that First Horizon may receive a financial benefit does not put the average homebuyer on notice of any improper or illegal conduct either.  *See, e.g.*, Reinsurance Kickbacks (noting that even HUD's investigation "may have stagnated because demonstrating that the captive reinsurance amounted to kickbacks would require accounting expertise that the Department does not possess").  If it is at least arguable that HUD—the agency tasked with enforcing RESPA—did

not have the requisite expertise to fully vet these claims even after they were brought to their attention, how could a layperson ever be expected to have knowledge of such a complex, hidden claim after merely reading his or her settlement documents, including, for example, the HUD-1 statement.  This is especially true where affirmative misrepresentations as to transfer of risk are included in the lender's statements/disclosures concerning captive reinsurance.

167.    Likewise, even a disclosure that states that an affiliated reinsurer will assume some portion of the risk associated with Mortgage Insurance a borrower's loan is insufficient to put the average homebuyer on notice that anything improper or actionable may have occurred with respect to that reinsurance or that his rights under RESPA may be violated, especially given that the affirmative misrepresentations as to transfer of risk in such disclosure.

168.    Similarly, it is beyond unrealistic to expect members of the putative Class to be as diligent as state regulatory agencies such as the Minnesota Department of Commerce whose investigation of certain captive mortgage reinsurance transactions involving several of the Private Mortgage Insurer Defendants did not begin until around 2007, years after the transactions came into existence.  *See* Reinsurance Kickbacks (noting that the Minnesota Department of Commerce began to review the insurance on home loans around 2007 and presented its findings to the Department of Justice in the summer of 2009).

169.    First Horizon intentionally designed any disclosure that it provided to its borrowers in such a manner as to conceal from them information sufficient to put them on notice of the underlying basis for their claims and affirmatively misrepresent the nature of Defendants' conduct.  The putative Class members were not put on notice of First Horizon's wrongdoing.  For instance, First Horizon did not disclose to borrowers that its captive reinsurance arrangements were lawful only if they involved adequate assumption of risk by FT Reinsurance.

Moreover, the form disclosures provided to Plaintiffs note only that if mortgage guaranty insurance coverage is reinsured through an affiliate of First Horizon, that lender affiliates of the reinsurer "may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's Payment's for Mortgage Insurance" (*see* Exhibits 4 ¶ 10 and 6 ¶ 10), and that the reinsurance arrangement will not "increase" the borrower's mortgage guaranty insurance premiums. *Id.*

170. Defendants' alleged and ubiquitous misrepresentations about the legitimacy of their captive reinsurance arrangements as *bona fide* in various standardized mortgage and closing documents are separate and distinct acts of concealment that misled Plaintiffs and members of the putative Class.

171. Further, upon information and belief, FT Reinsurance and other captive reinsurance companies incorporated in "captive-friendly" states such as South Carolina, are not required to file with the NAIC the type of detailed annual reports usually required of commercial insurance companies. Even the most sophisticated borrower could not, for example, simply contact the NAIC to obtain actuarial reports relating to FT Reinsurance. Moreover, captive filings are confidential pursuant to South Carolina law. *See* S.C. Code Ann. § 38-90-25 and S.C. Code Ann § 38-90-35, only allowing access to such filings under limited circumstances by a party pursuant to a subpoena in a lawsuit to which the captive is a party. One would need a subpoena to obtain such information; and to obtain a subpoena, one would have to file a lawsuit.[20]

---

[20]        *See* Nicholas F. Potter et. al., *Making the Move: regulatory changes have forced life insurers to explore new ways to fund reserves,* Best's Review, Sept. 1, 2007, attached hereto as Exhibit 46 (noting that South Carolina is a captive friendly state, "These captives are usually domiciled in a 'captive friendly' jurisdiction such as Vermont, or more frequently, South Carolina."); *see also* Shanique Hall, *Recent developments in the Captive Insurance Industry,*

172.     Putative Class members exercised due diligence by fully participating in their loan transactions.  Because of Defendants' actions and because of the nature of the reinsurance scheme, the absent putative Class members were not put on notice of Defendants' wrongdoing despite exercising due diligence.

173.     First Horizon provided misleading and false information to Plaintiffs and the Class, thus affirmatively acting to conceal their unlawful kickback scheme.  By funneling kickbacks through FT Reinsurance and representing that such payments were for services actually performed, rather than referral fees, First Tennessee Bank and First Horizon Home Loans acted to conceal and prevent Plaintiffs from discovering the underlying basis for this action.  Any delay by the absent putative Class members is excusable and, accordingly, Plaintiffs and the Class contend that it would be inequitable for the Court to apply the one-year limitation period set forth in RESPA § 16, 12 U.S.C. § 2614 in a way that would preclude the claim of any Class member.

## CLAIMS FOR RELIEF

## COUNT ONE

## (Violation of RESPA, 12 U.S.C. § 2607)

174.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

175.     Throughout the Class Period, Defendants provided "settlement services" in respect of "federally-related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3).

176.     Plaintiffs and the Class obtained federally-related residential mortgage loans

CIPR Newsletter (NAIC), Jan. 2012 (reporting that South Carolina is home to the fourth largest number of captive reinsurers), attached hereto as Exhibit 47.

through First Tennessee Bank and/or First Horizon Home Loans and collectively paid over $46 million dollars for private mortgage insurance premiums in connection with their real estate closings during the class period.

177.     The amounts paid by the Defendant Private Mortgage Insurers and accepted by First Horizon through its captive reinsurance arrangements constituted "things of value" within the meaning of RESPA § 2602(2).

178.     Defendants arranged for an unlawfully excessive split of borrowers' premiums to be ceded to FT Reinsurance under carefully crafted reinsurance contracts as hereinabove described.

179.     These ceded premiums: (a) were not for services actually furnished or performed and/or (b) exceeded the value of such services.

180.     The millions of dollars paid by the Defendant Private Mortgage Insurers and accepted by First Horizon through its captive reinsurance arrangements constituted fees, kickbacks or things of value pursuant to agreements between First Horizon and the Defendant Private Mortgage Insurers that business incident to real estate settlement services involving federally-related mortgage loans would be referred to such insurers.  Such practice violated RESPA, 12 U.S.C. 2607(a).

181.     In connection with transactions involving federally-related mortgage loans, the Defendant Private Mortgage Insurers gave, and First Horizon accepted, a portion, split or percentage of charges received by the Private Mortgage Insurers for the rendering of real estate settlement services and/or business incident to real estate settlement services other than for services actually performed, in violation of RESPA, 12 U.S.C. 2607(b).  The money paid by the Defendant Private Mortgage Insurers and accepted by First Horizon through its captive reinsurer

was a portion, split or percentage of the private mortgage insurance premiums paid by First Horizon's customers.  FT Reinsurance participated in the scheme and served as the direct party to which the split was paid.  FT Reinsurance agreed to provide purported "reinsurance" services involving private mortgage insurance paid by Plaintiffs and the Class.

182.    Plaintiffs and the Class were subjected to settlement services and/or business incident to real estate settlement services tainted by naked kickbacks or referrals of business inherently biased by Defendants' unlawful kickback scheme, which involved major providers of private mortgage insurance in the United States.  First Horizon's reinsurance arrangements with the Defendant Private Mortgage Insurers over time affected the price, quality or other characteristics of the "referred" private mortgage insurance through, among other things, inherent limits on settlement service choice and competition.

183.    First, Plaintiffs and the Class were harmed in that, as a matter of law, they were entitled to purchase settlement services from providers that did not participate in unlawful kickback and/or fee-splitting schemes.  Congress bestowed upon Plaintiffs and the Class a right to a real estate settlement free from unlawful kickbacks and unearned fees and has expressly provided for private enforcement of this protected right by empowering consumers to recover statutory damages from offending parties without proof of an overcharge.  *See* 12 U.S.C. §§ 2601, 2607(d)(2).  Plaintiffs allege that the Defendant Private Mortgage Insurers have given, and First Horizon has accepted, unlawful kickback payments and/or an unearned portion of settlement service charges and/or service charges for business incident to real estate settlement services—private mortgage insurance premiums—in violation of RESPA.  Defendants' scheme resulted in a limitation on both settlement service choice and competition.  First Horizon eliminated competition among providers of private mortgage insurance by requiring its

borrowers to purchase private mortgage insurance from one of the Defendant Private Mortgage Insurers with whom it had an arrangement.  Upon information and belief, referred borrowers were allocated to one of the Private Mortgage Insurers on a rotating or other systematic basis, which unlawfully guaranteed business for each private mortgage insurer in return for a referral fee.  The referral fee included no evaluation of price, quality, service provided, reputation, performance or any other aspect of the product provided by any of the Private Mortgage Insurers receiving the referrals.  Further, as set forth above, Defendants did not disclose the true nature of the reinsurance arrangements to Plaintiffs.  Congress has already determined that an unlawful kickback/referral arrangement, such as the sham captive mortgage reinsurance arrangement at issue here, may reduce competition among settlement service providers.  *See Carter v. Welles-Bowen Realty, Inc.,* 553 F.3d 979, 987 (6th Cir. 2009) (explaining that the 1983 amendment to the RESPA statute was necessary to address "practices [that] could result in harm to consumers beyond an increase in the cost of settlement services," including the reduction of healthy competition) (citing H.R. Rep. No. 97-532, at 52 (1982)).

184.    Second, though not necessary to prevail on their claims, Plaintiffs and the Class were harmed in that their private mortgage insurance premiums were artificially inflated as a result of Defendants' conduct.[21]  Congress has already determined that the *aggregate* effect of an unlawful kickback/referral arrangement, such as a sham captive mortgage reinsurance arrangement, is to unnecessarily inflate the costs consumers pay for real estate settlement services.  *See* 12 U.S.C. § 2601(b) ("It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . (2) in the elimination of

---

[21]    The Third Circuit, in a directly analogous action, held that, although the plaintiffs contended that they were overcharged for mortgage insurance, "[t]he plain language of RESPA section 8 does not require plaintiffs to allege an overcharge."  *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 759 (3d Cir. 2009).

kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services."). Thus, kickbacks and unearned fees unnecessarily and artificially inflate the price of settlement service charges, including private mortgage insurance premiums. Under Defendants' scheme, the mortgage insurance premiums paid by Plaintiffs and the Class necessarily and wrongly included payments for both: (a) actual mortgage insurance services; and (b) payments unlawfully kicked back to FT Reinsurance that far exceeded the value of any services performed (indeed, there were no services performed in return for this payment) and, were also, in fact, illegal referral fees.

185.    The specific harms identified above have been recognized as widespread in the mortgage lending marketplace.    *See generally* Mortgage Kickback Scheme; Reinsurance Kickbacks.

186.    For the reasons set forth above, Defendants have violated RESPA, 12 U.S.C. 2607(a) and (b). Pursuant to RESPA, 12 U.S.C. 2607(d), Defendants are jointly and severally liable to Plaintiffs and the Class in an amount equal to three times the amounts they have paid or will have paid for private mortgage insurance as of the date of judgment.

187.    In accordance with RESPA, 12 U.S.C. 2607(d), Plaintiffs also seek attorneys' fees and costs of suit.

## COUNT TWO

## (COMMON-LAW RESTITUTION/UNJUST ENRICHMENT)

188.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

189.    Plaintiffs have conferred a substantial benefit upon Defendants which has been appreciated by Defendants. During the Class Period, the Defendant Private Mortgage Insurers

collected and wrongfully paid to First Horizon tens of millions of dollars as First Horizon's unlawful split or share of the private mortgage insurance premiums paid by Plaintiffs and the putative Class members.

190.    The amounts collected and ceded to FT Reinsurance as purported reinsurance premiums were accepted and retained by First Horizon under circumstances such that it would be inequitable for First Horizon to retain the benefit without payment to Plaintiffs and the Class.

191.    The Private Mortgage Insurers were guaranteed a steady stream of business in return for ceding portions of the premiums they received from borrowers with respect to the loans involved in Defendants' captive reinsurance scheme, and they were unjustly enriched through receipt of this guaranteed stream of business.

192.    As a result of Defendants' unjust enrichment, Plaintiffs and the respective Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

193.    Further, Plaintiffs and the Class seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

A.    Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Class and Plaintiffs' counsel as counsel for the Class;

B.    Declaring, adjudging and decreeing the conduct alleged herein as unlawful;

C.      Awarding Plaintiffs and the Class statutory damages pursuant to RESPA §
8(d)(2), 12 U.S.C. § 2607(d)(2);

D.      Granting Plaintiffs and the Class costs of suit, including reasonable attorneys' fees
and expenses;

E.      Granting Plaintiffs and the Class restitution of all improperly collected
reinsurance premiums and/or disgorgement of Defendants' ill-gotten gains, and imposing an
equitable constructive trust over all such amounts for the benefit of the Class; and

F.      Granting Plaintiffs and the Class such other, further and different relief as the
nature of the case may require or as may be determined to be just, equitable and proper by this
Court.

Dated: May 31, 2012                          Respectfully submitted,

                                             **KESSLER TOPAZ**
                                             **MELTZER & CHECK, LLP**

                                             JHM6596
                                             Joseph H. Meltzer
                                             Edward W. Ciolko
                                             Terence S. Ziegler
                                             Donna Siegel Moffa
                                             Amanda R. Trask
                                             Joshua C. Schumacher
                                             280 King of Prussia Road
                                             Radnor, PA  19087
                                             Telephone: (610) 667-7706
                                             Facsimile: (610) 667-7056

                                             **BRAMSON PLUTZIK MAHLER &**
                                             **BIRKHAEUSER LLP**
                                             Alan R. Plutzik
                                             2125 Oak Grove Boulevard, Ste. 120
                                             Walnut Creek, California 94598
                                             Telephone: (925) 945-0200

**BERKE, BERKE & BERKE**
Andrew L. Berke
420 Frazier Avenue
Chattanooga, Tennessee 37402
Telephone: (423) 266-5171

***Attorneys for Plaintiffs and the Proposed
Class***

## JURY DEMAND

Plaintiffs  hereby demand a trial by jury.

Dated: May 31, 2012

**KESSLER TOPAZ
MELTZER & CHECK, LLP**

JHM6596
Joseph H. Meltzer
Edward W. Ciolko
Terence S. Ziegler
Donna Siegel Moffa
Amanda R. Trask
Joshua C. Schumacher
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**BRAMSON PLUTZIK MAHLER &
BIRKHAEUSER LLP**
Alan R. Plutzik
2125 Oak Grove Boulevard, Ste. 120
Walnut Creek, California 94598
Telephone: (925) 945-0200

**BERKE, BERKE & BERKE**
Andrew L. Berke
420 Frazier Avenue
Chattanooga, Tennessee 37402
Telephone: (423) 266-5171

*Attorneys for Plaintiffs and the Proposed Class*