# EXHIBIT 31

REVISED REINSURANCE AGREEMENT
(Excess Layer)

between

REPUBLIC MORTGAGE INSURANCE COMPANY

and

NORTH STAR MORTGAGE GUARANTY REINSURANCE COMPANY

Dated: March 12, 2001

WF - KAY 05542

TABLE OF CONTENTS

| ARTICLE I | DEFINITIONS |
|---|---|
| ARTICLE II | COVERAGE |
| ARTICLE III | GENERAL PROVISIONS |
| ARTICLE IV | REINSURANCE PREMIUMS, PREMIUM TAXES AND CEDING COMMISSION |
| ARTICLE V | CAPITAL AND RESERVES |
| ARTICLE VI | POLICY CLAIM SETTLEMENT |
| ARTICLE VII | REINSURANCE CLAIM PROCEDURE |
| ARTICLE VIII | ACCOUNTING AND SETTLEMENT |
| ARTICLE IX | TERM AND TERMINATION |
| ARTICLE X | INSOLVENCY |
| ARTICLE XI | ARBITRATION |
| ARTICLE XII | SECURITY |
| ARTICLE XIII | REPRESENTATIONS AND WARRANTIES OF THE COMPANY |
| ARTICLE XIV | REPRESENTATIONS AND WARRANTIES OF THE REINSURER |
| ARTICLE XV | MISCELLANEOUS PROVISIONS |
| SCHEDULES | |
| SCHEDULE A | REINSURED LOANS |
| SCHEDULE B | PERMITTED INVESTMENTS |

WF - KAY 05543

## REVISED REINSURANCE AGREEMENT
(Excess Layer)

This Revised Reinsurance Agreement, dated as of March 12, 2001 ("Agreement") is made and entered into between REPUBLIC MORTGAGE INSURANCE COMPANY, a mortgage guaranty insurance company organized under the laws of North Carolina ("Company"), and NORTH STAR MORTGAGE GUARANTY REINSURANCE COMPANY, an insurance company organized under the laws of Vermont ("Reinsurer").

## WITNESETH:

In consideration of the mutual agreements contained herein, the Company and the Reinsurer mutually agree to enter this Agreement under the following terms and conditions:

## ARTICLE 1. DEFINITIONS

As used in this Agreement, the following terms in quotation marks, when capitalized, shall have the meanings set forth below (definitions are applicable to both the singular and the plural forms of each term defined in this Article):

1.01. "Accounting Period" shall mean the Company's fiscal quarter, except that the first Accounting Period shall be the period commencing with the Effective Date and ending with the last day of the Company's then current fiscal quarter, and the final Accounting Period shall be the period commencing with the first day of the Company's fiscal quarter that includes the Termination Date, and ending on such day. Effective on and after January 1, 2001, Accounting Period shall mean the Company's fiscal month, commencing with the first day of the fiscal month and ending with the last day of the Company's then current fiscal month. The final Accounting Period shall be the period commencing with the first day of the Company's fiscal month that includes the Termination Date, and ending on such day.

1.02. "Actual Cumulative Claim Termination Rate" means, with respect to any Book of Covered Business at the end of any Accounting Period, the ratio of (1) the number of Policies in such Book for which a Loss has been incurred to (2) the total number of Policies in such Book.

1.03. "Aggregate Net Losses" shall mean, with respect to the Reinsured Loans, during the term of this Agreement

a) Claim Payments, plus

3

b) Allocated Loss Adjustment Expenses actually paid by the Company to unaffiliated third parties with respect to Claim Payments (but excluding any expenses included within the definition of Claim Payment in Section 1.14 below), and all reasonable out-of-pocket expenses incurred by the Company in connection with the settlement of Losses or negotiations concerning a Loss, including those which are the result of actions and/or disputes between the Insured and the Company and sums paid in settlement of or resistance to claims and suits and in satisfaction of judgments, including pre-judgment interest when added to a judgment,

less:

a) any salvage or recovery, whether recovered or received prior or subsequent to settlement under this Agreement, which shall be applied as if recovered or received prior to the settlement and shall be first deducted from the actual Loss sustained.

Salvage or recovery shall not include amounts recoverable by the Company under any other reinsurance agreement and nothing in this Agreement shall be construed to mean Losses are not recoverable hereunder until the Aggregate Net Loss of the Company has been ascertained.

1.04. "Aggregate Risk" shall mean, with respect to a Book of Covered Business, an amount equal to the sum of the Risks Insured with respect to each Reinsured Loan.

1.05. "Aggregate Risk Exposure" shall mean, with respect to a Book of Covered Business, an amount equal to the product of the Aggregate Risk Exposure Percentage and the Aggregate Risk for such Book.

1.06  "Aggregate Risk Exposure Funding Amount" shall mean (i) the sum of Aggregate Risk Exposures for all Books of Covered Business for which the Actual Cumulative Claim Termination Rate equals or exceeds the Pro Forma Cumulative Claim Termination Rate for the  Accounting Period just ended, less (ii) the total of all Reinsurance Claims paid by the Reinsurer with respect to such Books.

1.07. "Aggregate Risk Exposure Percentage" shall mean (a) with respect to the 1999 Book of Covered Business, an amount equal to five percent (5%) for such Book of Covered Business, (b) with respect to the 2000 Book of Covered Business, an amount equal to seven percent (7%) for such Book of Covered Business, and (c) with respect to the 2001 Book of Covered Business and each Book of Covered Business thereafter, an amount equal to ten percent (10%) for such Books of Covered Business ,

1.08. "Allocated Loss Adjustment Expenses" shall mean all expenses incurred in connection with the adjustment and recording of a Claim Payment.

1.09. "Book" or "Book of Business" or "Book of Covered Business" shall mean, for each Underwriting Year, all Policies issued by the Company with respect to Reinsured

4

WF - KAY 05545

Loans as to which the Company has either (a) received the first periodic premium payment during such Underwriting Year or (b) received notice for the "Zero Initial Payments" product.

1.10. "Business Day" shall mean any day on which a national banking association is open for regular business.

1.11. "Calendar Year" shall mean the period beginning with January 1 and ending on December 31 for each year during the term of this Agreement.

1.12 "Capital Deposit Level" shall mean ten percent (10%) of the Aggregate Risk Exposure with respect to a Book of Covered Business.

1.13. "Capital Requirement Amount" shall mean twenty-five percent (25%) of the Aggregate Risk Exposures for all Books of Covered Business subject to the terms of this Agreement.

1.14 "Claim Payment" shall mean, with respect to a Reinsured Loan, the amount actually paid by the Company to an Insured for a covered Loss as required by the applicable Policy, including (a) any Ex Gratia Payments, (b) any payments (to the extent permitted by law) for punitive damages, extra-contractual obligations or excess of policy limits claims, unless such obligations arise solely as a result of the Company's action or inaction, (c) any class action judgments, provided the Company's action (or inaction) on which such class actions are based was consistent with insurance industry practice and made in good faith, or (d) any opportunity costs associated with purchasing a Reinsured Loan or a Property in a good faith effort to mitigate a Loss, provided that any such opportunity costs in each case shall be no greater than an amount equal to interest on the funds expended to purchase a Reinsured Loan or a Property for the period from such purchase through the related sale, calculated at a per annum rate equal to the rate announced by Citibank, NA from time to time as the base rate in effect at its principal office in the City of New York.

1.15. "Commissioner" shall mean the Commissioner of Insurance of North Carolina, the Company's state of domicile.

1.16. "Contingency Reserve" shall mean an amount equal to fifty percent (50%) of all Earned Premiums in respect of the current Underwriting Year's Book of Covered Business and each of the nine previous Books of Covered Business.

1.17. "Default" shall have the same meaning in this Agreement as that term has in a Policy.

1.18. "Distribution Funds Amount" shall mean the amount by which the Trust Account balance exceeds the greater of 102% of (a) the Capital Requirement Amount, (b) the Contingency Reserve, or (c) the Aggregate Risk Exposure Funding Amount for the

5

WF - KAY 05546

Accounting Period first following the end of the fifth Underwriting Year and each Accounting Period thereafter.

1.19.  "Earned Premium" shall mean, for any Accounting Period, the amount of gross Earned Premium from Reinsured Loans reported by the Company in its statutory financial statement for each Accounting Period.

1.20.  "Effective Date" shall have the meaning specified in Section 2.01.

1.21.  "Ex Gratia Payment" shall mean a Claim Payment not necessarily required by a Policy but made as a commercial accommodation by the Company to the Insured.

1.22.  "First Loss Amount" shall mean, with respect to a Book of Covered Business, an amount equal to the product of the First Loss Percentage and the Aggregate Risk for such Book.

1.23.  "First Loss Percentage" shall have the meaning set forth in section 2.02.

1.24.  "Gross Written Premiums" shall mean, with respect to Reinsured Loans, gross written premiums (including renewal premiums) received by the Company after the Effective Date of this Agreement, less cancellation and return premiums (returned for whatever reason).

1.25.  "Insured" shall have the same meaning in this Agreement as that term has in a Policy.

1.26.  "Loss" shall have the same meaning in this Agreement as that term has in a Policy.  In particular, a Loss shall be deemed to have occurred, or to have been incurred as of the date when a Default occurs, notwithstanding that the amount of the Loss is not then either presently ascertainable or due and payable.

1.27.  "LTV Ratio" shall mean the ratio, expressed as a percentage, of (i) the original principal amount of a Reinsured Loan, divided by (ii) (a) the lower of the sale price of the Property securing such Reinsured Loan or the appraised value thereof or (b) if the Reinsured Loan is made in connection with refinancing rather than sale, the appraised value of such Property; provided, however, that to the extent such definition is inconsistent with the manner in which the term is used in any applicable Company state insurance rate filings, the parties shall attempt in good faith to reconcile such inconsistency.

1.28.  "Mortgage Guaranty Insurance" shall mean insurance against financial Loss by reason of nonpayment of principal, interest and other sums agreed to be paid under the terms of any note, bond or other evidence of indebtedness secured by a mortgage, deed of trust, or other instrument constituting or equivalent to a first lien or charge on real estate of the type permitted to be insured under the Company's insurance licenses.

6

WF - KAY 05547

1.29.   "NAIC" shall mean the National Association of Insurance Commissioners.

1.30.   "Obligations" shall have the meaning set forth in Section 12.09.

1.31.   "Policy" shall mean any Mortgage Guaranty Insurance policy or master policy, and any certificates issued thereunder and endorsements attached thereto, that provides coverage for a Reinsured Loan.

1.32.   "Pro Forma Cumulative Claim Termination Rate" shall mean, with respect to any Book of Covered Business for any Calendar Year, the Pro Forma Cumulative Claim Termination Rate produced for each such Calendar Year by multiplying the sum of the First Loss Percentage and the Aggregate Risk Exposure Percentage by the applicable loss development factor shown below:

| Calendar Year | Loss Development Factor |
|---|---|
| 1 | 0.16% |
| 2 | 6.25% |
| 3 | 20.16% |
| 4 | 35.60% |
| 5 | 50.92% |
| 6 | 66.59% |
| 7 | 80.90% |
| 8 | 91.56% |
| 9 | 97.45% |
| 10 | 100.00% |

1.33.   "Property" shall have the same meaning in this Agreement as that term has in a Policy.

1.34.   "Qualified United States Financial Institution" shall mean a bank which is a member of the Federal Reserve System. Such bank shall not be a parent, subsidiary or affiliate of either the Company or the Reinsurer.

1.35.   "Reinsurance Claim" shall mean the amount payable by the Reinsurer to the Company for Aggregate Net Losses, in the manner set forth in Section 2.02, and subject to exclusions in Section 2.03.

1.36.   "Reinsurance Premiums" shall have the meaning specified in Section 4.01.

1.37.   "Reinsured Loan" shall mean a loan originated by an Insured, covered by a Policy issued by the Company and reinsured under this Agreement, provided that such loan or class of loans is identified in and complies with Schedule A. No mortgage banking affiliate of the Reinsurer shall be required to obtain Mortgage Guaranty Insurance from the Company, it being the parties intent that any such affiliate shall be free to obtain any such insurance from other companies as is appropriate in its sole discretion.

7

WF - KAY 05548

1.38. "Reserves" shall have the meaning specified in Section 5.01.

1.39. "Risk Insured" shall mean, with respect to a Reinsured Loan, the original unpaid principal balance of such Reinsured Loan, multiplied by the coverage percentage applicable to such Reinsured Loan under the applicable Policy.

1.40. "Termination Date" shall mean the date on which any complete termination of this Agreement, as provided in Article IX, is effective.

1.41. "Termination Report" shall mean the report required to be prepared in accordance with Section 9.07 and providing the calculations for the terminal accounting and settlement described in Section 9.06.

1.42. "Trust Account" shall have the meaning set forth in Section 12.01.

1.43. "Trust Agreement" shall have the meaning set forth in Section 12.01.

1.44. "Underwriting Year" shall mean (a) for 1999, the period commencing on the Effective Date and ending on December 31, 1999, and (b) for all years subsequent to 1999, the period commencing on January 1 following the last day of the previous Underwriting Year and ending on the following December 31.

1.45. "Unearned Premiums" shall mean for any Accounting Period, the amount of Gross Written Premiums less Earned Premiums from Reinsured Loans as reported by the Company in its statutory financial statement for such Accounting Period.

## ARTICLE II.  COVERAGE

2.01.  Coverage. As of July 1, 1999, (the "Effective Date"), the Reinsurer shall indemnify the Company as provided in Section 2.02 below, with respect to any Loss incurred during the term of this Agreement in connection with Reinsured Loans on each Book of Covered Business that may accrue to the Company, subject to the exclusions set forth in Section 2.03, provided that the effective date of Policy coverage for such loan is (a) on or after the Effective Date of this Agreement and, in any event, (b) before the Termination Date of this Agreement.

2.02.  Coverage Amount. The Reinsurer shall not be liable for any Losses with respect to Reinsured Loans in a Book of Covered Business until the Company's Aggregate Net Losses with respect to such Book exceed the First Loss Amount for such Book . Thereafter, the Reinsurer shall be liable for one hundred percent (100%) of Aggregate Net Losses sustained by the Company with respect to such Book until the Company's Aggregate Net Losses with respect to such Book equals the sum of First Loss Amount (the sole responsibility of the Company) plus Aggregate Risk Exposure (the responsibility of the Reinsurer) for such Book.  Thereafter, the Reinsurer shall have no liability for Losses with respect to that Book of Covered Business.

8

The First Loss Amount shall be (a) with respect to the 1999 Book of Covered Business, an amount equal to the sum of the amounts resulting from multiplying the Risk Insured in respect of each Insured Loan of the Loan Type indicated in the following table by the applicable First Loss Percentage:

| Loan Type | First Loss Percentage |
|---|---|
| Fixed Rate Loans | |
| 95.1%-97.0% LTV | 8.0% |
| 90.1%- 95.0% LTV | 6.0% |
| 85.1%-90.0% LTV | 4.0% |
| Up to 85% LTV | 3.0% |
| Non-Fixed Rate Loans | |
| 90.01%-95.00% LTV | 8.0% |
| 85.01%- 90.00% LTV | 5.0% |
| 80.01%-85.00% LTV | 4.0% |

and  (b) with respect to the 2000 Book of Covered Business, an amount equal to the sum of the amounts resulting from multiplying the Risk Insured in respect of each insured Loan of the Loan Type indicated in the following table by the applicable First Loss Percentage:

| Loan Type | First Loss Percentage |
|---|---|
| Fixed Rate Loans | |
| 95.1%-97.0% LTV | 4.8% |
| 90.1%- 95.0% LTV | 3.6% |
| 85.1%-90.0% LTV | 2.4% |
| Up to 85% LTV | 1.8% |
| Non-Fixed Rate Loans | |
| 90.01%-95.00% LTV | 4.8% |
| 85.01%- 90.00% LTV | 3.0% |
| 80.01%-85.00% LTV | 2.4% |

and (c) with respect to the 2001 Book of Covered Business and each Book of Covered Business thereafter, an amount equal to the sum of the amounts resulting from multiplying the Risk Insured in respect of each insured Loan of the Loan Type indicated in the following table by the applicable First Loss Percentage:

| Loan Type | First Loss Percentage |
|---|---|
| Fixed Rate Loans | |
| 95.1%-97.0% LTV | 6.20% |
| 90.1%- 95.0% LTV | 4.90% |
| 85.1%-90.0% LTV | 2.80% |
| Up to 85% LTV | 1.95% |
| Non-Fixed Rate Loans | |
| 90.01%-95.00% LTV | 6.15% |

WF - KAY 05550

| | |
|---|---|
| 85.01%- 90.00% LTV | 4.40% |
| 80.01%-85.00% LTV | 3.10% |

Within forty-five (45) days after the end of each Underwriting Year, the Company will issue to the Reinsurer a letter confirming to the Reinsurer the First Loss Amount, Aggregate Risk and the Aggregate Risk Exposure for the Book of Covered Business in such Underwriting Year.

2.03. Exclusions. This Agreement does not apply to and specifically excludes from coverage hereunder:

    a) any insurance policy issued by the Company other than a Policy covering a loan defined herein as a Reinsured Loan; or

    b) any Reinsurance Claims resulting from dishonesty or fraud on the part of the Company's employees, agents or representatives; or

    c) any fines or penalties exacted against the Company and not resulting from the acts, errors or omissions of the Reinsurer.

2.04. Follow the Fortunes. Except as provided in Section 2.03, the Reinsurer's liability shall attach simultaneously with that of the Company and shall be subject in all respects to the same risks, terms, conditions, interpretations, waivers, and to the same modifications, alterations and cancellations as the respective Policies reinsured hereunder to which such reinsurance relates, the true intent of this Agreement being that the Reinsurer shall, in every case to which this Agreement applies, follow the fortunes of the Company.

## ARTICLE III.  GENERAL PROVISIONS

3.01. Inspection. The Reinsurer or its designated representative may inspect, at the offices of the Company where such records are located, the papers, books, records or other documents of the Company which pertain to this Agreement and which are reasonably required to verify Reinsurance Claims or the calculation of Gross Written Premium or of Aggregate Net Losses. The results of such inspection shall be shared with the Company.  Such inspection shall take place during normal business hours for such period as this Agreement is in effect or for as long thereafter as the Company seeks performance by the Reinsurer pursuant to the terms of this Agreement.  Upon the Reinsurer's reasonable request, copies of such records shall be furnished to the Reinsurer, at the expense of the Reinsurer. The information obtained shall be used only for purposes relating to reinsurance under this Agreement. The Reinsurer's rights under this Section shall survive termination of this Agreement.

3.02. Misunderstandings and Oversights. If any delay, omission, error or failure to pay amounts due or to perform any other act required by this Agreement is unintentional and caused by misunderstanding or oversight, the Company and the Reinsurer will adjust

WF - KAY 05551

the situation to what it would have been had the misunderstanding or oversight not occurred. The party first discovering such misunderstanding or oversight, or act resulting from the misunderstanding or oversight, will notify the other party in writing promptly upon discovery thereof, and the parties shall act to correct such misunderstanding or oversight within twenty (20) Business Days of receipt of such notice. However, this Section 3.02 shall not be construed as a waiver by either party of its right to enforce strictly the terms of this Agreement.

3.03. Compliance with Applicable Laws and Regulations.

a) Agreement to be Construed in Accordance with Existing Law. It is the intention of the parties that this Agreement shall comply with all applicable state and federal laws and regulations, and as from time to time are or may be in effect.

b) Notification of Disapproval or Change in Law. Each party to this Agreement shall promptly notify the other party of (i) any disapprovals, recommended changes or statements regarding the Agreement that are made by any insurance regulatory or tax authorities and (ii) any change (of which such party becomes aware) in law, regulation or rulings affecting the Agreement. Each party shall be allowed to make its own defense of the Agreement with said authorities, in cooperation with any defense made by the other party.

3.04  Setoff and Recoupment. Any debts or credits, matured or unmatured, liquidated or unliquidated, regardless of when they arose or were incurred, in favor of or against either the Company or the Reinsurer with respect to this Agreement and the Trust Agreement are deemed mutual debts or credits, as the case may be, and shall be set off, and only the net balance shall be allowed or paid. This setoff provision (to the extent permitted by any applicable law) shall not be modified or reconstrued due to the insolvency, liquidation, rehabilitation, conservatorship, or receivership of either party. The Reinsurer shall be allowed to recoup past due and currently due Reinsurance Premiums against any indemnity payments past due or currently due to the Company.

3.05.  Agent for Service of Process. The Reinsurer designates the Insurance Commissioner of the State of Vermont as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding begun by or on behalf of the Company.

3.06.  Confidentiality. The Company and the Reinsurer agree to keep this Agreement, the terms hereof, and all documents and information relating hereto, or furnished pursuant to or in connection herewith, confidential, except as may be required by law. Notwithstanding the foregoing, nothing in this Section 3.06 shall prohibit the Company or the Reinsurer from disclosing such confidential information to (a) state or federal regulators or rating agencies, if in the Company's or the Reinsurer's judgment, it believes that such disclosure is required or advisable, (b) the Company's or the Reinsurer's parent or affiliated companies, whether direct or indirect, provided such parent or affiliated companies also agree to keep such information confidential, (c) the outside legal,

11

WF - KAY 05552

financial or accounting advisors of the Company or the Reinsurer and (d) other parties, with the prior written consent of the Company or the Reinsurer as the case may be. This Section 3.06 shall survive termination of this Agreement.

## ARTICLE IV. REINSURANCE PREMIUMS, PREMIUM TAXES AND CEDING COMMISSION

4.01. Reinsurance Premiums. In the manner provided in Article VIII, the Reinsurer shall be entitled to receive from the Company Reinsurance Premiums which are equivalent to : (a) thirty-one and one-quarter percent (31.25%) of the Gross Written Premium for all Reinsured Loans contained in the 1999 Book of Covered Business, (b) forty percent (40.00%) of the Gross Written Premium for all Reinsured Loans contained in the 2000 Book of Covered Business, and (c) forty seven percent (47.00%) of the Gross Written Premium for all Reinsured Loans contained in the 2001 Book of Covered Business and each Book of Covered Business thereafter.

4.02. Premium Taxes. The Company shall be liable for any and all premium taxes imposed on premiums written with respect to Policies covering Reinsured Loans. The Reinsurer shall be liable for any and all premium taxes imposed on any Reinsurance Premiums paid to the Reinsurer hereunder.

4.03. Ceding Commission. The Company shall receive from the Reinsurer a ceding commission of: (a) twenty percent (20.00%) of Reinsurance Premiums for the 1999 Book of Covered Business, (b) twelve and one half of one percent (12.50%) of Reinsurance Premiums for the 2000 Book of Covered Business, and (c) fifteen percent (15.00%) of Reinsurance Premiums for the 2001 Book of Covered Business and each Book of Covered Business thereafter.

## ARTICLE V. CAPITAL AND RESERVES

5.01. Statutory Capital and Reserves. The Company and the Reinsurer shall establish and maintain (a) all such capital required by the laws of their respective domiciliary states and (b) all such reserves as may be required under relevant state insurance laws and regulations with respect to Unearned Premiums, Contingency Reserves, claims, Loss or Allocated Loss Adjustment Expenses relating to each risk (the "Reserves"). Any such Reserves shall be established by the Company in accordance with applicable state insurance laws and regulations, if any, and by the consistent application of the Company's standard reserving practices and techniques for Mortgage Guaranty Insurance business. With respect to the Reinsurer, such Reserves shall be established in a manner consistent with the methodology used by the Company for its Reserves, in which case, such methodology shall also be consistent with applicable legal requirements and industry practices.

WF - KAY 05553

## ARTICLE VI.  POLICY CLAIM SETTLEMENT

6.01. Policy Claim Settlement.  All Losses, compromises of Losses and expenses and allowances in consequences of a claim for benefits under a Policy shall be settled by the Company without consultation with the Reinsurer. The Company agrees to settle each claim under a Policy in a manner which, in its good faith opinion, is in accordance with the terms and conditions of the Policy as interpreted in good faith by the Company. Nevertheless, the Company shall have the authority to grant reasonable extensions of time for the filing of claims and to waive notice requirements by Insureds and such other technical Policy violations as it deems reasonable and prudent to effectuate a good faith application of the terms imposed by the Policy.

6.02. Salvage and Subrogation.  All decisions regarding salvage and/or subrogation shall be made by the Company, without consultation with the Reinsurer, in accordance with customary mortgage insurance industry practices and in a manner which is consistent with such decisions made by the company with respect to its other reinsurance agreements.

## ARTICLE VII.  REINSURANCE CLAIM PROCEDURE

7.01. Filing a Reinsurance Claim. The Company shall, in connection with quarterly reports, file Reinsurance Claims with the Reinsurer as provided herein in a form approved by the parties to this Agreement. Payments due from the Reinsurer for Reinsurance Claims shall be made to the Company by the Trustee referred to in Article XII hereof or by the Reinsurer as contemplated in Section 7.03 below. The Company shall pay for all expenses pertaining to reporting to the Reinsurer.

7.02.  Compliance with Policy. Except as provided by Section 6.01, and notwithstanding anything to the contrary provided in Article X below, no Reinsurance Claim shall be made by the Company or payable by the Reinsurer unless and until substantially all terms and conditions of the Policy with respect to the Claim Payment which is the basis for such Reinsurance Claim have been reasonably complied with and satisfied, and the Company has, in its own reasonable estimation, paid the Insured all amounts due with respect to such Loss.

7.03.  Claim Filing Method and Timing. All Reinsurance Claims shall be filed within the time period set forth in Section 8.01. Such Reinsurance Claims shall be made by personal delivery to the Reinsurer, or by deposit in the U.S. Mail, postage prepaid, addressed to the Reinsurer at its address set forth herein. The Company shall also furnish upon the request of the Reinsurer, made within a reasonable period, not to exceed forty-five (45) days after the end of each Accounting Period ending on the last day of the Company's fiscal year or forty-five (45) days after the end of any other Accounting Period for which such Reinsurance Claims were submitted, records required to verify such Reinsurance Claims, and Aggregate Net Losses. The Company shall not unreasonably deny requests for copies of such documentation for purposes of verification after such forty-five (45) or thirty (30) day period has elapsed if the Reinsurer

WF - KAY 05554

demonstrates good cause for such request. The Trustee will pay Reinsurance Claims to the Company from the Trust Account in accordance with the terms of this Agreement and the Trust Agreement, unless the Reinsurer elects to pay such amounts to the Company out of its own funds, in which case Reinsurer shall do so within the time period set forth in Article VIII below by check or by other immediately available funds, and the Reinsurer shall promptly notify the Company and the Trustee of such election.

## ARTICLE VIII - ACCOUNTING AND SETTLEMENT

8.01. <u>Company Reports.</u> Within forty-five (45) days after the end of each Accounting Period which concludes on the last day of the Company's fiscal year or after the end of any other Accounting Period, the Company shall submit to the Reinsurer reports for such Accounting Period containing the following information for each Book in summary printed format, and with respect to each individual Reinsured Loan, in electronic format:

a) Insurance in Force. As of the end of such Accounting Period, gross insurance in force, gross risk outstanding and gross Unearned Premiums thereon, before any deduction for reinsurance hereunder, all in summary fashion.

b) Premiums. For Reinsured Loans for which either an initial premium payment or renewal premium payment has been paid to the Company during such Accounting Period, the Gross and Net Written Premium, Earned Premium, and Unearned Premium, all in gross and in the net amount due the Reinsurer for each Reinsured Loan and in summary fashion.

c) Delinquency Reserves. As of the end of such Accounting Period, each delinquent loan reported to the Company pursuant to a Policy, the vintage of the delinquency and the amount of reserve therefor that the Company has established, without any deduction for reinsurance.

d) Reinsurance Claims.  Aggregate Net Losses and the Reinsurance Claim, if any, due from Reinsurer.

e) Reinsurance Premiums.

f) Contingency Reserve.

g) Capital Deposit Amount, as described in Sections 12.05 and 12.06.

h) Capital Requirement Amount.

i) Aggregate Risk Exposure Funding Amount.

j) Distribution Funds Amount.

14

WF - KAY 05555

k) Other. Such additional information as the Reinsurer may reasonably require, including, without limitation, information necessary to manage its reinsurance risk exposure under this Agreement on a monthly basis.

8.02. Reinsurer Reports. The Reinsurer shall provide to the Company quarterly and annual reports, which shall contain such information as the Company may reasonably require, including (a) the income statement and balance sheet of the Reinsurer to be provided to the Company, (b) such financial information as may be required to provide particulars concerning the reserves established by the Reinsurer to secure balances due, (c) sufficient information from the Reinsurer to allow the Company to meet all requirements of the NAIC, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, or any rating agency, and (d) an accounting of amounts paid or to be paid pursuant to Section 12.07.

8.03. Remittances. The balance after setoff (as provided in Section 3.04) that is due to a party by the other party hereunder shall be paid:

a) if to the Company, within forty-five (45) days following the receipt by the Reinsurer of a quarterly or annual report delivered pursuant to Section 8.01 for each Accounting Period; or

b) if to the Reinsurer, within forty-five (45) days after the end of an Accounting Period and as an accompaniment to the quarterly or annual report delivered pursuant to Section 8.01 for each Accounting Period.

## ARTICLE IX. TERM AND TERMINATION

9.01. Term. The term of this Agreement shall commence at 12:01 am., Eastern Standard Time, on the Effective Date and, except as otherwise provided herein, shall be unlimited in duration.

9.02. Unilateral Termination upon Ninety Days Notice. Either party may terminate its participation in this Agreement as of 11:59 p.m., Eastern Time by providing at least ninety (90) days' prior written notice thereof to the other party by certified U.S. Mail with return receipt requested, or by other delivery service wherein the sender receives a receipt noting the date of delivery. Anything to the contrary herein notwithstanding, unless otherwise agreed, any termination under this Section 9.02 shall be on a run-off basis only.

9.03. Immediate Termination. If, at any time, the funds in the Trust Account are insufficient to pay in full any amount(s) then due and payable by the Reinsurer hereunder, and such insufficiency continues for a period of thirty (30) days from the date such amount(s) initially became due and payable, then this Agreement shall automatically and immediately terminate without requirement of any waiting period or notice by or to either party and all amounts remaining in the Trust Account shall be remitted to the Company, which shall reassume all liabilities theretofore ceded to the Reinsurer pursuant to this

WF - KAY 05556

Agreement. All rights and obligations of both parties under this Agreement shall then be extinguished as of the date of such termination.

The Company shall have the right, at its option, to terminate this Agreement immediately in the event that the Reinsurer fails to make the deposits required in Sections 12.05 and 12.06 and the value of the Trust Account established in Article XII falls below 102% of the greater of the Capital Requirement Amount or Contingency Reserve and the Reinsurer fails to cure such shortfall within thirty (30) days after the date notice of such shortfall first is received by the Reinsurer. Subject to the provisions of Sections 9.05 and 9.06 hereof, such termination shall be the Company's sole and exclusive remedy in the event of such shortfall and failure to cure. Either party may immediately terminate this Agreement if any law or regulation of any federal agency should render this Agreement illegal, as finally determined by a federal court or a federal regulator, or as interpreted by the written opinion of competent legal counsel reasonably chosen by the Company or the Reinsurer. If any law or regulation of any state in which the Company or the Reinsurer is doing business should render this Agreement illegal, as finally determined by a state court or state regulator, or as interpreted by the written opinion of competent legal counsel reasonably chosen by the Company or the Reinsurer, both parties agree that this Agreement shall be terminated immediately with respect to such state(s) only and shall continue in effect with respect to all other states in which this Agreement has not been so determined to be illegal; provided, however, the Company or the Reinsurer may terminate this Agreement immediately and completely (a) if, due to this Agreement, any order has been issued by a state court or state regulator which would jeopardize the Company's or the Reinsurer's license to do business in such state or (b) if the Company's or the Reinsurer's ability to manage risk ceded hereunder is impaired because this Agreement has been determined to be illegal in one or more states. The Company may cease ceding, or the Reinsurer may cease accepting, additional risk under this Agreement or terminate this Agreement if so ordered by the Commissioner or any other regulatory authority in a jurisdiction where the Company or the Reinsurer is licensed.

9.04. <u>Termination Due to Non-Payment or Material Breach.</u> Either party may terminate this Agreement at any time if:

    a) any payment to be made hereunder by the other party is more than ninety (90) days overdue, and said payment has not been made within thirty (30) days after written notice to pay has been served upon the party not paying, or

    b) there is a material breach by the other party with respect to any of its representations, warranties or obligations set forth herein, and said breach has not been cured within thirty (30) days after written notice to cure said breach has been served upon the party committing said breach.

9.05. <u>Reinsurer's Liability After Termination.</u> Notwithstanding any termination as provided for in this Agreement (other than a termination on a cut-off basis including a termination as provided in Section 9.08 hereof), the Reinsurer shall continue to be liable, subject to all other terms and conditions of this Agreement, with respect to all Reinsured

WF - KAY 05557

Loans until the natural expiration, cancellation or termination of coverage of each Reinsured Loan, in which event the Reinsurer shall continue to receive the applicable Reinsurance Premiums with respect thereto, unless the Company and the Reinsurer agree that such termination shall be on a cut-off basis with portfolio transfer, in which event the Reinsurer shall not continue to (a) be liable with respect to the Reinsured Loans or (b) receive Reinsurance Premiums with respect thereto. In the event the Company has terminated this Agreement under the first sentence of Section 9.03 or under Section 9.04, the Company alone shall determine the basis for termination, i.e., either run-off or cut-off basis. In the event the Reinsurer has terminated this Agreement under Section 9.04, the Reinsurer alone shall determine the basis for termination, i.e., either run-off or cut-off basis. In the event termination is finally ordered by a state or federal court or regulator, such termination shall be in accordance with such order, anything to the contrary herein notwithstanding. If such order is silent on the question of termination, such termination shall be on a run-off basis unless otherwise agreed.  Notwithstanding the preceding sentence, if such order is issued during the first Underwriting Year and the order is silent on the question of termination, in connection with such termination the parties agree to cooperate in order to reverse, as promptly as is practicable, all transactions that have occurred to date hereunder so as to restore the parties to the economic positions that would have existed had this Agreement never taken effect.

9.06.  Payments on Termination. In the event that this Agreement is terminated pursuant to this Article IX and the party possessing the right to do so elects that such termination shall be on a cut-off basis with portfolio transfer pursuant to Section 9.05, a net accounting and settlement as to any balance due under this Agreement shall be undertaken by the parties to this Agreement. Any net payment required under such terminal accounting and settlement will become due as of the Termination Date, and shall be paid by the Reinsurer or the Company, as appropriate, no later than the day on which the Termination Report described in Section 9.07 is due to be provided. Net payments required under such terminal accounting and settlement shall consist of (a) the settlement for the final Accounting Period, as set forth in Sections 8.01 and 8.03, provided that in calculating the amount due either party, the Company shall retain amounts to cover:

    i.   Losses and Allocated Loss Adjustment Expenses paid by the Company but not recovered from the Reinsurer;

    ii.   Reserves for Losses reported and outstanding;

    iii.   Reserves for Losses incurred but not reported;

    iv.   Reserves for Allocated Loss Adjustment Expenses with respect to Losses specified in items (b) and (c) immediately above;

    v.   Reserves for Unearned Premiums; and

    vi.   Contingency Reserve, provided that, in the event of the termination of this Agreement, on a cut off basis, such Contingency Reserve will be calculated based on each year's Book remaining in force as of the Termination Date

17

WF - KAY 05558

and (b) interest on the net payment amount described in clause (a) for the period from and including the Termination Date to the date on which such net payments are made, calculated at a rate equal to the rate announced by Citibank, N.A. from time to time as the base rate in effect at its principal office in the City of New York; each change in the base rate shall be effective on the date such change is announced as effective.

Any amounts remaining in the Trust Account following the net accounting, settlement and payment contemplated by this Section 9.06 and not otherwise reserved or payable under this Agreement or in accordance with applicable law shall be paid promptly to the Reinsurer. The Contingency Reserve, as calculated in Section 9.06(a) vi., will be retained by Company in a separate account, apart from its other assets, in the name of the Company, in any bank or trust company organized in the United States, in trust for the use and purpose of paying losses arising from the loans previously covered by this Reinsurance Agreement and amounts not used to pay such losses shall promptly be released to the Reinsurer, together with interest earned thereon in such trust account, upon the earliest to occur of the following events: (A) the date on which the aggregate of the outstanding principal balances of all Reinsured Loans has been reduced to zero; (B) the tenth (10th) anniversary of the date on which such Contingency Reserve was deemed deposited in the Trust Account; and (C) the tenth (10th) anniversary of the effective date of such trust termination.

   9.07.   Termination Report. Within ninety (90) Business Days after the Termination Date, the Company shall supply the Reinsurer with a report that shall show the terminal accounting and settlement described in Section 9.06 (the "Termination Report"). Such Termination Report shall contain the following information:

   a)   information for the final Accounting Period as specified in Section 8.01;

   b)   the calculation of final balances due, as specified in Section 8.03;

   c)   year-to-date information, up to and including the Termination Date, listing Policies in force under this Agreement in the aggregate, gross loan amount in force and gross risk outstanding; and interest due pursuant to Section 9.06(b) of this Agreement.

   9.08.   Automatic Termination After Ten Years. Anything to the contrary herein notwithstanding, the obligation of the Reinsurer to indemnify the Company in accordance with Article II, and the obligation of the Company to cede premiums to the Reinsurer in accordance with Article IV, shall cease as of the last day of the Company's fiscal year which is the ninth year after the end of the Underwriting Year in which the Book of Covered Business was underwritten, whereupon this Agreement shall be terminated with respect to that Book of Covered Business only. Such termination shall be on a cut-off basis, in accordance with the requirements for calculations, payments and reports contemplated by this Article IX for termination on that basis.

WF - KAY 05559

9.09.  Notice to Trustee Upon Termination.  To the extent applicable under the circumstances in connection with any termination under this Agreement, the Company and the Reinsurer shall also give the "Notice of Intention" to the Trustee as provided in Section 10(a) of the Trust Agreement.

## ARTICLE X.  INSOLVENCY

10.01.  Payments by Reinsurer.  In the event of insolvency of the Company, the Reinsurer hereby agrees that, as to all reinsurance becoming effective hereunder, the reinsurance shall be payable immediately upon demand, with reasonable provision for verification by the Reinsurer, to the Company, or to its conservator, receiver, liquidator or statutory successor on the basis of the liability of the Company under a Policy with regard to a Reinsured Loan, without diminution because of the insolvency of the Company or because the conservator, receiver, liquidator or statutory successor of the Company has failed to pay all or a portion of any claim.

10.02.  Claims. It is agreed that the conservator, receiver, liquidator or statutory successor of the Company shall give prompt written notice to the Reinsurer of the pendency or submission of a claim under any Policy with regard to a Reinsured Loan. During the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense available to the Company or its conservator, receiver, liquidator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to the approval of the court, against the Company as a part of the expense of insolvency, liquidation or rehabilitation to the extent of a proportionate share of the benefit which accrues to the Company solely as a result of the defense undertaken by the Reinsurer.

10.03.  No Waiver of Defenses. Nothing in this Article X shall preclude the Reinsurer from asserting any excuse or defense to payment of this reinsurance other than the excuses or defenses of the insolvency of the Company and the failure of the Company's conservator, receiver, liquidator or statutory successor to pay all or a portion of any claim.

## ARTICLE XI.  ARBITRATION

11.01.  Scope. All controversies which arise with respect to the validity or interpretation of this Agreement, or the performance of the respective obligations of the parties under this Agreement which cannot be resolved by the parties in the normal course of business, shall be submitted to arbitration in accordance herewith as a condition precedent to the commencement of any right of action hereunder.

11.02.  Selection of Arbitrator. One arbitrator shall be chosen by the Company and one by the Reinsurer. If a party fails to choose an arbitrator within sixty (60) days after receiving a written request from the other party to do so, then the party making the request may choose a second arbitrator. The two arbitrators selected shall choose a third arbitrator, who shall be the umpire. If the two arbitrators selected are unable to choose the

19

WF - KAY 05560

umpire, at the end of sixty (60) days following the last date of the selection of the two arbitrators, each of the parties shall name three qualified persons, two of whom shall be certified as reinsurance arbitrators by AIDA Reinsurance & Insurance Arbitration Society of the United States ("ARIAS U.S.") if, as of the last date of the selection of the two arbitrators selected, ARIAS U.S. maintains a list of at least 25 active certified reinsurance arbitrators. Of the three persons so named by a party, the other party shall decline two, and the umpire shall be selected from the two remaining names by lot.

11.03.  Qualification.  The arbitrators shall be individuals who may be active or retired officers of an insurance or reinsurance company or professionals experienced in insurance or reinsurance matters, other than officers, directors or employees or former officers, directors or employees of any party or an affiliate of any party. The umpire shall, in addition to being an individual who meets the foregoing requirements, be impartial and disinterested.

11.04.  Arbitration Procedures.  To the extent not inconsistent with the express provisions of this Agreement, the arbitrators shall follow the rules of the American Arbitration Association applicable to commercial disputes and the arbitrators shall make their decisions in accordance with the terms of this Agreement. The decision of the majority of the arbitrators shall be binding upon the parties. The arbitrators may include interest on any amount awarded in arbitration.

11.05.  Submission of Position.  Each party shall submit its case to the arbitrators within sixty (60) days after receipt of notice of the selection of the umpire unless the period is extended by the arbitrators or by agreement of the parties.

11.06.  Cost of Arbitration.  The cost of arbitration shall be borne equally by the parties unless the arbitrators decide otherwise. Notwithstanding the foregoing, each party shall bear the fees of the arbitrator that it selected, or if either party failed to select an arbitrator, that party shall bear the cost of the arbitrator selected for such party pursuant to Section 11.02, and the parties shall bear equally the fees of the third arbitrator. The arbitration shall be held in New York at the time and place agreed upon by the arbitrators. If the arbitrators fail to agree on the time to meet, they shall meet within one month of the selection of the additional arbitrator.

11.07.  Entry of Arbitration Award.  Either party may petition a court of competent jurisdiction to confirm, correct or vacate the award.  If an award is confirmed, judgment shall be entered in conformity therewith.  The judgment so entered shall have the same force and effect as, and be subject to all the provisions of law relating to, a judgment in a civil action; and may be enforced like any other judgment of the court in which it is entered.

11.08.  Survival of Article.  This Article shall survive termination of this Agreement.

20

WF - KAY 05561

## ARTICLE XII. SECURITY

12.01. Establishment of Trust. The Reinsurer and the Company have entered into a trust agreement (the "Trust Agreement"), dated as of March 30, 2000, with The First National Bank of Chicago which shall continue to be a Qualified United States Financial Institution (the "Trustee"). A trust account (the "Trust Account") has been established under the Trust Agreement for the benefit of the Company with respect to the liabilities due the Company hereunder. The Trust Agreement shall continue to be in a form acceptable to the Company.

12.02. Purpose of Trust. The Reinsurer agrees to deposit and maintain in the Trust Account assets to be held in trust by the Trustee for the benefit of the Company as security for the payment of the Reinsurer's obligations to the Company under this Agreement. Such assets shall be maintained in the Trust Account by the Reinsurer as long as the Reinsurer continues to remain liable for any Reinsured Loan as provided in Section 9.05.Only assets deposited in the Trust Account pursuant to this Agreement shall be considered as assets of the Trust Account for purposes of this Agreement, and such assets shall not be used as security or otherwise for the payment of the Reinsurer's obligations to the Company under any other reinsurance agreement. It is understood that the Reinsurer may establish other trusts to secure other reinsurance obligations. The Trust required under this Article XII secures the Reinsurer's obligations under this Agreement and is not available to support or secure obligations of the Reinsurer arising out of any agreement other than this Agreement. The assets of the Reinsurer that may be held in different trusts are intentionally segregated and allocated in support of, and secure its various obligations under, separate reinsurance agreements without commingling or cross-collateralization and any assets not included in the Trust Account are not available to support or secure this Agreement.

12.03. Trust Assets. The Reinsurer agrees that the assets so deposited shall consist only of investments listed in Schedule B (the "Permitted Investments"), and investment income thereon. Such Trust Assets shall collateralize the risk reinsured for all Books of Covered Business.

12.04. Title of Assets. The Reinsurer, prior to depositing assets with the Trustee, shall execute all assignments, endorsements in blank, and transfer legal title to the Trustee of all shares, obligations or any other assets requiring assignment, in order that the Company, or the Trustee upon direction of the Company, may whenever necessary negotiate any such assets without consent or signature from the Reinsurer or any other entity.

12.05. Funding of Trust. The Reinsurer has made an initial deposit in the Trust Account of fifty thousand dollars ($50,000), and will make additional deposits to the Trust Account as follows: (a) with respect to the 1999 Book of Covered Business, during the first two Underwriting Years the Reinsurer shall deposit in the Trust Account, within 45 days of its receipt of the reports provided pursuant to Section 8.01, an amount equal to ten percent (10.00%) of the Aggregate Risk Exposure for those Books of Covered

21

WF - KAY 05562

Business (giving credit for the initial deposit). For each Underwriting Year subsequent to the second Underwriting Year, the Reinsurer shall deposit and maintain funds in the Trust Account as provided in Section 12.06; (b) with respect to the 2000 Book of Covered Business, for the first four quarters the Reinsurer shall deposit in the Trust Account, within 45 days of its receipt of the reports provided pursuant to Section 8.01, an amount equal to ten percent (10.00%) of the Aggregate Risk Exposure for that Book of Covered business (giving credit for the initial deposit and deposits made pursuant to Section 12.05). For each quarter subsequent to the first four, the Reinsurer shall deposit and maintain funds in the Trust Account as provided in Section 12.06, (c) with respect to the 2001 Book of Covered Business, for the first four quarters the Reinsurer shall deposit in the Trust Account, within 45 days of its receipt of the reports provided pursuant to Section 8.01, an amount equal to ten percent (10.00%) of the Aggregate Risk Exposure for that Book of Covered business (giving credit for the initial deposit and deposits made pursuant to Section 12.05). For each quarter subsequent to the first four, the Reinsurer shall deposit and maintain funds in the Trust Account as provided in Section 12.06.

12.06. Capital Deposit Amount. The Reinsurer shall, within forty-five (45) days of its receipt of the reports provided in Section 8.01, deposit into the Trust Account, such amounts, if any, as are necessary to attain a balance in the Trust Account equal to or greater than the Capital Deposit Level for all Books of Covered Business.

12.07. Maintenance of Trust. All net amounts payable by the Company pursuant to Section 4.01 shall be paid directly into the Trust Account, other than the following amounts, which shall be paid to the Reinsurer upon reasonable verification by the Company of the accuracy of such amounts: (i) an amount equal to 0.225% of Reinsurance Premiums received by the Reinsurer (or such greater amount as subsequently may be required by law), in respect of Vermont premium taxes payable by the Reinsurer; (ii) an amount in respect of the Reinsurer's actual and necessary out-of-pocket operational expenses, not to exceed $30,000.00 per Calendar Year; and (iii) an amount or amounts necessary, from time to time, to enable the Reinsurer to pay federal income taxes actually due and owing in respect of Books of Covered Business. To the extent any Reinsurance Premiums are paid directly to the Reinsurer, the Reinsurer shall deposit one hundred percent (100%) of such Reinsurance Premiums, net of the amounts contemplated by clauses (i), (ii) and (iii) above, into the Trust Account upon receipt. At the end of each quarterly Accounting Period, the Company shall determine if the Trust Account is adequately funded with respect to the Company's liabilities reinsured hereunder. If the Company determines that the Trust Account is not adequately funded, i.e., the Trust Account contains less than the Capital Deposit Level for all Books of Covered Business, the Company shall send the Reinsurer a notice specifying the amount of the inadequacy and the Reinsurer shall, in its discretion, deposit such amount in the Trust Account within thirty (30) days of receipt of such notice. Anything in this Agreement to the contrary notwithstanding, in the event the Reinsurer fails to timely deposit such amount, the Company's sole and exclusive recourse and remedy shall be, at its election, to terminate this Agreement on a cut-off basis or to place this Agreement in run-off, in accordance with the provisions of Article IX hereof.

WF - KAY 05563

12.08. <u>Settlements.</u> All settlements of account under the Trust Agreement between the Company and the Reinsurer shall be made in cash or its equivalent.

12.09. <u>Withdrawals by Company.</u> The Reinsurer and the Company agree that the assets in the Trust Account may be withdrawn by the Company at any time, notwithstanding any other provisions in this Agreement, provided such assets are applied and utilized by the Company or any successor of the Company by operation of law, including, without limitation, any liquidator, rehabilitator, receiver or conservator of the Company, without diminution because of the insolvency of the Company or the Reinsurer, only for the following purposes:

(i)   to reimburse the Company for the Reinsurer's share of any Losses and Allocated Loss Adjustment Expenses paid by the Company with respect to Reinsured Loans and due but not recovered from the Reinsurer under this Agreement;

(ii)   to pay the Reinsurer for fees and expenses described in Section 12.07;

(iii) · to pay the Reinsurer any amount held in the Trust Account and approved by the Company in accordance with Section 12.10 or to make payment to the Reinsurer or to the Company upon termination of this Agreement as provided in Article IX; and

(iv)   where the Trustee has received notice of termination of the Trust Account and where any of Reinsurer's Obligations (as hereinafter defined) remain unliquidated and undischarged ten days prior to the effective date of such trust termination, to withdraw amounts equal to such Obligations and deposit such amounts in a separate account, apart from its other assets, in the name of the Company, in any bank or trust company organized in the United States, in trust for the uses and purposes specified in subparagraphs (i), (ii), (iii), and (iv) of this Section 12.09. "Obligations" within this Section 12.09 shall mean:

"Obligations" within this Section 12.09 shall mean:

i.   Losses and Allocated Loss Adjustment Expenses paid by the Company but not recovered from the Reinsurer;

ii.   Reserves for Losses reported and outstanding;

iii.   Reserves for Losses incurred but not reported;

iv.   Reserves for Allocated Loss Adjustment Expenses with respect to Losses specified in items (b) and (c) immediately above;

v.   Reserves for Unearned Premiums; and

23

WF – KAY 05564

vi.  Contingency Reserve; provided that, in the event of the termination of this Agreement, on a cut off basis, such Contingency Reserve will be calculated based on each year's Book remaining in force as of the Termination Date.

12.10.  Substitution and Release of Assets.

a)  At the end of each Underwriting Year, the Reinsurer shall have the right to seek the Company's approval to withdraw all or any part of the assets in the Trust Account and transfer such assets to the Reinsurer, provided that, at the time of withdrawal, the Reinsurer shall replace the withdrawn assets with other assets of a type permitted hereunder having a market value equal to the market value of the assets withdrawn.

b)  At the end of the Accounting Period first following the end of the fifth Underwriting Year of this Agreement and at the end of each Accounting Period thereafter, the Company shall direct the Trustee to pay to Reinsurer the Distribution Funds Amount, if any.

12.11.  Return of Assets.  In the event that the Company withdraws assets or permits the Reinsurer to withdraw assets in the Trust Account for the purposes set forth in Section 12.07 and Section 12.09(i) or (ii) in excess of actual amounts required to meet such purposes, or in excess of amounts determined to be due under Section 12.09(iii), the Company or the Reinsurer will return such excess to the other party.  In the event of a dispute arising under this Article XII, the arbitration panel established pursuant to Article XI shall have the right to award interest at a rate that it determines to be equitable, and may award attorney's fees, arbitration costs and other expenses.

## ARTICLE XIII.  REPRESENTATIONS AND WARRANTIES OF THE COMPANY

13.01.  Organization, Standing and Authority of the Company.  The Company is a mortgage guaranty insurance company duly organized, validly existing and in good standing under the laws of the State of North Carolina. It is duly authorized and qualified to carry on the business of Mortgage Guaranty Insurance in each state where a Policy was issued and meets the requirements for carrying on such business.

13.02.  Authorization.  The Company has all requisite power and authority to enter into this Agreement, and to perform its obligations hereunder.  The execution and delivery by the Company of this Agreement, and the performance by the Company of its obligations under this Agreement, have been duly authorized. This Agreement, when duly executed and delivered by the Company, and, subject to the due execution and delivery by the Reinsurer, will be a valid and binding obligation of the Company, enforceable against the Company, its permitted successors and assigns, in accordance with its terms.

13.03.  Reports and Reinsurance Claims Submissions. All reports and all Reinsurance Claims submitted hereunder by the Company shall be accurate and complete.

24

WF - KAY 05565

13.04. Submission of Covered Reinsurance Claims Only. No Reinsurance Claim shall be submitted to the Reinsurer except in connection with a Loss on a Reinsured Loan reinsured under the Agreement.

13.05. No Conflict or Violation. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby in accordance with the respective terms and conditions hereof will not (a) violate any provision of the Articles of Incorporation or Bylaws of the Company, or (b) violate any order, judgment, injunction, award or decree of any court, arbitrator or governmental or regulatory body against, or binding upon, or any agreement with, or condition imposed by, or consent required by, any governmental or regulatory body, foreign or domestic, binding upon the Company.

13.06. Intermediaries and Financial Advisers. No reinsurance intermediary or broker has acted directly or indirectly as such for, or is entitled to any compensation from, the Company in connection with this Agreement.

13.07. Investigations. The Company will notify the Reinsurer immediately, in writing, of any and all investigations of the Company or its directors, principal officers, or shareholders conducted by any federal, state, or local governmental or regulatory agency other than routine state insurance department examinations; provided, however, that any such notice shall be required only in connection with matters relating solely to this Agreement.

13.08. Materiality of and Reliance Upon Warranties and Representations. Each such warranty and representation is material to this Agreement and relied upon by the Reinsurer in entering into this Agreement. Each such representation and warranty shall continue to be true during the term of this Agreement.

13.09. Year 2000 Readiness. The Company will use its best efforts to ensure that all date-related output or results produced by the Company will be Year 2000 Ready. For purposes of this section, "Year 2000 Ready" means that Company's software has been analyzed and tested and issues have been identified, updated or remediated as appropriate and that the Company's system will (i) be capable of accounting for all calculations using a century/date-sensitive algorithm for the 20th and 21st centuries; and, (ii) recognize the rollover to the year 2000 and the fact that it is a leap year. The representation under this section will not apply to output, results, errors, or abnormal terminations caused or transmitted by the Reinsurer. As Reinsurer's sole and exclusive remedy for any breach of this representation, the Company will use commercially reasonable efforts to correct any data or system so as to be Year 2000 Ready and any and all costs associated with such efforts shall be borne by Company and not the Reinsurer. The Company is hereby providing official notice that the content of this paragraph constitutes Year 2000 Readiness Disclosure and Year 2000 Statements as defined in the "Year 2000 Information and Readiness Disclosure Act" (P.L. 105-271).

25

WF - KAY 05566

13.10.  Survival of Article. This Article XIII shall survive termination of this Agreement.

## ARTICLE XIV.  REPRESENTATIONS AND WARRANTIES
## OF THE REINSURER

14.01.  Organization. Standing and Authority of the Reinsurer. The Reinsurer is a reinsurance company duly organized, validly existing and in good standing under the laws of Vermont  and is authorized under the laws and regulations of that state to reinsure policies within the purview of this Agreement.

14.02.  Authorization. The Reinsurer has all requisite power and authority to enter into this Agreement, and to perform its obligations hereunder.  The execution and delivery by the Reinsurer of this Agreement, and the performance by the Reinsurer of its obligations under this Agreement, have been duly authorized. This Agreement, when duly executed and delivered by the Reinsurer, and, subject to the due execution and delivery by the Company, will be a valid and binding obligation of the Reinsurer, enforceable against the Reinsurer, its permitted successors and assigns in accordance with its terms.

14.03.  No Conflict or Violation.  The execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby will not (a) violate any provision of the Articles of Incorporation, Bylaws or other charter or organizational document of the Reinsurer; or (b) violate any order, judgment, injunction, award or decree of any court, arbitrator or governmental or regulatory body against, or binding upon, or any agreement with, or condition imposed by, any governmental or regulatory body, foreign or domestic, binding upon the Reinsurer.

14.04.  Intermediaries and Financial Advisers. No reinsurance intermediary or broker has acted directly or indirectly as such for, or is entitled to any compensation from, the Reinsurer in connection with this Agreement.

14.05.  Investigations.  The Reinsurer will notify the Company immediately, in writing, of any and all investigations of the Reinsurer or its directors, principal officers, or shareholders conducted by any federal, state, or local governmental or regulatory agency other than routine state insurance department examinations; provided, however, that any such notice shall be required only in connection with matters relating solely to this Agreement.

14.06.  Materiality of and Reliance Upon Warranties and Representations.  Each such warranty and representation is material to this Agreement and relied upon by Company in entering into this Agreement. Each such representation and warranty shall continue to be true during the term of this Agreement.

14.07.  Year 2000 Readiness.  The Reinsurer will use its best efforts to ensure that all date-related output or results produced by the Reinsurer will be Year 2000 Ready.  For purposes of this section, "Year 2000 Ready" means that Reinsurer's software has been analyzed and tested and issues have been identified, updated or remediated as appropriate

26

WF - KAY 05567

and that the Reinsurer's system will (i) be capable of accounting for all calculations using a century/date-sensitive algorithm for the 20th and 21st centuries; and, (ii) recognize the rollover to the year 2000 and the fact that it is a leap year. The representation under this section will not apply to output, results, errors, or abnormal terminations caused or transmitted by the Company. As Company's sole and exclusive remedy for any breach of this representation, the Reinsurer will use commercially reasonable efforts to correct any data or system so as to be Year 2000 Ready and any and all costs associated with such efforts shall be borne by Reinsurer and not the Company. The Reinsurer is hereby providing official notice that the content of this paragraph constitutes Year 2000 Readiness Disclosure and Year 2000 Statements as defined in the "Year 2000 Information and Readiness Disclosure Act" (P.L. 105-271).

14.08. <u>Survival of Article.</u> This Article XIV shall survive termination of this Agreement.

## ARTICLE XV.  MISCELLANEOUS PROVISIONS

15.01. <u>Headings and Schedules.</u> Headings used herein are not a part of this Agreement and shall not affect the terms hereof. The attached Schedules are incorporated in and made a part of this Agreement.

15.02. <u>Notices and Reports.</u> Except as otherwise specifically set forth herein, all notices and reports to be given by a party shall be in writing and shall be sufficiently given if sent by facsimile transmission, next day delivery service or by prepaid, first class mail. Every such notice and report given by mail shall be conclusively deemed to have been given on the earlier of the date it is received by the other party (if a signed receipt is obtained) or, in all other cases the third business day following the date of transmission or mailing thereof. The addresses and facsimile numbers of the parties for notices and reports are as follows:

If to the Company:

Republic Mortgage Insurance Company
190 Oak Plaza Blvd.
Winston-Salem, North Carolina  27105
Attention:  D. Christopher Cash, Controller
Telephone: (336) 661-0015
Fax: (336) 661-3280

With copies of all notices to:

Republic Mortgage Insurance Company
190 Oak Plaza Blvd.
Winston-Salem, North Carolina  27105
Attention:  Joel H. Pasternak, Vice President - House Counsel
Telephone: (336) 661-0015
Fax: (336) 661-2211

WF - KAY 05568

If to the Reinsurer:

North Star Mortgage Guaranty Reinsurance Company
100 South Fifth Street
MAC #X4801-191
Minneapolis, MN 55042

    Attention:  Laurie McGoogan
    Telephone:  612-341-6864
    Fax:  612-341-1925

    With copies of all notices to:

American Risk Management
PO Box 1530
Burlington, Vermont 05402-1530
Attention:  Peter Tuhacek
Fax:  802-862-7797

Changes in notice addresses or recipients may be made by the Reinsurer or the Company by following the procedure specified in this Section rather than the procedure for amendment of this Agreement.

    15.03.  <u>Severability and Governing Law.</u> If any term or provision of this Agreement shall be held void, illegal, or unenforceable, the validity of the remaining portions or provisions shall not be affected thereby.  This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, without regard to principles regarding choice of law, except to the extent that this Agreement expressly refers to other applicable laws.  Any arbitration under this Agreement, or any dispute regarding the right to arbitration shall be governed by the Federal Arbitration Act (9 USC Section 1, et. seq.) and not by the laws of the State of North Carolina.

    15.04.  <u>Not Assignable.</u> This Agreement may not be assigned by either party.

    15.05.  <u>No Third Party Beneficiaries.</u> Nothing in this Agreement is intended or shall be construed to give any person, other than the parties hereto, their successors and permitted assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.

    15.06.  <u>Execution in Counterpart.</u> This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

    15.07.  <u>Currency.</u> All payments and accounts shall be made in United States Dollars, and all fractional amounts shall be rounded to the nearest whole dollar.

WF - KAY 05569

15.08.  Integrated Contract.  This Agreement (and any written amendments to it) constitutes the entire agreement between the parties and supersedes all prior agreements and understandings, oral or written, relating to the subject matter hereof.

15.09.   Amendment.  This Agreement may only be amended by an instrument in writing signed by the parties.

15.10.    Prior Agreements.  This Agreement supersedes and replaces the Reinsurance Agreement, dated as of March 30, 2000 (the "Prior Agreement"), between the Company and the Reinsurer.  The Prior Agreement is hereby terminated in its entirety.  The Trust Agreement, dated as of September 20, 1999, between the Company, the Reinsurer, and First National Bank of Chicago (as Trustee) remains in effect for the benefit of the Company as security for the payment of the Reinsurer's obligations to the Company under this Agreement, and no withdrawals from the Trust Account established under the Trust Agreement shall be made under Article IX of the Prior Agreement as a result of the termination of the Prior Agreement.

15.11.  Exercise of Rights.  The failure or refusal by any party to exercise any rights granted hereunder shall not constitute a waiver of such rights or preclude the subsequent exercise thereof, and no verbal communication shall be asserted as a waiver of any such rights hereunder unless such communication shall be confirmed in a writing plainly expressing an intent to waive such rights and signed by the party against whom such waiver is asserted.

15.12.  Good Faith.  The parties agree to deal with each other fairly and in utmost good faith in the performance of this Agreement.

15.13.  Brokers or Finders.  Each party hereby warrants that it has not employed any broker or finder in connection with the placement of this Agreement or any Policies hereunder and knows of no person claiming a fee or commission as such. If any person shall make such a claim with respect to either party, the party with respect to whom such claim is made shall hold the other party harmless against any such claim and all costs and expenses in relation thereto.

15.14.  Disclosures.  In connection with the Company and the Reinsurer entering into this Agreement, the Company and the Reinsurer understand and agree that each borrower whose loan is or may be subject to this Agreement must, before such loan shall be eligible for coverage under this Agreement, have received a special reinsurance disclosure in such form as may be appropriate under applicable law or regulation or reasonable interpretation thereof by the appropriate regulatory authority to reflect the affiliation of Norwest Mortgage, Inc. with the Reinsurer.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives.

Republic Mortgage Insurance Company

WF - KAY 05570

By: _____
    Joel H. Pasternak

Title:  Vice President

Date: _____

North Star Mortgage Guaranty Reinsurance
Company

By: _____
    James G. Engelhardt

Title:  Executive Vice President

Date: _____

30

WF - KAY 0557