# EXHIBIT 32

REINSURANCE AGREEMENT
(Excess Layer)


between


RADIAN GUARANTY INC.


and


NORTH STAR MORTGAGE GUARANTY REINSURANCE COMPANY


Dated as of March 1, 2000

WF - KAY 05397

## REINSURANCE AGREEMENT
### (Excess Layer)

This Reinsurance Agreement (the "Agreement") is made and entered into this 1st day of  March, 2000 between RADIAN GUARANTY INC., a mortgage guaranty insurance company organized under the laws of the Commonwealth of Pennsylvania (the "Company"), and NORTH STAR MORTGAGE GUARANTY REINSURANCE COMPANY, an insurance company organized under the laws of Vermont (the "Reinsurer").

### WITNESSETH:

In consideration of the mutual agreements contained herein, the Company and the Reinsurer mutually agree to enter this Agreement under the following terms and conditions:

### ARTICLE I.—DEFINITIONS

As used in this Agreement, the following terms in quotation marks, when capitalized, shall have the meanings set forth below (definitions are applicable to both the singular and the plural forms of each term defined in this Article):

1.01.    "Accounting Period" shall mean the Company's fiscal quarter, except that the first Accounting Period shall be the period commencing with the Effective Date and ending with the last day of the Company's then-current fiscal quarter, and the final Accounting Period shall be the period commencing with the first day of the Company's fiscal quarter that includes the Termination Date, and ending on such day.

1.02.    "Aggregate Net Losses" shall mean, with respect to the Reinsured Loans, during the term of this Agreement:

(a)    Claim Payments; plus

(b)    allocated loss adjustment expenses actually paid by Company to unaffiliated third parties with respect to Claim Payments (but excluding any expenses included within the definition of Claim Payment in Section 1.10 below), and all reasonable out-of-pocket expenses incurred by Company in connection with the settlement of Losses or negotiations concerning a Loss, including those which are the result of actions and/or disputes between the Insured and Company and sums paid in settlement of or resistance to claims and suits and in satisfaction of judgments, including prejudgment interest when added to a judgment;

less

(c)    any salvage or recovery, whether recovered or received prior or subsequent to settlement under this Agreement, which shall be applied as if recovered or received prior to the settlement and shall be first deducted from the actual loss sustained.

Salvage or recovery shall not include amounts recoverable by Company under any other reinsurance agreement and nothing in this Agreement shall be construed to mean Losses are not recoverable hereunder until the Aggregate Net Loss of Company has been ascertained.

1.03.    "Aggregate Risk" shall mean, with respect to a Book of Covered Business, an amount equal to the sum of the Risks Insured with respect to each Reinsured Loan.

1.04    "Aggregate Risk Exposure" shall mean, with respect to a Book of Covered Business, an amount equal to five percent (5.00%) of the sums of the Risks Insured in respect of such Book.

1.05.    "Book" or "Book of Covered Business" shall mean, for each Underwriting Year, all Policies issued by the Company with respect to Reinsured Loans as to which the Company has either (a) received the first periodic premium payment during such Underwriting Year or (b) received notice for the "Zero Monthly" product.

1.06.    "Business Day" shall mean any day on which a national banking association is open for regular business.

-2-

WF - KAY 05398

1.07.   "Capital Ratio" shall mean the ratio, expressed as a percent, of (i) the Capital Reserves to (ii) Aggregate Risk Exposure.

1.08.   "Capital Requirement Amount" shall mean, with respect to each Book of Covered Business, all Reinsurer reserves in respect of unearned premiums, claims, Losses or loss adjustment expenses relating to each risk, calculated in accordance with Pennsylvania law, plus the greater of an amount (a) sufficient to ensure that, at all times, the Capital Ratio relating to such Book is at least 10%, or (b) equal to a contingency reserve equal to 50% of earned premiums in respect of the previous 10 Books of Covered Business.

1.09.   "Capital Reserves" shall mean the sum of the Reinsurer's paid-in capital, gross paid in and contributed surplus, contingency reserves, and unassigned surplus (or their equivalent) held from time to time by the Reinsurer in respect of a Book of Covered Business.

1.10.   "Claim Payment" shall mean, with respect to a Reinsured Loan, the amount actually paid by the Company to an Insured for a covered Loss as required by the applicable Policy, including (a) any Ex Gratia Payments, (b) any payments (to the extent permitted by law) for punitive damages, extra-contractual obligations or excess of policy limits claims, unless such obligations arise solely as a result of the Company's action or inaction, (c) any class action judgments, provided the Company's action (or inaction) on which such class actions are based was consistent with insurance industry practice and made in good faith, or (d) any opportunity costs associated with purchasing a Reinsured Loan or a Property in a good faith effort to mitigate a Loss, provided that any such opportunity costs in each case shall be no greater than an amount equal to interest on the funds expended to purchase a Reinsured Loan or a Property for the period from such purchase through the related sale, calculated at a per annum rate equal to one-half of one percent below the rate announced by Citibank, N.A. from time to time as the base rate in effect at its principal office in the City of New York.

1.11.   "Commissioner" shall mean the Commissioner of Insurance of the Commonwealth of Pennsylvania, the Company's state of domicile.

1.12.   "Default" shall have the same meaning in this Agreement as that term has in a Policy.

1.13.   "Effective Date" shall have the meaning specified in Section 2.01.

1.14.   "Ex Gratia Payment" shall mean a Claim Payment not necessarily required by a Policy but made as a commercial accommodation by the Company to the Insured.

1.15.   "First Loss Percentage Amount" shall have the meaning set forth in Section 2.02 hereof.

1.16.   "Fixed Rate Loan" shall mean a Reinsured Loan with fixed payments as defined by the applicable coverage certificate.

1.17.   "Gross Written Premiums" shall mean, with respect to Reinsured Loans, gross written premiums (including renewal premiums) received by the Company, after the Effective Date of this Agreement, less cancellation and return premiums (returned for whatever reason).

1.18.   "Insured" shall have the same meaning in this Agreement as that term has in a Policy.

1.19.   "Loss" shall have the same meaning in this Agreement as that term has in a Policy. In particular, a Loss shall be deemed to have occurred, or to have been incurred as of the date when a Default occurs, notwithstanding that the amount of the Loss is not then either presently ascertainable or due and payable.

1.20.   "LTV Ratio" shall mean the ratio, expressed as a percentage, of (i) the original principal amount of a Reinsured Loan, divided by (ii) (a) the lower of the sale price of the property securing such Reinsured Loan or the appraised value thereof or (b) if the Reinsured Loan is made in connection with refinancing rather than sale, the appraised value of such property; provided, however, that to the extent such definition is inconsistent with the manner in

-3-

WF - KAY 05399

which the term is used in any applicable Company state insurance rate filings, the parties shall attempt in good faith to reconcile such inconsistency.

1.21. "Mortgage Guaranty Insurance" shall mean insurance against financial loss by reason of nonpayment of principal, interest and other sums agreed to be paid under the terms of any note, bond or other evidence of indebtedness secured by a mortgage, deed of trust, or other instrument constituting or equivalent to a first lien or charge on real estate of the type permitted to be insured under the Company's insurance licenses.

1.22. "NAIC" shall mean the National Association of Insurance Commissioners.

1.23. "Non-Fixed Rate Loan" shall mean any Reinsured Loan which is not a Fixed Payment Loan.

1.24. "Obligations" shall have the meaning set forth in Section 12.08 of this Agreement.

1.25. "Policy" shall mean any Mortgage Guaranty Insurance policy or master policy, and any certificates issued thereunder and endorsements attached thereto, that provides coverage for a Reinsured Loan.

1.26. "Property" shall have the same meaning in this Agreement as that term has in a Policy.

1.27. "Qualified United States Financial Institution" shall mean a bank which is either a member of the Federal Reserve System or a New York state-chartered bank. Such bank shall not be a parent, subsidiary or affiliate of either the Company or the Reinsurer.

1.28. "Reinsurance Claim" shall mean the amount payable by the Reinsurer to the Company for Aggregate Net Losses, in the manner set forth in Section 2.02, and subject to exclusions in Section 2.03.

1.29. "Reinsurance Premiums" shall have the meaning specified in Section 4.01.

1.30. "Reinsured Loan" shall mean a loan originated by an Insured, covered by a Policy issued by the Company and reinsured under this Agreement, provided that such loan or class of loans is identified in and complies with the requirements of Schedule A.

1.31. "Reserves" shall have the meaning specified in Section 5.01.

1.32. "Risk Insured" shall mean, with respect to a Reinsured Loan, the original unpaid principal balance of such Reinsured Loan, multiplied by the coverage percentage applicable to such Reinsured Loan under the applicable Policy.

1.33. "Termination Date" shall mean the date on which any complete termination of this Agreement, as provided in Article IX, is effective.

1.34. "Termination Report" shall mean the report required to be prepared in accordance with Section 9.07 and providing the calculations for the terminal accounting and settlement described in Section 9.06.

1.35. "Total Capital Requirement Amount" shall mean the aggregate of all Capital Requirement Amounts for all Books of Covered Business.

1.36. "Trust Account" shall have the meaning set forth in Section 12.01.

1.37. "Trust Agreement" shall have the meaning set forth in Section 12.01.

1.38. "Underwriting Year" shall mean (a) for 1999, the period commencing on the Effective Date and ending on the date on which the Company closes its books for its 1999 fiscal year, which date shall be no later than December 31, 1999, and (b) for all years subsequent to 1999, the period commencing on the Business Day following the last day of the previous Underwriting Year and ending on the last day of the Company's current fiscal year.

WF - KAY 05400

## ARTICLE II—COVERAGE

2.01.    Coverage. As of October 1, 1999 (the "Effective Date"), the Reinsurer shall indemnify the Company as provided in Section 2.02 below, with respect to any Aggregate Net Losses incurred during the term of this Agreement in connection with Reinsured Loans on each Book of Covered Business that may accrue to Company, subject to the exclusions set forth in Section 2.03 below, provided that the effective date of Policy coverage for such loan is (a) on or after the Effective Date of this Agreement and, in any event, (b) before the Termination Date of this Agreement.

2.02.    Coverage Amount. The Reinsurer shall not be liable for any Aggregate Net Losses with respect to Reinsured Loans in a Book of Covered Business until the Company's Aggregate Net Losses with respect to such Book exceed the First Loss Percentage Amount for such Book. Thereafter, the Reinsurer shall be liable for one hundred percent (100%) of Aggregate Net Losses sustained by the Company with respect to such Book until the Company's Aggregate Net Losses with respect to such Book equals the sum of (i) the First Loss Percentage Amount (solely the responsibility of the Company)  and (ii) the Aggregate Risk Exposure (solely the responsibility of the Reinsurer) for such Book. Thereafter, the Reinsurer shall have no liability for Aggregate Net Losses with respect to that Book of Covered Business.

The First Loss Percentage Amount for a Book of Covered Business shall be the sum of the amounts resulting from multiplying the Risk Insured in respect of each Reinsured Loan in such Book of the loan type indicated below by the applicable First Loss Percentage indicated below:

| Loan Type | First Loss Percentage |
|-----------|----------------------|
| Fixed Rate Loan | 4.75% |
| Non-Fixed Rate Loan | 6.00% |

Within forty-five (45) days after the end of each Underwriting Year, the Company will issue to the Reinsurer a letter confirming to the Reinsurer the First Loss Percentage Amount, the Aggregate Risk and the Aggregate Risk Exposure for the Book of Covered Business in such Underwriting Year.

2.03.    Exclusions. This Agreement does not apply to and specifically excludes from coverage hereunder:

(a)    any insurance policy issued by the Company other than a Policy covering a loan defined herein as a Reinsured Loan; or

(b)    any Reinsurance Claims resulting from dishonesty or fraud on the part of the Company's employees, agents or representatives.

(c)    any fines or penalties exacted against the Company and not resulting from the acts, errors or omissions of the Reinsurer.

2.04.    Follow the Fortunes. Except as provided in Section 2.03 above, the Reinsurer's liability shall attach simultaneously with that of the Company and shall be subject in all respects to the same risks, terms, conditions, interpretations, waivers, and to the same modifications, alterations and cancellations as the respective Policies reinsured hereunder to which such reinsurance relates, the true intent of this Agreement being that the Reinsurer shall, in every case to which this Agreement applies, follow the fortunes of the Company.

## ARTICLE III—GENERAL PROVISIONS

3.01.    Inspection. The Reinsurer or its designated representative may inspect, at the offices of the Company where such records are located, the papers, books, records or other documents of the Company reasonably required to verify Reinsurance Claims or the calculation of Gross Written Premium or of Aggregate Net Losses. Such inspection shall take place during normal business hours for such period as this Agreement is in effect or for as long thereafter as the Company seeks performance by the Reinsurer pursuant to the terms of this Agreement. Upon the Reinsurer's reasonable request, copies of such records shall be furnished to the Reinsurer, at the expense of the Reinsurer. The

WF - KAY 05401

information obtained shall be used only for purposes relating to reinsurance under this Agreement. The Reinsurer's rights under this section shall survive termination of this Agreement.

3.02.    Misunderstandings and Oversights.   If any delay, omission, error or failure to pay amounts due or to perform any other act required by this Agreement is unintentional and caused by misunderstanding or oversight, the Company and the Reinsurer will adjust the situation to what it would have been had the misunderstanding or oversight not occurred. The party first discovering such misunderstanding or oversight, or act resulting from the misunderstanding or oversight, will notify the other party in writing promptly upon discovery thereof, and the parties shall act to correct such misunderstanding or oversight within twenty (20) Business Days of receipt of such notice. However, this Section 3.02 shall not be construed as a waiver by either party of its right to enforce strictly the terms of this Agreement.

3.03.    Compliance with Applicable Laws and Regulations.

(a)    Agreement to be Construed in Accordance with Existing Law.   It is the intention of the parties that this Agreement shall comply with all applicable State and Federal laws and regulations, and as from time to time are or may be in effect.

(b)    Notification of Disapproval or Change in Law.   Each party to this Agreement shall promptly notify the other party of (i) any disapprovals, recommended changes or statements regarding the Agreement that are made by any insurance regulatory or tax authorities and (ii) any change (of which such party becomes aware) in law, regulation or rulings affecting the Agreement. Each party shall be allowed to make its own defense of the Agreement with said authorities, in cooperation with any defense made by the other party.

3.04.    Setoff and Recoupment.   Any debts or credits, matured or unmatured, liquidated or unliquidated, regardless of when they arose or were incurred, in favor of or against either the Company or the Reinsurer with respect to this Agreement and the Trust Agreement are deemed mutual debts or credits, as the case may be, and shall be set off, and only the net balance shall be allowed or paid. This setoff provision (to the extent permitted by any applicable law) shall not be modified or reconstrued due to the insolvency, liquidation, rehabilitation, conservatorship, or receivership of either party. The Reinsurer shall be allowed to recoup past due and currently due Reinsurance Premiums against any indemnity payments past due or currently due to the Company.

3.05.    Agent for Service of Process.   The Reinsurer designates the Insurance Commissioner of the State of Vermont as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding begun by or on behalf of Company.

3.06.    Confidentiality.   The Company and the Reinsurer agree to keep this Agreement, the terms hereof, and all documents and information relating hereto, or furnished pursuant to or in connection herewith, confidential, except as may be required by law. Notwithstanding the foregoing, nothing in this Section 3.06 shall prohibit the Company or the Reinsurer from disclosing such confidential information to (a) state or federal regulators or rating agencies, if in the Company's or the Reinsurer's judgment, it believes that such disclosure is required or advisable, (b) the Company's or the Reinsurer's parent or affiliated companies, whether direct or indirect, provided such parent or affiliated companies also agree to keep such information confidential, (c) the outside legal, financial or accounting advisors of the Company or Reinsurer and (d) other parties including, without limitation, Freddie Mac, Fannie Mae or other similar government-sponsored entities, with the prior written consent of the Company or Reinsurer as the case may be, which consent shall not be unreasonably withheld. This Section 3.06 shall survive termination of this Agreement.

### ARTICLE IV—REINSURANCE PREMIUMS, PREMIUM TAXES AND CEDING COMMISSION

4.01.    Reinsurance Premiums.   In the manner provided in Article VIII below, the Reinsurer shall be entitled to receive Reinsurance Premiums which are equivalent to thirty-one and twenty five hundredths percent (31.25%) of the Gross Written Premium.

4.02.    Premium Taxes.   Company shall be liable for any and all premium taxes imposed on premiums written with respect to Policies covering Reinsured Loans. Reinsurer shall be liable for any and all premium taxes imposed on any Reinsurance Premiums paid to Reinsurer hereunder.

WF - KAY 05402

4.03.    Ceding Commission.   Company shall receive a ceding commission of twenty percent (20%) of Reinsurance Premiums.

## ARTICLE V—CAPITAL AND RESERVES

5.01.    Statutory Capital and Reserves.   The Company and the Reinsurer shall establish and maintain (a) all such capital required by the laws of their respective domiciliary states and (b) all such reserves as may be required under relevant state insurance laws and regulations with respect to unearned premiums, contingency reserves, claims, Loss or loss adjustment expenses relating to each risk (the "Reserves"). Any such Reserves shall be established by the Company in accordance with applicable state insurance laws and regulations, if any, and by the consistent application of the Company's standard reserving practices and techniques for Mortgage Guaranty Insurance business.  With respect to the Reinsurer, such Reserves shall be established in a manner consistent with the methodology used by the Company for its Reserves, in which case, such methodology shall also be consistent with applicable legal requirements and industry practices.

## ARTICLE VI—POLICY CLAIM SETTLEMENT

6.01.    Policy Claim Settlement.   All Losses, compromises of Losses and expenses and allowances in consequences of a claim for benefits under a Policy shall be settled by Company without consultation with the Reinsurer. Company agrees to settle each claim under a Policy in a manner which, in its good faith opinion, is in accordance with the terms and conditions of the Policy as interpreted in good faith by Company.  Nevertheless, Company shall have the authority to grant reasonable extensions of time for the filing of claims and to waive notice requirements by Insureds and such other technical Policy violations as it deems reasonable and prudent to effectuate a good faith application of the terms imposed by the Policy.

6.02.    Salvage and Subrogation.   All decisions regarding salvage and/or subrogation shall be made by the Company, without consultation with the Reinsurer, in a manner which is consistent with such decisions made by the Company in its normal course of business.

## ARTICLE VII—REINSURANCE CLAIM PROCEDURE

7.01.    Filing a Reinsurance Claim.   Company shall, in connection with quarterly reports, file Reinsurance Claims with Reinsurer as provided for herein in a form approved by the parties to this Agreement.  Payments due from Reinsurer for Reinsurance Claims shall be made to Company by the Trustee referred to in Article XII hereof.  Company shall pay for all expenses pertaining to reporting to Reinsurer.

7.02.    Compliance with Policy.   Except as provided by Section 6.01 above, and notwithstanding anything to the contrary provided in Article X below, no Reinsurance Claim shall be made by Company or payable by Reinsurer unless and until substantially all terms and conditions of the Policy with respect to the Claim Payment which is the basis for such Reinsurance Claim have been reasonably complied with and satisfied, and Company has, in its own reasonable estimation, paid the Insured all amounts due with respect to such Loss.

7.03.    Claim Filing Method and Timing.   All Reinsurance Claims shall be filed within the time period set forth in Section 8.01 below.  Such Reinsurance Claims shall be made by personal delivery to Reinsurer, or by deposit in the U.S. Mail, postage prepaid, addressed to Reinsurer at its address set forth herein.  Company shall also furnish upon the request of Reinsurer, made within a reasonable period, not to exceed forty-five (45) days after the end of each Accounting Period ending on the last day of the Company's fiscal year or thirty (30) days after the end of any other Accounting Period for which such Reinsurance Claims were submitted, records required to verify such Reinsurance Claims, and Aggregate Net Losses.  Company shall not unreasonably deny requests for copies of such documentation for purposes of verification after such forty-five (45) or thirty (30) day period has elapsed if Reinsurer demonstrates good cause for such request.  Reinsurer shall pay (or allow the Trustee to pay from the Trust Account) to the Company all Reinsurance Claims within the time period set forth in Article VIII below, by check to:

WF - KAY 05403

Radian Guaranty Inc.
1601 Market Street
Philadelphia, PA 19103

or other immediately available funds.

## ARTICLE VIII—ACCOUNTING AND SETTLEMENT

8.01.    Company Reports.   Within forty-five (45) days after the end of each Accounting Period which concludes on the last day of the Company's fiscal year or within thirty (30) days after the end of any other Accounting Period, Company shall submit to Reinsurer reports for such Accounting Period containing the following information for each Book in summary printed format and, with respect to each individual Reinsured Loan, in electronic format:

(a) Insurance in Force.  As of the end of such Accounting Period, gross insurance in force for all risk, including gross risk outstanding and gross unearned premiums thereon, before any deduction for reinsurance hereunder, all in summary fashion.

(b) Premiums.  For Reinsured Loans for which either an initial premium payment or renewal premium payment has been paid to the Company during such Accounting Period, the net written premium, earned premium, and unearned premium, all in gross and in the net amount due the Reinsurer for each Reinsured Loan and in summary fashion.

(c) Delinquency Reserves.  As of the end of such Accounting Period, each delinquent Reinsured Loan reported to the Company pursuant to a Policy, the vintage of the delinquency and the amount of reserve therefor that Company has established, without any deduction for reinsurance.

(d) Reinsurance Claims.  Aggregate Net Losses and the Reinsurance Claim, if any, due from Reinsurer.

(e) Reinsurance Premiums.  Reinsurance Premiums due from Company.

(f) Contingency reserve.

(g) Other.   Such additional information as the Reinsurer may reasonably require, including without limitation information necessary to manage its reinsurance risk exposure under this Agreement on a monthly basis.

8.02.    Reinsurer Reports.   Within ninety (90) days after the end of each fiscal quarter and within ninety (90) days after the end of each fiscal year, the Reinsurer shall provide to the Company quarterly and annual reports, which shall contain such information as the Company may reasonably require, including (a) the income statement and balance sheet of the Reinsurer, prepared on both a statutory basis and in accordance with generally accepted accounting principles in effect from time to time in the United States of America ("GAAP") and, with respect to the year-end GAAP statement, audited by the Reinsurer's independent certified public accountants, provided that such audited statement shall be provided to the Company within sixty (60) days from receipt thereof by the Reinsurer (b) such financial information as may be required to provide particulars concerning the reserves established by the Reinsurer to secure balances due, (c) sufficient information from the Reinsurer to allow the Company to meet all requirements of the Commissioner, the NAIC, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, or any rating agency, and (d) an accounting of amounts paid or to be paid pursuant to clauses (i), (ii) and (iii) of Section 12.06 hereof.

8.03.    Remittances.  The balance after set off (as provided in Section 3.04 above) that is due to a party by the other party hereunder shall be paid:

(a)       if to Company, within thirty (30) days following the receipt by Reinsurer of a quarterly or annual report delivered pursuant to Section 8.01 above for each Accounting Period; or

(b)       if to Reinsurer, then such remittances shall be made to the Trust Account or, if the amounts then in such account exceed the amounts required to be maintained therein pursuant to the

WF – KAY 05404

terms of this Agreement, to the Reinsurer, in either event within thirty (30) days after the end of an Accounting Period and as an accompaniment to the quarterly or annual report delivered pursuant to Section 8.01 for each Accounting Period.

## ARTICLE IX—TERM AND TERMINATION

9.01.    Term.   The term of this Agreement shall commence at 12:01 a.m., Eastern Standard Time, on the Effective Date and, except as otherwise provided herein, shall be unlimited in duration.

9.02.    Unilateral Termination upon Ninety Days Notice.   Either party may terminate its participation in this Agreement as of 11:59 p.m., Eastern Time by providing at least ninety (90) days' prior written notice thereof to the other party by certified U.S. Mail with return receipt requested, or by other delivery service wherein the sender receives a receipt noting the date of delivery. Anything to the contrary herein notwithstanding, unless otherwise determined by the Company or the Reinsurer as permitted under Section 9.05 hereof, any termination under this Section 9.02 shall be on a run-off basis only.

9.03.    Immediate Termination.   The Company shall have the right, at its option, to terminate this Agreement immediately in the event that the Reinsurer fails to make the deposit required in Section 12.05 and the value of the Trust Account established in Article XII falls below the greater of the Total Capital Requirement Amount or contingency reserve and the Reinsurer fails to cure such shortfall within thirty (30) days after the date notice of such shortfall first is received by the Reinsurer. Subject to the provisions of Sections 9.05 and 9.06 hereof, such termination shall be the Company's sole and exclusive remedy in the event of such shortfall and failure to cure. Either party may immediately terminate this Agreement if any law or regulation of any federal agency should render this Agreement illegal, as finally determined by a federal court or a federal regulator, or as interpreted by the written opinion of competent legal counsel reasonably chosen by the Company or the Reinsurer. If any law or regulation of any state in which the Company or the Reinsurer is doing business should render this Agreement illegal, as finally determined by a state court or state regulator, or as interpreted by the written opinion of competent legal counsel reasonably chosen by the Company or the Reinsurer, both parties agree that this Agreement shall be terminated immediately with respect to such state(s) only and shall continue in effect with respect to all other states in which this Agreement has not been so determined to be illegal; provided, however, the Company or the Reinsurer may terminate this Agreement immediately and completely (a) if, due to this Agreement, any order has been issued by a state court or state regulator which would jeopardize the Company's or the Reinsurer's license to do business in such state or (b) if the Company's or the Reinsurer's ability to manage risk ceded hereunder is impaired because this Agreement has been determined to be illegal in one or more states. The Company may cease ceding, or the Reinsurer may cease accepting, additional risk under this Agreement or terminate this Agreement if so ordered by the Commissioner or any other regulatory authority in a jurisdiction where the Company or the Reinsurer is licensed.

9.04.    Termination Due to Non-Payment or Material Breach.   Either party may terminate this Agreement at any time if:

(c)    any payment to be made hereunder by the other party is more than ninety (90) days overdue, and said payment has not been made within thirty (30) days after written notice to pay has been served upon the party not paying, or

(d)    there is a material breach by the other party with respect to any of its representations, warranties or obligations set forth herein, and said breach has not been cured within thirty (30) days after written notice to cure said breach has been served upon the party committing said breach.

9.05.    Reinsurer's Liability After Termination.   Notwithstanding any termination as provided for in this Agreement (other than a termination on a cut-off basis including a termination as provided in Section 9.08 hereof), the Reinsurer shall continue to be liable, subject to all other terms and conditions of this Agreement, with respect to all Reinsured Loans until the natural expiration, cancellation or termination of coverage of each Reinsured Loan, in which event the Reinsurer shall continue to receive the applicable Reinsurance Premiums with respect thereto, unless, as permitted under this Section 9.05, the Company or the Reinsurer determines that such termination shall be on a cut-off

-9-

WF - KAY 05405

basis with portfolio transfer, in which event the Reinsurer shall not continue to (a) be liable with respect to the Reinsured Loans or (b) receive Reinsurance Premiums with respect thereto. In the event the Company has terminated this Agreement under the first sentence of Section 9.03 or under Section 9.04, the Company alone shall determine the basis for termination, i.e., either run-off or cut-off basis. In the event the Reinsurer has terminated this Agreement under Section 9.04, the Reinsurer alone shall determine the basis for termination, i.e. either run-off or cut-off basis. In the event termination is finally ordered by a state or federal court or regulator, such termination shall be in accordance with such order, anything to the contrary herein notwithstanding. If such order is silent on the question of termination, such termination shall be on a run-off basis unless otherwise mutually agreed by the parties. Notwithstanding the preceding sentence, if such order is issued during the first Underwriting Year and the order is silent on the question of termination, in connection with such termination the parties agree to cooperate in order to reverse, as promptly as is practicable, all transaction that have occurred to date hereunder so as to restore the parties to the economic positions that would have existed had this Agreement never taken effect.

     9.06.   Payments on Termination.  In the event that this Agreement is terminated pursuant to this Article IX and the party possessing the right to do so elects that such termination shall be on a cut-off basis with portfolio transfer pursuant to Section 9.05, a net accounting and settlement as to any balance due under this Agreement shall be undertaken by the parties to this Agreement. Any net payment required under such terminal accounting and settlement will become due as of the Termination Date, and shall be paid by the Reinsurer or the Company, as appropriate, no later than the day on which the Termination Report described in section 9.07 is due to be provided. Net payments required under such terminal accounting and settlement shall consist of (a) the settlement for the final Accounting Period, as set forth in Sections 8.01 and 8.03, provided that in calculating the amount due either party, the Company shall retain amounts to cover Unearned Premium reserves and Loss reserves applicable to Reinsured Loans, including incurred but not reported Losses, as of the Termination Date; and (b) interest on the payments described in clause (a) for the period from and including the Termination Date to the date on which such net payments are made, calculated at a rate equal to the rate announced by Citibank, N.A. from time to time as the base rate in effect at its principal office in the City of New York; each change in the base rate shall be effective on the date such change is announced as effective.

Any amounts remaining in the Trust Account following the net accounting, settlement and payment contemplated by this Section 9.06 and not otherwise reserved or payable under this Agreement or in accordance with applicable law shall be paid to the Reinsurer.

     9.07.   Termination Report.  Within ninety (90) Business Days after the Termination Date, the Company shall supply the Reinsurer with a report that shall show the terminal accounting and settlement described in Section 9.06 above (the "Termination Report"). Such Termination Report shall contain the following information:

          (a)     information for the final Accounting Period as specified in Section 8.01 of this Agreement;

          (b)     the calculation of final balances due, as specified in Section 8.03 of this Agreement;

          (c)     any interest due pursuant to Section 9.06 of this Agreement; and

          (d)     year-to-date information, up to and including the Termination Date, listing Policies in force under this Agreement in the aggregate, gross loan amount in force and gross risk outstanding.

     9.08    Automatic Termination After Ten Years.  Anything to the contrary herein notwithstanding, the obligation of the Reinsurer to indemnify the Company in accordance with Article II hereof, and the obligation of the Company to cede premiums to the Reinsurer in accordance with Article IV, shall cease as of the last day of the Company's fiscal year which is the ninth year after the end of the Underwriting Year in which the Book of Covered business was underwritten, whereupon this Agreement shall be terminated with respect to that Book of Covered Business only. Such termination shall be on a cut-off basis, in accordance with the requirements for calculations, payments and reports contemplated by this Article IX for termination on that basis.

     9.09    Notice to Trustee Upon Termination. To the extent applicable under the circumstances in connection with any termination under this Agreement, the Company and the Reinsurer shall also give the "Notice of Intention" to the Trustee as provided in Section 10(a) of the Trust Agreement.

WF - KAY 05406

## ARTICLE X—INSOLVENCY

10.01. Payments by Reinsurer. In the event of insolvency of the Company, the Reinsurer hereby agrees that, as to all reinsurance becoming effective hereunder, the Reinsurance Claim shall be payable immediately upon demand, with reasonable provision for verification by the Reinsurer, to the Company, or to its conservator, receiver, liquidator or statutory successor on the basis of the liability of the Company under a Policy with regard to a Reinsured Loan, without diminution because of the insolvency of the Company or because the conservator, receiver, liquidator or statutory successor of the Company has failed to pay all or a portion of any claim.

10.02. Claims. It is agreed that the conservator, receiver, liquidator or statutory successor of the Company shall give prompt written notice to the Reinsurer of the pendency or submission of a claim under any Policy with regard to a Reinsured Loan. During the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense available to the Company or its conservator, receiver, liquidator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to the approval of the court, against the Company as a part of the expense of insolvency, liquidation or rehabilitation to the extent of a proportionate share of the benefit which accrues to the Company solely as a result of the defense undertaken by the Reinsurer.

10.03. No Waiver of Defenses. Nothing in this Article X shall preclude the Reinsurer from asserting any excuse or defense to payment of a Reinsurance Claim other than the excuses or defenses of the insolvency of the Company and the failure of the Company's conservator, receiver, liquidator or statutory successor to pay all or a portion of any claim.

## ARTICLE XI—ARBITRATION

11.01. Scope. All controversies which arise with respect to the validity or interpretation of this Agreement, or the performance of the respective obligations of the parties under this Agreement which cannot be resolved by the parties in the normal course of business, shall be submitted to arbitration in accordance herewith as a condition precedent to the commencement of any right of action hereunder.

11.02. Selection of Arbitrator. One arbitrator shall be chosen by the Company and one by the Reinsurer. If a party fails to choose an arbitrator within sixty (60) days after receiving a written request from the other party to do so, then the party making the request may choose a second arbitrator. The two arbitrators selected shall choose a third arbitrator, who shall be the umpire. If the two arbitrators selected are unable to choose the umpire, at the end of sixty (60) days following the last date of the selection of the two arbitrators, each of the parties shall name three qualified persons, two of whom shall be certified as reinsurance arbitrators by AIDA Reinsurance & Insurance Arbitration Society of the United States ("ARIAS U.S.") if, as of the last date of the selection of the two arbitrators selected, ARIAS U.S. maintains a list of at least 25 active certified reinsurance arbitrators. Of the three persons so named by a party, the other party shall decline two, and the umpire shall be selected from the two remaining names by lot.

11.03. Qualification. The arbitrators shall be individuals who may be active or retired officers of an insurance or reinsurance company or professionals experienced in insurance or reinsurance matters, other than officers, directors or employees or former officers, directors or employees of any party or an affiliate of any party. The umpire shall, in addition to being an individual who meets the foregoing requirements, be impartial and disinterested. The impartiality and disinterestedness of the umpire shall be demonstrated by negative responses to each of the questions set forth on a questionnaire in the form attached hereto as Exhibit 1.

11.04. Arbitration Procedures. To the extent not inconsistent with the express provisions of this Agreement, the arbitrators shall follow the rules of the American Arbitration Association applicable to commercial disputes and the arbitrators shall make their decisions in accordance with the terms of this Agreement. The decision of the majority of the arbitrators shall be final and binding upon the parties. The arbitrators may include interest on any amount awarded in arbitration.

11.05. Submission of Position. Each party shall submit its case to the arbitrators within sixty (60) days after receipt of notice of the selection of the umpire unless the period is extended by the arbitrators or by agreement of the parties.

-11-

WF - KAY 05407

11.06.   Cost of Arbitration.  The cost of arbitration shall be borne equally by the parties unless the arbitrators decide otherwise.  Notwithstanding the foregoing, each party shall bear the fees of the arbitrator that it selected, or if either party failed to select an arbitrator, that party shall bear the cost of the arbitrator selected for such party pursuant to Section 11.02, and the parties shall bear equally the fees of the third arbitrator.  The arbitration shall be held in New York, New York at the time and place agreed upon by the arbitrators.  If the arbitrators fail to agree on the time to meet, they shall meet within one month of the selection of the additional arbitrator.

11.07.   Entry of Arbitration Award.  Either party may petition a court of competent jurisdiction to confirm, correct or vacate the award.  If an award is confirmed, judgment shall be entered in conformity therewith.  The judgment so entered shall have the same force and effect as, and be subject to all the provisions of law relating to, a judgment in a civil action, and may be enforced like any other judgment of the court in which it is entered.

11.08.   Survival of Article.  This Article shall survive termination of this Agreement.

## ARTICLE XII—SECURITY

12.01.   Establishment of Trust.  The Reinsurer shall enter into a trust agreement (the "Trust Agreement") in a form acceptable to the Company and establish a trust account (the "Trust Account") for the benefit of the Company with respect to the liabilities due the Company (including but not limited to Reserves) with Bank One Trust Company, N.A., which shall be at the time the Trust Account is established, and shall continue to be, a Qualified United States Financial Institution (the "Trustee").

12.02.   Purpose of Trust.  Reinsurer agrees to deposit and maintain in said Trust Account assets to be held in trust by the Trustee for the benefit of the Company as security for the payment of the Reinsurer's obligations to the Company under this Agreement.  Such assets shall be maintained in the Trust Account by the Reinsurer as long as the Reinsurer continues to remain liable for any Reinsured Loan as provided in Section 9.05 of this Agreement.  Only assets deposited in the Trust Account pursuant to this Agreement shall be considered as assets of the Trust Account for purposes of this Agreement, and such assets shall not be used as security or otherwise for the payment of the Reinsurer's obligations to the Company under any other reinsurance agreement.  It is understood that the Reinsurer may have established, or from time to time may establish, other trusts to secure other reinsurance obligations.  The trust required to be created under this Article XII secures the Reinsurer's obligations under this Agreement and is not available to support or secure obligations of the Reinsurer arising out of any agreement other than this Agreement.  The assets of the Reinsurer held in different trusts are intentionally segregated and allocated in support of, and secure its various obligations under, separate reinsurance agreements without commingling or cross-collateralization and any assets not included in the Trust Account are not available to support or secure this Agreement.

12.03.   Trust Assets.  Reinsurer agrees that the assets so deposited shall consist only of investments listed in Schedule B, Permitted Investments, and investment income thereon.  Such trust assets shall collateralize the risk reinsured for all Books of Covered Business.

12.04.   Title of Assets.  Reinsurer, prior to depositing assets with the Trustee, shall execute all assignments, endorsements in blank, and transfer legal title to the Trustee of all shares, obligations or any other assets requiring assignments, in order that the Company, or the Trustee upon direction of the Company, may whenever necessary negotiate any such assets without consent or signature from the Reinsurer or any other entity.

12.05.   Capital Deposit Amount.  The Reinsurer shall, within thirty (30) days of its receipt of the reports provided in Section 8.01 accompanied by the notice specified in Section 12.06, deposit into the Trust Account such amounts, if any, as are necessary to attain a balance in the Trust Account equal to or greater than the Total Capital Requirement Amount

12.06.   Maintenance of Trust.  All net amounts payable by the Company pursuant to Section 4.01 and 4.03 hereof shall be paid directly into the Trust, other than the following amounts, which shall be paid to the Reinsurer upon reasonable verification by the Company of the accuracy of such amounts:  (i) an amount equal to 0.225% of gross written premium assumed hereunder by the Reinsurer (or such greater amount as subsequently may be required by law), in respect of Vermont premium taxes payable by the Reinsurer; (ii) an amount not to exceed fifteen thousand dollars ($15,000) per quarter (or such greater amount as may be agreed to in writing by the Company in its sole discretion), in

-12-

WF - KAY 05408

respect of the Reinsurer's actual and necessary out-of-pocket operational expenses; and (iii) an amount or amounts necessary, from time to time, to enable the Reinsurer or its parent to pay federal income taxes actually due and owing in respect of a Book of Covered Business. The amount actually withdrawn pursuant to clause (ii) of this Section 12.06 shall not exceed the Company's pro-rata share of the Reinsurer's operational expenses after taking into account other mortgage guaranty insurance companies ceding business to the Reinsurer. To the extent any Reinsurance Premiums are paid directly to the Reinsurer, the Reinsurer shall deposit one hundred percent (100%) of such Reinsurance Premiums, net of the amounts contemplated by clauses (i), (ii) and (iii) above, into the Trust Account upon receipt. At the end of each quarterly Accounting Period, the Company shall determine if the Trust Account is adequately funded with respect to the Company's liabilities reinsured hereunder. If the Company determines that the Trust Account is not adequately funded, _i.e._, the Trust Account contains less than the Total Capital Requirement Amount, the Company shall send the Reinsurer, as an accompaniment to the reports provided in Section 8.01, a notice specifying the amount of the inadequacy and the Reinsurer shall, in its discretion, deposit such amount in the Trust Account within thirty (30) days of receipt of such notice. Anything in this Agreement to the contrary notwithstanding, in the event the Reinsurer fails to timely deposit such amount, the Company's sole and exclusive recourse and remedy shall be, at its election, to terminate this Agreement on a cut-off basis or to place this Agreement in run-off, in accordance with the provisions of Article IX hereof.

12.07.   Settlements. All settlements of account under the Trust Agreement between the Company and the Reinsurer shall be made in cash or its equivalent.

12.08.   Withdrawals by Company. The Reinsurer and the Company agree that the assets in the Trust Account may be withdrawn by the Company at any time, notwithstanding any other provisions in this Agreement, provided such assets are applied and utilized by the Company or any successor of the Company by operation of law, including, without limitation, any liquidator, rehabilitator, receiver or conservator of the Company, without diminution because of the insolvency of the Company or the Reinsurer, only for the following purposes:

(i)   to reimburse the Company for the Reinsurer's share of any Losses and allocated loss adjustment expense paid by the Company with respect to Reinsured Loans and due but not recovered from the Reinsurer under the Agreement;

(ii)   to pay the Reinsurer for fees and expenses described in Section 12.06;

(iii)   to pay the Reinsurer any amount held in the Trust Account and approved by the Company in accordance with Section 12.09 of this Agreement or to make payment to the Reinsurer upon termination of this Agreement as provided in Article IX hereof;

(iv)   where the Trustee has received notice of termination of the Trust Account and where any of Reinsurer's Obligations (as hereinafter defined) remain unliquidated and undischarged ten days prior to the effective date of such trust termination, to withdraw amounts equal to such Obligations and deposit such amounts in a separate account, apart from its other assets, in the name of the Company, in any bank or trust company organized in the United States, in trust for the uses and purposes specified in subparagraphs (i) and (ii) of this Section 12.08.

"Obligations" shall mean:

(a)   Losses and allocated loss expenses paid by the Company but not recovered from the Reinsurer;

(b)   Reserves for Losses reported and outstanding;

(c)   Reserves for Losses incurred but not reported

(d)   Reserves for allocated loss expenses with respect to Losses specified in items (b) and (c) immediately above;

(e)   Reserves for unearned premiums

(f)   Contingency reserve

-13-

WF - KAY 05409

12.09. <u>Withdrawals by Reinsurer</u>. From and after the third Underwriting Year, the Reinsurer shall have the right to seek the Company's approval to withdraw all or any part of the assets from the Trust Account and transfer such assets to the Reinsurer, provided that the withdrawal conforms to the following requirements:

   (i)   the Reinsurer shall, at the time of withdrawal, replace the withdrawn assets with other assets of a type permitted hereunder having a market value equal to the market value of the assets withdrawn, so as to maintain the Trust Account in the Total Capital Requirement Amount, or

   (ii)   except as set forth in paragraph (iii), after such withdrawal and transfer, the market value of the Trust Account is no less than 102% of an amount equal to the sum of A and B below:

       A.   An amount necessary to maintain the greater of (1) a Capital Ratio of at least 20% relating to all Books as to which termination on a cut-off basis has not occurred, or (2) a contingency reserve equal to 50% of premiums earned in respect of the most recent ten (10) Books; provided, however, that if there are not yet ten Books, the required contingency reserve shall be equal to 50% of premiums earned in respect of all Books of Covered Business

       B.   The sum of the Reinsurer's share of (1) losses and allocated loss expenses paid by the Company but not yet recovered from the Reinsurer; (2) reserves for losses reported and outstanding, losses incurred but not reported and allocated loss expenses in respect of such losses; and (3) unearned premium reserves; or

   (iii)   from and after a termination of this Agreement, unless the termination shall be on a cut-off basis (as set forth in Section 9.05 or 9.08 hereof), after such withdrawal and transfer, the market value of the Trust Account is no less than 102% of an amount equal to a Capital Ratio of 100%.

In the event that the Reinsurer seeks the Company's approval hereunder, the Company shall not unreasonably or arbitrarily withhold its approval.

12.10  <u>Return of Assets</u>.  In the event that the Company withdraws assets from the Trust Account for the purposes set forth in section 12.08(i) or (ii) in excess of actual amounts required to meet the Reinsurer's obligations to the Company, or in excess of amounts determined to be due under section 12.08(iii), the Company will return such excess to the Reinsurer, plus interest at the prime (or base) rate of interest as set forth in section 8.04 of this Agreement. In the event of a dispute arising under this Article XII, the arbitration panel established pursuant to Article XI of this Agreement shall have the right to award interest at a rate that it determines to be equitable, and may award attorney's fees, arbitration costs and other expenses.

<u>ARTICLE XIII—REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>

13.01.  <u>Organization, Standing and Authority of the Company</u>.  The Company is a mortgage guaranty insurance company duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania. It is duly authorized and qualified to carry on the business of Mortgage Guaranty Insurance in each state where a Policy was issued and meets the requirements for carrying on such business.

13.02.  <u>Authorization</u>.  The Company has all requisite power and authority to enter into this Agreement, and to perform its obligations hereunder.  The execution and delivery by the Company of this Agreement, and the performance by the Company of its obligations under this Agreement, have been duly authorized.  This Agreement, when duly executed and delivered by the Company, and, subject to the due execution and delivery by the Reinsurer, will be a valid and binding obligation of the Company, enforceable against the Company, its permitted successors and assigns, in accordance with its terms.

-14-

13.03.   Reports and Reinsurance Claims Submissions.   All reports and all Reinsurance Claims submitted hereunder by the Company shall be accurate and complete.

13.04.   Submission of Covered Reinsurance Claims Only.   No Reinsurance Claim shall be submitted to Reinsurer except in connection with a Loss on a Reinsured Loan reinsured under the Agreement.

13.05.   No Conflict or Violation.   The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby in accordance with the respective terms and conditions hereof will not (a) violate any provision of the Articles of Incorporation or Bylaws of the Company, or (b) violate any order, judgment, injunction, award or decree of any court, arbitrator or governmental or regulatory body against, or binding upon, or any agreement with, or condition imposed by, or consent required by, any governmental or regulatory body, foreign or domestic, binding upon the Company.

13.06.   Intermediaries and Financial Advisers.   No reinsurance intermediary or broker has acted directly or indirectly as such for, or is entitled to any compensation from, the Company in connection with this Agreement.

13.07.   Investigations.   The Company will notify the Reinsurer immediately, in writing, of any and all investigations of the Company or its directors, principal officers, or shareholders conducted by any federal, state, or local governmental or regulatory agency other than routine state insurance department examinations; provided, however, that any such notice shall be required only in connection with matters relating solely to this Agreement.

13.08   Materiality of and Reliance Upon Warranties and Representations.   Each such warranty and representation is material to this Agreement and relied upon by Reinsurer in entering into this Agreement.  Each such representation and warranty shall continue to be true during the term of this Agreement and thereafter so long as obligations are owed hereunder.

13.09   Year 2000 Readiness.   The Company will use its best efforts to ensure that all date-related output or results produced by the Company will be Year 2000 Ready.  For purposes of this section, "Year 2000 Ready" means that Company's software has been analyzed and tested and issues have been identified, updated or remediated as appropriate and that the Company's system will (i) be capable of accounting for all calculations using a century/date-sensitive algorithm for the 20th and 21st centuries; and, (ii) recognize the rollover to the year 2000 and the fact that it is a leap year.  The representation under this section will not apply to output, results, errors, or abnormal terminations caused or transmitted by the Reinsurer.  As Reinsurer's sole and exclusive remedy for any breach of this representation, the Company will use commercially reasonable efforts to correct any data or system so as to be Year 2000 Ready and any and all costs associated with such efforts shall be borne by Company and not the Reinsurer.  The Company is hereby providing official notice that the content of this paragraph constitutes Year 2000 Readiness Disclosure and Year 2000 Statements as defined in the "Year 2000 Information and Readiness Disclosure Act" (P.L. 105-271).

13.10   Survival of Article.   This Article XIII shall survive termination of this Agreement.

## ARTICLE XIV—REPRESENTATIONS AND WARRANTIES OF THE REINSURER

14.01.   Organization, Standing and Authority of the Reinsurer.   The Reinsurer is a reinsurance company duly organized, validly existing and in good standing under the laws of Vermont and is authorized under the laws and regulations of that state to reinsure policies within the purview of this Agreement.

14.02.   Authorization.   The Reinsurer has all requisite power and authority to enter into this Agreement, and to perform its obligations hereunder.  The execution and delivery by the Reinsurer of this Agreement, and the performance by the Reinsurer of its obligations under this Agreement, have been duly authorized.  This Agreement, when duly executed and delivered by the Reinsurer, and, subject to the due execution and delivery by the Company, will be a valid and binding obligation of the Reinsurer, enforceable against the Reinsurer, its permitted successors and assigns in accordance with its terms.

14.03.   No Conflict or Violation.   The execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby will not (a) violate any provision of the Articles of Incorporation,

-15-

WF - KAY 05411

Bylaws or other charter or organizational document of the Reinsurer; or (b) violate any order, judgment, injunction, award or decree of any court, arbitrator or governmental or regulatory body against, or binding upon, or any agreement with, or condition imposed by, any governmental or regulatory body, foreign or domestic, binding upon the Reinsurer.

14.04.   Intermediaries and Financial Advisers.   No reinsurance intermediary or broker has acted directly or indirectly as such for, or is entitled to any compensation from, the Reinsurer in connection with this Agreement.

14.05.   Investigations.   The Reinsurer will notify the Company immediately, in writing, of any and all investigations of the Reinsurer or its directors, principal officers, or shareholders conducted by any federal, state, or local governmental or regulatory agency other than routine state insurance department examinations; provided, however, that any such notice shall be required only in connection with matters relating solely to this Agreement.

14.06.   Materiality of and Reliance Upon Warranties and Representations.   Each such warranty and representation is material to this Agreement and relied upon by Company in entering into this Agreement. Each such representation and warranty shall continue to be true during the term of this Agreement and thereafter, so long as obligations are owed hereunder.

14.07.   Year 2000 Readiness.   The Reinsurer will use its best efforts to ensure that all date-related output or results produced by the Reinsurer will be Year 2000 Ready. For purposes of this section, "Year 2000 Ready" means that Reinsurer's software has been analyzed and tested and issues have been identified, updated or remediated as appropriate and that the Reinsurer's system will (i) be capable of accounting for all calculations using a century/date-sensitive algorithm for the 20th and 21st centuries; and, (ii) recognize the rollover to the year 2000 and the fact that it is a leap year. The representation under this section will not apply to output, results, errors, or abnormal terminations caused or transmitted by the Company. As Company's sole and exclusive remedy for any breach of this representation, the Reinsurer will use commercially reasonable efforts to correct any data or system so as to be Year 2000 Ready and any and all costs associated with such efforts shall be borne by Reinsurer and not the Company. The Reinsurer is hereby providing official notice that the content of this paragraph constitutes Year 2000 Readiness Disclosure and Year 2000 Statements as defined in the "Year 2000 Information and Readiness Disclosure Act" (P.L. 105-271).

14.08.   Survival of Article.   This Article XIV shall survive termination of this Agreement.

## ARTICLE XV—MISCELLANEOUS PROVISIONS

15.01.   Headings and Schedules.   Headings used herein are not a part of this Agreement and shall not affect the terms hereof. The attached Schedules are incorporated in and made a part of this Agreement.

15.02.   Notices and Reports.   Except as otherwise specifically set forth herein, all notices and reports to be given by a party hereto shall be in writing and shall be sufficiently given if sent by facsimile transmission, next day delivery service or by prepaid, first class mail. Every such notice and report given by mail shall be conclusively deemed to have been given on the earlier of the date it is received by the other party (if a signed receipt is obtained) or, in all other cases the third business day following the date of transmission or mailing thereof. The addresses and facsimile numbers of the parties for notices and reports are as follows:

If to the Company:

Radian Guaranty Inc.
1601 Market Street
Philadelphia, PA 19103
Attention: President and Secretary
Fax No.: (215) 405-9160

If to the Reinsurer:

-16-

WF - KAY 05412

North Star Mortgage Guaranty Reinsurance Company
C/o Norwest Mortgage, Inc.
100 S. Fifth St., MAC# X4801-191
Minneapolis, MN 55402
Attn: Laurie McGoogan

Fax No. (612)341-1925

With copies of all notices to:

North Star Mortgage Guaranty Reinsurance Company
C/o American Risk Management Corp.
P.O. Box 1530
Burlington, VT 05402-1530
Attn: Peter Joy

Fax No. (802) 862-7797

Changes in notice addresses or recipients may be made by the Reinsurer or the Company by following the procedure specified in this section rather than the procedure for amendment of this Agreement.

15.03.   Severability and Governing Law.   If any term or provision of this Agreement shall be held void, illegal, or unenforceable, the validity of the remaining portions or provisions shall not be affected thereby. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without regard to principles regarding choice of law, except to the extent that this Agreement expressly refers to other applicable laws. Any arbitration under this Agreement, or any dispute regarding the right to arbitration shall be governed by the Federal Arbitration Act (9 USC Section 1, et seq.) and not by the laws of the Commonwealth of Pennsylvania.

15.04.   Not Assignable.   This Agreement may not be assigned by either party

15.05.   No Third Party Beneficiaries.   Nothing in this Agreement is intended or shall be construed to give any person, other than the parties hereto, their successors and permitted assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.

15.06.   Execution in Counterpart.   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

15.07.   Currency.   All payments and accounts shall be made in United States Dollars, and all fractional amounts shall be rounded to the nearest whole dollar.

15.08.   Integrated Contract.   This Agreement (and any written amendments to it) constitutes the entire agreement between the parties and supersedes all prior agreements and understandings, oral or written, relating to the subject matter hereof.

15.09.   Amendment.   This Agreement may only be amended by an instrument in writing signed by the parties.

15.10.   Exercise of Rights.   The failure or refusal by any party to exercise any rights granted hereunder shall not constitute a waiver of such rights or preclude the subsequent exercise thereof, and no verbal communication shall be asserted as a waiver of any such rights hereunder unless such communication shall be confirmed in a writing plainly expressing an intent to waive such rights and signed by the party against whom such waiver is asserted.

15.11.   Good Faith.   The parties agree to deal with each other fairly and in utmost good faith in the performance of this Agreement.

WF – KAY 05413

15.12.   <u>Brokers or Finders</u>.   Each party hereby warrants that it has not employed any broker or finder in connection with the placement of this Agreement or any Policies hereunder and knows of no person claiming a fee or commission as such.   If any person shall make such a claim with respect to either party, the party with respect to whom such claim is made shall hold the other party harmless against any such claim and all costs and expenses in relation thereto.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives.

RADIAN GUARANTY INC.

By: _____

Title: _____

Date: _____


NORTH   STAR   MORTGAGE   GUARANTY REINSURANCE COMPANY

By: _____

Title: _____

Date: _____

-18-

WF - KAY 05414

## SCHEDULE A

### Reinsured Loans

This Agreement shall be applicable to mortgage loans covered by Policies issued by the Company which the Company and North Star Mortgage Guaranty Reinsurance Company shall have individually identified and agreed and confirmed from time to time in one or more writings, supplemental to this Agreement, shall be reinsured hereunder, where such mortgage loans were (i) originated by Norwest Mortgage, Inc. or an affiliate thereof (collectively, "Norwest"), on or after the Effective Date and had a LTV ratio at origination equal to or less than 97%, or (ii) originated by a third party on or after the Effective Date, had a LTV ratio at origination equal to or less than 97% and were purchased by Norwest not later than 120 days after the date of the loan closing.

The following types of mortgage loans are excluded as Reinsured Loans under this Agreement:  (i) any certificate of insurance issued under a Policy where the borrower on the related insured mortgage loan has advised the Reinsurer, and the Reinsurer has advised the Company, that such certificate of insurance issued under the Policy is not to be reinsured under this Agreement, (ii) any mortgage loan covered by a captive mortgage reinsurance agreement other than this Agreement, by a pool insurance policy, by a pool reinsurance agreement, by any other agreement to which the Company or an affiliate of the Company is a party that involves the sharing of risk or return tied to performance, or by another transaction between the Company or an affiliate of the Company and Norwest that involves the sharing of risk or of a return tied to performance, (iii) any mortgage loan with the following primary mortgage insurance coverages:

|  | Loan Term Greater than 20 Years and Coverage of: | Loan Term Equal to or Less than 20 Years and Coverage of: |
|---|---|---|
| 97-95.01% LTV | Less than 30% | Less than 30% |
| 95-90.01% LTV | Less than 25% | Less than 25% |
| 90-85.01% LTV | Less than 17% | Less than 12% |
| 85-80.01% LTV | Less than 12% | Less than 6% |

and (iv) a mortgage loan insured under a lender paid, single premium plan, or discounted premium plan of the Company.

WF - KAY 05415

**SCHEDULE B**

Permitted Investments

Any one or more of the following:

i.　　Bonds, notes, or other evidences of indebtedness, excluding any derivatives thereof, that are direct obligations of the U.S. Government or for which the full faith and credit of the U.S. Government is pledged for the payment of principal and interest, commercial paper issued by an institution with an S&P rating of "A" or "A-1" or equivalent rating from a Nationally Recognized Statistical Rating Organization, bonds rated "AA" or "AAA", or certificates of deposit of any depository institution rated "AA" or "AAA" or which are federally insured;

ii.　　One Group Fund, which shall consist of (A) the One Group Cash Management Money Market Fund, the One Group U.S. Government Securities Cash Management Money Market Fund, or the One Group Treasury Prime Cash Management Money Market Fund, including any successor or similar fund to any such fund, or (B) any other money market fund rated in the highest applicable category by Standard & Poors or Moody's Investor Services; or

iii.　　Other obligations or registered securities that are acceptable to the Company;

provided, however, that no such securities shall have been issued by a Parent, a Subsidiary or an Affiliate of either the Grantor or the Beneficiary.

-2-

WF - KAY 05416

# EXHIBIT 33

AMENDMENT DATED MARCH 29, 2000 TO
REINSURANCE AGREEMENT (EXCESS LAYER)
BETWEEN
RADIAN GUARANTY INC.
AND
NORTH STAR MORTGAGE GUARANTY
REINSURANCE COMPANY

WHEREAS, Radian Guaranty Inc. and North Star Mortgage Guaranty Reinsurance Company (together, the "Parties") entered into a Reinsurance Agreement (Excess Layer) dated March 1, 2000 (the "Agreement") (all capitalized terms not defined in this Amendment shall be given the meaning set forth in the Agreement);

WHEREAS, the Parties desire to amend the Agreement;

NOW THEREFORE, in consideration of the mutual promises and covenants made herein and intending to be legally bound, the Parties hereby agree that the Agreement shall be amended as follows:

1.      Section 1.04 shall be amended by deleting said Section in its entirety and replacing it with the following:

        1.04    "Aggregate Risk Exposure" shall mean: (i) with respect to the Book of Covered Business for the Underwriting Year October 1, 1999 through December 31, 1999 (the "1999 Book of Covered Business"), an amount equal to five percent (5.00 %) of the sums of the Risks Insured in respect of such Book; and (ii) with respect to all other Books of Covered Business, an amount equal to seven percent (7.00 %) of the sums of the Risks Insured in respect of such Book."

2.      Section 2.02 shall be amended by deleting said Section in its entirety and replacing it with the following:

        "2.02.  Coverage Amount.  The Reinsurer shall not be liable for any Aggregate Net Losses with respect to Reinsured Loans in a Book of Covered Business until the Company's Aggregate Net Losses with respect to such Book exceed the First Loss Percentage Amount for such Book.  Thereafter, the Reinsurer shall be liable for one hundred percent (100%) of Aggregate Net Losses sustained by the Company with respect to such Book until the Company's Aggregate Net Losses with respect to such Book equals the sum of (i) the First Loss Percentage Amount (solely the responsibility of the Company) and (ii) the Aggregate Risk Exposure (solely the responsibility of the Reinsurer) for such Book.  Thereafter, the Reinsurer shall have no liability for Aggregate Net Losses with respect to that Book of Covered Business.

WF - KAY 05417

The First Loss Percentage Amount for the 1999 Book of Covered Business shall be the sum of the amounts resulting from multiplying the Risk Insured in respect of each Reinsured Loan in such Book of the loan type indicated below by the applicable First Loss Percentage indicated below:

| Loan Type | First Loss Percentage |
|---|---|
| Fixed Rate Loan | 4.75% |
| Non-Fixed Rate Loan | 6.00% |

The First Loss Percentage Amount for each other Book of Covered Business shall be the sum of the amounts resulting from multiplying the Risk Insured in respect of each Reinsured Loan in such Book of the loan type indicated below by the applicable First Loss Percentage indicated below:

| Loan Type | First Loss Percentage |
|---|---|
| Fixed Rate Loan | 2.75% |
| Non-Fixed Rate Loan | 4.00% |

Within forty-five (45) days after the end of each Underwriting Year, the Company will issue to the Reinsurer a letter confirming to the Reinsurer the First Loss Percentage Amount, the Aggregate Risk and the Aggregate Risk Exposure for the Book of Covered Business in such Underwriting Year.

3.   Section 4.01 shall be shall be amended by deleting said Section in its entirety and replacing it with the following:

"4.01   Reinsurance Premiums.  In the manner provided in Article VIII below, the Reinsurer shall be entitled to receive Reinsurance Premiums which are equivalent to: (i) for the 1999 Book of Covered Business, thirty-one and twenty five hundredths percent (31.25%) of the Gross Written Premium; and (ii) for each other Book of Covered Business, forty percent (40%) of the Gross Written Premium."

4.   Section 4.03 shall be amended by deleting said Section in its entirety and replacing it with the following:

"4.03.  Ceding Commission.  Company shall receive from the Reinsurer a ceding commission of (i) twenty percent (20%) of Reinsurance Premiums for the 1999 Book of Covered Business and (ii) twelve and one-half percent (12.5%) of Reinsurance Premiums for each other Book of Covered Business."

WF - KAY 05418

5.    A new Section 12.11 shall be added to the Agreement as follows:

"12.11 Insufficient Funds in Trust Account.  Notwithstanding anything herein to the contrary, if, at any time, the funds in the Trust Account are insufficient to pay in full any amount(s) then due and payable by the Reinsurer hereunder, and such insufficiency continues for a period of thirty (30) days from the date such amount(s) initially became due and payable, then this Agreement shall automatically and immediately terminate without requirement of any waiting period or notice by or to either Party, and all amounts remaining in the Trust Account shall be remitted to the Company, which shall reassume all liabilities theretofore ceded to the Reinsurer pursuant to this Agreement.  All rights and obligations of both Parties under this Agreement shall then be extinguished as of the date of such termination."

6.    All other terms and conditions of the Agreement shall remain unchanged and shall continue in full force and effect.

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed by their duly authorized representatives and delivered as of the date first written above.

RADIAN GUARANTY INC.

By: _____
Title: President

NORTH STAR MORTGAGE GUARANTY REINSURANCE COMPANY

By: _____
Title: _____

WF - KAY 05419

Radian Guaranty Inc.

# RADIAN

March 19, 2001

Ms. Laurie McGoogan
Vice President
Wells Fargo Home Loans, Inc
100 S. 5th Street
Minneapolis, MN 55402

Re:   Reinsurance Agreement (Excess Layer) between
Radian Guaranty Inc. and North Star Mortgage Guaranty
Reinsurance Company (the "Reinsurance Agreement")

Dear Ms. McGoogan:

Enclosed are two originals of an Amendment to the above-referenced Reinsurance Agreement, both of which have been executed on behalf of Radian Guaranty Inc. Please have both executed on behalf of North Star Mortgage Guaranty Reinsurance Company and return one original to me for our files.

Also, per our prior discussions and in accordance with Schedule A of the Reinsurance Agreement, I am writing to confirm our agreement that the following loans shall be eligible for inclusion in the captive: (i) correspondent loans originated on or after January 1, 2001, purchased by Wells Fargo not later than 120 days after the date of the loan closing, and meeting the eligibility criteria set forth in Schedule A of the Reinsurance Agreement; (ii) branch retail loans originated on or after June 1, 2001 (or as otherwise agreed in writing by the parties) and meeting the eligibility criteria set forth in Schedule A of the Reinsurance Agreement; and (iii) broker wholesale loans originated on or after June 1, 2001 (or as otherwise agreed in writing by the parties), purchased by Wells Fargo not later than 120 days after the date of the loan closing , and meeting the eligibility criteria set forth in Schedule A of the Reinsurance Agreement.

Please evidence your agreement to the above by signing one copy of this letter in the space indicated below and returning it to me.

Sincerely yours,

H. Scott Theobald
Vice President

Agreed to and Accepted:

NORTH STAR MORTGAGE GUARANTY REINSURANCE COMPANY

By: _____
Title: _____
Date: _____

WF - KAY 05438

Radian Guaranty Inc.

# RADIAN

1601 Market Street
Philadelphia, Pennsylvania
19103-2337
800 523.1988
215 564.6600

March 19, 2001
(revised September 27, 2001)

Ms. Laurie McGoogan
Vice President
Wells Fargo Home Loans, Inc
100 S. 5th Street
Minneapolis, MN 55402

Re:   Reinsurance Agreement (Excess Layer) between
Radian Guaranty Inc. and North Star Mortgage Guaranty
Reinsurance Company (the "Reinsurance Agreement")

Dear Ms. McGoogan:

Enclosed are two originals of an Amendment to the above-referenced Reinsurance Agreement, both of which have been executed on behalf of Radian Guaranty Inc. Please have both executed on behalf of North Star Mortgage Guaranty Reinsurance Company and return one original to me for our files.

Also, per our prior discussions and in accordance with Schedule A of the Reinsurance Agreement, I am writing to inform you that the following loans shall be eligible for inclusion in the captive: (i) correspondent loans originated on or after January 1, 2001, purchased by Wells Fargo not later than 120 days after the date of the loan closing, and meeting the eligibility criteria set forth in Schedule A of the Reinsurance Agreement; (ii) branch retail loans originated on or after June 1, 2001 (or as otherwise agreed in writing by the parties) and meeting the eligibility criteria set forth in Schedule A of the Reinsurance Agreement; and (iii) broker wholesale loans originated on or after June 1, 2001 (or as otherwise agreed in writing by the parties), purchased by Wells Fargo not later than 120 days after the date of the loan closing , and meeting the eligibility criteria set forth in Schedule A of the Reinsurance Agreement.

Please evidence your understanding to the above by signing one copy of this letter in the space indicated below and returning it to me.

Sincerely yours,

H. Scott Theobald
Vice President

Agreed to and Accepted:

NORTH STAR MORTGAGE GUARANTY REINSURANCE COMPANY

By:
Title:
Date:

WF - KAY 05439

Radian Guaranty Inc.

# RADIAN

1601 Market Street
Philadelphia, Pennsylvania
19103-2337
800 523.1988
215 564.6600

March 19, 2001
(revised September 27, 2001)

Ms. Laurie McGoogan
Vice President
Wells Fargo Home Loans, Inc
100 S. 5th Street
Minneapolis, MN 55402

> Re:   Reinsurance Agreement (Excess Layer) between
> Radian Guaranty Inc. and North Star Mortgage Guaranty
> Reinsurance Company (the "Reinsurance Agreement")

Dear Ms. McGoogan:

Enclosed are two originals of an Amendment to the above-referenced Reinsurance Agreement, both of which have been executed on behalf of Radian Guaranty Inc. Please have both executed on behalf of North Star Mortgage Guaranty Reinsurance Company and return one original to me for our files.

Also, per our prior discussions and in accordance with Schedule A of the Reinsurance Agreement, I am writing to inform you that the following loans shall be eligible for inclusion in the captive: (i) correspondent loans originated on or after January 1, 2001, purchased by Wells Fargo not later than 120 days after the date of the loan closing, and meeting the eligibility criteria set forth in Schedule A of the Reinsurance Agreement;  (ii) branch retail loans originated on or after June 1, 2001 (or as otherwise agreed in writing by the parties) and meeting the eligibility criteria set forth in Schedule A of the Reinsurance Agreement; and (iii) broker wholesale loans originated on or after June 1, 2001 (or as otherwise agreed in writing by the parties),  purchased by Wells Fargo not later than 120 days after the date of the loan closing , and meeting the eligibility criteria set forth in Schedule A of the Reinsurance Agreement.

Please evidence your understanding to the above by signing one copy of this letter in the space indicated below and returning it to me.

Sincerely yours,

H. Scott Theobald
Vice President

Agreed to and Accepted:

NORTH STAR MORTGAGE GUARANTY REINSURANCE COMPANY

By:
Title:
Date:                 03.31

WF - KAY 05440

Radian Guaranty Inc.                **RADIAN**

March 19, 2001

Ms. Laurie McGoogan
Vice President
Wells Fargo Home Loans, Inc
100 S. 5th Street
Minneapolis, MN 55402

> Re:   Reinsurance Agreement (Excess Layer) between
> Radian Guaranty Inc. and North Star Mortgage Guaranty
> Reinsurance Company (the "Reinsurance Agreement")

Dear Ms. McGoogan:

Enclosed are two originals of an Amendment to the above-referenced Reinsurance Agreement, both of which have been executed on behalf of Radian Guaranty Inc. Please have both executed on behalf of North Star Mortgage Guaranty Reinsurance Company and return one original to me for our files.

Also, per our prior discussions and in accordance with Schedule A of the Reinsurance Agreement, I am writing to confirm our agreement that the following loans shall be eligible for inclusion in the captive: (i) correspondent loans originated on or after January 1, 2001, purchased by Wells Fargo not later than 120 days after the date of the loan closing, and meeting the eligibility criteria set forth in Schedule A of the Reinsurance Agreement; (ii) branch retail loans originated on or after June 1, 2001 (or as otherwise agreed in writing by the parties) and meeting the eligibility criteria set forth in Schedule A of the Reinsurance Agreement; and (iii) broker wholesale loans originated on or after June 1, 2001 (or as otherwise agreed in writing by the parties), purchased by Wells Fargo not later than 120 days after the date of the loan closing , and meeting the eligibility criteria set forth in Schedule A of the Reinsurance Agreement.

Please evidence your agreement to the above by signing one copy of this letter in the space indicated below and returning it to me.

Sincerely yours,

H. Scott Theobald
Vice President

Agreed to and Accepted:

NORTH STAR MORTGAGE GUARANTY REINSURANCE COMPANY

By:
Title:
Date:

WF - KAY 05441

# EXHIBIT 34

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| DONNA MOORE, et al. | : | CIVIL ACTION NO. 07-4296 |
| | : | |
| v. | : | Philadelphia, Pennsylvania |
| | : | March 2, 2010 |
| GMAC, LLC, et al. | : | 10:03 o'clock a.m. |

. . . . . . . . . . . . . . .

CLASS CERTIFICATION HEARING
BEFORE THE HONORABLE PAUL S. DIAMOND
UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Plaintiff:    DONNA SIEGEL-MOFFA, ESQUIRE
EDWARD W. CIOLKO, ESQUIRE
Barrow Topaz Kessler Meltzer &
Check, LLP
280 King of Prussia Road
Radnor, PA  19087

For the Defendant:    MARC DURANT, ESQUIRE
Durant & Durant
325 Chestnut Street, Suite 1116
Philadelphia, PA  19106

MICHAEL J. AGOGLIA, ESQUIRE
Morrison & Foerster
425 Market Street, Suite 3000
San Francisco, CA  94105

- - -

ESR Operator:    Marion Scarengelli

Transcribed by:    Jo-Anne L. Hutt,
Laws Transcription Service

(Proceedings recorded by For The Record Gold digital sound
recording; transcript provided by transcription service.)

- - -

Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610)623-4178

1        If I think that is incorrect, if -- and I truly

2  haven't made up my mind -- this really is in the form of a

3  question --

4        MS. SIEGEL-MOFFA:  Mm-hmm.

5        THE COURT:  -- but if under Third Circuit

6  controlling authority, I have to allow the defendants to show

7  that each class member exercised due diligence in seeking to

8  determine whether or not this was a legitimate insurance

9  arrangement -- and we keep going back to whether it's a

10  legitimate insurance arrangement -- doesn't that become a

11  case-by-case, plaintiff-by-plaintiff inquiry?

12        MS. SIEGEL-MOFFA:  I think that it doesn't

13  necessarily.  I don't think that the Third Circuit law

14  precludes the circumstances from dictating that a due

15  diligence determination could be made in certain

16  circumstances where equity dictates it should be such that a

17  defendant doesn't benefit by its own wrongdoing, that you

18  could, in fact, make a due diligence inquiry on a class-wide

19  basis.  I don't think that there's an absolute prohibition on

20  that in the Third Circuit.  And the Third Circuit case law

21  does seem to indicate --

22        THE COURT:  Don't I have to allow the defendants to

23  explore it?  Can I, with that language, I understand what you

24  expect to show, and I understand you expect to show these

25  agreements, I guess, what seven agreements, they're all the

12

1  same, more or less, and they all put money in GMAC Mortgage's

2  pocket for -- and just so I understand the basic facts of the

3  case, which I guess I should have started with, and I

4  apologize, somebody gets a mortgage from GMAC Mortgage.

5  According to the mortgage agreement, GMAC requires the home

6  buyer to go to one of seven companies to get mortgage

7  insurance, if they put less than 10 percent -- less than 20

8  percent down; is that correct?

9          MS. SIEGEL-MOFFA:  That's basically correct.  They

10  require that the borrowers get private mortgage insurance and

11  the private --

12          THE COURT:  Do they specify the seven --

13          MS. SIEGEL-MOFFA:  They assign them on a rotating

14  basis through the seven different --

15          THE COURT:  They assign them.

16          MS. SIEGEL-MOFFA:  Yes, that's what the documents

17  indicate.

18          THE COURT:  So it's a contractual requirement.  It's

19  not a recommendation if --

20          MS. SIEGEL-MOFFA:  Right.

21          THE COURT:  Okay.

22          MS. SIEGEL-MOFFA:  Absolutely.

23          THE COURT:  And so they go to the ABC, whatever it

24  is, company, they buy the mortgage insurance, and the

25  mortgage insurance company, whether it's UGI or one of these

13

1    other companies --

2              MS. SIEGEL-MOFFA:  Mm-hmm.

3              THE COURT:   -- then buys reinsurance from cap re --

4              MS. SIEGEL-MOFFA:  Correct.

5              THE COURT:   -- which is, in effect, putting money

6    back into General Motors' pocket?

7              MS. SIEGEL-MOFFA:  Right.

8              THE COURT:  That's the theory.  That's your theory

9    of the case.

10             MS. SIEGEL-MOFFA:  Exactly.

11             THE COURT:  All right.  So I did get the basic facts

12   right.

13             Don't I have to allow the defendants the

14   opportunity, the opportunity to show that any particular

15   plaintiff in the exercise of his or her due diligence could

16   have discovered what was going on, and thus for that

17   particular person, the statute is not tolled?  Can I preclude

18   them from doing that?

19             MS. SIEGEL-MOFFA:  I think that you can, that the

20   record can be developed in such a way that that inquiry, on

21   an individual basis, may not be required any more, because --

22   and the inquiry for purposes of equitable tolling is whether

23   the -- the lies that were set, were told about this

24   relationship, the representations were legitimate, the

25   representations that we're buying services, this is a bona

# EXHIBIT 35



# Private Mortgage Insurer Eligibility Requirements

**January 2008**

© Freddie Mac.   All rights reserved.

# Table of Contents

|  |  | Page No. | Date of Last Update |
|---|---|---|---|
| **Foreword** |  | v | 1/2008 |
| **General Information** |  |  |  |
| 100 | Compliance with Eligibility Requirements | 1 | 1/2008 |
| 101 | State Compliance | 1 | 1/2008 |
| 102 | Applicable NAIC Regulations | 1 | 1/2008 |
| 103 | Type I/Type II Insurers | 2 | 1/2008 |
| 104 | Nondiscrimination | 2 | 1/2008 |
| **Application** |  |  |  |
| 200 | Application Criteria | 3 | 1/2008 |
| 201 | Application Submission | 3 | 1/2008 |
| 202 | Application Fee | 3 | 1/2008 |
| 203 | Appeal of Application Denial | 3 | 1/2008 |
| **Business Requirements** |  |  |  |
| 300 | Scope of Business | 5-6 | 1/2008 |
| 301 | Organization | 6 | 1/2008 |
| 302 | Policies, Procedures, Practices | 6-7 | 1/2008 |
| 303 | Compliance | 7 | 1/2008 |
| 304 | Rebates, Commissions, Charges and Compensating Balances | 7 | 1/2008 |
| 305 | Separation of Responsibilities | 8 | 1/2008 |
| 306 | Master Policy | 8 | 1/2008 |
| 307 | Geographic Concentration and Diversity | 8 | 1/2008 |
| 308 | Policies of Insurance | 8 | 1/2008 |
| **Policy Underwriting** |  |  |  |
| 400 | State Compliance | 9 | 1/2008 |
| 401 | Delegated Underwriting | 9 | 1/2008 |
| 402 | Evaluation of Borrower Creditworthiness | 9 | 1/2008 |
| 403 | Property Valuation | 9 | 1/2008 |

**Table of Contents**

|  | Page No. | Date of Last Update |
|---|---|---|
| **Quality Control** | | |
| 500 Quality Control Program Requirements | 11 | 1/2008 |
| 501 Quality Control Program Guidelines | 11 | 1/2008 |
| 502 Sampling Guidelines | 12 | 1/2008 |
| 503 Quality Control Loan File Review Guidelines | 13 | 1/2008 |
| 504 Reporting Guidelines | 13 | 1/2008 |
| **Lender Approval and Monitoring** | | |
| 600 Guidelines | 15 | 1/2008 |
| 601 Lender Approval Guidelines | 15 | 1/2008 |
| 602 Lender Monitoring Guidelines | 15-16 | 1/2008 |
| 603 Delegated Underwriting/Limited Documentation Guidelines | 16 | 1/2008 |
| 604 Delegated Underwriting Requirements | 16 | 1/2008 |
| **Financial Requirements** | | |
| 700 State Compliance | 17 | 1/2008 |
| 701 Minimum Total Policyholders' Surplus | 17 | 1/2008 |
| 702 Contingency Reserve | 17 | 1/2008 |
| 703 Loss Reserve | 17 | 1/2008 |
| 704 Liquidity of Assets | 17 | 1/2008 |
| 705 Risk-to-Capital | 18 | 1/2008 |
| 706 Combined Ratio | 18 | 1/2008 |
| 707 Financial Requirements for Captive Reinsurance | 18-22 | 1/2008 |
| **Reports/Documentation/Monitoring** | | |
| 800 Statement of Purpose | 23 | 1/2008 |
| 801 Immediate Notices | 23-24 | 1/2008 |
| 802 Required Scheduled Reports | 25-26 | 1/2008 |
| 803 Required Periodic Reports | 26-27 | 1/2008 |
| 804 Supplemental Information | 27 | 1/2008 |
| 805 Document Retention | 28 | 1/2008 |
| 806 Periodic Reviews | 28 | 1/2008 |

Private Mortgage Insurer Eligibility Requirements

Table of Contents

| | Page No. | Date of Last Update |
|---|---|---|
| **Disqualification or Suspension** | | |
| 900  General Policy | 29 | 1/2008 |
| 901  Consequences of Suspension | 29 | 1/2008 |
| 902  Consequences of Disqualification | 30 | 1/2008 |
| 903  Notice of Intent to Disqualify or Suspend | 30 | 1/2008 |
| | | |
| **Appeals** | | |
| 1000 Request for Appeal of Application Denial, Suspension or Disqualification | 31 | 1/2008 |
| 1001 Hearings | 31 | 1/2008 |
| 1002 Date of Hearing | 32 | 1/2008 |
| 1003 Conduct of Hearings | 32-33 | 1/2008 |
| 1004 Recommended Decision | 33 | 1/2008 |
| 1005 Final Decision | 33 | 1/2008 |
| | | |
| **Exhibit** | | |
| Exhibit 1, NAIC Mortgage Guaranty Insurance Model Act | E1 | 1/2008 |
| Exhibit 2, New Product or Program/ Existing Product or Program Revisions Considerations for Periodic Report Submissions | E2 | 1/2008 |
| Exhibit 3, Annual Certification | E3 | 1/2008 |
| | | |
| **Glossary** | G1-7 | 1/2008 |

# Foreword

**Introduction**

This document contains both requirements and guidelines for obtaining and maintaining Freddie Mac *approved insurer* status. *Approved insurers* must comply with requirements, which are preceded by the term "must."

**Purpose**

The purpose of this document is to inform *approved insurers* of how Freddie Mac will implement the requirements of Section 305(a)(2) of the Federal Home Loan Mortgage Corporation Act, that states, Freddie Mac may purchase mortgages guaranteed or insured by a qualified *approved insurer*.

**Amendments**

The *eligibility requirements* may be amended or supplemented from time to time only by a written communication from Freddie Mac. An amendment to this document is effective on the date specified by Freddie Mac.

Freddie Mac may modify, amend or waive any provision of these *eligibility requirements*, or impose additional requirements, applicable to an individual *approved insurer* or all or a group of *approved insurers*. Any amendments, waivers, or modifications to the *eligibility requirements*, or additional requirements, will be communicated in writing to each *approved insurer* that is subject to the requirement. Any waiver of the *eligibility requirements* must be in writing, signed by Freddie Mac. Any such written waiver, amendment or modification must expressly refer to the *eligibility requirements* and be denoted as a waiver to the *eligibility requirements*.

**Discretion**

Freddie Mac reserves the right to modify, waive, amend and/or impose additional requirements, at any time, to any *approved insurer* regardless of its current status or upon any entity seeking *approved insurer* status, at its sole discretion.

**Defined Terms**

All terms in italics are defined in the glossary located at the back of this document. Terms not defined in the glossary are used in the context of standard industry practice.

# General Information

**100
Compliance
with Eligibility
Requirements**

An *approved insurer* must provide annual written certification of its compliance with Freddie Mac's *eligibility requirements,* including compliance with applicable *eligibility requirements* as described in Section 707 of these requirements for those *captive reinsurance* arrangements where the *approved insurer* is a beneficiary of such *captive reinsurance*. The *approved insurer* must notify Freddie Mac in writing within 15 business days upon discovery of its failure to comply with any one or more of the *eligibility requirements*.

**101
Compliance
with Laws**

An *approved insurer* must maintain compliance with all applicable laws and regulations, including without limitation:
1) All applicable federal laws, regulations and orders; and
2) The laws and regulations of its *state* of domicile and each *state* in which it does business.

The *approved insurer* must notify Freddie Mac in writing within 15 business days upon its determination of *material* noncompliance with any applicable law and regulation.

**102
Applicable
NAIC
Regulations**

For the *eligibility requirements* stated in Sections 304, 702 and 703 within this document, Freddie Mac is requiring compliance with the National Association of Insurance Commissioner's *(NAIC) Model Act* (See Exhibit 1, NAIC Mortgage Guaranty Insurance Model Act); unless the laws and regulations prescribed by an *approved insurer's state* of domicile conflict with the *Model Act*, in which case, the *approved insurer* must comply with *state* laws and regulations.

In the event the *NAIC* changes the affected provision(s) of the *Model Act*, the revised *NAIC Model Act* may be adopted by Freddie Mac and this document may be amended.  Freddie Mac will inform *approved insurers* of its decision subsequent to any changes.

## General Information

**103
Type I/Type II
Insurers**

This document refers to *approved insurers* as *Type I insurer* or *Type II insurer*. Classification as *Type I insurer* or *Type II insurer* is as defined in the Glossary to these requirements.

In the event ratings of an *approved insurer* are dependent, in whole or in part, on *capital support agreement(s)* the *approved insurer* must:
1) Provide Freddie Mac with certified copies of such agreement(s).
2) Notify Freddie Mac and the rating agencies in advance of any change in such agreement(s) that could have a *material* adverse impact on the *approved insurer's* safety and soundness or the value of the insurance provided to Freddie Mac, or immediately in the event of any *material* adverse change in the financial condition of the providers of such agreement(s).

**104
Non-
discrimination**

An *approved insurer's* underwriting guidelines should be applied consistently to each borrower, regardless of race, color, religion, national origin, age, sex, marital status, familial status, or handicap.

# Application

| | |
|---|---|
| **200**<br>**Application**<br>**Criteria** | All private mortgage insurers are eligible to apply for Freddie Mac *approved insurer* status. Freddie Mac's approval is based on compliance with the *eligibility requirements,* including the approval of the applicant's master policy, and any other requirement, document or action required at Freddie Mac's discretion. |
| **201**<br>**Application**<br>**Submission** | In order to become an *approved insurer,* an applicant must submit the application form prescribed by Freddie Mac and the applicant's master policies, generally made available to *insureds.* Freddie Mac may require the applicant to supplement the application with additional information or certification, as Freddie Mac may deem appropriate.<br><br>Freddie Mac will then determine whether the applicant is deemed an *approved insurer* under such terms and conditions as Freddie Mac may prescribe or whether the applicant is ineligible to become an *approved insurer.* |
| **202**<br>**Application**<br>**Fee** | The applicant must pay to Freddie Mac a nonrefundable application fee of $2,500 at the time of filing an application. |
| **203**<br>**Appeal of**<br>**Application**<br>**Denial** | If the applicant wishes to appeal the application denial, it must do so pursuant to Section 1000, Request for Appeal of Application Denial, *Suspension* or *Disqualification.* |

**Application**

Private Mortgage Insurer Eligibility Requirements

# Business Requirements

**300**
**Scope of**
**Business**

An *approved insurer* must limit its business activities to the underwriting of *mortgage guaranty insurance* secured by *1-4 unit residential properties.*

An *approved insurer* may not enter into any transaction or series of transactions with the effect, or for the purpose of, circumventing these *eligibility requirements.*

An *approved insurer* may enter into a *risk sharing transaction* with a *mortgage enterprise*, or an *affiliate* of a *mortgage enterprise*, only if the *risk sharing transaction* is:

1) A *reinsurance* agreement with a *qualified reinsurer*, entered into in compliance with these eligibility requirements and all applicable legal and regulatory requirements, or
2) Any other *risk sharing transaction* which:
   a) Has not been prohibited by a state that asserts extraterritoriality with respect to insurance regulation (whether or not that state's extraterritorial authority would apply to the *risk sharing transaction* or the *approved insurer* in the absence of this requirement),  and
   b) Complies in all respects with (i) the rules and regulations established by any state asserting extraterritoriality with respect to such *risk sharing transaction* (whether or not that state's extraterritorial authority would apply to the *risk sharing transaction* or the *approved insurer* in the absence of this requirement), and (ii) all other applicable laws and regulations.

*Risk sharing transactions* that constitute or involve non-captive captives or performance notes, as defined by the Insurance Department of the State of New York, are expressly prohibited.

Except as otherwise provided in Section 707 of these *eligibility requirements*, and notwithstanding any other provisions of these *eligibility requirements*, Freddie Mac's express written approval must be obtained for any *risk sharing transaction* which involves ceding over 25% of the gross aggregate risk or premium with respect to a loan or pool of loans and which is entered into with a *mortgage enterprise*, or an *affiliate* of a *mortgage enterprise*, other than a *qualified reinsurer* that is not a *captive reinsurer.*

**Business Requirements**

| | |
|---|---|
| **300**<br>**Scope of**<br>**Business**<br>**(continued)** | These eligibility requirements apply to:<br>1) Any *reinsurance* agreement, or other *risk sharing transaction* entered into, renewed, extended, modified or amended on or after January 1, 2001, and<br>2) All loans closed on or after January 1, 2001, irrespective of the date the applicable reinsurance agreement, or other *risk sharing transaction*, became effective or was renewed, extended, modified or amended.<br><br>The eligibility requirements in Section 707 apply to any *risk sharing transaction* entered into, renewed, extended, modified or amended after the effective date of the most current version of *eligibility requirements*. |
| **301**<br>**Organization** | An *approved insurer* or *captive reinsurer* must be a corporation duly organized pursuant to the laws and regulations of its *state* of domicile (or, in the case of a *captive reinsurer*, its country of organization) and operating according to the laws of the *state(s)* or *country* in which it is licensed or has authority to do business or in which it does business. |
| **302**<br>**Policies,**<br>**Procedures,**<br>**Practices** | An *approved insurer's* or *captive reinsurer's* policies, procedures and practices must be developed and executed on the basis of safe and sound industry standards. An *approved insurer* must also:<br>1) maintain policies and procedures that ensure timely and accurate payment of claims, and may not unreasonably delay or deny claim payments;<br>2) have an effective system of internal controls;<br>3) maintain internal controls processes to ensure that any *reinsurance* agreements with *captive reinsurers* continue to meet the applicable *eligibility requirements*.<br><br>An *approved insurer* must have on file an opinion prepared by an independent certified actuary that (i) each *reinsurance* agreement with a *captive reinsurer* constitutes "transfer of risk" and (ii) there is commensurate ceding premium associated with such "transfer of risk" in accordance with applicable regulatory and accounting standards. The opinion may address the *reinsurance* agreements on a program-by-program basis, rather than addressing each individual *reinsurance* agreement separately, so long as the *reinsurance* agreements entered into under the program do not vary from the program in any *material* respect. Examples of *material* changes would include, but not be limited to, changes to ceded premium, ceded risk/risk layer, dividending, risk-to-assets ratios, or required *reinsurance*. |

| | |
|---|---|
| **302**<br>**Policies,**<br>**Procedures,**<br>**Practices**<br>**(continued)** | An *approved insurer* must provide Freddie Mac with full access to all of the *approved insurer's* captive *reinsurance* documentation including but not limited to copies of the *reinsurance* agreement and all associated trust agreement, letters of credit, guarantees, regulatory and accounting opinions, for each captive *reinsurance* transaction. The names of the lender and *captive reinsurer* may be redacted on all documents, so long as the *approved insurer* provides a written representation and warranty that all documents provided relate to the same *reinsurance* agreement. |

An *approved insurer* must provide the *approved insurer's* rating agencies with such access to all of the *approved insurer's* captive *reinsurance* documentation as the rating agency may require.

An *approved insurer* shall have 180 days from the date a captive *reinsurance* agreement, or *captive reinsurer*, fails to comply with any of the requirements set forth in these *eligibility requirements* to bring the captive *reinsurance* agreement into compliance, or to cause the *captive reinsurer* to comply, as applicable. After such 180-day period, the *approved insurer* must cease ceding additional *reinsurance* risk and premium or be subject to the provisions of Section 903.

| | |
|---|---|
| **303**<br>**Compliance** | An *approved insurer* or *qualified reinsurer* must maintain compliance with the applicable federal laws and regulations and the applicable laws and regulations of its *state* or *country* of domicile and each *state* in which it does business and with any other applicable laws or regulations as required by these *eligibility requirements*. An *approved insurer* must notify Freddie Mac in writing within 15 business days upon its determination of *material* noncompliance with any applicable law and regulation. Without limiting the foregoing, each *approved insurer* or *qualified reinsurer* shall at all times comply with the Real Estate Settlement Procedures Act. |

| | |
|---|---|
| **304**<br>**Rebates,**<br>**Commissions,**<br>**Charges and**<br>**Compensating**<br>**Balances** | When not specified otherwise in its *state* of domicile laws and regulations, an *approved insurer* must comply with the rebates, commissions, charges and compensating balance requirements found in the *NAIC Model Act*, Section 13 - Rebates, Commissions and Charges, Section 14 - Compensating Balances Prohibited, and Section 15(B) - Conflict of Interest. An *approved insurer* must notify Freddie Mac in writing, within 15 business days upon its determination of *material* noncompliance with these requirements. |

**Note:**
Freddie Mac is not adopting Section 15(a) of the *NAIC Model Act*.

**Business Requirements**

| | |
|---|---|
| **305**<br>**Separation of**<br>**Responsibilities** | An employee of an *approved insurer* whose responsibilities include sales for the *approved insurer* must not underwrite or approve insurance on mortgages. Excluded from this restriction are those employees who are in a management position accountable for both sales and underwriting functions. |
| **306**<br>**Master Policy** | An *approved insurer*'s master policies, generally made available to *insureds,* are subject to Freddie Mac approval prior to use. Any *material* changes or endorsements must be filed with Freddie Mac pursuant to Section 803, Required Periodic Reports. |
| **307**<br>**Geographic**<br>**Concentration**<br>**and Diversity** | In addition to complying with Section 303, State Compliance, a *Type II insurer* must also comply with the following requirements:<br><br>1) Shall not have more than 20 percent of its total *risk-in-force* in any one Consolidated Metropolitan Statistical Area (CMSA) or Standard *Metropolitan Statistical Area (MSA),* as applicable.  No combination of *risk-in-force* in any one *state* may exceed 40 percent of its total *risk-in-force*.  An new *approved insurer* shall have three years from the date of its first policy issuance, to meet such requirement.<br>2) Shall not insure mortgages secured by properties in a single housing tract or a contiguous tract where the *risk-in-force* applicable thereto is in excess of 10 percent of its *total policyholders' surplus*.<br>3) Shall not insure mortgages secured by a single risk in excess of 10 percent of its *total policyholders'* surplus. |
| **308**<br>**Policies of**<br>**Insurance** | An *approved insurer* must maintain policies of insurance (such as Fidelity, E&O, and hazard insurance on acquired *REO,* etc.) or provide for a reserve for self-insurance in accordance with its *state* of domicile laws and regulations. |
| **309 Business**<br>**Continuity**<br>**Planning** | An *approved insurer* must maintain business continuity plans and test such plans periodically to ensure that the *approved insurer*'s business operations are sustainable in the event of disaster or other event requiring the activation of a business continuity plan. |

# Policy Underwriting

| | |
|---|---|
| **400**<br>**State Compliance** | An *approved insurer* must maintain compliance with applicable federal laws and regulations and the applicable laws and regulations of its *state* of domicile and each *state* in which it does business. The *approved insurer* must notify Freddie Mac within 15 business days upon its determination of *material* noncompliance with any applicable law and/or regulation. |
| **401**<br>**Delegated**<br>**Underwriting** | *Delegated underwriting* may be utilized provided that the *approved insurer* has established an adequate system of controls and safeguards, including, but not limited to, a lender approval and monitoring process, and a quality control (QC) program to ensure compliance with the *approved insurer's* underwriting standards. (Refer to Quality Control, Sections 500-504 and Lender Approval and Monitoring, Sections 600-604 for requirements and guidelines.) |
| **402**<br>**Evaluation of**<br>**Borrower**<br>**Creditworthiness** | An *approved insurer* or its delegated underwriter must determine the creditworthiness of the borrower prior to issuing a certificate or policy of insurance.<br><br>The *approved insurer* or its delegated underwriter must determine that the borrower has the willingness and financial ability to make timely repayment of the home mortgage being insured. The determination of creditworthiness should be made with specific consideration to the characteristics of the mortgage and repayment terms and be based on a thorough evaluation of all pertinent credit information. |
| **403**<br>**Property**<br>**Valuation** | The *approved insurer* must establish a methodology for property valuation that will allow the *approved insurer* or its delegated underwriter to determine that the subject property is of sufficient market value to support the decision to insure, and should include a soft market policy, as appropriate.<br><br>As a guideline, an *approved insurer's* risk management controls should provide for the identification and reverification of fraudulent appraisals or other property valuations or unsubstantiated values found in the underwriting, quality control, and claims areas, including loans insured under delegated underwriting programs. |

**Policy Underwriting**

# Quality Control

**500
Quality
Control
Program
Requirements**

An *approved insurer* must operate a quality control (QC) program to assess the effectiveness of its underwriters and that of its *delegated underwriting* programs. While Freddie Mac does not believe that any one specific QC program can meet the needs of all *approved insurers*, certain common characteristics are found in all effective QC programs. These common characteristics are the foundation of Freddie Mac's requirements. An *approved insurer's* QC program must:

1) Contain documented standard operating procedures for the entire QC process.
2) Operate independently from the sales function, the area that underwrites and/or approves mortgages for insurance.
3) Determine whether the underwriting decisions made were consistent with the *approved insurer's* policies and procedures and expectations for quality.
4) Ensure that areas where improvement, training, or other corrective actions are needed are brought to the attention of, acknowledged by, , and implemented at the direction of senior management.

**501
Quality
Control
Program
Guidelines**

The information provided in Sections 502 - 504 is presented as guidelines for consideration and such guidelines are encouraged, but not required to obtain or maintain Freddie Mac *approved insurer* status. Guidelines are denoted by the term "should."

**Quality Control**

**502 Sampling Guidelines**

A selection method should be used that ensures that every type of transaction has a chance of being selected for review within a specified period of time after the decision to insure is made (including both new production mortgages and seasoned mortgages). The selection method should also include provisions for expanded, discretionary and targeted sampling as needed.

The appropriate frequency of sampling by an *approved insurer* is dependent on a variety of factors, one of which may be the volume of business. Minimum sampling rates should be representative of the *approved insurer's* business and result in a statistically valid sampling of loans insured and perhaps on loans declined for insurance.

The sampling should take into account the individual characteristics of the *approved insurer's* business, including but not limited to such areas as:

1) Experience and expertise of its underwriting staff and/or the delegated underwriters
2) Geographic areas of insured mortgages
3) Volume of transactions, especially those with high-risk characteristics
4) Distribution of risk exposure among lenders
5) Types of insurance programs offered
6) Any significant changes in the *approved insurer's* business, such as a new product or new geographic area served
7) Areas of rapid appreciation or depreciation
8) Increased incidence of fraud, flipping, straw buyers or rapid prepayment

**Delegated Underwriting Sampling**

Increased sampling and scope of reviews is expected when *approved insurers* delegate the decision to insure. This increased sampling and scope may be modified as the *approved insurer* gains confidence in the ability of the delegated underwriter to make appropriate decisions on insurability.

**Quality Control**

**503
Quality
Control Loan
File Review
Guidelines**

The review itself should focus on evaluating the quality of the documentation provided at the time of the insuring decision, and the reasonableness of the original underwriting decision.

The QC review should examine file contents for completeness and for their use as a basis for the underwriting decision. For cases with *delegated underwriting,* or where the package submitted to the *approved insurer* for decision was less than the completed mortgage file (limited document approvals), the *approved insurer's* review may include a request to view the complete original mortgage file.

The following information should be reverified on a sample basis through the QC process:

1) Borrower's employment
2) Borrower's income
3) Borrower's deposits and sources of funds used for down payment and closing costs
4) Borrower's credit history

In addition, the appraised value of the insured property should be reviewed on a sample basis through the QC process. As a general guideline, an *approved insurer's* risk management controls should also provide for the identification and reverification of fraudulent appraisals or other property valuations, or unsubstantiated values found in the underwriting, quality control, and claims areas, including loans insured under delegated underwriting programs.

**504
Reporting
Guidelines**

The QC program should include regular reporting of findings to senior management. Monthly reporting of results is suggested, with immediate reporting recommended to senior management in the event that fraud is suspected. The findings are a basis for ongoing feedback and training to both staff and the *insured,* as well as a key component in the *approved insurer's* efforts to detect fraud.

**Quality Control**

# Lender Approval and Monitoring

**600**
**Guidelines**

The information provided in Sections 601-603 is presented as guidelines for consideration and such guidelines are encouraged, but not required to obtain or maintain Freddie Mac's *approved insurer* status unless denoted by the term "must." Guidelines are denoted by the term "should."

**601**
**Lender Approval**
**Guidelines**

In addition to the requirements stated under Section 604, Delegated Underwriting Requirements, an *approved insurer* is encouraged to have and apply written standards and procedures for evaluating and approving the lenders from whom they receive requests to insure mortgage loans. These procedures should be applied to all lenders and should include steps sufficient to allow the *approved insurer* to know the quality of the lender from whom it will receive business. The level of inquiry and information reviewed may vary depending on the scope and level of business with the lender. The following areas of consideration are recommended:

1) The lender's appraiser and broker and correspondent approval and monitoring processes
2) The lender's fraud prevention controls
3) The lender's historical loan performance

**602**
**Lender**
**Monitoring**
**Guidelines**

An *approved insurer* should monitor the quality and performance of its master policyholders. Management should receive regular monitoring reports about each lender relationship. By doing so, it can make an informed decision on whether to continue the business relationship.

**Lender Approval and Monitoring**

| | |
|---|---|
| **602**<br>**Lender**<br>**Monitoring**<br>**Guidelines**<br>**(continued)** | Some indicators of a lender's overall performance may include:<br><br>1) Volume of business and market share trends<br>2) Claims paid ratios<br>3) Delinquency information, including early payment defaults<br>4) Reject rates<br>5) Servicing problems or trends<br>6) Underwriting discrepancies allowed/exceptions granted<br>7) QC results<br>8) Records of any performance issues and their resolution<br>9) Changes in key personnel, such as senior management, or those underwriting or servicing insured mortgages<br>10) Changes in payoff activity<br><br>The amount of monitoring the *approved insurer* should perform directly relates to the amount of risk it is taking from a particular lender. This will vary with volume, type of loans insured, geographic location and servicing characteristics. |
| **603**<br>**Delegated**<br>**Underwriting/**<br>**Limited**<br>**Documentation**<br>**Guidelines** | If the lender has *delegated underwriting* or submits mortgages under a limited documentation program, the increased risk (of a potential poor decision to insure) should be offset by increased monitoring steps, such as selective reunderwriting or periodic requests for full documentation. More frequent reviews may also be appropriate. |
| **604**<br>**Delegated**<br>**Underwriting**<br>**Requirements** | **Approval**<br>If the lender is performing *delegated underwriting* for the *approved insurer*, the *approved insurer* <u>must</u> perform a level of due diligence, incorporating an assessment of the areas mentioned in Section 401, Delegated Underwriting, sufficient to ascertain if the lender is capable of meeting the *approved insurer's* quality expectations.<br><br>**Monitoring**<br>The overall performance of an *approved insurer's delegated underwriting* program must be tracked separately, by lender, from other insured loans. |

# Financial Requirements

## Basic Financial Requirements for all *Approved Insurers* (700-703)

**700
State
Compliance**

An *approved insurer* must maintain compliance with the applicable laws and regulations of its *state* of domicile and each *state* in which it does business. The *approved insurer* must notify Freddie Mac within 15 business days upon its determination of *material* noncompliance with any applicable law and regulation.

**701
Minimum Total
Policyholders'
Surplus**

All Freddie Mac *approved insurers* must meet and maintain a minimum *total policyholders' surplus a)* as required to comply with applicable laws and regulations of its *state* of domicile and each *state* in which it does business and b) if the *approved insurer* is a *Type I insurer*, to maintain ratings necessary to retain *Type I insurer* status unless specifically approved otherwise by Freddie Mac.

**702
Contingency
Reserve**

If the applicable *state* laws and regulations do not address *contingency reserve*, the *approved insurer* must comply with the *NAIC Model Act*, Section 16(C), Contingency Reserves.

**703
Loss Reserve**

If the applicable *state* laws and regulations do not address loss reserve, the *approved insurer* must comply with the *NAIC Model Act*, Section 16(B), Loss Reserves.

## Additional Requirements for *Type II Insurers* (704-706)

In addition to the basic financial requirements, a *Type II insurer* must comply with the requirements stated in Sections 704-706.

**704
Liquidity of
Assets**

A *Type II insurer* must maintain not less than 90 percent of total *admitted assets* in the form of *liquid assets*.

## Financial Requirements

| | |
|---|---|
| **705 Risk-to-Capital** | A *Type II insurer* must not at any time have total *risk-in-force* in excess of 15 times its *total policyholders' surplus*. |
| **706 Combined Ratio** | A *Type II insurer* must not have a *combined ratio* computed on an annual basis in excess of 85 percent for more than one calendar year. |

## Additional Requirements for Captive Reinsurance Transactions (707)

| | |
|---|---|
| **707 Financial Requirements for Captive Reinsurance** | The following requirements shall apply to transactions involving a *captive reinsurer*: |

1) The ceding *approved insurer* must at all times be a *Type I insurer*. A *Type I insurer* that becomes a *Type II insurer* for any reason must, within 15 days of the date it becomes a *Type II insurer,* provide notice to the *captive reinsurer* that it will cease reinsuring new risk with the *captive reinsurer* no later than 90 days subsequent to the *Type II insurer*'s notice to the *captive reinsurer*.

2) The *reinsurance* agreement between an *approved insurer* and *captive reinsurer* may permit allocation of expenses, provided that the allocated expenses must be (i) commercially reasonable, and (ii) directly related to the acquisition and administration of the loans for which premium is ceded.

3) Premium ceded or assumed with respect to any *reinsurance* agreement that involves a *captive reinsurer* as a party shall not be disproportionate to the risk ceded or assumed.  Ceded premium may only be paid as received.

**Financial Requirements**

**707
Financial
Requirements
for Captive
Reinsurance
(continued)**

4) Any *reinsurance* obtained by a *captive reinsurer* on ceded risk from a *Type I insurer* must be obtained from a *qualified reinsurer*. For purposes of this requirement only, the definition of *qualified reinsurer* (i) includes the ceding *Type I insurer* itself, and (ii) does not include (a) any company that qualifies as a *qualified reinsurer* only because it is an *affiliate* of a ceding *Type I insurer* with the sole purpose of providing *reinsurance* for the ceding insurer, or (b) a *captive reinsurer*. The *captive reinsurer* obtaining *reinsurance* must have on file an opinion prepared by an independent actuary certifying that each *reinsurance* agreement with a *qualified reinsurer* (i) constitutes real "transfer of risk" and (ii) there is commensurate ceding premium associated with such "transfer of risk" in accordance with applicable regulatory and accounting standards. The opinion may address the *reinsurance* agreements on a program-by-program basis, rather than addressing each individual *reinsurance* agreement separately, so long as the *reinsurance* agreements entered into under the program do not vary from the program in any *material* respect.

5) For *reinsurance* agreements providing for coverage on a quota-share or excess-of-loss basis:

  a) With respect to any loan or pool of loans, the aggregate amount of gross risk and/or gross premium ceded under all *reinsurance* agreements may not exceed 50%, either directly or indirectly, and

  b) With respect to any loan or pool of loans, if any risk is reinsured in which either the aggregate gross ceded risk or the aggregate gross ceded premium exceeds 25%, the *captive reinsurer* must at all times:

    i) maintain a rating of AA- or Aa3 by a Freddie Mac-approved rating agency, or

    ii) maintain a minimum *restricted asset balance* of not less than $35,000,000.00. To meet this requirement, the *restricted asset balance* may include

      (1) the aggregate *restricted asset balances* in all mortgage guaranty *reinsurance* trusts maintained by a *captive reinsurer* or

      (2) the aggregate *restricted asset balances* contained in all such trusts held by all the *captive reinsurers* which are wholly-owned subsidiaries of the same *mortgage enterprise*. The *restricted asset balance* in each trust must be in proportion to the risk in that trust.

**Financial Requirements**

**707
Financial
Requirements
for Captive
Reinsurance
(continued)**

6) Whether or not balance sheet credit for the *reinsurance* is sought by the *approved insurer,* all *reinsurance* agreements must provide for, and the *approved insurer* and the *captive reinsurer* must execute and at all times maintain, trust agreements wherein the *approved insurer* is the beneficiary of the trust and the *captive reinsurer* is the grantor of the trust, and the trust is established, collateralized and maintained in compliance with standards pertaining to collateralization set forth in NY Ins. Ch. 27, Article 65, § 6507 and § 6501(g), 11 NYCRR § 79 and § 126.5, or any successor statutes or regulations. The trust must be funded only by ceded premiums, the *mortgage enterprise,* or investment earnings on trust assets. *Reinsurance* agreements that do not cover multiple book-years are prohibited. Independent trusts may not be established for each book-year covered by the *reinsurance* agreement. In addition,

a) The trustee must hold all trust assets in the U.S.

b) The trustee must be a bank or trust company organized and domiciled in the U.S, or a U.S. branch of a foreign banking organization that is subject to regulatory supervision in the U.S.

c) The trustee must not be a parent, subsidiary or *affiliate* of the *captive reinsurer.*

d) Investment of trust assets must comply with the requirements of 11 NYCRR § 126.5, except that up to five percent (5%) of the aggregate value of all investments need not meet the quality requirements of that regulation; provided that no portion of the 5% is an investment in the equity or debt securities or other obligations of an *affiliate* of the *captive reinsurer.*

e) Effective as of December 31, 2008, *mortgage guaranty insurance* tax and loss bonds issued under or in accordance with 31 C.F.R. § 343 et. seq., shall not count as assets held by the trust for purposes of calculation of the *risk-to-assets ratio* or minimum trust account balance or aggregate minimum trust account balances as required below or elsewhere in these requirements.

7) In the event of a conversion of one type of *reinsurance* agreement to another (e.g., excess-of-loss to quota-share), the new agreement must cross-collateralize trust assets relating to all book years under the previous agreement with the ceding company.

**Financial Requirements**

| | |
|---|---|
| **707**<br>**Financial**<br>**Requirements**<br>**for Captive**<br>**Reinsurance**<br>**(continued)** | 8)  With respect to *captive reinsurers* who do not maintain a rating of AA- or Aa3 by a Freddie Mac-approved rating agency:<br><br>a)  Except and only to the extent necessary to pay commercially reasonable operating expenses and taxes due and payable, at all times the *risk-to-assets ratio* with respect to the trust established in connection with each *reinsurance* agreement shall not exceed the following:<br><br>i)  10:1 for an excess-of-loss agreement, or<br>ii)  20:1 for a quota-share agreement<br><br>b)  Except and only to the extent necessary to pay commercially reasonable operating expenses and taxes due and payable, distribution of assets from the trust to the *captive reinsurer* may be made only if, before and after such distributions, the *restricted asset balance* is not less than the greater of:<br><br>i)  the reinsurer's share of the contingency reserve, or<br>ii)  an amount such that the *risk-to-assets ratio* does not exceed:<br>(1)  5:1 for an excess-of-loss agreement, or<br>(2)  15:1 for a quota-share agreement. |

## Financial Requirements

**707
Financial
Requirements
for Captive
Reinsurance
(continued)**

   c)  With respect to conversions of one type of *reinsurance* agreement to another, e.g., excess-of-loss to quota-share, the risk associated with each type of agreement must comply with the maximum *risk-to-assets ratio* requirements and the distribution of assets requirements applicable to such agreement, as set forth in this section. In such case, the minimum required aggregate trust account balance shall be determined as the sum of the minimum trust account balances for each type of *reinsurance* agreement under the foregoing requirements.

9)  *Ceding commission* or an equivalent arrangement shall be included in every quota-share *reinsurance* agreement with a *captive reinsurer* or obtained by a *captive reinsurer*, and shall accurately reflect the commercially reasonable costs incurred in the course of underwriting and administering the reinsured coverage.

10)  Ceding commission or an equivalent arrangement on excess-of-loss agreements with a *captive reinsurer* or obtained by a *captive reinsurer* are not required.

# Reports/Documentation/Monitoring

**800
Statement of
Purpose**

Documents submitted in accordance with this chapter will be evaluated to determine compliance with the *eligibility requirements* and to evaluate an *approved insurer's* practices.

**801
Immediate
Notices**

An *approved insurer,* and any *affiliate* of a ceding *Type I insurer* with the sole purpose of providing *reinsurance* for the ceding *Type I insurer*, must notify *Freddie Mac* in writing of any of the events listed below within 15 business days of its occurrence.  The notice of the change must describe the event with reasonable specificity, without reference to any other documents.

1) Upon receipt of notice of *material* noncompliance with any applicable law and regulation of its *state* of domicile or any *state* in which it is licensed or has authority to do business.

2) Upon investigation of or *material* action by any *state* attorney general, or by any other regulatory or enforcement body of any *state* in which the *approved insurer* or *affiliate* is authorized to transact business (information requests in the normal course of business are not investigations for the purposes of this requirement).

3) Upon discovery of noncompliance with the *eligibility requirements.*

4) Upon notification that any one of the Fitch, Moody's, or S&P rating has been affirmed or confirmed, or has been or will be decreased, regardless of whether the rating affects the *approved insurer's* classification as a *Type I* or *Type II insurer.*  (For example, placement on Creditwatch or other watchlist.)

5) Upon notification that any rating for a *captive reinsurer* or captive *reinsurance* agreement fails to meet the minimum standards set forth in section 707 of these *eligibility requirements* for such arrangements, if ratings are used to qualify the *captive reinsurer* or captive *reinsurance* agreement under these requirements.

6) It goes into *run-off.*

7) Any *material* change occurs in its ownership or organization.  Such change may include, but is not limited to, a merger, consolidation, sale or transfer of stock, name change or change in its senior management or the membership of its board of directors.

8) Any *material* adverse change in the financial condition or performance of an *approved insurer* or actions or events that threaten *material* adverse change.

9) It is placed into supervision, conservatorship or liquidation.

**Reports/Documentation/Monitoring**

**801
Immediate
Notices
(continued)**

10) It is put on probation or its activities are restricted in any manner by any agency of the federal or *state* government.

11) Receipt of notification of any action or investigation by the Securities and Exchange Commission (SEC), Federal Trade Commission (FTC), Department of Justice (DOJ), the Department of Housing and Urban Development (HUD) or any *material* action by any other federal regulatory body or enforcement agency (information requests in the normal course of business are not investigations for the purposes of this requirement).

12) It becomes subject to any judgment, order, finding, or regulatory action that would adversely affect the *approved insurer*'s ability to comply with the terms and conditions of the *eligibility requirements*.

13) Any change to any existing *capital support agreement(s)* and/or execution of a new *capital support agreement* for the benefit of, or provided by the *approved insurer* that could have a *material* adverse impact on the value of the insurance provided to *Freddie Mac* or the safety and soundness of the *approved insurer*.

14) Discovery of any conflict between applicable laws and regulations and any provision of these *eligibility requirements* or the terms and conditions of approval.

An *approved insurer*, and any *affiliate* of a ceding *Type I insurer* with the sole purpose of providing *reinsurance* for the ceding insurer, must notify *Freddie Mac* within 30 days of determination that any *risk sharing transaction*, or special program or structure or insurance of non-standard loans is likely to have a *material* adverse impact on the value of the insurance provided to *Freddie Mac* or the safety and soundness of the *approved insurer*.

An *approved insurer*, and any *affiliate* of a ceding *Type I insurer* with the sole purpose of providing *reinsurance* for the ceding insurer, must provide *Freddie Mac* with details of any *reinsurance* agreements under which risk is ceded to a reinsurer rated less than AA- by Fitch or S&P, or Aa3 by Moody's within 30 days of entering into the agreement or of ratings action by one or more rating agency (does not apply to *captive reinsurance* agreements or *reinsurance* agreements with an affiliate of the *approved insurer*).

**Reports/Documentation/Monitoring**

**802
Required
Scheduled
Reports**

### Quarterly Reports

An *approved insurer*, and any *affiliate* of a ceding *Type I insurer* with the
sole purpose of providing *reinsurance* for the ceding *Type I insurer*, either
individually or on a consolidated basis, must file Form 443 with *Freddie
Mac* within 45 days after the end of each quarter, except for the last
quarter of each calendar year.  The report for the last quarter of a calendar
year must be filed with *Freddie Mac* within 60 days after the end of that
calendar year.

When submitting the Form 443, the insurer must also notify *Freddie Mac*
that funds have been removed from the *contingency reserve* during the
previous quarter if removed prior to the 10 year hold period specified in
the *NAIC Model Act*, Section 16(c), Reserves.

An *approved insurer* must, within 45 days after the end of each quarter
(except for the last quarter of each calendar year;  the report for the last
quarter of a calendar year must be filed with *Freddie Mac* within 60 days
after the end of that calendar year):

1)  file a quarterly report on a consolidated basis for all captive
    *reinsurance* agreements and individually for each of the *approved
    insurer's* top 10 *captive reinsurers* (measured by aggregate dollar
    amount of potential exposure reinsured with such *captive reinsurer*)
    and any *captive reinsurer* that must meet the minimum *restricted asset
    balance* standards outlined in section 707 herein with respect to
    captive *reinsurance* arrangements above 25% ceded risk and/or
    premium.  Such report must include:
    a)  gross and ceded premium
    b)  gross and ceded new insurance written
    c)  gross and ceded risk in force (and by policy year)
    d)  trust account balances
    e)  ceding commissions received
2)  file a quarterly report on a consolidated basis for all *reinsurance*
    agreements with *qualified reinsurers* that are not *captive reinsurers*
    and individually for each of the top 10 *qualified reinsurers* that are not
    *captive reinsurers*.  Such report must include:
    a)  reinsurer ratings for the top 10 *qualified reinsurers*
    b)  ceded risk in force

**Reports/Documentation/Monitoring**

---

**802
Required
Scheduled
Reports
(continued)**

### Annual Reports

Each *approved insurer*, and any *affiliate* of a ceding *Type I insurer* with the sole purpose of providing *reinsurance* for the ceding insurer, is required to submit the following reports to *Freddie Mac* by April 15 (unless such reports are available on or through links on the web site of the *approved insurer* or its parent company within such time period):

1) An annual *Convention Statement* as filed with *state* insurance regulatory authorities and all correspondence relating thereto.

2) An annual "Certificate of Compliance" which states that it is in compliance with the *eligibility requirements*. The form of such certificate is prescribed by *Freddie Mac* in Exhibit 3 and must be signed by an authorized officer of the *approved insurer*.

3) An audit report prepared by an independent certified public accountant or in lieu thereof a copy of Form 10K for the *approved insurer* or its parent company as filed with the Securities and Exchange Commission, attaching a schedule which will reconcile the audited consolidated financial statements included in the Form 10K with the statutory financial statements of the *approved insurer*, if such reconciling schedule exists (reconciling schedule must be provided as soon as available if not typically available by April 15).

4) *Material* changes in generally applicable premium rates for its most commonly insured loans.

5) The *approved insurer's* statement of actuarial opinion.

---

**803 Required
Periodic
Reports**

An *approved insurer*, and any *affiliate* of a ceding *Type I insurer* with the sole purpose of providing *reinsurance* for the ceding *Type I insurer*, must submit the following for approval to *Freddie Mac* 30-days prior to their effective date if there is a potential *material* impact on the operations or financial obligations of the *approved insurer* or *Freddie Mac*:

1) Master policy endorsements.

2) Documentation related to new or special products or programs or revisions to existing products or programs.

In assessing potential *material* impact of new products or programs or revisions to existing programs, an *approved insurer*, and any *affiliate* of a ceding *Type I insurer* with the sole purpose of providing *reinsurance* for the ceding *Type I insurer*, must consider the items listed on Exhibit 2 hereto titled 'New Product or Program/ Existing Product or Program Revisions – Considerations for Periodic Report Submissions.

---

**Reports/Documentation/Monitoring**

**803 Required
Periodic
Reports
(continued)**

An *approved insurer*, and any *affiliate* of a ceding *Type I insurer* with the sole purpose of providing reinsurance for the ceding *Type I insurer*, must submit the following documents for approval regardless of *materiality*:

New master and pool policies generally made available to *insureds*, no later than 30-days prior to the effective date of the policy.

For informational purposes, the following documents must be submitted to *Freddie Mac* no later than 15 days after their preparation or release date (unless they are available on or through links on the web site of the *approved insurer* or its parent company within such time period):

1)  Any financial statements or other reports furnished to stockholders of publicly held companies.
2)  Filings made with the Securities and Exchange Commission pursuant to the Securities Act of 1933 and/or the Securities Exchange Act of 1934 (including all exhibits and all amendments) material to the continuing eligibility of the *approved insurer*, and any *affiliate* of a ceding *Type I insurer* with the sole purpose of providing *reinsurance* for the ceding insurer.
3)  An annual report to policyholders.

**804
Supplemental
Information**

At any time, *Freddie Mac* reserves the right to request any additional reports and documents which may contain information relating to the *approved insurer's* compliance with the *eligibility requirements* or the *approved insurer's* practices, or the *eligibility requirements* or practices of any *affiliate* of a ceding *Type I insurer* with the sole purpose of providing *reinsurance* for the ceding insurer. *Freddie Mac* also reserves the right to request any report identified in this document on a more frequent basis.

**Reports/Documentation/Monitoring**

**805
Document
Retention**

An *approved insurer*, and any *affiliate* of a ceding *Type I insurer* with the sole purpose of providing *reinsurance* for the ceding insurer, must retain documents and records that are necessary to demonstrate compliance with the *eligibility requirements*. Documents must be retained in accordance with the *approved insurer's state* of domicile laws and regulations with respect to document retention. In the absence of such laws and regulations, such documents must be retained for a period of three years.

An *approved insurer*, and any *affiliate* of a ceding *Type I insurer* with the sole purpose of providing *reinsurance* for the ceding insurer, is required to maintain records with respect to claim denials, policy cancellations and partial settlements in accordance with the requirement stated above. These records must also indicate the percentage and dollar amount of partial settlements, the amount of any claim denial or policy cancellation, as well as the reason for these actions.

The files with respect to each settled claim must contain such information and documentation as necessary to show that losses were computed pursuant to requirements of the master policy.

The *mortgage payment record* must be maintained by either the *approved insurer* or the *insured*. If the *insured* maintains the record, the *approved insurer* must employ adequate controls documenting the maintenance and quality of such records.

**806
Periodic
Reviews**

Periodically, at *Freddie Mac*'s discretion, *Freddie Mac* will conduct on-site reviews of an *approved insurer* and/or any *affiliate* of a ceding *Type I insurer* with the sole purpose of providing *reinsurance* for the ceding insurer to ensure an understanding of the *approved insurer's* ongoing ability to meet obligations to *Freddie Mac*.

An *approved insurer*, and any *affiliate* of a ceding *Type I insurer* with the sole purpose of providing *reinsurance* for the ceding *Type I insurer*, must give *Freddie Mac* personnel access to documents and staff necessary to determine the *approved insurer*'s compliance with *eligibility requirements* and evaluate the *approved insurer*'s practices.

# Disqualification or Suspension

**900**
**General Policy**

If at any time *Freddie Mac* believes that an *approved insurer* has violated, is violating or is about to violate any of the *eligibility requirements*, or *Freddie Mac* has significant concerns regarding the *approved insurer*'s safety and soundness or ability to honor obligations to *Freddie Mac*, *Freddie Mac* may take any one or more of the following actions:

1) *Freddie Mac* may in its discretion, issue a warning to an *approved insurer* that it has violated, is violating, or is about to violate any of the provisions of the *eligibility requirements,* and that unless corrective action is taken within a specified time period, *disqualification* or *suspension* may result. This warning may be given by *Freddie Mac* as part of an audit report or as a result of any other review or investigation of the *approved insurer* by *Freddie Mac*.
2) An informal warning may be given to the *approved insurer* that expresses *Freddie Mac*'s concern and suggests possible corrective actions.
3) The *approved insurer* may be disqualified or suspended in accordance with Section 903, Notice of Intent to Disqualify or Suspend.
4) Impose additional terms and conditions of approval, including corrective action.
5) Reclassify a *Type I insurer* as a *Type II insurer*.

**901**
**Consequences**
**of Suspension**

During a period of *suspension*, *Freddie Mac* will not purchase mortgages insured by a suspended *approved insurer* undertaking remedial action in order to comply with all provisions of the *eligibility requirements*. During this period, however, *Freddie Mac* may permit renewals of existing *mortgage guaranty insurance* coverage issued by the suspended mortgage insurer for mortgages serviced for *Freddie Mac* and provide Seller/Servicers appropriate notices consistent with the foregoing actions.

## Disqualification or Suspension

**902
Consequences
of
Disqualification**

*Freddie Mac* will refuse to purchase mortgages insured by a disqualified *approved insurer*, and will not permit renewals of existing *mortgage guaranty insurance* for mortgages serviced for *Freddie Mac*.

*Freddie Mac* will notify all of its Seller/Servicers that it will not purchase mortgage loans insured by the disqualified *approved insurer* or permit renewals of existing insurance. *Freddie Mac* may negotiate transfer of the existing insurance in-force to other *approved insurer*(s).

If an *approved insurer* wishes to voluntarily discontinue compliance with the terms and conditions of approval, the *approved insurer* must inform *Freddie Mac* 30 days in advance, in writing. Upon receipt of written notification, *Freddie Mac* will discontinue approval of the *approved insurer*. *Freddie Mac* will not purchase mortgages insured by the former *approved insurer* and at its sole discretion may not permit renewals of existing insurance. *Freddie Mac* will provide Seller/Servicers with notices consistent with the foregoing actions.

A disqualified or voluntarily discontinued *approved insurer* will be responsible for any costs associated with the substitution of insurance exceeding the amount of renewal premiums due.

**903
Notice of
Intent to
Disqualify or
Suspend**

*Freddie Mac* will provide the *approved insurer* with not less than 30 days prior written notice of an intent to disqualify or suspend unless *Freddie Mac* determines, at its sole discretion, that a shorter or no notice period is necessary or advisable to protect *Freddie Mac*'s interests.

Certain violations of the *eligibility requirements* are viewed with particular seriousness by *Freddie Mac*, including but not limited to, violations pertaining to an *approved insurer's* safety and soundness or its claims paying ability. In such cases, *Freddie Mac* will act without prior written notice to disqualify or suspend the *approved insurer*. If prior written notice is not provided, *disqualification* or *suspension* will become effective upon oral notice from *Freddie Mac* to the *approved insurer*. Written confirmation of that oral notice will follow.

# Appeals

**1000
Request for
Appeal of
Application
Denial,
Suspension or
Disqualification**

The applicant may write to *Freddie Mac* to appeal an application denial and an *approved insurer* may write to *Freddie Mac* to appeal a determination to disqualify or suspend pursuant to Section 903, Notice of Intent to Disqualify or Suspend.

The appeal must be postmarked or hand delivered no later than 15 days

1) From the date the applicant or *approved insurer* received written notice of action from *Freddie Mac* or
2) From the date the *approved insurer* received written confirmation of *Freddie Mac*'s oral notice of action, if prior written notice was not provided by *Freddie Mac*.

If an appeal is not filed within the 15-day period, the applicant or *approved insurer* will be deemed to have forfeited its right to appeal. The appeal must contain the following, in the order indicated:

1) A cover page bearing the names and addresses of the applicant or *approved insurer* and its representative, if any.
2) A reference to *Freddie Mac*'s action or proposed action and a concise statement of the case.
3) A listing in separate numbered paragraphs of each on the grounds on which the applicant or *approved insurer* relies.
4) The argument, generally amplifying the applicant or *approved insurer's* grounds for appeal and clearly exhibiting the points of fact, policy, and law being presented.
5) A conclusion, specifying the action the applicant or *approved insurer* believes *Freddie Mac* should take.

**1001
Hearings**

The requirements of Sections 1002 and 1003 shall be applicable to any circumstances in which the *eligibility requirements* provide for an opportunity for a hearing or *Freddie Mac* determines that a hearing should be held.  Generally, an evidentiary hearing will not be a necessary part of the appeal process. *Freddie Mac* reserves the right, however, to schedule an evidentiary hearing when appropriate.

**Appeals**

| | |
|---|---|
| **1002**<br>**Date of**<br>**Hearing** | *Freddie Mac* shall by resolution or order establish a date for such hearing. That date shall be no more than 60 days after receipt from an applicant or *approved insurer* of the request for a hearing. Such resolution or order shall be served upon all interested parties, shall state the time, place and nature of the hearing, and, if a presiding officer has been designated by *Freddie Mac* to preside at the hearing, the name and address of the presiding officer. |
| **1003**<br>**Conduct of**<br>**Hearings** | In such cases, *Freddie Mac* will be represented by its general counsel or the counsel's designee. *Freddie Mac* will appoint an individual from within or outside *Freddie Mac* to serve as presiding officer at any hearing. The presiding officer will establish the rules and procedures under which the hearing will be conducted. At a minimum, the rules for the hearing will provide for the taking of oral testimony under oath, the taking of documentary evidence, and the transcription of the hearing. The rules of evidence will not apply to the proceedings, but the presiding officer will retain discretion to exclude clearly irrelevant, repetitious, or untrustworthy evidence. The presiding officer shall have all powers necessary to that end, including, but not limited to, the following: |

1) To require any party to produce documents.
2) To receive relevant evidence and to rule upon the admission of evidence and offers of proof.
3) To take or cause depositions to be taken.
4) To regulate the course of the hearing and the conduct of the parties and their counsel.
5) To hold conferences for the settlement or simplification of issues or for any proper purpose.
6) To consider the rule upon, as justice may require, all procedural and other motions appropriate in any adversary proceeding, except that a presiding officer other than *Freddie Mac* will not have the power to decide any motion to dismiss the proceeding or other motion which results in final determination of the merits of the proceeding.

Every party will have the right to present their case or defense by oral and documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. Irrelevant, immaterial, or unduly repetitious evidence shall be excluded.

**Appeals**

**1003
Conduct of
Hearings
(continued)**

All hearings will be private and will be attended only by the parties, their representative or counsel, witnesses (while testifying), and other persons having an official interest in the proceedings.

Hearings will be recorded and transcripts will be made available to any party upon payment of the cost thereof. A copy of the transcript of the testimony taken at any hearings, duly certified by the reporter, together with all exhibits, all papers and requests filed in the proceedings, and any briefs or memoranda of law filed in the proceedings shall be deemed the record at such proceedings.

**1004
Recommended
Decision**

The presiding officer will within 30 days of the completion of the hearing, serve upon each party and certify to *Freddie Mac* for decision the entire record of the hearing. The record will include his recommended decision, the transcript, and the exhibits (including, on request of any of the parties, any exhibits excluded from evidence or tenders of proof), exceptions, rulings, and all briefs and memoranda filed in connection with the hearing.

**1005
Final Decision**

*Freddie Mac*'s Chief Executive Officer, or that person's designee, will review the appeal of the applicant, or *approved insurer* and the hearing record, if any, before rendering a decision.

The Chief Executive Officer or that person's designee, will then render a decision in writing either affirming, reserving, or modifying *Freddie Mac*'s prior determination to reject, disqualify or suspend. The decision will be made, and notice of it will be given to the applicant or *approved insurer* in the ordinary course of business.

**Appeals**

Private Mortgage Insurer Eligibility Requirements

# Exhibit 1, NAIC Mortgage Guaranty Insurance Model Act

**Please contact NAIC at <u>WWW.NAIC.ORG</u> for a copy of the *Mortgage Guaranty Insurance Model Act*.**

# Exhibit 2, New Product or Program/ Existing Product or Program Revisions Considerations for Periodic Report Submissions

| Information Type | Detail Description |
|---|---|
| Legal Considerations | 1. Any need to change the Uniform Instruments, such as the Note, Mortgage, Deed of Trust or the need for a Rider or Addendum<br>2. Any conflict with any provision of the Uniform Instruments<br>3. Any changes to existing Primary or Pool Master Policies, including endorsements whether general or state specific<br>4. Any need for special disclosures to borrowers<br>5. Laws (state or federal) that could impact the product or its use by originators<br>6. Analysis of product/program, including specific requirements or parameters in relation to anti-predatory lending laws and Freddie Mac's anti-predatory lending policies or "fair lending" laws and regulations<br>7. Any involvement of non-mortgage insurer third-party relationship necessary for product offering |
| Operations | 8. Need to develop documentation, data dictionary and description of data elements necessary to support this product, if different from standard products<br>9. Need for special tracking of product<br>10. Any request for a reporting regimen between Freddie Mac and the insurer, including proposed reporting schedules |
| Credit/Collateral/LP | 11. Compatibility with LP or other AUS and Freddie Mac Seller/Servicer underwriting guidelines |
| Securitization Considerations | 12. Eligibility for and or compatibility with existing credit enhancements<br>13. Product features that may impact TBA securitization<br>14. Product features that may impact delivery under Freddie Mac cash programs |
| Servicing | 15. Ability of existing servicing systems to support product<br>16. Need for special servicing guidelines, policies or procedures<br>17. Need for changes in Freddie Mac claims submission/processing |
| Marketing | 18. Implementation timeline<br>19. Any need of or request for Freddie Mac involvement or use of our name<br>20. Any need for joint product training |

# Exhibit 3, Annual Certification

**Instructions:**

Requirements for annual filing are noted in Section 802, Annual Reports, of the *eligibility requirements*. By April 15 of each year each *approved insurer* must submit (unless available on or through links on the web site of the insurer or its parent company):

1) Certificate of Compliance (form noted below)
2) The annual Convention Statement
3) The audited financial statements or Form 10K, and any required schedules as indicated in Section 802 (reconciliation of the consolidated financial statements included in the Form 10K with the statutory financial statements of the *approved insurer* must be provided as soon as available if not typically available by April 15)
4) Changes in generally applicable premium rates for its most commonly insured loans
5) The *approved insurer's* actuarial opinion

Areas of noncompliance with the *eligibility requirements* must be identified on the Certificate of Compliance. If a request for a temporary waiver from the *eligibility requirements* is made, an explanation of the situation, supporting documentation, and an action plan demonstrating steps to resolve the noncompliance issue must accompany the certificate.

## Certificate of Compliance

(Date)

Freddie Mac
Counterparty Credit Risk Management
MS D3A
1551 Park Run Drive
McLean, Virginia 22102

Dear Sir or Madam:

This Certificate of Compliance is furnished to you pursuant to Section 100 of the Federal Home Loan Mortgage Corporation's Private Mortgage Insurer Eligibility Requirements (Eligibility Requirements).

We have read the Eligibility Requirements and we have made, or caused to be made, under our supervision, a review to determine compliance therewith.

To the best of our knowledge and belief, (NAME OF COMPANY) was in compliance with all of the Eligibility Requirements as of December 31, 20XX (preceding calendar year), [except (NUMBER AND NAME OF SECTION) for which a request for temporary waiver is enclosed].

Sincerely,

Authorized Officer

# Glossary

| | |
|---|---|
| **Admitted Assets** | Assets that are recognized and accepted by state insurance laws in determining the solvency of insurers or reinsurers. |
| **Affiliate or Affiliated** | With respect to any person (including any natural person or corporation, business trust, general or limited partnership, limited liability company, limited liability partnership, or other similar organization or legal entity), a corporation, business trust, general or limited partnership, limited liability company, limited liability partnership, or other similar organization or legal entity: |

1) Where the person directly or indirectly owns or controls 10% or more of the voting shares or voting rights, through stock ownership or in any other manner, or
2) Where the person is a *mortgage enterprise* and directly or indirectly owns or controls, either jointly or severally with other *mortgage enterprises*, 10% or more of the voting shares or voting rights, through stock ownership or in any other manner, or
3) Where the person controls in any manner the election of a majority of the directors or trustees or members of the governing body, or
4) Where the person is a *mortgage enterprise* and, either jointly or severally with other *mortgage enterprises*, controls in any manner the election of a majority of the directors or trustees or members of the governing body, or
5) Which has a majority of the directors or trustees or members of the governing body who are also directors or trustees or members of the person's governing body, or
6) Which has the same ultimate parent company as the person.

| | |
|---|---|
| **Approved Insurer** | A private *mortgage guaranty insurance company* that has been duly approved by *Freddie Mac* as qualified to guarantee or insure mortgages purchased by *Freddie Mac*. |
| **Board** | The Board of Directors of *Freddie Mac*. |
| **Capital Support Agreement** | Any agreement that supports the *approved insurer*'s capital position, including but not limited to a guarantee by a parent or third-party, *reinsurance* or *risk sharing transaction*, or net worth maintenance agreement. |

## Glossary

| | |
|---|---|
| **Captive Reinsurer** | An *affiliate* of a *mortgage enterprise,* or a group captive, sponsored captive or reciprocal captive, which:<br>1) is eligible and duly licensed by a *state* insurance commissioner, or an insurance company licensed and authorized to enter into *reinsurance* agreements under the laws of a foreign country to write *reinsurance* coverage, and<br>2) reinsures mortgages insured by an *approved insurer* that are originated, purchased, sold or serviced by a *mortgage enterprise* which is *affiliated* or otherwise participates in the *captive reinsurer*, and<br>3) may contain one or more trusts, provided that the trust reinsuring the risk of an *approved insurer* may only reinsure *mortgage guaranty insurance* on first lien mortgages secured by *1-4 unit residential properties* and the assets of the trust may not be cross-collateralized with any other *approved insurer*'s trust(s), and<br>4) does not continually maintain:<br>  a) A minimum *total policyholder's surplus* of $25,000,000, and<br>  b) A Fitch rating of AA or AAA, Moody's rating of Aaa or Aa, or an S&P rating of AA or AAA. |
| **Ceding Commission** | A commission paid to a ceding insurer by a reinsurer to reimburse the ceding insurer for underwriting and administering reinsured *mortgage guaranty insurance* coverage. |
| **Certificate of Authority** | The license or document granted by a *state* to a private mortgage insurer authorizing such private mortgage insurer to engage in the business of *mortgage guaranty insurance* in such *state*. |
| **Combined Ratio** | The sum of the loss and *underwriting (expense) ratios* as calculated on the *Freddie Mac* Quarterly Report, Form 443. |
| **Contingency Reserve** | A reserve required by statute or regulation generally equal to 50 percent of premiums earned. Such reserve must be maintained for a period of 10 years, unless earlier related as a result of losses in excess of 35 percent of the premiums earned. |
| **Convention Statement** | The National Association of Insurance Commissioners (*NAIC's*) Annual Convention Statement. |

**Glossary**

| | |
|---|---|
| **CMSA** | The Consolidated Metropolitan Statistical Area, which shall have the same meaning as used by the U.S. Office of Management and Budget (OMB). |
| **Delegated Underwriting** | A contractual arrangement between an insurer and a lender under which the insurer permits the lender to commit the insurer to insure loans originated by the lender provided the loans meet certain underwriting guidelines.  Also referred to as "modified" or "certified" underwriting. |
| **Disqualification** | The complete removal of an insurer from *Freddie Mac*'s list of *approved insurers*. |
| **Earned Premium** | The gross premium less premiums returned to policyholders less *unearned premiums*. |
| **Eligibility Requirements** | *Freddie Mac*'s *Eligibility Requirements for Private Mortgage Insurers* and all of the requirements contained therein. |
| **Freddie Mac** | The Federal Home Loan Mortgage Corporation. |
| **Insured** | The lender that is covered by private *mortgage guaranty insurance*. |
| **Insurance-in-Force** | The aggregate of the unpaid principal balance of all mortgage directly insured and if a portion of any insurance risk is reinsured, the insurer accepting such risk shall add the same percentage of the unpaid principal balance of the reinsured mortgage as the percentage of risk accepted (assumed risk) and the insurer ceding such risk (ceded risk) shall deduct that same percentage. |
| **Loss Ratio** | The ratio of incurred losses to net premium earned determined in accordance with statutory accounting practices. |

## Glossary

| | |
|---|---|
| **Liquid Assets** | Liquid investments that qualify as insurance company investments under the laws and regulations of the *state* of its domicile and the standards and interpretations of the *NAIC*. |
| **Material** | Any change, event, or information where there is a substantial likelihood that such change, event or information either individually or together with other changes, events, or information is relevant to *Freddie Mac*, including without limitation *Freddie Mac*'s determination of the safety and soundness or claims-paying ability of the *approved insurer* and/or the value of the insurance provide to *Freddie Mac* by the *approved insurer*. The SEC's regulations that govern securities registration and disclosure can be used as a guideline to evaluate whether such change, event, or information may be relevant to *Freddie Mac*. |
| **Model Act** | The Mortgage Guaranty Insurance Model Act promulgated by the *NAIC*. |
| **Mortgage Guaranty Insurance** | The insurance or guarantee against financial loss by reason of nonpayment of principal, interest and other sums agreed to be paid under the terms of a note, bond or other evidence of the indebtedness secured by a mortgage, deed of trust or other instruments constituting a first lien or its equivalent, or charge on personal property, or on real property (which terms shall not include any property commonly known as a "mobile home") that is an improvement designed for occupancy as a residential structure. |
| **MSA** | The Standard Metropolitan Statistical Area, which shall have the same meaning as used by the U.S. Office of Management and Budget (OMB). |
| **Mortgage Enterprise** | A mortgage broker, lender, seller, servicer or mortgage insurance master policy holder.  The term does not include a government sponsored enterprise. |
| **Mortgage Payment Record** | A historical record produced by a lender that documents the payment pattern of a borrower.  Such record would indicate the amount of each due payment, the date due and payable, and the date the payment was received. |

Private Mortgage Insurer Eligibility Requirements

**Glossary**

| | |
|---|---|
| **NAIC** | The National Association of Insurance Commissioners. |
| **Net Risk-in-Force** | The net dollar amount (retained after reinsurance) equal to, in the case of primary insurance, the sum of each insured mortgage loan's current principal balance multiplied by such loan's coverage percentage or, in the case of pool insurance, the remaining aggregate loss limit. |
| **1-4 Unit Residential Properties** | Real estate on which there is located a structure designed principally for the residential use by one to four families (including cooperatives). |

**Qualified Reinsurer**   A qualified reinsurer is one of the following:

1) A *Type I insurer* unaffiliated with the ceding *approved insurer*, or
2) An *affiliate* of the ceding *approved insurer*, so long as (i) the ceding *approved insurer* is a *Type I insurer*, (ii) the *affiliate's* sole purpose is to provide reinsurance for the ceding insurer, and (iii) no direct or indirect ownership interest in the *affiliate* is held by a *mortgage enterprise*, or
3) An insurer or reinsurer which is either:
   a) A domestic or foreign (outside the *state* of domicile) insurer, or an alien, or a branch of an alien, insurance company (an insurance company incorporated under the laws of a foreign country), eligible and duly licensed to write *reinsurance* coverage, provided that the insurer or reinsurer also continually maintains:
      i) A minimum total policyholder's surplus of $25,000,000, and
      ii) A Fitch rating of AA or AAA, Mood y's rating of Aaa or Aa, or an S&P rating of AA or AAA, and
      iii) Compliance with applicable state laws, regulations and requirements, or
   b) A *captive reinsurer*.

| | |
|---|---|
| **Reinsurance** | A binding contractual obligation with one or more reinsurers to reinsure all or a portion of the ceded insurance risks of an *approved insurer*. |
| **REO** | Real estate owned (REO) is property acquired through foreclosure or deed in lieu of foreclosure. |

## Glossary

| | |
|---|---|
| **Restricted Asset Balance** | See definition of *Risk-to-Assets Ratio* |
| **Risk Sharing Transaction** | A transaction, agreement, program or arrangement involving the ceding of risk, premium, other payments, or other transfer of value. |
| **Risk-to-Assets Ratio** | The ratio of the *net risk-in-force* assumed by the reinsurer from the *approved insurer* relative to the associated *restricted asset balance.* The restricted assets are those assets set aside for the exclusive purpose of payment of the reinsurer's obligation on the risk assumed from the approved insurer. The *restricted asset balance* is the market value of the restricted assets, less unearned premium and loss reserves. |
| **Risk-to-Capital** | The ratio of *net risk-in-force* an insurer has relative to its *total policyholders' surplus.* |
| **Run-off** | A period or status when an *approved insurer* no longer issues new *mortgage guaranty insurance* policies but continues to renew existing *mortgage guaranty insurance* policies. |
| **State** | Including the several states, the District of Columbia, the Commonwealth of Puerto Rico, Guam, U.S. Virgin Islands and other territories and possessions of the United States. |
| **Suspension** | An *approved insurer's* status when *Freddie Mac* will not purchase mortgages insured by an *approved insurer* due to violations of the *eligibility requirements* or due to *approved insurer's* management practices, that as determined by *Freddie Mac*, present a threat to the safety and soundness of the *approved insurer.* |
| **Total Policyholders' Surplus** | The sum of the policyholders' surplus, *contingency reserve* and deferred risk premium calculated in accordance with statutory accounting practices. This total is used in the calculation of the *risk-to-capital* ratio. |

**Type I Insurer**   An *approved insurer* that is rated by at least two of the following three rating agencies - S&P, Moody's, and Fitch, and no rating is less than AA-/Aa3 by any listed rating agency.

**Type II Insurer**   An *approved insurer* that is 1) unrated or 2) rated by less than two of the following rating agencies - Fitch, S&P, or Moody's or 3) rated lower than AA-/Aa3 by any listed rating agency.

# EXHIBIT 36



# 2008 ANNUAL REPORT

Genworth Financial, Inc.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

We have no unresolved comments from the staff of the SEC.

## ITEM 2. PROPERTIES

We own our headquarters facility in Richmond, Virginia, which consists of approximately 461,000 square feet in four buildings, as well as several facilities in Lynchburg, Virginia with approximately 450,000 square feet. In addition, we lease approximately 669,000 square feet of office space in 44 locations throughout the U.S. We also own two buildings outside the U.S. with approximately 42,000 square feet, and we lease approximately 498,000 square feet in 72 locations outside the U.S.

Most of our leases in the U.S. and other countries have lease terms of three to five years, although some leases have terms of up to 17 years. Our aggregate annual rental expense under all leases was $31 million during the year ended December 31, 2008.

We believe our properties are adequate for our business as presently conducted.

## ITEM 3. LEGAL PROCEEDINGS

We face a significant risk of litigation and regulatory investigations and actions in the ordinary course of operating our businesses, including the risk of class action lawsuits. Our pending legal and regulatory actions include proceedings specific to us and others generally applicable to business practices in the industries in which we operate. In our insurance operations, we are, have been, or may become subject to class actions and individual suits alleging, among other things, issues relating to sales or underwriting practices, payment of contingent or other sales commissions, bidding practices in connection with our management and administration of a third-party's municipal guaranteed investment contract business, claims payments and procedures, product design, product disclosure, administration, additional premium charges for premiums paid on a periodic basis, denial or delay of benefits, charging excessive or impermissible fees on products, recommending unsuitable products to customers, our pricing structures and business practices in our mortgage insurance business, such as capital reinsurance arrangements with lenders and contract underwriting services, violations of RESPA or related state anti-inducement laws, and breaching fiduciary or other duties to customers. Plaintiffs in class action and other lawsuits against us may seek very large or indeterminate amounts,

including punitive and treble damages, which may remain unknown for substantial periods of time. In our investment-related operations, we are subject to litigation involving commercial disputes with counterparties. We are also subject to litigation arising out of our general business activities such as our contractual and employment relationships. We are also subject to various regulatory inquiries, such as information requests, subpoenas, books and record examinations and market conduct and financial examinations from state, federal and international regulators and other authorities. A substantial legal liability or a significant regulatory action against us could have an adverse effect on our business, financial condition and results of operations. Moreover, even if we ultimately prevail in the litigation, regulatory action or investigation, we could suffer significant reputational harm, which could have an adverse effect on our business, financial condition and results of operations.

The insurance industry has become the focus of increased scrutiny by regulatory and law enforcement authorities concerning certain practices within the insurance industry. In this regard, in May 2005, each of our U.S. mortgage insurance subsidiaries received an information request from the State of New York Insurance Department with respect to captive reinsurance transactions with lender-affiliated reinsurers and other types of arrangements in which lending institutions receive from our subsidiaries any form of payment, compensation or other consideration in connection with issuance of a policy covering a mortgagor of the lending institution. In February 2006, we received a follow-up industry-wide inquiry from New York requesting supplemental information. In addition, in early 2006 as part of an industry-wide review, one of our U.S. mortgage insurance subsidiaries received an administrative subpoena from the Minnesota Department of Commerce, which has jurisdiction over insurance matters, with respect to our reinsurance arrangements, including captive reinsurance transactions. Periodically in 2008, the Minnesota Department of Commerce requested additional information. In addition, in June 2008, the same subsidiary received from the Minneapolis, Minnesota office of the Inspector General for the U.S. Department of Housing and Urban Development a subpoena requesting information substantially similar to the Minnesota Department of Commerce's request. We have responded to these industry-wide regulatory inquiries and follow-up inquiries, and will cooperate with respect to any follow-up requests or inquiries.

As previously reported, in November 2006, one of our subsidiaries received a grand jury subpoena from the United States Department of Justice, Antitrust Division, and a subpoena from the SEC, each requiring the production of documents and information related to an investigation into alleged bid-rigging involving the sale of GICs to municipalities. In June 2008, the same subsidiary also received subpoenas from the Office of the Florida Attorney General and the Office of the Connecticut Attorney General, representing multiple state Attorney General offices, seeking information relating to an

# EXHIBIT 37

# RADIAN GROUP INC (RDN)

## 10-K
Annual report pursuant to section 13 and 15(d)
Filed on 03/03/2010
Filed Period 12/31/2009

THOMSON REUTERS ACCELUS™

 THOMSON REUTERS

Table of Contents

Our financial guaranty business also is required to establish contingency reserves. The contingency reserve on direct financial guaranty business written is established net of reinsurance, in an amount equal to the greater of 50% of premiums written or a stated percentage (based on the type of obligation insured or reinsured) of the net amount of principal guaranteed, ratably over 15 to 20 years depending on the category of obligation insured. The contingency reserve may be released with regulatory approval to the extent that losses in any calendar year exceed a pre-determined percentage of earned premiums for such year, with the percentage threshold dependent upon the category of obligation insured. Such reserves may also be released, subject to regulatory approval in certain instances, upon demonstration that the reserve amount is excessive in relation to the outstanding obligation. In September 2009, we requested and received approval from the NYID to transfer approximately $143.0 million of contingency reserves to statutory surplus. At December 31, 2009, Radian Asset Assurance had statutory policyholders' surplus of $1,059.1 million and a contingency reserve of $366.1 million.

### 5. Reinsurance (Regulation—State Regulation)

Restrictions apply under the laws of several states to any licensed company ceding business to an unlicensed reinsurer. Under those laws, if a reinsurer is not admitted, authorized or approved in such state, the company ceding business to the reinsurer cannot take credit in its statutory financial statements for the risk ceded to the reinsurer without compliance with certain reinsurance security requirements.

The State of California Department of Insurance and the NAIC Mortgage Guaranty Insurance Model Act limit the amount of risk a mortgage insurer may retain with respect to coverage on an insured loan to 25% of the principal balance of the insured loan. Coverage in excess of 25% (*i.e.*, deep coverage) must be reinsured. Radian Guaranty currently reinsures coverage in excess of 25% with CMAC of Texas and Radian Mortgage Reinsurance to remain in compliance with these insurance regulations.

### 6. Accreditation (Regulation—State Regulation)

The NAIC instituted the Financial Regulatory Accreditation Standards Program ("FRASP") in response to federal initiatives to regulate the insurance business. FRASP provides standards intended to establish effective state regulation of the financial condition of insurance companies. FRASP requires states to adopt certain laws and regulations, institute required regulatory practices and procedures, and have adequate personnel to enforce these items in order to become accredited. In accordance with the NAIC's Model Law on Examinations, accredited states are not permitted to accept certain financial examination reports of insurers prepared solely by the insurance regulatory agencies of non-accredited states. The NYID received its accreditation in September 2009, and prior to such date, no state where Radian Asset Assurance is licensed refused to accept the NYID's Examination Report for Radian Asset Assurance.

## B. Federal Regulation (*Regulation*)

### 1. Mortgage Insurance Tax Deductibility (Regulation—Federal Regulation)

On December 20, 2006, federal legislation was enacted making mortgage insurance premiums tax deductible with regard to loans closing on or after January 1, 2007. Originally scheduled to expire at the end of 2007, the legislation was extended for three more years in December 2007 as part of the Mortgage Forgiveness Debt Relief Act of 2007. The legislation allows borrowers with adjusted gross incomes of $100,000 or less ($50,000 in the case of a married individual filing a separate return) to deduct the full amount of their mortgage insurance premiums paid in calendar years 2007 through 2010. Borrowers making between $100,000 and $110,000 are eligible to write off a portion of the premiums paid in those years. As extended, the legislation applies to loans closing on or after January 1, 2007 through December 31, 2010, and to both purchase and refinance transactions.

### 2. Real Estate Settlement Practices Act of 1974 ("RESPA") (Regulation—Federal Regulation)

The origination or refinance of a federally regulated mortgage loan is a settlement service, and therefore, subject to RESPA. In December 1992, regulations were issued stating that mortgage insurance also is a settlement service. As a result, mortgage insurers are subject to the anti-referral provisions of Section 8(a) of RESPA, which provide, in essence, that mortgage insurers are prohibited from paying anything of value to a

Table of Contents

mortgage lender in consideration of the lender's referral of business to the mortgage insurer. Although many states prohibit mortgage insurers from giving rebates, RESPA has been interpreted to cover many non-fee services as well. The U.S. Department of Housing and Urban Development ("HUD"), as well as the insurance commissioner or an attorney general of any state, may conduct investigations, levy fines and other sanctions, or enjoin future violations of RESPA.

We and other mortgage insurers have faced private lawsuits alleging, among other things, that our captive reinsurance arrangements, as well as pool insurance and contract underwriting services, constitute unlawful payments to mortgage lenders under RESPA. Although to date we have successfully defended against all such lawsuits on the basis that the plaintiffs lacked standing, we cannot be certain that we will have continued success defending against similar lawsuits.

The insurance law provisions of many states, including New York, also prohibit paying for the referral of insurance business and provide various mechanisms to enforce this provision. In February 1999, the NYID issued Circular Letter No. 2 that discusses its position concerning various transactions between mortgage guaranty insurance companies licensed in New York and mortgage lenders. The letter confirms that captive reinsurance transactions are permissible if they "constitute a legitimate transfer of risk" and "are fair and equitable to the parties." The letter also states that "supernotes/performance notes," "dollar pool" insurance, and "un-captive captives" violate New York insurance law.

We and other mortgage insurers have been subject to multiple inquiries from the Minnesota Department of Commerce relating to our captive reinsurance and contract underwriting arrangements, and we have also received a subpoena from the Office of the Inspector General of HUD, requesting information relating to captive reinsurance. We have responded to these requests and continue to provide information and documents as requested. Insurance departments or other officials in other states may also conduct such investigations or reviews.

We cannot predict whether these inquiries will lead to further inquiries, or further investigations of these arrangements, or the scope, timing or outcome of the present inquiries or any other inquiry or action by these or other regulators. Although we believe that all of our captive reinsurance and contract underwriting arrangements comply with applicable legal requirements, we cannot be certain that we will be able to successfully defend against any alleged violations of RESPA or other laws. See "Risk Factors—*Legislation and regulatory changes and interpretations could harm our mortgage insurance business.*"

HUD proposed an exemption under RESPA for lenders that, at the time a borrower submits a loan application, give the borrower a firm, guaranteed price for all the settlement services associated with the loan, commonly referred to as "bundling." In 2004, HUD indicated its intention to abandon the proposed rule and to submit a revised proposed rule to the U.S. Congress. HUD began looking at the reform process again in 2005 and a new rule was proposed in 2008. We do not know what form, if any, this rule will take or whether it will be promulgated. In addition, HUD has also declared its intention to seek legislative changes to RESPA. We cannot predict which changes will be implemented and whether the premiums we are able to charge for mortgage insurance will be negatively affected.

### 3. Home Mortgage Disclosure Act of 1975 ("HMDA") (Regulation—Federal Regulation)

Most originators of mortgage loans are required to collect and report data relating to a mortgage loan applicant's race, nationality, gender, marital status and census tract to HUD or the Federal Reserve under HMDA. The purpose of HMDA is to detect possible discrimination in home lending and, through disclosure, to discourage this discrimination. Mortgage insurers are not required pursuant to any law or regulation to report HMDA data, although under the laws of several states, mortgage insurers are currently prohibited from discriminating on the basis of certain classifications.

Several mortgage insurers, through the trade association Mortgage Insurance Companies of America ("MICA"), entered into an agreement with the Federal Financial Institutions Examinations Council ("FFIEC") to

61

# EXHIBIT 38

HUD Archives: Statement of Gary M. Cunningham, Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing, before the United State...



## U.S. Department of Housing and Urban Development

# *Archives*

**Statement of Gary M. Cunningham**
**Deputy Assistant Secretary for Regulatory Affairs**
**and Manufactured Housing**
**before the**
**United States House Committee**
**on Financial Services**
**Subcommittee on Housing and Community Opportunity**
**United States House of Representatives**

**April 26, 2006**

### Title Insurance: Cost and Competition

Chairman Ney, Ranking Member Waters and distinguished Members of the Subcommittee, I appreciate the opportunity to be here today to discuss the important issues related to title insurance under the Real Estate Settlement Procedures Act (RESPA), and to highlight aspects of RESPA enforcement that provide examples of improper schemes by title companies and other settlement service providers to avoid the prohibitions of RESPA. At your pleasure, I would like to submit my written testimony for the record.

Enforcement of the Real Estate Settlement Procedures Act (RESPA) is a high priority of Secretary Jackson, and Brian Montgomery, the Assistant Secretary for Housing and Federal Housing Commissioner. We view RESPA enforcement as a very important part of HUD's mission to increase homeownership and help provide affordable housing opportunities. Let me also say that while the focus of the hearing today is on title insurance, we certainly recognize that RESPA enforcement is an industry-wide issue with respect to settlement service providers, and that most providers across the industry desire a level playing field on which to compete, and take their obligations under RESPA seriously.

### RESPA Coverage and Prohibitions

Prior to enacting RESPA in 1974, Congress found that consumers needed more timely information on the nature and costs of the settlement process, and that abusive practices, including the payment of referral fees and kickbacks among settlement service providers, had developed in the process of buying a home. Congress also found that these payments artificially drove up the cost of settlement because consumers indirectly paid the referral fees. It sought to end these kinds of payments as one way of lowering costs to consumers when buying a home.

RESPA, therefore, was enacted to provide consumers protection during the homebuying and mortgage process by: (1) requiring that consumers receive certain information in the form of disclosures during the process; and (2) prohibiting certain practices that unnecessarily increase the costs of settlement. The statute was later amended several times, primarily to allow affiliated business arrangements and to address loan servicing and escrow account issues. More than 30 years later, it is still against the law for "any thing of value" to change hands merely for the referral of business related to a settlement service.

RESPA covers millions of transactions every year, as its coverage extends to virtually all loans secured by one-to-four family residential properties. RESPA's jurisdiction extends to all providers of settlement services required to close the loan. Among these services are the provision of title and closing services, including title examinations, and the issuance of title commitments and title insurance policies.

Disclosures required by RESPA include the Settlement Costs Booklet, the Good Faith Estimate, and the HUD-1. The Good Faith Estimate is given by the lender or mortgage broker and itemizes charges it is anticipated the borrower will have to pay to close the transaction. This disclosure is intended, in part, to be a shopping tool to help borrowers compare costs among various settlement service providers. The HUD-1 itemizes the charges actually imposed upon both the buyer and seller in connection with the settlement. All charges by the lender and other settlement service providers must be reported on the form.

Another key purpose of RESPA is to eliminate practices such as kickbacks, referral fees, and unearned fees in the settlement process. Specifically, Section 8(a) of RESPA provides that "no person shall give and no person shall

Case 2:12-cv-03045-HB Document 1-8 Filed 05/31/12 Page 94 of 223

HUD Archives: Statement of Gary M. Cunningham, Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing, before the United State...

accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to, or part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."

Section 8(b) prohibits the giving or acceptance of "any portion, split or percentage of any charge made or received for the rendering of a real estate settlement service ...other than for services actually performed." By regulation, HUD has established that the prohibitions include a charge for which "no or nominal services are performed." 24 C.F.R. § 3500.14(c).

Section 8(c) of RESPA sets forth various exclusions from these prohibitions In particular, Section 8(c) provides that nothing in Section 8 shall be construed as prohibiting: (1) the payment of a fee by a title company to its duly appointed agent for services actually performed in the issuance of a policy of title insurance; and (2) the payment to any person of a *bona fide* salary or compensation or other payment for goods or facilities actually furnished or for services actually performed.

### Affiliated Business Arrangements, Required Use and the Provision of Settlement Services

Affiliated business arrangements are arrangements in which a person who is in a position to refer business to a real estate settlement service provider has an ownership interest in or affiliate relationship with a provider of settlement services, and directly or indirectly refers business to that provider.

Section 8(c)(4) permits affiliated business arrangements so long as: (1) a disclosure is made of the existence of such an arrangement to the person being referred, which includes a written estimate of the charge or range of charges generally made by the provider to which the person is referred; (2) such person is not required to use any particular provider of settlement services; and (3) the only thing of value received from the arrangement, other than the payments permitted under other exemptions in Section 8(c), is a return on the ownership interest or franchise relationship.

Another provision of RESPA that relates to title insurance is Section 9, which provides that "no seller of property that will be purchased with the assistance of a federally related mortgage loan shall require directly or indirectly, as a condition to selling the property, that title insurance covering the property be purchased by the buyer from any particular title company."

A study of the title industry conducted for HUD by Peat, Marwick and Mitchell in 1980 examined title insurance and settlement practices and pricing in eight metropolitan areas. The study was designed to determine if consumers were served well in the provision of title insurance and other settlement services. It concluded that such services and products were not provided to consumers "at a price which approximates the cost of efficiently providing those services."[1] The study also found that the title insurance industry followed a pattern of reverse competition, in that there is competition for "referral by providers rather than competition for customers themselves."[2] Later studies substantiated the Peat, Marwick findings."[3] Current anecdotal evidence and case investigations discussed below indicate that these practices still exist in the title insurance market environment.

HUD has sought to clarify certain provisions of RESPA and address specific abuses in the marketplace through its regulations and policy statements. In its regulations, HUD sets forth some criteria that address whether payment is made for a "bona fide" settlement service. One provision states that "[w]hen a person in a position to refer settlement service business, such as an attorney, mortgage lender, real estate broker or agent, or developer or builder, receives a payment for providing additional settlement services as part of a real estate transaction, such payment must be for **actual, necessary and distinct from the primary services provided by such person.**" 24 C.F.R.§ 3500.14(g) (3) (emphasis added). Other provisions make it clear that a charge "for which no or nominal services are performed or for which duplicative fees are charged" violates Section 8 and HUD's regulations. 24 C.F.R.§3500.14(a) and(c).

HUD addressed the statutory exemption for payments from a title insurance company to its duly appointed agents in its Statement of Policy 1996-4, Title Insurance Practices in Florida (61 Fed.Reg. 49398, Sept. 19, 1996). This policy statement sets forth the work a title agent must perform to share in the title insurance premium. HUD addressed abuses in affiliated business arrangements through Statement of Policy 1996-2, Sham Controlled Business Arrangements (61 Fed.Reg. 29258, June 7, 1996). This policy statement set forth factors that HUD uses to determine whether the payments made by a settlement service provider to affiliated entities are for *bona fide* settlement services.

As provided by RESPA, HUD takes enforcement actions against those who accept kickbacks or other things of value, as well as those who give them. Other service providers are often in a position to refer settlement service business to specific providers, and they may demand things of value in return for referring that business. The things of value

D Archives: Statement of Gary M. Cunningham, Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing, before the United State...

(such as money, payment of advertising costs, or provision of gift certificates and prizes) may be paid directly. In some cases, the parties may enter into elaborate affiliated business arrangements, such as joint venture companies, that have no business purpose other than to act as a conduit for distributing referral fee payments.

**Captive Title Reinsurance Investigations**

One affiliated business practice HUD has been investigating in cooperation with several states and the National Association of Insurance Commissioners (NAIC), is captive title reinsurance. Briefly, in the cases we have looked at, the practice of captive title reinsurance operates as follows. A settlement service provider, frequently a lender, builder, or real estate broker refers business to the primary title insurer. The title insurer in turn reinsures a portion of the risk of the title insurance policy with the lender, builder, or real estate broker-affiliated reinsurance company for a significant portion of the premium. Typically, the affiliated reinsurance companies do not operate as independent business entities offering reinsurance in the market place.

It is HUD's position that it is a violation of Section 8(a) of RESPA to accept a thing of value in the form of participation in money-making captive title reinsurance arrangements in return for the referral of settlement service business without valuable services being performed. It is further HUD's position that any captive title reinsurance arrangement in which payments to the reinsurer are not *bona fide* compensation and exceed the value of the reinsurance, violate Section 8 of RESPA.

In HUD's view, there is almost never any *bona fide* business purpose for title reinsurance on a single-family residence, and such an arrangement between an entity or an affiliate of an entity that is in a position to refer business to the primary title insurer and the primary insurer are deserving of close scrutiny. Further, when there is a history of little or no claims being paid, or the premium payments to the captive reinsurer far exceed the risk borne by the reinsurer, there is strong evidence that there is an arrangement constructed for the purpose of payment of referral fees or other things of value in violation of Section 8 of RESPA.

**Recent Case Examples**

**Captive Title Reinsurance Arrangement:** HUD investigated a reinsurance arrangement between a primary title insurance underwriter and a homebuilder. The homebuilder created an affiliated title reinsurance company and referred title insurance business to the primary title insurer, who in turn reinsured a portion of the risk with the builder's affiliated title reinsurance company. The homebuilder agreed to make a payment to the U.S. Treasury in the amount of $675,000, and to refrain from entering into any such captive title reinsurance arrangements in the future.

**In Memphis, Tennessee,** a title company established eight affiliated title companies with various builders, real estate agents and mortgage brokers. HUD found that the newly formed affiliated companies were paid for certain title and settlement work they did not perform, and that the affiliated companies were businesses created to make referral payments to the builders, real estate agents and mortgage brokers who owned the affiliated companies with the title company, in violation of RESPA. The title insurance company agreed to make a $680,000 payment to the U.S. Treasury and cease any further business operations involving the affiliated companies. HUD later reached a settlement for $226,000 with nine builders who were partners in the affiliated companies who received the unearned premiums. The settlements also provided that each title insurance entity will compete in the marketplace for title insurance business by actively seeking business from parties other than those that created the entity.

**In Tulsa, Oklahoma**, HUD determined that several area homebuilders, real estate companies and title companies violated Section 8 of RESPA by establishing middleman companies that distributed a portion of the profits earned by the title company that performed the core title services, to the members of the affiliated businesses in exchange for referring customers to the title company. HUD also alleged that one of the title companies violated RESPA by marking up charges for abstract services and recording fees.; Together, the companies agreed to pay $450,000 and cease the business practices that triggered HUD's investigation. The real estate broker involved agreed that all of its agents would attend at least three hours of qualified training on the requirements of RESPA within six months of the settlement.

**In Detroit, Michigan**, a title company paid real estate brokers for the use of conference rooms at rates that were substantially higher than the fair market rent in violation of RESPA and HUD's Statement of Policy on the issue. The title company agreed to make a $150,000 payment to the U.S. Treasury, and that all future office lease agreements would conform to standard commercial lease terms. HUD later reached agreements with certain real estate brokers involved who received the above-market rent payments, and collectively paid $80,000 to the Treasury to settle the matter.

**In Boston, Massachusetts,** HUD and the Federal Deposit Insurance Corporation (FDIC) found that a mortgage company solicited and received sporting event tickets, restaurant gift certificates, and other things of value from

D Archives: Statement of Gary M. Cunningham, Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing, before the United State...

attorneys, appraisers, title companies and others in exchange for the referral of business. The mortgage company agreed to stop accepting kickbacks from settlement service providers, to cooperate with the agencies' ongoing investigation of the settlement service providers who provided the tickets and other things of value to the mortgage company, and pay $150,000.

**In Atlanta, Georgia,** HUD found that a real estate broker offered its sales agents incentives including trips, Atlanta Braves baseball tickets, higher commission splits, and agent-of-the-month ads in local newspapers based on the number and volume of referrals to the broker's affiliated title company. The real estate broker agreed to make a $250,000 payment to the U.S. Treasury, to cease the business practices that triggered HUD's concern, and to notify all of its real estate agents that any compensation to them based on referring business to affiliated partners is a violation of RESPA.

**In Houston, Texas,** HUD, the Office of Thrift Supervision (OTS) and the Office of the Comptroller of the Currency (OCC) conducted a joint investigation that uncovered suspected acts of residential mortgage fraud that involved bank officers and a title company. The agencies claimed the title company engaged in a pattern of violating Section 4 of RESPA by providing inaccurate HUD-1 Settlement Statements to lenders and their borrowers. HUD further alleged that the title company's conduct was part of an agreement for the referral of business in violation of Section 8 of RESPA. The title company agreed to pay a $5 million civil penalty to the U.S. Treasury and to reform its settlement service practices nationwide. In a separate but related action, the Texas Insurance Commission also fined the title company.

**In Lebanon, Pennsylvania,** HUD's investigation of a title company revealed that it set up an affiliated title agency with real estate agents who referred business to the company, and made payments to the affiliated agency that had no employees, no office space, minimal capitalization, and performed no core title services. The title company agreed that it would receive at least 40% of its future business from real estate brokers or agents and mortgage brokers who were not affiliates, paid $15,000 to the U.S. Treasury, and agreed to abide by RESPA in the future.

**Other Practices that Violate RESPA**

Among its current cases, HUD is investigating other alleged practices that if true, would violate RESPA:

- A builder established affiliated mortgage and title companies. The builder requires the use of a large title insurer for closing and title insurance, however, the insurer splits the title insurance premium with the builder's affiliated title insurance company ostensibly for title services performed by the builder. In addition to the required use issue, the question is whether bona fide title services are being performed by the builder.

- To get title insurance referrals in a particular part of the country, title companies have established in-house marketing departments that employ full-time graphic artists and business development teams. The marketing department provides its services to real estate agents and builders, including producing open house flyers, "just listed" and "just sold" post cards and other advertising materials at no or below market costs.

- HUD has received complaints that allege builders are requiring buyers to purchase title insurance from the builders' affiliated title companies. In some instances, the builder may pay substantial closing costs or impact fees only if the affiliated company is used. In these examples, HUD questions whether a true discount is being offered or whether the discount is made up through the cost of the home. In a few instances, the buyer may be charged an extra fee if the affiliated title insurance company is not used.

- A title agent, who is an attorney, solicits business from a lender and is told that he must give the lender $50,000 to be a partner in its co-branded marketing in order to receive business.

- Real estate brokers writing in contracts that their affiliated title companies must be used for closing and title services.

**Overview of HUD's RESPA Enforcement Efforts**

HUD has recognized the need to devote more resources to RESPA enforcement. In the last several years, the Department created the Office of Regulatory Affairs and Manufactured Housing that directs the RESPA, Interstate Land Sales and manufactured housing programs. The Office of RESPA has substantially increased its staff and contracted with a private firm that includes former federal agents to provide nationwide investigative services. The Office coordinates with HUD's Office of General Counsel on policy issues and enforcement actions. This Office also has increased its staff. Additionally, HUD's Office of Inspector General (OIG) has assisted with some investigations. Last summer, the Department conducted training sessions for approximately 125 OIG agents.

**Coordination with Federal and State Agencies**

Case 2:12-cv-03045-HB   Document 1-8   Filed 05/31/12   Page 97 of 223

HUD Archives: Statement of Gary M. Cunningham, Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing, before the United State...

The Department has coordinated investigations with other federal agencies including the Office of the Comptroller of the Currency, the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the Federal Trade Commission and the Department of Justice. We are currently working jointly on several investigations and anticipate others this year.

The Department has also worked closely with state regulators regarding RESPA. Over the last two years it has met with the National Association of Insurance Commissioners' Title Working Group, the Association of Real Estate License Law Officials, the primary association of state regulators of real estate brokers, and the American Association of Residential Mortgage Regulators. We will continue to foster relationships with state attorneys general and insurance commissioners, as well as with these important state regulatory associations, and will continue to share information with specific state regulators.

The Department is aggressively pursuing kickback schemes and affiliated business arrangements that do not comply with RESPA. Such schemes and arrangements unnecessarily increase the costs of settlement services by enabling the payment of fees and things of value without the performance of *bona fide* services. Of course settlement costs are of paramount importance to the homeowner, and it is in the interest of fairness to maintain a level playing field among settlement service providers.

**Legislation to Enhance Enforcement**

The success of HUD's regulatory efforts to implement RESPA for the benefit of both industry and consumers depends greatly on effective enforcement. Certain statutory amendments may advance the goals of RESPA. For example, RESPA does not currently include authority for regulators to enforce important sections of the statute: there are no remedies for violations of the requirements relating to the Good Faith Estimate, settlement costs booklet, or HUD-1 settlement statement. The effectiveness of RESPA could be enhanced by assuring that creative business structures do not defeat the purposes of Sections 8 and 9 of RESPA, and by providing the Secretary and State regulators with the necessary tools to enforce the statute.

Thank you for this opportunity to discuss these important issues regarding title insurance and the settlement services industry as they relate to RESPA.

---

[1] Chapter XII: "The Title Assurance and Conveyance Industries" of *Real Estate Closing Costs, RESPA, Section 14a, Vol. II Settlement Performance Evaluation* prepared by Peat, Marwick, Mitchell and Co. for U.S. Department of Housing and Urban Development, Oct. 1980, as quoted and discussed in "An Analysis of Competition in the California Title Insurance and Escrow Industry," Birnbaum, B., Dec. 2005, at p.32.

[2] *Birnbaum Study* at p. 32.

[3] See *Birnbaum Study* at sec. 5.1 for a discussion of economic studies conducted between 1980-2005 regarding competition in title insurance markets.

Content Archived: June 25, 2010





U.S. Department of Housing and Urban Development
451 7th Street S.W.
Washington, DC 20410
Telephone: (202) 708-1112 TTY: (202) 708-1455

# EXHIBIT 39

# The Subprime Lending Crisis: Causes and Effects of the Mortgage Meltdown

*Katalina M. Bianco, J.D., CCH Writer Analyst, CCH Federal Banking Law Reporter, CCH Mortgage Compliance Guide and Bank Digest.*

© 2008, CCH. All rights reserved.

# INTRODUCTION

The subprime mortgage crisis, popularly known as the "mortgage mess" or "mortgage meltdown," came to the public's attention when a steep rise in home foreclosures in 2006 spiraled seemingly out of control in 2007, triggering a national financial crisis that went global within the year. Consumer spending is down, the housing market has plummeted, foreclosure numbers continue to rise and the stock market has been shaken. The subprime crisis and resulting foreclosure fallout has caused dissension among consumers, lenders and legislators and spawned furious debate over the causes and possible fixes of the "mess."

## International Monetary Fund Report

In its semiannual Global Financial Stability Report released on April 8, 2008, the International Monetary Fund (IMF) said that falling U.S. housing prices and rising delinquencies on the residential mortgage market could lead to losses of $565 billion dollars. When combining these factors with losses from other categories of loans originated and securities issued in the United States related to commercial real estate, IMF puts potential losses at about $945 billion.

This was the first time that IMF has made an official estimate of the global losses suffered by banks and other financial institutions in the U.S. credit crunch that began in 2007 amid the rising number of defaults on subprime home loans.

The incredible $945 billion estimate of losses, made in March, represents approximately $142 per person worldwide and 4 percent of the $23.21-trillion credit market. IMF noted in its report that global banks likely will carry about half of these losses. The report cautioned that the loss estimates are just that, estimates, and the actual numbers may be even higher.

In March, Standard & Poor's had predicted that global banking firms would write off approximately $285 billion dollars in various securities linked to U.S. subprime real estate, with more than half the losses already recognized. Some analysts have put the figure higher for the subprime market and related losses.

The IMF, whose stated core mission is to promote global financial stability, said there was "a collective failure to appreciate the extent of leverage taken on by a wide range of institutions—banks, monoline insurers, government-sponsored entities, hedge funds—and the associated risks of a disorderly unwinding."

"It is now clear that the current turmoil is more than simply a liquidity event, reflecting deep-seated balance sheet fragilities and weak capital bases, which means its effects are likely to be broader, deeper, and more protracted," the report said.

© 2008, CCH. All rights reserved.

## Unique Situation

As recently as mid-2007, many experts believed that the crisis would be contained within the arena of mortgage issuers who had overloaded on subprime loans. Few would have predicted that the subprime fallout would be so severe as to threaten the economy to the extent that it has thus far.

While downturns in the mortgage and housing markets have caused economic problems before, experts explain that the current situation is unique. In a 2007 interview, Susan M. Wachter, professor of real estate and finance at Wharton, University of Pennsylvania, said that in the past such events have created downturns in the overall economy through a credit crunch in the banking sector. This would be the first time downturns are driven by a credit crunch in the non-banking sector of finance.

## ROOTS OF THE SUBPRIME CRISIS

There are a number of theories as to what led to the mortgage crisis. Many experts and economists believe it came about though the combination of a number of factors in which subprime lending played a major part.

## Housing Bubble

The current mortgage meltdown actually began with the bursting of the U.S. housing "bubble" that began in 2001 and reached its peak in 2005. A housing bubble is an economic bubble that occurs in local or global real estate markets. It is defined by rapid increases in the valuations of real property until unsustainable levels are reached in relation to incomes and other indicators of affordability. Following the rapid increases are decreases in home prices and mortgage debt that is higher than the value of the property.

Housing bubbles generally are identified after a market correction, which occurred in the United States around 2006. Former Chairman of the Federal Reserve Board, Alan Greenspan, said in 2007 that "we had a bubble in housing," and that he "really didn't get it until very late in 2005 and 2006."

Freddie Mac CEO Richard Syron agreed with Greenspan that the United States had a housing bubble and concurred with Yale economist Robert Shiller's 2007 warning that home prices "appeared overvalued" and that the necessary correction could "last years with trillions of dollars of home value being lost." Greenspan also warned of "large double digit declines" in home values, much larger than most would expect.

© 2008, CCH. All rights reserved.

4

## Historically Low Interest Rates

Many economists believe that the U.S. housing bubble was caused in part by historically low interest rates. In response to the crash of the dot-com bubble in 2000 and the subsequent recession that began in 2001, the Federal Reserve Board cut short-term interest rates from about 6.5 percent to 1 percent. Greenspan admitted in 2007 that the housing bubble was "fundamentally engendered by the decline in real long-term interest rates."

Mortgage rates typically are set in relation to 10-year Treasury bond yields, which, in turn, are affected by federal funds rates. The Fed has acknowledged the connection between lower interest rates, higher home values and the increased liquidity that the higher home values bring to the overall economy. In a 2005 report by the Fed, "International Finance Discussion Papers, Number 841, House Prices and Monetary Policy: A Cross-Country Study," the agency said that house prices, like other asset prices, are influenced by interest rates, and in some countries the housing market is a key channel of monetary policy transmission.

## Criticism of Greenspan

Some have criticized then-Chairman Greenspan for "engineering" the housing bubble, saying it was the Fed's decline in rates that inflated the bubble. In a December 2007 interview, Greenspan disputes that claim, stating that the housing bubble had far less to do with the Fed's policy on interest rates than on a global surplus in savings that drove down interest rates and pushed up housing prices in countries around the world.

In March 2007, Greenspan led a Q&A session at the Futures Industry Association's annual convention. In answer to a question about the causes of the subprime crisis, Greenspan said that it was more an issue of house prices than mortgage credit. The former Fed Chairman said that the increase in subprime lending was new. Subprime borrowers who "came late in the game," borrowing after prices had already gone up, were not able to build enough equity before interest rates rose.

Despite Greenspan's argument that low interest rates did not contribute to the housing bubble, Richard W. Fisher, President and CEO of the Federal Reserve Bank of Dallas, has stated that the Fed's interest rate policy during the period of 2000–2003 was misguided by erroneously low inflation data, thus contributing to the housing bubble. Speaking before the New York Association for Business Economics in November 2006, Fisher said:

> A good central banker knows how costly imperfect data can be for the economy. This is especially true of inflation data. In late 2002 and early 2003, for example, core PCE measurements were indicating inflation rates that were

© 2008, CCH. All rights reserved.

crossing below the 1 percent "lower boundary." At the time, the economy was expanding in fits and starts. Given the incidence of negative shocks during the prior two years, the Fed was worried about the economy's ability to withstand another one. Determined to get growth going in this potentially deflationary environment, the FOMC adopted an easy policy and promised to keep rates low. A couple of years later, however, after the inflation numbers had undergone a few revisions, we learned that inflation had actually been a half point higher than first thought.

In retrospect, the real fed funds rate turned out to be lower than what was deemed appropriate at the time and was held lower longer that it should have been. In this case, poor data led to a policy action that amplified speculative activity in the housing and other markets. Today, as anybody not from the former planet of Pluto knows, the housing market is undergoing a substantial correction and inflicting real costs to millions of homeowners across the country. It is complicating the task of achieving our monetary objective of creating the conditions for sustainable non-inflationary growth.

## The Bubble Bursts

Between 2004 and 2006, the Federal Reserve Board raised interest rates 17 times, increasing them from 1 percent to 5.25 percent. The Fed stopped raising rates because of fears that an accelerating downturn in the housing market could undermine the overall economy. Some economists, like New York University economist Nouriel Roubini, feel that the Fed should have tightened up on the rates earlier than it did "to avoid a festering of the housing bubble early on."

Roubini also warned that because of slumping sales and prices in August 2006, the housing sector was in "free fall" and would derail the rest of the economy, causing a recession in 2007.

In August 2006, *Barron's* magazine warned that a housing crisis was approaching and noted that the median price of new homes had dropped about 3 percent since January 2006. At that time the magazine also predicted that the national median price of housing would fall about 30 percent in the next three years.

## Housing Market Correction

Adding to the growing crisis was the prediction by many economists and business writers in 2006 and 2007 that there would be a housing market correction because of the over-

© 2008, CCH. All rights reserved.

valuation of homes during the bubble period. Estimates ranged from a correction of a few points to 50 percent or more from peak values.

Chief economist Mark Zandi of the economic research firm Moody's Economy.com, predicted a "crash" of double-digit depreciation by 2007-2009. In August 2007, in a paper presented at a Fed economic symposium, Yale University economist Robert Shiller warned that "past cycles indicate that major declines in real home prices—even 50 percent declines in some places—are entirely possible going forward from today or from the not too distant future."

## The Rise of Subprime Lending

Subprime borrowing was a major factor in the increase in home ownership rates and the demand for housing during the bubble years. The U.S. ownership rate increased from 64 percent in 1994 to an all-time high peak of 69.2 percent in 2004. The demand helped fuel the rise of housing prices and consumer spending, creating an unheard of increase in home values of 124 percent between 1997 and 2006. Some homeowners took advantage of the increased property values of their home to refinance their homes with lower interest rates and take out second mortgages against the added value to use for consumer spending. In turn, U.S. household debt as a percentage of income rose to 130 percent in 2007, 30 percent higher than the average amount earlier in the decade.

With the collapse of the housing bubble came high default rates on subprime, adjustable rate, "Alt-A" and other mortgage loans made to higher-risk borrowers with lower income or lesser credit history than "prime" borrowers. Alt-A is a classification of mortgages in which the risk profile falls between prime and subprime. The borrowers behind these mortgages typically will have clean credit histories, but the mortgage itself generally will have some issues that increase its risk profile. These issues include higher loan-to-value and debt-to-income ratios or inadequate documentation of the borrower's income.

The share of subprime mortgages to total originations increased from 9 percent in 1996 to 20 percent in 2006 according to Forbes. Subprime mortgages totaled $600 billion in 2006, accounting for approximately one-fifth of the U.S. home loan market. An estimated $1.3 trillion in subprime loans are outstanding.

The number of subprime loans rose as rising real estate values led to lenders taking more risks. Some experts believe that Wall Street encouraged this type of behavior by bundling the loans into securities that were sold to pension funds and other institutional investors seeking higher returns.

## Declining Risk Premiums

A Federal Reserve study in 2007 reported that the average difference in mortgage interest rates between subprime and prime mortgages declined from 2.8 percentage points in 2001 to 1.3 percentage points in 2007. This means that the risk premium required by

© 2008, CCH. All rights reserved.

lenders to offer a subprime loan declined. This decline occurred even though subprime borrower and loan characteristics declined overall during the 2001-2006 period, which should have had the opposite effect. Instead, the decline of the risk premium led to lenders considering higher-risk borrowers for loans.

## New Kind of Lender Emerges

Some economists blame the emergence in the boom years of a new kind of specialized mortgage lender for fueling the mortgage crisis. These lenders were not regulated as are traditional banks. In the mid-1970s, traditional lenders carried approximately 60 percent of the mortgage market. Today, such lenders hold about 10 percent. During this time period, the share held by commercial banks had grown from virtually zero to approximately 40 percent of the market.

## Risky Mortgage Products and Lax Lending Standards

Along with the rise of unregulated lenders came a rise in the kinds of subprime loans that economists say have sounded an alarm. The large number of adjustable rate mortgages, interest-only mortgages and "stated income" loans are an example of this thinking. "Stated income" loans, also called "no doc" loans and, sarcastically, "liar loans," are a subset of Alt-A loans. The borrower does not have to provide documentation to substantiate the income stated on the application to finance home purchases. Such loans should have raised concerns about the quality of the loans if interest rates increased or the borrower became unable to pay the mortgage.

In many areas of the country, especially those areas with the highest appreciation during the bubble days, such non-standard loans went from being almost unheard of to prevalent. Eighty percent of all mortgages initiated in San Diego County in 2004 were adjustable-rate, and 47 percent were interest-only loans.

In addition to increasingly higher-risk loan options like ARMs and interest-only loans, lenders increasingly offered incentives for buyers. An estimated one-third of ARMs originated between 2004 and 2006 had "teaser" rates below 4 percent. A "teaser" rate, which is a very low but temporary introductory rate, would increase significantly after the initial period, sometimes doubling the monthly payment.

Programs such as seller-funded downpayment assistance programs (DPA) also came into being during the boom years. DPAs are programs in which a seller gives money to a charitable organization that then gives the money to buyers. From 2000 to 2006, more than 650,000 buyers got their downpayments via nonprofits. According to the Government Accountability Office (GAO), there are much higher default and foreclosure rates for these types of mortgages. A GAO study also determined that the sellers in DPA programs inflated home prices to recoup their contributions to the nonprofits.

© 2008, CCH. All rights reserved.

In May 2006, the Internal Revenue Service ruled that DPA plans are no longer eligible for non-profit status because of "the circular nature of the cash flows, in which the seller pays the charity a 'fee' after closing." On Oct. 31, 2007, the Department of Housing and Urban Development adopted regulations banning seller-funded downpayment programs.

## Moral Hazard Led to Lax Standards

Some experts believe that mortgage standards became lax because of a "moral hazard," where each link in the mortgage chain collected profits while believing it was passing on risk. Mortgage denial rates for conventional home purchase loans reported under the Home Mortgage Disclosure Act, dropped from 29 percent in 1998 to 14 percent in 2002 and 2003.

## Mortgage Brokers and Underwriters

Because mortgage brokers do not lend their own money, there is no direct correlation between loan performance and compensation for them. Brokers also have financial incentive for selling complex ARMs because they earn higher commissions on them.

One study has found that in 2004, mortgage brokers originated 68 percent of all residential loans in the United States, with subprime and Alt-A loans accounting for over 42 percent of the volume. The Mortgage Bankers Association has claimed that brokers profited from the home loan boom but didn't do enough to determine whether borrowers could repay the loans, leaving lenders and banks with resulting defaults.

Mortgage underwriters determine if the risk of lending to a borrower under certain parameters is acceptable. Most of the risks and terms considered by underwriters fall under three categories—credit, capacity and collateral.

In 2007, 40 percent of all subprime loans were generated by automated underwriting. Automated underwriting meant minimal documentation and much quicker decisions, sometimes as soon as within 30 seconds as opposed to the week it would take for an underwriter to generate a decision. An executive vice-president for Countrywide Home Loans also noted in 2004 that "previously, every mortgage required a standard set of full documentation."

Many experts believe that lax controls and a willingness to rely on shortcuts led to the approval of buyers that under a less-automated system would not have been approved.

## Securitization

*Black's Law Dictionary* defines securitization as a structured finance process in which assets, receivables or financial instruments are acquired, classified into pools and offered as collateral for third-party investment. Due to securitization, investor appetite for

© 2008, CCH. All rights reserved.

mortgage-backed securities (MBS) and the tendency of rating agencies to assign investment-grade ratings to MBS, loans with a high risk of default could be originated, packaged and the risk readily transferred to others.

Asset securitization began with the structured financing of mortgage pools in the 1970s, according to the Office of the Comptroller of the Currency's *Asset Securitization Comptroller's Handbook*. The securitized share of subprime mortgages, those passed to third-party investors, increased from 54 percent in 2001, to 75 percent in 2006. In a speech given in London in October 2007, Alan Greenspan, while defending the U.S. subprime mortgage market, said that the securitization of home loans for people with poor credit—not the loans themselves—were to blame for the mortgage meltdown.

## Credit Rating Agencies

Credit rating agencies are now under scrutiny for giving investment-grade ratings to securitization transactions holding subprime mortgages. Higher ratings theoretically were due to the multiple, independent mortgages held in the mortgage-backed securities, according to the agencies. Critics claim that conflicts of interest were involved, as rating agencies are paid by those companies selling the MBS to investors, such as investment banks.

In a 2007 speech Greenspan made in London he implicitly criticized the role of ratings agencies in the crisis.

"The problem was that people took that as a triple-A because ratings agencies said so." Yet when they tried to sell the products they ran into difficulties, which shook confidence. "What we saw was a 180 degree swing from euphoria to fear and what we've learned over the generations is that fear is a very formidable challenge."

As of November 2007, credit rating agencies had downgraded over $50 billion in highly-rated collateralized debt obligations and more such downgrades are possible. Since certain types of institutional investors are allowed to only carry higher-quality assets, there is an increased risk of forced asset sales, which could cause further devaluation.

Ratings agencies such as Standard & Poor's Corp., Moody's Investors Service Inc. and Fitch Ratings have come under fire for being slow to lower their ratings on securities based on mortgage loans to U.S. borrowers with poor credit records.

## Economists Say Borrowers Played a Role in Crisis

Easy credit and the assumption that housing prices would continue to appreciate encouraged many subprime borrowers to obtain ARMS that they could not afford after the initial incentive period had passed. Once housing prices started to decrease, due to the

© 2008, CCH. All rights reserved.

housing market correction and the bursting of the housing bubble, refinancing, readily available during the boom, became much more difficult. Homeowners who could not refinance started to default on their loans as the loans reset to higher interest rates and payment amounts. Some homeowners chose to stop paying their mortgages and just walk away from their homes, allowing foreclosure of the property.

George Mason University economics professor Tyler Cowen said in January 2008, that "[t]here has been plenty of talk about predatory lending, but predatory borrowing may have been the bigger problem."

As much as 70 percent of recent early payment defaults had fraudulent misrepresentations on their original loan applications, according to BasePoint Analytics, a company that assists lenders and banks to identify fraudulent transactions. A study done by the company analyzed over three million loans dating from 1997 to 2006, with a majority of the loans originating in 2005 and 2006. Applications with misrepresentations were determined to be five times as likely to go into default. The study found that many of the misrepresentations were quite simple. Some borrowers simply lied about their incomes, reporting up to five times their actual earnings. Other borrowers used false income documents created on their computers.

Suspicious Activity Reports of mortgage fraud increased by 1,411 percent between 1997 and 2005, according to the Financial Crimes Enforcement Network.

## Legislators Blame Fed

At a Senate Banking Committee hearing held in March 2007, "charges of blame were flying . . . for the meltdown of the high-risk mortgage market," according to the Associated Press. Congress was feeling mounting pressure to fix the problem of rising foreclosures among homeowners unable to make their mortgage payments.

"What we're looking at is a tsunami of foreclosures that is on the horizon," Sen. Robert Menendez, D-N.J., said.

Members of the committee blamed federal regulators for much of the mortgage crisis. Sen. Christopher Dodd, D-Conn., Chairman of the Senate Banking Committee, laid out what he termed a "chronology of regulatory neglect" as banks and other lenders "loosened their standards for making riskier mortgage loans" during the housing boom.

"Our nation's financial regulators were supposed to be the cops on the beat, protecting hardworking Americans from unscrupulous financial actors," Dodd said. "Yet they were spectators for far too long.

Regulators said that they lacked full authority to prevent the crisis that began with the soaring housing boom. Many mortgage lenders had not been under the Fed's supervision because their primary regulators were state banking authorities. Dodd and others argued,

© 2008, CCH. All rights reserved.

however, that the central bank does have authority under federal law to exert jurisdiction over these lenders and to broaden lending regulations to cover them.

## Did Fed Fail?

In December 2007, the *New York Times*, in an article written by Edmund L. Andrews, accused the Fed of doing nothing as the subprime crises grew. According to the article, Edward M. Gramlich, a Fed governor who died in September 2007, had been warning of just such a crisis since 2000. Gramlich felt that a "fast-growing new breed of lenders was luring many people into risky mortgages they could not afford."

Gramlich claimed that when he approached then Fed Chairman Alan Greenspan with his fears, he was "rebuffed."

In 2004, leaders of a housing advocacy in California, a state hit early and hard by the subprime meltdown, met with Greenspan to warn him of the spread of unscrupulous practices by lenders. John C. Gamboa and Robert L. Gnaizda of the Greenlining Institute asked Greenspan to press lenders for a voluntary code of conduct. Gnaizda reported in December 2007 that Greenspan "never gave us a good reason, but he didn't want to do it."

"He just wasn't interested," Gnaizda added.

Greenspan defended his actions, saying that the Fed was not equipped to investigate deceptive lending and that it was not to blame for the housing bubble and its eventual bust. The former chairman noted that the Fed's accountants and bank examiners were ill-suited to investigate fraud, which is "essentially an enforcement action, and the question is, who are the best enforcers?" he asked. "A large enough share of these cases are fraud, and those are areas that I don't think accountants are best able to handle."

In his memoir, *The Age of Turbulence: Adventures in a New World*, Greenspan wrote that "I was aware that the loosening of mortgage credit terms for subprime borrowers increased financial risk." However, he "believed then, as now, that the benefits of broadened home ownership are worth the risk."

## Government and Federal Regulatory Policies

Some economists have suggested that government policy encouraged the development of the subprime meltdown through legislation like the Community Reinvestment Act, which they claim forces banks to lend to uncreditworthy consumers. Economist Robert Kuttner criticized the repeal of the Glass-Steagall Act as contributing to the mortgage crisis. Others have noted that a taxpayer-funded government bailout related to mortgages during the Savings and Loan crisis may have created the above-mentioned moral hazard and acted as encouragement to lenders to make similar higher-risk loans.

© 2008, CCH. All rights reserved.

Changes in the reserve requirements of U.S. banks and the creation in 1994 of special "sweep" accounts that link commercial checking and investment accounts allowed banks greater liquidity. This meant that they could offer more credit. From 2001 to 2002, in the wake of the dot-com crash, the Federal Reserve Funds Rate was reduced from 6 percent to 1.24 percent, leading to similar cuts in the London Interbank Offered Rate that banks use to set some ARM rates. Drastically lowered ARM rates meant that in the United States the monthly cost of a mortgage on a $500,000 home fell to about the monthly cost of a mortgage on a $250,000 home purchased two years earlier. Demand skyrocketed and the housing bubble was born.

## SUBPRIME FALLOUT

By 2005, the housing bubble had burst and federal interest rates had climbed. Foreclosures of homes purchased with subprime loans had risen drastically, and there was every indication that they would continue to climb. Despite these warning signs, subprime mortgages continued to gain in popularity. In Massachusetts, for example, subprime loans fueled by refinancings grew from 1.6 percent of mortgages in 2000 to 12.3 percent by August 2005.

With the subprime industry's growth came problems for homeowners. Subprime lenders foreclose on properties much more frequently than do conventional lenders. The prevalence of subprime loans contributed to a 31-percent spike in foreclosure filings in the first half of 2006. Economists in Boston warned that if home prices fell, these subprime loans would accelerate a downturn as overleveraged homeowners throw their homes on the market or lenders sell foreclosed properties at bargain basement prices.

## Collapse of Subprime Mortgage Industry

Another bad omen for the housing market was the collapse of the subprime mortgage industry in early 2007.

By early January 2007, the United States' subprime mortgage industry started to show signs of collapsing from higher-than-expected home foreclosure rates.

As homeowners fell behind in their mortgage payments in ever-growing numbers, foreclosures continued to rise and interest rates rose to their highest level in years. These conditions left subprime lenders unable to finance new loans.

Due to the collapsing subprime market, Ameriquest, formerly the country's largest subprime lender, closed its doors and laid off 3,800 employees. In addition to the plunge in the housing market, Ameriquest made a $325 million settlement with 30 states' Attorneys General over deceptive marketing and lending practices.

© 2008, CCH. All rights reserved.

Economists saw the failures of subprime lenders as bad omens for the housing market as a whole.

A Center for Responsible Lending (CRL) study in 2007 found that one in five subprime loans issued during 2005-2006 would fail, leaving two million homeowners at risk for foreclosure. The CRL study placed much of the responsibility on the marketing of risky "creative" mortgage products such as adjustable-rate mortgages to consumers with bad or no credit or bad financial histories.

## Industry Analysts Warn Subprime Collapse Not Isolated Event

By March 2007, the U.S., subprime mortgage industry had collapsed. More than 25 subprime lenders had declared bankruptcy, announced significant losses or put themselves up for sale. The stock of the nation's largest subprime lender, New Century Financial, plunged 84 percent amid Justice Dept. investigations before filing for Chapter 11 bankruptcy on April 2, 2007, with liabilities exceeding $100 million.

The manager of the world's largest bond fund, PIMCO, stated in June 2007, that the subprime mortgage crisis was not an isolated event and would eventually take a toll on the economy. The meltdown's greatest impact, he said, would be on the impaired prices of homes.

By mid-2007, financial analysts were predicting that the subprime mortgage market meltdown would result in earnings reductions for large Wall Street investment banks trading in mortgage-backed securities, especially Bear Stearns, Lehman Brothers, Goldman Sachs, Merrill Lynch and Morgan Stanley.

Lou Ranieri of Salomon Brothers, inventor of the mortgage-backed securities market in the 1970s, warned of the future impact of mortgage defaults, saying "This is the leading edge of the storm . . . If you think this is bad, imagine what it's going to be like in the middle of the crisis."

In Ranieri's opinion, more than $100 billion in home loans were likely to default once the problems in the subprime industry appeared in the prime mortgage markets.

## Impact on Stock Markets, Other Industries

On July 19, 2007, the Dow Jones Industrial Average hit a record high, closing above 14,000 for the first time. By Aug. 15, 2007, the Dow had dropped below 13,000, and the S&P had crossed into negative territory year-to-date. Similar drops occurred in virtually every market in the world. Large daily drops became common, with, for example, the Korea Composite Stock Price Index dropping about 7 percent in one day. 2007's largest daily drop by the Standard & Poor's 500 in the United States was in February 2007, and was a direct result of the subprime crisis.

© 2008, CCH. All rights reserved.

Many banks, mortgage lenders, real estate investment trusts and hedge funds suffered significant losses as a result of mortgage payment defaults or mortgage asset devaluation. As of Dec. 21, 2007, financial institutions had recognized subprime-related losses or write downs exceeding $80 billion, with an additional $8-11 billion expected from Citibank.

Mortgage lenders and home builders were hard hit, and losses cut across sectors, with some of the worst-hit industries, such as metal and mining companies, having only the vaguest of ties with lending or mortgages.

## Problems with Alt-A Mortgages Appear

In April 2007, financial problems similar to the subprime mortgages began to appear with Alt-A loans made to homeowners who were considered to be less risky. Alt-A loans fall in between prime and subprime loans.

American Home Mortgage said that it would earn less and pay out a smaller dividend to its shareholders because it was being asked to buy back and write down the value of Alt-A loans made to borrowers with decent credit. This caused company stocks to tumble 15.2 percent. American Home Mortgage filed for bankruptcy in August 2007.

The delinquency rate for Alt-A mortgages had been rising in 2007. In June 2007, Standard & Poor's warned that U.S. homeowners with good credit increasingly were falling behind on mortgage payments, an indication that lenders had been offering higher-risk loans outside the subprime market. S&P said that rising late payments and defaults on Alt-A mortgages made in 2006 are "disconcerting," and delinquent borrowers appear to be "finding it increasingly difficult to refinance" or catch up on their payments.

## Foreclosures on the Rise

It was reported in August 2007 that the number of residential mortgage foreclosures jumped 9 percent from June to July 2007, surging a whopping 93 percent over July 2006. The monthly U.S. Foreclosure Market Report from RealtyTrac, an online marketplace for foreclosed properties, showed a total of 179,599 foreclosure filings in July 2007.

Foreclosure activity jumped a staggering amount in August 2007, soaring 115 percent over August 2006 and 36 percent over July 2007. RealtyTrac reported that August was the busiest month since it began issuing a monthly report in January 2005.

The report indicated that the national foreclosure rate had swelled to one foreclosure filing for every 520 households, representing the highest figure ever issued in the report.

© 2008, CCH. All rights reserved.

"The jump in foreclosure filings this month might be the beginning of the next wave of increased foreclosure activity, as a large number of subprime adjustable rate loans are beginning to reset now," predicted Saccacio.

"Another significant factor in the increased level of foreclosure activity is that the number of REO filings (bank repossessions) is increasing dramatically, which means that a greater percentage of homes entering foreclosure are going back to the banks."

## MBA Report

RealtyTrac's numbers align with an August 2007 report from the Mortgage Bankers Association (MBA). The MBA found that incidents of foreclosure for the second quarter of 2007 were at their highest rates in the organization's 55-year history.

In discussing the August 2007 report, MBA Senior Vice-President and Chief Economist Doug Duncan pointed to the continuing collapse of formerly hot housing markets in California, Nevada, Florida and Arizona as responsible for extending the foreclosure epidemic.

"Were it not for the increases in foreclosure starts in those four states, we would have seen a nationwide drop in the rate of foreclosure filings," Duncan said.

Duncan noted that "The four states of California, Florida, Nevada and Arizona have more than one-third of the nation's subprime ARMs, more than one-third of the foreclosure starts on subprime ARMs, and are responsible for most of the nationwide increase in foreclosure actions."

## Subprime Loans Set to "Reset"

Much of the high-risk lending that helped drive the housing boom dried up in the summer of 2007 when investors backed away from these loans after tens of billions of dollars worth of mortgage-backed paper all but disappeared. Economists say that the credit scare has chilled all mortgage lending, threatening to prolong the ongoing housing slump.

Countrywide Financial said in November 2007 that it had financed $22 billion worth of home loans in October, down 48 percent from November 2006. The lender, which was one of the biggest suppliers of subprime loans to borrowers with risky credit backgrounds, said it wrote $42 million worth of subprime loans in October 2007. That figure was down $3 billion from 2006.   .

Although lenders reported in late 2007 that they were avoiding stretched borrowers with risky credit, economists warned that millions of existing loans with two- and three-year introductory "teaser" rates would begin resetting in 2008.

© 2008, CCH. All rights reserved.

Federal Reserve Board Chairman Ben Bernanke told Washington lawmakers in November 2007 that nearly 2.3 million subprime mortgages would reset at higher rates through the end of 2008. An estimated one million to two million borrowers would be unable to avoid foreclosure, Bernanke said.

When foreclosures cannot be avoided, borrowers lose their homes. The losses also extend beyond borrowers. The foreclosure process typically costs lenders added legal fees, taxes due until the property is sold and lost equity in a house that must be priced to sell in a falling market. The added inventory of unsold homes further weakens local housing markets, depressing the value of other nearby homes.

## U.S. Conference of Mayors Adds to Gloom of Subprime Meltdown

In what many economists called "the grimmest assessment to date," the U.S. Conference of Mayors reported at the end of November 2007 that the subprime mortgage meltdown and resulting foreclosure fallout would have massive economic consequences for the nation's 361 metro areas.

The mayors' report projected $166 billion in lost gross domestic product growth, stemming from plunging real estate values.

The report, prepared by the economic and financial analysis firm Global Insight, projected that the foreclosure crisis would result in 524,000 fewer jobs being created in 2008 and a potential loss of $6.6 billion in tax revenues in 10 states.

"Not that long ago economists said housing was the backbone of our economy," Mayors Conference President Doug Palmer, Mayor of Trenton, N.J., said at a meeting of mayors, mortgage industry representatives and community advocates in Detroit shortly after the release of the report.

"Today the foreclosure crisis has the potential to break the back of our economy, as well as the backs of millions of American families, if we don't do something soon," Palmer said.

## Foreclosures Hit New Record in Third Quarter 2007

Home foreclosures shot up to an all-time high in third quarter 2007. The Mortgage Bankers Association (MBA) in its quarterly snapshot of the mortgage market released on Dec. 6, 2007, reported that the percentage of all mortgages nationwide that started the foreclosure process jumped to a record high of 0.78 percent in the third quarter.

Homeowners with adjustable rate mortgages were especially hard hit. The percentage of subprime ARMs that entered the foreclosure process soared to a record 4.72 percent, up from 3.84 percent in the second quarter. Late payments also reached a record high.

© 2008, CCH. All rights reserved.

MBA's Doug Duncan stated that:

> As conditions in the housing finance market continue to deteriorate, several factors are clear:
>
> - This is the first quarter which registers the full combined effects of the seizure of the nonconforming securitization market, broad-based home price declines, continued weakness in some regional economies and rate adjustments on monthly payments. The predictable results are increased delinquency and foreclosure.
>
> - In areas where the supply of homes far exceeds demand at current prices, home prices are falling and leading to more foreclosures. In Michigan and Ohio the problem continues to be the declines in demand due to drops in employment and population that have left empty houses in cities like Cleveland, Detroit and Flint. In states like California, the problem is excess supply due to speculative over-building and properties coming back onto the market.
>
> - While subprime ARM delinquencies and foreclosures are climbing in all states, in most states the actual number of loans involved is fairly modest. For example, the number of subprime ARM foreclosure starts in California during the third quarter equaled the starts in 35 other states combined.
>
> - While this quarter's numbers show the highest level of foreclosure starts (on a seasonally adjusted basis) for prime fixed rate mortgages in the last 10 years, that increase is largely due to increases in Florida, Ohio, Michigan and California. In most states the increase in prime fixed rate foreclosure starts is due to borrowers who will fall behind on their payments for the traditional reasons (employment, medical, marital, etc.) but who cannot sell their homes due to market conditions.

© 2008, CCH. All rights reserved.

## Moody's Reports Home Prices Could Fall Further

In addition to the dire reports on delinquency and foreclosure numbers for third quarter 2007 was a warning issued by Moody's Economy that the national average value of homes in the United States is likely to drop further before rebounding. The report, issued by the financial service in December 2007, indicated that the housing market will not begin to recover until 2010.

Nationwide, the price of the average home was forecast by Moody's at the end of 2007 to fall 13 percent from their 2005 peaks through early 2009. The report added that further incentives might be required to sell some property, which could push the average decline to as low as 15 percent.

## Housing Market Continues to Fall in 2008

In late March 2008, it was reported that Standard & Poor's/Case-Shiller index showed that U.S. home prices fell another 11.4 percent in January 2008, the housing market's steepest drop since S&P started collecting data in 1987.

Economists say the decline means prices have been growing more slowly or dropping for 19 consecutive months. The index tracks the prices of single-family homes in 10 major metropolitan areas in the United States.

A broader 20-city composite index also is down, falling 10.7 percent in January from a year ago. This is the first time that both indexes dropped by double-digit percentages, according to S&P.

Sales of new homes fell in February 2008 for the fourth straight month, pushing activity down to a 13-year low. The Commerce Department reported on March 25, 2008, that new home sales dropped 1.8 percent in February to a seasonally-adjusted annual rate of 590,000 units, the slowest sales pace since February 2005.

The median price of a home sold in February dropped to $244,100, down 2.7 percent from a year ago.

Many economists and analysts believe that the prolonged housing slump has dragged overall economic activity down with it. Many say that the slump, combined with other problems including a severe credit crunch, high energy prices and low consumer confidence, could drive the country into a full-blown recession.

© 2008, CCH. All rights reserved.

## Prime Borrowers Hit Hard

As home prices continue to fall and banks tighten their lending standards, people with prime credit histories now are falling behind on their payments for home loans, auto loans and credit cards.

Like subprime mortgages, many prime loans made in recent years allowed borrowers to pay less initially and face higher adjustable payments a few years later. As long as home prices continued to rise, prime borrowers could refinance their loans or sell their properties to pay their mortgages. With falling prices and stricter lending standards, homeowners with solid credit histories are starting to come under the same financial stress as those with subprime credit.

## Home Equity Falls to New Low

The Federal Reserve Board reported on March 5, 2008, that Americans' percentage of equity in their homes has fallen below 50 percent for the first time on record.

Homeowners' percentage of equity declined to 47.9 percent in the fourth quarter of 2007–the third straight quarter it was under 50 percent. The decline means that for the first time since the Fed starting tracking the data, in 1945, homeowners' debt on their houses exceeds their equity.

Economists expect the figures to drop even further as declining home prices strike at the value of most Americans' single largest asset.

Moody's Economy estimated that 8.8 million homeowners, or about 10.3 percent of homes, would have zero or negative equity by the end of March 2008.

## U.S. Crisis Sends Global Stocks Plunging

The subprime meltdown affecting the United States went global when stock markets around the world plummeted on Jan. 21, 2008. U.S. markets were closed for Martin Luther King Jr. Day, but all the world's other major economies experienced a sell-off. Stock prices fell more than 7 percent in Germany and India, 5.5 percent in Britain, 5.1 percent in China and 3.9 percent in Japan. Many countries reported their worst market declines since Sept. 11, 2001.

Analysts said that the markets fell as fears spread that massive losses on loans made to U.S. home buyers would cascade through the world financial system.

LaSalle Bank Chief Economist Carl Tannenbaum said the sudden wave on January 22 was hard to explain. "Much of the blame was placed on recession fears, but those fears have been expressed many times in recent weeks."

© 2008, CCH. All rights reserved.

Tannenbaum said that there was no single trigger to the huge sell-off. However, other analysts believe that the biggest fear factor was a new wave of pessimism about the global banking sector.

First Trust Advisors L.P. Chief Economist Brian Wesbury said part of the problem stemmed from a major downgrade of a firm that insures municipal debts. When such debt is marked lower, banks are forced to write it down against their capital.

"This affects the ability of banks to lend, and it helped to create an overreaction among investors overseas," Wesbury stated. "There is an incredible amount of fear in the world," he added, even though he said that most economies remain robust. Wesbury felt that the fears were based in part on worries that derivative instruments could default.

Wesbury said that he believes such fears are "overblown," but that they have become widespread.

Comments about the possibility of a recession by President Bush and Federal Reserve Chairman Ben Bernanke "may have helped to incite anxiety, even though we have a very sturdy and resilient economy," he added.

## Mortgage Meltdown Inflicts Collateral Damage

As delinquencies and foreclosures rise and housing prices fall, the range of victims continues to broaden. Homeless rates are rising as families lose their own homes to foreclosure.

Renters also are suffering the effects of the crisis as landlords face foreclosures. RealtyTrac estimates that more than 20 percent of foreclosures involve investment properties. When landlords lose their properties, tenants lose their homes. Homeless shelters say that they are unprepared for the large numbers of people who have lost their homes because of foreclosure or landlord defaults and now are homeless.

Financial analysts warn that state and local governments will soon feel the effects of the resulting reduction in property tax revenue. "The housing market has put a big negative for local government revenues across the board," said Stephen Levy, Director of the Center for Continuing Study of the California Economy in Palo Alto.

For example, the nonprofit Center for Responsible Lending warns that California could lose nearly $3 billion in property tax revenue and another $1 billion in sales and transfer tax revenue because of foreclosures.

"Property tax revenues are going to be a lot less than local governments built into their budgets, and there are going to be tough times at the local level," Levy said.

© 2008, CCH. All rights reserved.

Atlanta City Council member Mary Norwood noted that property tax revenues also would take a hit because foreclosed homes bring down property values in a neighborhood, leading to lower assessments on people who do pay taxes. Norwood said that neighborhoods with a number of foreclosed properties experience vandalism and house deteriorations that affect the property values of other homeowners in the community.

The ripple effect illustrates the wide-ranging impact the subprime mortgage crisis has had not only on the U.S. economy but on society in general.

## Conclusion

Economists and analysts have come to understand the causes of the subprime crisis. The resulting fallout of the mortgage crisis has been well-documented. Legislators, regulators, industry insiders and others have witnessed its devastating effect on U.S. and global economies. But the most crucial issue of the crisis still looms: what steps must be taken to "fix" the "mess?"

Resolving this issue has created a firestorm of dissension and debate among state and federal legislators, federal regulators, lenders and industry insiders. Criticism of proposed fixes is rife in the media, and economists and financial analysts have been divided over the plausibility of the cleanup theories.

As of publication, the questions remain unanswered.

© 2008, CCH. All rights reserved.

# EXHIBIT 40

Catastrophe Risk Financing in the US and the EU:
A Comparative Analysis of Alternative Regulatory Approaches

Draft: October 28, 2007

Robert W. Klein
Shaun Wang
Georgia State University

Contact Author:
Robert W. Klein
Center for RMI Research
Georgia State University
P.O. Box 4036
Atlanta, GA 430302-4036
Tel: 404-413-7471
E-Mail: rwklein@gsu.edu

**Note**: The authors express their appreciation to SCOR and the JRI for sponsoring the conference at which this paper was originally presented. We also thank Georges Dionne and J. David Cummins for their support and advice in the development of this paper and the assistance of Janne Lipponen, Phillipe Trainar and Morton Lane. The comments of an anonymous reviewer also were helpful. Of course, the views expressed in this paper are solely those of the authors and do not necessarily represent the views of any other person or organization.

### Catastrophe Risk Financing in the US and the EU:
### A Comparative Analysis of Alternative Regulatory Approaches
*Abstract*

The regulation of insurance companies in the United States (US) and the European Union (EU) continues to evolve in response to market forces and the changing nature of risk but with somewhat different philosophies and at different rates. One important area where both economic realities and markets are changing is catastrophe risk and its financing. This paper examines and compares regulatory and other government policies in the US and the EU generally and their approaches to the financing of catastrophe risk specifically. It is important to understand the fundamental differences between the two systems to gain insights into their disparate treatment of catastrophe risk financing. While policies could be improved in both jurisdictions, we argue that the much greater reform is needed in the US relative to the EU regulatory policies that are being developed. We offer recommendations on how US policies could be significantly improved as well as comment on issues facing the EU. We conclude with some observations on the potential for further progress in advancing and harmonizing the US and EU regulatory systems.

1

Introduction

The threat of "natural" and "man-made" disasters continues to grow in many parts of the world do to a confluence of factors, including population growth and economic development, climatic changes and weather cycles, geologic activity, and political unrest. Figures 1 and 2 underscore the growing significance of catastrophe risk in terms of both actual and potential catastrophe losses.[1] Figure 1 plots total worldwide insured losses from natural disasters over time and Figure 2 shows aggregate loss exceedance probability curves for worldwide catastrophe losses and hurricane losses in Florida. The nature and severity of the catastrophe threat varies among countries and regions of the world but its implications raise certain common issues and increasing global integration intensifies the inter-dependencies between countries and the rippling effects of a disaster. At its core, the problem of catastrophe risk poses a number of challenges to mitigating its effects, financing the costs that are incurred, and responding to the needs of those affected.

The regulation of insurance and reinsurance companies, among other government policies, has significant implications for the management and financing of catastrophe risk. At present, the risk and cost of catastrophes are borne by many "stakeholders" in different ways through the interaction of public and private sectors that affect their incentives and the efficiency of catastrophe risk management. This paper examines the different regulatory systems and government policies of the United States (US) and the European Union (EU) generally and how they address catastrophe risk financing specifically. The link between the fundamental philosophies and elements of these

---

[1] The authors express their appreciation to Patricia Grossi and Risk Management Solutions, Inc. for permission to use the data from which Figure 2 was constructed.

regulatory systems and their treatment of risk financing is important. Current policies and the prospects for reforming any specific policy depend on the government frameworks in which they reside.

Box 1 summarizes and compares US and EU policies in several key areas.

[Insert Box 1]

There are reasons to prefer maximum reliance on private risk financing to the extent that is feasible and efficient but governments necessarily play some role and can either encourage or discourage private financing. Hence, it is important to assess government policies towards catastrophe risk financing to determine whether they enhance or diminish economic efficiency. In this context, the regulation of insurance and reinsurance markets and government insurance programs for catastrophe perils can have significant implications for private financing and risk management. There are a number of insights that can be gained from examining these issues that are important for the subject jurisdictions as well as other nations and economies affected by catastrophe risk.

To provide some additional context for our review, we note that advocates of international insurance regulatory standards have tended to embrace a "three pillar" approach to regulation (as described in International Actuarial Association, 2004) that encompasses:

Pillar I: Minimum Financial Requirements

Pillar II: Supervisory Review Process

Pillar III: Measures to Foster Market Discipline

3

It is helpful to consider this framework in evaluating regulatory systems in different jurisdictions.

The next two sections of this paper review the basic regulatory philosophies and systems in the US and the EU and how they differ. This is followed by a brief discussion of the efforts to harmonize international insurance regulation and the prospects for the convergence of the US and EU approaches. We then evaluate how regulatory policies in the US and the EU address catastrophe risk financing and how these policies could be improved. We conclude with a summary of our analysis and a discussion of its implications for catastrophe risk management and the prospects for improving government policies.

**Solvency Regulation in the US**

Overview

Insurance regulation in the US is rooted in its historical legacy. The states each retain the principal responsibility for regulating insurance – the federal government has the authority to supersede state regulation when it chooses but has only done so on a selective basis to date.[2] Principal responsibility for the financial regulation of an insurer is delegated to its domiciliary state but the other states still perform some financial monitoring of all insurers licensed to operate in their jurisdictions and can suspend or revoke their licenses. Each state retains the principal responsibility for regulating the market practices of all insurers operating in its jurisdiction. The states utilize the National Association of Insurance Commissioners (NAIC) to coordinate and support their regulatory activities.

---

[2] Klein (1995) and Klein (2005) provide more comprehensive and detailed reviews of the US insurance regulatory system.

Financial regulations, such as risk-based capital (RBC) requirements, are fairly uniform among the states but each still retains the authority to diverge from the common regulations. Market regulation (e.g., rates, policy forms, market conduct, etc.) can vary to a much a greater degree among the states. The market regulation of an insurer in a non-domiciliary state (e.g., the regulation of its rates) can affect its financial condition and risk. This can lead to an externality problem in that practices such as regulatory rate suppression in one state can spread financial distress or insolvency costs to other states (see Klein, 1995).

Legislation has been introduced in Congress that would establish an Optional Federal Charter (OFC) for insurers that choose to be federally regulated. OFC-chartered insurers would not be subject to state regulation. It is unlikely that OFC legislation will be enacted in the near future but many believe that some form of a federal system is inevitable. The philosophy and policies of a federal regulator are unknown at this time but they could embrace many reforms that would establish or more effective and efficient system.

The states have tended to apply a prescriptive or rules-based approach to regulating insurers' financial condition and market practices that is heavily influenced by an accounting perspective. This is reflected in a voluminous set of laws, regulations, rules and other measure that govern insurers' actions. Regulators tend to focus on insurers' compliance with these prescriptions rather than the prudence of their management and actions and their overall financial risk. To their credit, US regulators indicate that they are seeking to move toward a more risk-based and principles-based approach to financial regulation as well as easing inefficient constraints on insurers' activities. However, this

has been a slow evolution that has tended to lag behind economic realities and market developments and its ultimate consummation is not guaranteed.

The emphasis on an accounting rather than a financial risk view in US regulation affects insurers' incentives to use catastrophe risk financing devices. Because of the importance of obtaining "accounting credit" for risk transfer arrangements (explained further below), insurers are compelled to consider how these arrangements affect their financial statements in terms of valuing assets and liabilities, calculating losses and income, and estimating their risk exposure. If regulators placed more emphasis on financial risk assessment than accounting values, insurers would have greater incentives to use the most efficient methods. This is especially true with respect to catastrophe risk – currently US regulators tend to do very little to assess insurers' exposure to and management of catastrophe risk and hence insurers do not obtain a more favorable regulatory evaluation if they manage this risk well.

Accounting Standards

Insurers are generally subject to two sets of accounting standards in the US: 1) Statutory Accounting Principles (SAP); and 2) Generally Accepted Accounting Principles (GAAP). SAP rules are determined by state insurance regulators through the NAIC and insurers are required to file detailed financial statements and other reports in accordance with SAP. GAAP rules are determined by the Financial Accounting Standards Boards (FASB) and insurers are required to follow GAAP in their non-regulatory financial statements and the reports that stock insurers are required to file with the Securities and Exchange Commission (SEC).

SAP and GAAP are similar but there are some important differences. In concept, SAP is intended to determine the liquidation value of an insurer at a point in time whereas GAAP is intended to measure the value of a firm as a going concern which is the primary concern of investors. Hence, SAP does not recognize certain assets recognized by GAAP (e.g., "goodwill" or "franchise value") and requires insurers to book all acquisition expenses at the time a policy is written rather than pro-rating or amortizing these expenses over the duration of the policy.

One aspect of SAP and GAAP, among others, is particularly relevant to the regulation of cat risk financing. The first is the "accounting credit" that insurers receive for reinsurance and other forms of risk transfer. "Credit" is obtained when an insurer is allowed to account for the amount of risk transferred by posting an asset or reducing a liability and decreasing estimates of their potential net losses. For example, insurers are not allowed to reflect premium cessions to or recoverables from foreign insurers that do not post collateral to cover their liabilities. The resulting accounting values are reflected in the calculation of insurers' surplus and their RBC requirements, among other financial regulatory measures.

Capital Standards and Risk Analysis

The states impose two types of capital requirements on insurers. Each state has its own "fixed-minimum" requirement.[3] Insurers are also subject to uniform RBC requirements based on a formula developed by the NAIC that is both complex and contains flaws as discussed below. An insurer is required to have capital that meets or

---

[3] The state fixed minimum requirements are fairly crude and are not adjusted for the size of an insurer or factors associated with its financial risk. Among the states, they range from $500,000 to $6 million, with the median requirement in the area of $2 million.

exceeds the higher of the two standards. All of the "charges" used to calculate an insurer's RBC requirement involve the application of selected factors to various accounting values. The charges are summed into several baskets and subjected to a covariance adjustment to reflect the independence of certain risks, using the basic formula shown below.[4]

R0: Investments in Affiliates

R1: Fixed Income Assets (interest rate and credit risk)

R2: Equity Assets ("market value" risk)

R3: Credit (risk associated with reinsurance recoverables)

R4: Loss Reserves (risk associated with adverse loss development)

R5: Premiums (risks of under-pricing and rapid growth)

$$RBC = 0.5[R0 + \sqrt{R1^2 + R2^2 + R3^2 + R4^2 + R5^2}\,]$$

Currently, the current risk-based capital requirement for US insurers does not consider catastrophe risk explicitly.

Under the US RBC system, certain company or regulatory actions are authorized or mandated according to the relationship of an insurers' Total Adjusted Capital (TAC) to its RBC requirement -- see Box 2 below. TAC is essentially equal to an insurer's actual surplus with minor adjustments for determining its RBC compliance. Because the US RBC system does not allow a great amount of regulatory discretion, its imperfections and stringency are significant considerations. US regulators have tended to set the RBC bar

---

[4]. The inclusion of the 0.5 factor in the RBC formula is essentially a political concession to the insurance industry. As shown in Box 2, company action is required at 200% of its RBC requirement. This is really the operative level of RBC, but halving the formula calculation and calling this the RBC requirement allows insurers to report higher ratios of their actual capital to their RBC requirements.

fairly low to avoid being forced to take actions against insurers that are not warranted. As reflected in Figure 3, relatively few insurers (3.1 percent) fall below their Authorized Control Level RBC requirement (the 200 percent level) and many of these insurers are already under some form of regulatory supervision. Insurers with TAC/RBC ratios in excess of 400 percent account for 86.9 percent of all insurers and 47.4 percent of insurers have a TAC/RBC ratio greater than 1,000 percent. Another way to gauge the US system is to compare insurers' regulatory RBC requirements with how they perform in meeting rating agencies' capital standards. This is reflected in Figure 4, which groups insurers into several classes according to the relationship of their TAC/RBC ratio to their Best's Capital Adequacy Ratio (BCAR). Figure 4 reveals that most property-casualty insurers have TAC/RBC ratios considerably higher than their respective BCARs.[5]

[Insert Box 2 & Figures 3 & 4]

A full discussion of the issues with the US RBC formula is beyond the scope of this paper but they are addressed in Cummins, Harrington and Klein (2002). One significant aspect of the formula is the use of selected factors to calculate RBC charges for asset risks that are uniform for all insurers.[6] A second notable problem is the calculation of insurers' RBC charges for risks related to errors in reserving, pricing and underwriting. These charges are based on an insurer's historical experience which can be

---

[5] A.M. Best is a US rating agency that has developed its own Best's Capital Adequacy Ratio (BCAR), as other US rating agencies have developed their own capital standards. In Best's explanation of its system, a BCAR of less than 100% is considered "inadequate", a BCAR of 100%-200% is considered "adequate", and a BCAR exceeding 200% is considered "more than adequate".

[6] These factors were selected on the basis of statistical analysis of historical data on declines in asset values due to changes in interest rates, bond/loan defaults, etc. and the judgment of actuaries and regulators.

misleading and potentially manipulated, e.g., by setting lower reserves insurers can reduce their RBC charge for reserve risk.[7]

Currently, US property-casualty insurers are not subject to any requirements to perform internal risk modeling or allowed to use it as an optional approach to demonstrate the adequacy of their capital and financial risk management. US regulatory standards also have not embraced an Enterprise Risk Management (ERM) perspective in requiring insurers to evaluate the full range of risks they face and their interaction. Consequently, regulators do not provide any incentives for insurers to employ internal risk modeling or ERM, although some insurers may still retain internal incentives to undertake these analyses. This, in turn, diminishes insurers' regulatory incentives to better manage and finance their catastrophe risk.

US regulators also tend to be cautious in accepting or approving new approaches to risk financing by insurers or their participation in alternative financing mechanisms for insureds. Generally, transactions involving the transfer or hedging of risk are not prohibited but neither do insurers gain any credit for such transactions beyond those involving what regulators consider to be "authorized reinsurance" or insurance-linked securities issued through US-regulated entities.[8] Conversely, regulators tend to take a dim view of insurers taking large positions on the risk-assumption side of derivatives.

Company Versus Group Perspective

---

[7] In the short-term, an insurer can lower its RBC requirement by underestimating its loss reserves. In the long-term, inevitable adverse loss development will eventually increase the insurer's RBC requirement but there will be a lag between reserve underestimation and its detection by regulators and its reflection in the RBC formula.

[8] As noted below, US insurers issuing cat bonds through offshore SPRVs have tended to deposit the associated trust funds in US institutions. This allows these insurers to treat these securitizations as "authorized" reinsurance because the funds effectively collateralize the reinsurance or risk transfer arrangement.

US regulators focus on the financial condition of each insurance company within a group, although they also pay some attention to the financial condition of an insurer's group and its implications for adversely affecting its members. One reason for the company focus may stem from US law and its principle of the "corporate veil". From a legal perspective, except under special circumstances (e.g., deliberate fraud), the parent company or group of a subsidiary insurance company is not required to bail out the subsidiary if it becomes insolvent. Although insurance groups have rarely exercised this option in practice, it still looms as a possibility that regulators must consider. Unfortunately, one of the consequences of the individual company approach to regulation is that less consideration is given to capital and risk management at the group level.

Solvency Monitoring, Intervention and Market Conditions

The second and third pillars of the international regulatory vision encompass solvency monitoring, regulatory intervention and market conditions that promote solvency and curtail excessive financial risk. The US has a highly-developed monitoring framework that, arguably, is motivated in part by its relatively low capital requirements. The NAIC has developed several tools for financial monitoring, including two early warning systems (IRIS and FAST) and a set of applications that state regulators can use and customize to analyze an insurer (Klein, 2005).[9] These systems are static, "ratio-based" tools. They involve no dynamic testing or modeling, which admittedly is difficult to perform using a standard approach but not impossible. The NAIC provides other ratio-

---

[9] IRIS is the acronym for the Insurance Regulatory Information System. FAST is the acronym for the Financial Analysis Solvency Tracking system. An insurer's IRIS ratio results are publicly available. The specifications of the FAST system and an insurer's FAST results are not public See Klein (2005) for more detailed descriptions of these systems.

based analysis tools to regulators which they can readily modify for their particular needs and regulators also may develop their own monitoring and analysis tools.

Although each state is expected to perform extensive monitoring of the insurers domiciled in its jurisdiction, there is second level of monitoring at the national level performed by the NAIC for companies considered to be "nationally significant", i.e., insurers that write business in 17 or more states and write annual premiums of $50 million or more (for property-casualty insurers). NAIC analysts, using the FAST system, score insurers in terms of their need for further review. Insurers that score above a certain level or set off other warning triggers are subject to further analysis and potential review by an NAIC working group comprised of regulators from different states. If warranted, the regulators of "targeted" insurers are queried about the financial condition of the insurer and may be compelled to take actions deemed appropriate by the working group.[10] This second layer of review enhances and widens the oversight of insurers and has likely prompted more timely regulatory intervention for certain insurers.

Finally, in theory, solvency/financial regulation and market regulation (e.g., rates, policy forms, market practices, etc.) should be coordinated to promote the safe and viable operation of efficient insurers. However, it appears that some US regulators tend to prioritize the "affordability and availability" of insurance over solvency considerations. In practice, regulators in some states attempt to suppress insurers' rate levels and compress rate structures in the personal and certain commercial lines (e.g., property insurance in hurricane-prone states) and impose other restrictions or mandates that increase insurers' financial risk. US regulators rarely if ever disapprove or prevent

---

[10] Other states retain leverage over the domiciliary regulator as they can suspend the licenses of non-domestic insurers operating in their jurisdictions. Such actions would effectively halt an insurer an insurer in its tracks and force its domiciliary regulator to seize the insurer.

excessive under-pricing, lax underwriting and the assumption of large concentrations of catastrophe exposures (Klein, 1995). This is reflected by the financial failure of five insurers in Florida following the 2004-2005 storm seasons that were allowed to write large concentration of high-risk exposures without adequate management of their catastrophe risk.[11]

### Solvency Regulation in the EU

Overview

From a jurisdictional standpoint, countries in the EU face some of the same challenges that the states in the US have faced in coordinating and harmonizing their insurance regulatory activities. However, the situation is not exactly the same – the EU is comprised of sovereign countries and the EU's authority and influence differs from that of the federal government in the US. The EU must achieve a consensus among its members in support of its regulatory standards and other policies. At the present time, EU member states are subject to some common, minimum standards (based on the Solvency I EU directive) on top of which the majority of jurisdictions are applying their own additional standards. Hence, in some instances we refer to country-specific policies, recognizing that that they must ultimately converge.

A principal goal of EU policies has been to facilitate cross-border trade within the EU and make it easier and more efficient for an insurer domiciled in one member country to sell insurance in other member countries, either across borders or through the establishment of branch companies, as well as engage in trade beyond Europe. EU member countries will continue to regulate the insurers domiciled in their respective

---

[11] See Klein (2007) for a more detailed discussion of the financial and market regulation of property insurers subject to hurricane risk in Florida and other states.

jurisdictions but each will do so according to EU policies and standards. To the extent that EU countries abide by similar standards and policies, confidence in the adequacy of each country's regulation is increased and insurers do not have to deal with vastly different regulatory requirements or discrimination across countries.

The two most important aspects of the EU's regulatory approach is its guiding philosophy and its program to develop a stronger and more effective approach to insurance regulation as reflected in the Solvency II initiative (see Eling, Schmeiser and Schmit, 2007; Trainar, 2006). This initiative follows Solvency I regulations that took effect in 2004. The EU took a major step when the European Commission published its long-awaited proposal for a Solvency II Directive in July 2007. The Proposal articulates a view for a new regulatory framework reflecting the economic substance of insurance, focused on the management of risk, and grounded in risk-sensitive capital requirements. The Proposal follows the high-level 3-pillar philosophy as developed for bank regulation in the Basel II accords (Commission of the European Communities, 2007) but the Proposal has some substantial differences with Basel II as well as innovations. The Proposal will need to be adopted by the Ministries of Finance (Ecofin Council and European Parliament.

The Framework Directive will be supported by technical implementing measures that will have the force of law. The substance of these implementing measures will be primarily formulated by the Committee of European Insurance and Occupational Pension Supervisors (CEIOPS) – the cooperation body consisting of the relevant supervisory authorities from each member state.[12] In addition to the legislative framework, CEIOPS

---

[12] This period of further development will be extremely important in terms of its additional specification of EU solvency policy and its implementation. As has occurred in the development of the proposed directive,


will work on joint implementation guidelines in order to ensure consistent implementation across all member states. The new regime will be in place and operational towards the end of 2012 or early 2013. This new framework will establish a more advanced and uniform approach to solvency regulation among EU countries with particular emphasis on risk-sensitive capital requirements and risk management, effectively supplanting the different regulatory systems and policies currently employed by different countries.

Unlike the US, many European countries have been moving much more quickly to apply what might be labeled as a "prudential" or principles-based approach to insurance regulation (distinguished from a prescriptive or rules-based approach). In a prudential system, emphasis is placed on insurers' maintaining an adequate "solvency margin" and the competence and judgment of an insurer's management and actions with an insurer's financial risk being the ultimate point of focus for supervisors. EU regulators tend not to subject insurers to the kind of voluminous and detailed set of rules used in the US. Instead, they maintain closer scrutiny of how insurers are managed and exercise greater discretion in the actions or interventions they may employ to correct practices or problems as they deem necessary. Many EU countries have also more quickly embraced a financial/economic approach (contrasted with an accounting approach) to insurer regulation than their US counterparts. This approach tends to allow insurers greater freedom as long as they use that freedom judiciously, do not engage in excessively hazardous ventures or transactions, and ultimately keep their financial risk within reasonable bounds.

---

various stakeholder groups will be heavily involved in expressing their opinions in this process which the EU must consider in finalizing and implementing its standards.

Accounting Standards

The Solvency II directive suggests that EU insurance accounting standards will be broadly compatible with international accounting standards although it does not indicate how closely EU standards will conform to international standards. Specifically, the Commission's Proposal notes that:

> In line with the latest developments in risk management, in the context of the International Association of Insurance Supervisors, the International Accounting Standards Board and the International Actuarial Association and with recent developments in other financial sectors, an economic risk-based approach should be adopted which provides incentives for insurance and reinsurance undertakings to properly measure and manage their risks. Harmonization should be increased by providing specific rules for the valuation of assets and liabilities, including technical provisions.

There are several issues in melding EU accounting standards with international standards. One is that IFRS is compulsory only for companies that have to establish consolidated accounts, i.e., insurer groups. Hence, IFRS is not compulsory for stand-alone companies. The second problem is that there are currently no IASB standards for insurance liabilities, which we discuss further below. Hence, the Solvency II Directive has to be further developed without the articulation of what international standards for insurers' reserves will be.

In the international accounting and regulatory community (IASB and IAIS), there are still no final agreements on the exact definition of the fair value of insurance liabilities (which is the sum of the present value of expected payouts plus a market risk margin). Accountants are called in to perform tests of whether a contract carries enough elements of transfer of risk in order to qualify for reinsurance accounting or hedging accounting. One of the key issues is whether a risky liability should be valued within the

16

context of the entity's own portfolio, or should be valued with respect to an average third party "market" portfolio. It appears that the accounting rules that will be finalized will have an impact on insurance-linked securities.

Capital Standards and Risk Analysis

The EU philosophy is reflected in its approach to capital requirements. As noted above, Solvency II has taken a cue from the Basel II banking accords. In the banking sector, international regulators have divided a bank's capital into three tiers, reflecting the extent to which instruments meet the key underlying principles of capital, loss absorbency and permanence.

- Tier 1 capital is the core bank capital from a regulator's point of view. Only assets considered to be the most reliable and liquid can qualify as core capital. Examples of Tier 1 capital include common stock, preferred stock that is irredeemable and non-cumulative, and retained earnings. Certain subordinated debt is also included in Tier 1 capital.

- Tier 2 and Tier 3 capital is secondary bank capital that includes items such as undisclosed reserves, revaluation reserves, general provisions, hybrid instruments and subordinated term debt.

- Currently, Tier 2 and Tier 3 capital is limited to 100% of Tier 1 capital.

The current Solvency II initiative for insurance explicitly establishes a two-level capital requirement, specifying a Minimum Capital Requirement (MCR) and a Solvency Capital Requirement (SCR) that also utilizes a three-tier approach.

- The Minimum Capital Requirement (MCR) represents an absolute regulatory minimum level of capital needed by an insurer. The calculation method for and the calibration of MCR will be set by the legislators.

- The Solvency Capital Requirement (SCR) will be the "normal" operating requirement level of capital for an insurer. This capital level may be derived either through a firm's own internal capital model or through a standard model formula set out in the implementing legislation adopted by the EU.

17

The MCR standard has two components: 1) an absolute minimum (also called the "minimum guarantee fund"); and 2) an additional solvency margin. For non-life insurers, the absolute minimum is equal to 18 percent of the first €50 million of premiums and 16 percent for premiums above that level. The margin component is based on claims – 26 percent for the first €35 million and 23 percent for claims above that amount. While this MCR standard may be considered factor-based, it is still more responsive to differences in insurers' size as reflected by their premiums and claims than the US fixed-minimum capital standards which are only crudely adjusted for insurer characteristics. It also should be noted that the MCR factors are envisioned to be applicable only during the transition period until Solvency II is implemented. Long term, the MCR is expected to be a certain "confidence margin" or a certain fraction (e.g., one third) of the SCR.

The SCR is the most important contribution of Solvency II. It is intended to be the amount of capital that an insurer needs to remain viable from a business perspective and maintain its default risk or probability (using a Value-at-Risk (VaR) approach) below a certain level.[13] If an insurer fails to meet its SCR standard, it does not trigger a set of mandatory actions per se, but does require the insurer and its regulatory supervisor to evaluate and correct the deficiency if deemed necessary. In this sense, the SCR standard does not carry the prescribed company and regulatory actions embodied in the US RBC standards. At the same time, the SCR standard is based on a much more sophisticated approach to determining an insurer's capital needs than US RBC (even using the standard model) and is likely to be a more stringent standard than the RBC requirement that would be set for a comparable insurer.

---

[13] The current proposed directive has set this at a 0.5 percent level.

The ability of an insurer to use an internal risk model rather than a standard formula to determine its SCR is a significant forward step in insurer solvency regulation. An internal model, properly designed and estimated for a given insurer, should provide a more accurate assessment of an insurer's risk and capital needs and enable it to more efficiently manage that risk. The internal model used by an insurer must be validated and its use monitored and performance periodically checked by its regulatory supervisor. The issue of whether regulators may require certain insurers to use internal modeling is still a matter to be resolved in EU deliberations. Some are concerned that allowing all insurers to opt for either the standard model or an internal model would promote "adverse model shopping."

Insurers that do not use a validated certified internal model must use a standard model that is being developed by supervisors collectively in the EU. The rules that will govern whether an internal model will be strictly optional for all insurers necessarily have implications for the importance of the standard model and how it is designed. In its current stage of development, the structure of the EU formula borrows heavily from a formula developed by the German Insurance Association, although other formulas may also influence what is adopted (see Eling, Schmeiser, and Schmit, 2007).[14] Also, the calibration of the standard model will be determined by the EU. Standard models have their limitations but, obviously, there are numerous design and specification issues in developing the best possible model for its intended purposes.

The basic elements of the standard model (formula) and the specific risks they address are summarized in Box 3. The basic elements include underwriting risk, market risk, credit risk and operational risk. It appears that the EU standard model will have

---

[14] Schubert and Grießmann (2007) outline the German formula.

several advantages over the US RBC formula. First, it will use a more sophisticated approach in accounting for diversification effects and the interactions among different risks. Second, the model will allow for the use of "undertaking-specific" parameters rather than standard ones applied to all insurers. Third, the model will also include a catastrophe risk component.[15] Hence, it will likely be superior to its US analog. At the same time, some in the EU may view the contemplated standard model as being too complex and come close to constituting a "standardized internal model."

[Insert Box 3]

In general, the EU approach embraces a more comprehensive approach to determining whether an insurer has adequate capital and is appropriately managing its overall financial risk. This approach recognizes both the independence and interaction of the various risks that an insurer faces, consistent with the enterprise risk management (ERM) concept. The broader view potentially allows insurers more flexibility in managing individual risks and to take advantage of the independence of some risks and address the interdependence of others. This kind of perspective could lead to greater regulatory acceptance and recognition of alternative catastrophe risk financing methods by assessing their ultimate effect on an insurer's financial risk rather than the attributes of a particular method or device in isolation.

Group Versus Subsidiary Focus

---

The EU approach encompasses regulation at both a company and group level. The main focus is on individual companies but that there is additional, 'supplementary' supervision at group level aimed at capturing group-wide risks. A group approach to solvency regulation reflects the view that an insurance group is a single economic entity in which risk can be pooled and diversified. A group guarantee for a subsidiary can be viewed as a form of contingent capital. This diversification effect is most pronounced for reinsurance groups, whose business models and value proposition are based on diversification of risk, both by risk type and by region.

At the same time, in applying such an approach, EU supervisors will need to assess the nature of the guarantees between a group or parent company and its subsidiaries. The key question that would need to be resolved is how to ensure the fungibility of capital across the group. This will require a legal underpinning to meet regulatory requirements.

The EU view is reflected in the position taken by the Financial Services Authority (FSA) in the UK which recognizes that if insurance entities are required to hold higher levels of capital in their locale, it would not give due recognition to the diversification benefits that legitimately exist at a group level This would create an inefficient fragmentation of a group's capital which in turn could translate into higher prices for policyholders and higher financial risk. The UK is urging the EU to adopt this approach.

The UK Treasury and the FSA jointly published a discussion paper which reflected on how group supervision might be undertaken in the context of Solvency II (see HM Treasury and FSA, 2006). The paper proposes two essential policies regarding group versus subsidiary regulatory treatment. First, insurance groups should be allowed

21

greater freedom to allocate their capital resources among different subsidiaries within the EU. Subsidiaries within a group should not be required to hold capital locally in excess of their MCR. Rather, capital in excess of the MCR and any Pillar 2 requirements may be held at group level, for the benefit of subsidiaries. The SCR and Pillar 2 requirements would be set at the group level with the group being able to claim a capital benefit to the extent that the risk is effectively diversified across the group.

Second, there are respective responsibilities of the supervisors of groups and their subsidiaries. The group supervisor would be responsible for ensuring the group's compliance with its obligations to support its subsidiaries, as well as for meeting its SCR and Pillar 2 requirements. The local supervisors would be responsible for enforcing the MCR, governance issues relating to the subsidiary and its conduct of business. The success of this approach will require: 1) the group supervisor to coordinate supervisory activities and group-wide approaches to capital and supervision; and 2) the ability to remove some of the duplicative effects of group and entity supervision arrangements.

It should be noted that the approach advocated by UK on groups would require a greater degree of cooperation, information exchange, joint supervision and exchange of staff between supervisors if it is going to prove practical. To help accomplish this, the approach would also include incentives for supervisors to adhere to these practices as they would need the help and assistance of other supervisors to fulfill their responsibilities.

Solvency Monitoring, Intervention and Market Conditions

Solvency monitoring will also be important beyond the capital requirements imposed on insurers (see Eling, Schmeiser, and Schmit, 2007). This is an area that will be

22

subject to further development as the EU process continues. In a principles-based system, solvency monitoring will likely have a different character than that in the US. In such a system, solvency monitoring may tend to be more "informal" and rely on both qualitative as well as quantitative analysis. The reliance on static, ratio-based early warning systems in the US arguably has its limitations and the combination of internal risk models, a better standard model and the monitoring measures employed by the best EU regulators are likely to be superior to the systems and tools used by US regulators.

As presently contemplated, insurers would be required to demonstrate to supervisors that they have adequate systems and controls in place to manage current and future risks. In addition, the so-called Own Risk and Solvency Assessment would require firms to analyze and report to supervisors how they see their current and future position for all risks, not just for those risks captured by the standard model. This is a significant development and is already in place in the UK in the form of its ICAS assessment.

However, a chain is no stronger than its weakest link and proper supervision by and good communication among all regulators is critical in a multi-jurisdictional scheme.[16] First, insurers that do not use internal risk modeling warrant additional monitoring that helps to remedy this deficiency. Second, ideally, monitoring tracks major transactions by insurers that could significantly affect their financial risk before these transactions are reflected in insurers' regulatory reports. Admittedly, this can be difficult to do but the US experience has demonstrated the potential for such transactions to undo an insurer before regulators become cognizant of what has happened. Third, EU members need to have some level of confidence in the adequacy of each other's monitoring efforts

---

[16] Eling, Schmeiser, and Schmit (2007) discuss some of these issues.

and that insurer issues that affect multiple EU member states are communicated to all EU member states affected.

Finally, in terms of "market regulation", it would be desirable for all EU members to employ policies that do not undermine solvency goals. Our impression is that the EU regulatory policy seeks to promote reliance on market forces to the maximum extent possible rather than regulation to constrain prices and possibly other aspects of insurers' products and market practices A significant element of the EU legal framework has been to abolish controls on rates and policy forms.

Solvency II also includes considerable supervisory reporting and public disclosure which is aimed at ensuring that informed market participants will be in a position to evaluate and question various aspects of insurers' operations, e.g. an insurer's risk management practices or business plans, and to reward or punish those firms that they believe to be lacking or not engaging in best practices. If EU members embrace this philosophy, it should help to promote efficient and viable markets and insurers and avoid the problems created by excessive market regulation in the US. However, it would be unrealistic to believe that EU governments are fully insulated from political pressures to artificially lower the cost of insuring catastrophe risk. More favorable treatment of broad risk diversification and alternative forms of catastrophe risk financing should reduce some of this pressure.

### Efforts Toward Harmonizing International Regulation

There has been a significant effort to improve and "harmonize" insurance regulation among various countries in order to reduce barriers to trade and establish certain international standards that could increase one country's confidence in another

country's regulation of an insurer. The guiding vision of this effort is to elevate the sophistication and effectiveness of insurance solvency regulation to a fairly high level among countries, as well to make regulatory standards, policies and processes more similar and transparent (see International Actuarial Association, 2004). These international efforts will have implications for the regulation of catastrophe risk financing and hopefully will improve it for those countries that embrace these efforts. Understandably, these international efforts are tracking closely with Solvency II.

The efforts to develop international standards have tended to focus on capital adequacy and accounting/financial reporting systems. Basel II and Solvency II reflect the most recent initiatives to develop international solvency standards for banks and insurers. As noted above, an important element of Solvency II would place significant emphasis on an insurer's dynamic analysis of its financial risk for those insurers that are in a position to establish their capital needs using this approach. Another initiative has addressed the development of new international accounting standards (including GAAP and Fair Value) that would make insurers' financial statements more transparent and comparable across countries. The International Association of Insurance Supervisors (IAIS) has been a major supporter of this effort.

An additional major force has been international trade agreements including the most recent General Agreements on Tariffs and Trade (GATT) accords administered by the World Trade Organization (WTO).[17] GATT provisions on financial services have sought to ease barriers to trade in insurance markets by reducing unnecessary national regulatory impediments and enhancing the transparency of each country's regulatory systems and requirements. This has prompted many countries to upgrade their regulation

---

[17] See Grace and Skipper, 1998 for a discussion of international trade in insurance.

of financial services and insurance in order to allow foreign insurers to enter their markets and compete with domestic insurers without undermining the financial viability of their domestic industry. The World Bank and other organizations have been active in assisting developing countries in improving their financial regulatory systems to accommodate the changes required by GATT.

Understandably, these international regulatory initiatives have proceeded with considerable debate. Some US insurers are not enthusiastic about complying with the international standards being proposed but they also recognize that compliance with some standards will be necessary if they are or intend to be involved in international transactions.[18] US regulation may be pulled into the Solvency II approach in order to facilitate cross-border trade in insurance but it is not clear how quickly such a development would occur. Historically, the size and relative autonomy of the US insurance market has reduced US incentives to embrace an international approach to solvency regulation but the economic realities of global trade and the growth of other economies should pressure the US to alter its perspective. Indeed, some have opined that EU-regulated insurers will have an advantage over US insurers.[19]

### Evaluation of US and EU Regulation of Catastrophe Risk Financing

In terms of its economic implications for an insurer's catastrophe risk, securitization can offer risk transfer benefits similar to a reinsurance contract at a potentially lower cost for higher layers of risk. However, the implications of

---

[18] One factor chilling US insurers' enthusiasm may be the tendency of US regulators to layer additional solvency requirements (e.g., dynamic solvency testing) on top of existing ones, rather than replace antiquated requirements with newer ones or allow insurers to choose one approach over another to demonstrate the adequacy of their capital.

[19] See "Guy Carpenter Chief: Solvency II Gives an Edge to European Insurers," BestWire, October 22, 2007.

securitization for an insurer's regulatory capital calculations and regulatory assessments of its financial condition and risk can vary considerably among regulatory systems depending on their standards and policies. This could lead to a situation in a particular regulatory jurisdiction in which risk was transferred but there would be little or no regulatory recognition of the capital relief that motivated a securitization transaction. This situation would be unfortunate given the need for insurers to employ efficient catastrophe risk financing strategies. Below we discuss the implications of the US and the EU systems for the full array of catastrophe risk financing methods and devices.

Figure 5 reveals the flow of new capital into conventional reinsurance as well as other risk financing devices following major catastrophe loss shocks in 1992-1993, 2001-2002 and 2005-2006. While conventional reinsurance has still drawn the bulk of this new capital, other devices have commanded a small but growing share of this new capital. This also reflected in Figure 6 which shows the strong growth of cat bond issuances since 1996.[20] These are positive developments but experts in this area would probably agree that these devices have realized only a fraction of their potential in financing catastrophe risk. We discuss some of the regulatory and other government policies that may be affecting the use and growth of alternative risk financing.

[Insert Figures 5 & 6]

US Regulatory Approaches
*Overview*

---

[20] The authors express their appreciation to Morton Lane and Lane Financial LLC to reproduce Figures 5 and 6 from its publications.

Regulators can influence the use of risk financing mechanisms in several ways as depicted in Figure 7. First, they can impose constraints on or bar insurers from using certain instruments or create other impediments. Second, regulation can either facilitate or inhibit catastrophe risk financing. For example, if regulators allow an insurer to use a particular instrument, they determine how the insurer can reflect the instrument in its financial reporting, e.g., can it gain "accounting credit" on its financial statement in terms of reducing its losses, decreasing its liabilities, and or increasing its assets (as we discuss below). Further and very importantly, there is the question of whether an insurer's use of catastrophe risk financing is considered in regulatory assessments of its capital adequacy and financial risk which would tend to "boost" insurers' motivation to use efficient risk financing devices. Finally, other regulatory/government policies, such as the regulation of insurers' rates and market practices, the creation of government insurers/reinsurers, and tax rules also influence the economic feasibility and viability of these catastrophe financing instruments. Certain government actions, such as the creation of public insurance/reinsurance mechanisms, can "detract" from or reduce the demand for private risk financing.

[Insert Figure 7]

In discussing the interaction of US regulation with cat risk financing, it is also important to recognize the influence of rating agencies. Because of their important role in insurance markets, changes in rating agency policies can have a significant impact on insurers' actions and catastrophe risk management. Arguably, recent rating agency

initiatives regarding catastrophe risk are likely having a greater effect on insurers than regulators.

*Surplus and Catastrophe Reserves*

Holding additional surplus to handle catastrophe losses has served as a conventional catastrophe risk financing mechanism and is an insurer's first layer of protection – any catastrophe losses it retains essentially must come out of surplus and special catastrophe reserves if allowed. US regulators do not discourage this practice but government policies have made this a more costly technique than it would need to be. First, insurers are generally compelled to keep catastrophe funds in their general surplus account which makes it subject to depletions arising from other contingencies. Second, regulators may treat "extra surplus" as something that would justify greater restrictions on an insurer's prices. A third problem is that additions to surplus are taxed as income and the investment earnings on this surplus are also taxed which retards its accumulation (this is determined at the federal level). Under US SAP and GAAP accounting rules, there is no provision for catastrophe reserves, i.e., losses that have not yet been incurred.

The idea of allowing insurers to set up "catastrophe reserves" that could offer significant tax advantages has been nominally endorsed by state regulators but the necessary accounting and tax provisions to facilitate such reserves have not been enacted (Davidson 1996; Harrington and Niehaus 2001).[21] In concept, an insurer would be allowed to contribute up to a certain amount of its income every year to a reserve intended to fund future catastrophe losses – the reserve would be reported as a liability in

---

[21] New York has recently issued a proposed regulation that would require insurers to establish catastrophe reserves, but it would not change current state and federal tax rules.

an insurer's financial statement. Fundamental to this concept is the policy that contributions to the reserve and investment earnings associated with the reserve would not be taxed. Accounting and tax rules would govern contributions to and withdrawals from the reserve.[22] Such a provision for catastrophe reserves would allow insurers to more readily set aside and accumulate additional funds to cover retained catastrophe losses.

The primary barrier to catastrophe reserves appears to be the federal government which has been cool to the idea because of concerns that such reserves would be manipulated to reduce the tax liability of an insurer. This contrasts with tax policies in EU countries which typically allow insurers to deduct contributions to and investment earnings on catastrophe reserves from their income in determining their tax liability (U.S General Accountability Office, 2005). Historically, US insurers have not been aggressive in pushing for tax-favored catastrophe reserves in the Congress because of concerns that it would lead to a "quid pro quo" in terms of increasing the taxation of insurers in some other area. There is no indication that the current Congress would be any more supportive of tax-favored catastrophe reserves.

The NAIC has also been working on adding a catastrophe risk component to its RBC requirement. The current formula only reflects catastrophe risk to a limited degree to the extent that "underwriting risk" charges (reflected in the R5 component) are based on 10 years of historical experience.[23] The NAIC P-C RCB Working Group has recommended that a catastrophe risk charge be added to current RBC formula. Initial regulatory proposals contemplated a cat risk charge equal to the "one-in-250-years level"

---

[22] Withdrawals not used to fund catastrophe losses would ultimately be taxed.
[23] Insurers with higher loss ratios during the previous 10 years have a higher factor applied to their premiums to determine the amount of the R5 charge.

of expected annual losses (net of reinsurance) generated by an approved catastrophe risk model. The creation of an RBC catastrophe risk charge could be associated with accounting provisions to enable insurers to establish catastrophe reserves.

However, such an approach has generated a number of concerns among insurers and industry actuaries. Two prominent issues are what would constitute an "approved cat model" and the proposal of a one-in-250-years standard versus something lower (e.g., a one-in-100-years standard). There are a number of other issues associated with how an insurer's cat modeling would be reviewed and verified and related details. Of course, provisions for catastrophe reserves and recognition of catastrophe risk financing instruments would be important issues in the development of an RBC catastrophe risk component.

It is not clear what the industry would view to be acceptable in terms of more explicitly evaluating insurers' catastrophe risk. It appears to favor the approaches used by rating agencies and some EU countries that examine the adequacy of an insurer's catastrophe risk management (as an element of solvency monitoring) using internal risk modeling or other techniques but not the inclusion of a specific capital charge. Of course, insurers would also likely be supportive of the allowance of catastrophe reserves if such reserves would receive favorable tax treatment without a corresponding "quid pro quo". Given the issues associated with an RCB cat risk charge and the lack of consensus, it may be some time before the NAIC modifies its RCB formula to explicitly reflect catastrophe risk.

US rating agencies are strengthening their assessments of insurers' capital requirements with respect to their catastrophe risk exposures, primarily due to the

increased risk of hurricane losses (A.M. Best. 2006). These strengthened requirements are set within a context of the agencies' more extensive analysis of insurers' catastrophe risk exposure and management than that performed by regulators. These changes, combined with other initiatives discussed earlier, are increasing insurers' motivation to utilize conventional and alternative catastrophe risk financing measures.[24]

*Reinsurance*

Reinsurance continues to the primary vehicle used by insurers to diversify their catastrophe risk. The primary issue in the US has been the disparate treatment of domestic versus foreign reinsurers. Insurers are allowed "full credit" for contracts placed with reinsurers domiciled and regulated in the US and some "approved" foreign insurers that deposit funds in US financial institutions according to regulatory collateral requirements. These rules require foreign reinsurers to provide collateral equal to their gross liabilities to ceding US insurers.

This policy affects insurers' accounts and reported income in several ways. First, insurers are not allowed to subtract premiums ceded to unauthorized insurers in calculating their net premiums which is used as a proxy measure of their potential future liabilities and risk. Second, insurers are not allowed to count recoverables from unauthorized reinsurers as an asset except to the extent that ceding insurers hold or have access to collateral deposited by the reinsurers. US insurers are only allowed to value reinsurance recoverables up to the amount of collateral provided. All other things equal,

---

[24] It is our impression that this "strengthening" is focusing on revised models of insurers' catastrophe risk exposure rather than changing the associated minimum PMLs which have been set at 100-year events for hurricanes and 250-year events for earthquakes.

this has the effect of increasing insurers' net losses incurred and decreasing their income, assets and surplus. This would be the case for all types of reinsurance contracts.

Cummins (2007) strongly criticizes the US policy as being antiquated, unnecessary and inefficient. He argues that insurers have access to information and diversification measures to manage the counter-party risk associated with reinsurance contracts – resources that were not available in the 1940s-1950s when the US rules were established. Cummins cites three major sources of inefficiencies associated with US collateralization requirements: 1) collateralization is expensive for foreign reinsurers; 2) the requirements reduce the supply of reinsurance for US insurers; and 3) collateralization reduces incentives for US reinsurers to assess the credit quality of foreign reinsurers. Cummins also notes that the US requirements are inconsistent with global insurance/reinsurance markets and are directly opposed to the EU Reinsurance Directive that effectively abolishes collateralization.[25]

While US reinsurance policy has not caused US insurers to avoid contracts with "non-approved" foreign reinsurers, it is likely to have had some chilling effect on the demand for such contracts. US insurers and foreign reinsurers have continued to push US regulators to adopt a more reasonable, "merit-based" policy. The most recent proposal from the NAIC would place reinsurers (regardless of their domicile) into six rating categories that would determine the percentage of their gross liabilities that would need to be collateralized for ceding insurers to receive "accounting credit" – the better the rating, the lower the collateral requirement.[26] The NAIC would establish a Reinsurance

---

[25] See European Parliament (2005) and Evans (2007).
[26] New York has already moved forward in issuing proposed regulations that would ease collateral requirements for reinsurers non-authorized reinsurers on a sliding scale based on the reinsurers' financial strength ratings issued by rating agencies.

Evaluation Office (REO) that would determine the ratings for reinsurers based on a number of criteria.

Cummins argues that even this proposed approach would be a "second-best" solution that is overly bureaucratic and insufficient. His preferred approach would eliminate collateral requirements for all reinsurers, except for those in default. It should be noted, however, that the US approach is embedded in a system that relies more on accounting values and less on risk analysis. In essence, the many properly-managed companies are punished for the potential sins of a few improperly-managed companies. US regulators tend to subject all insurers to the same rules, rather than distinguish the small number that might not manage their reinsurance arrangements properly. The EU has the advantage of relying on a better regulatory approach and the high standards each of its members will enforce for reinsurers they regulate.

Despite its limitations, even the current reinsurance NAIC proposal is contentious and US reinsurers have strongly resisted relaxing current regulatory requirements. Some of the resistance of US reinsurers may be at least indirectly prompted by antiquated US regulatory policies that place them at a competitive disadvantage relative to foreign reinsurers. The current NAIC proposal (dated December 10, 2006) may be taken off the table at some point and US regulators may go back to "the drawing board" in terms of modifying their approach to how they value the reinsurance transactions of US insurers.

*Catastrophe Options and Swaps*

As noted in Klein and Wang (2007), attempts to establish markets for catastrophe put options for natural disasters have not proved to be successful in the past but there are recent efforts to reestablish viable options markets. US regulators allow insurers to use

34

options for risk hedging purposes but there are no provisions for valuing such transactions in financial reporting prior to their triggering and the secondary importance of financial risk assessment among US regulators further diminishes insurers' incentives to use such devices. Presumably, if a catastrophe option was triggered an insurer could report its expected payoff as an asset pending the receipt of a cash payment. Of course, this is a hypothetical discussion as no US insurer has purchased a catastrophe option that has been triggered to date.

Another problem is that US regulators tend to take a dim view of insurers taking the "risk assumption" side of such options – at least anything that would constitute more than a very small fraction of their investments. Admittedly, insurers would not provide the lion's share of the capital for such instruments but some may be in position to play a bigger role than they currently do. Insurers' familiarity with catastrophe risks and their varying levels of catastrophe exposures suggest that at least some may be in a good position to take a speculative position that would not unduly increase their financial risk. It would offer insurers without primary catastrophe exposures to undertake some catastrophe risk at a profit. Also, insurers with catastrophe exposures in one part of the country could hedge that risk and assume catastrophe risk in other regions as an alternative form of geographic diversification that would not entail the transactions costs of underwriting catastrophe coverage at a primary level in diverse geographic locations or issuing reinsurance contracts. Unfortunately, the current US regulatory system does not appear to be equipped to evaluate insurers' positions in catastrophe options or assess their overall impact on their financial risk.

35

Regulators have allowed insurers to engage in catastrophe swaps, albeit without associated financial accounting provisions or recognition of its favorable impact on their financial risk. As with a catastrophe option, we presume that if an insurer ultimately experienced losses that created an expected payoff from a catastrophe swap, it would be allowed to book the payoff as an asset pending receipt of a cash payment. While catastrophe swaps are unlikely to play a major role in risk financing/management, more favorable regulatory treatment in the US would increase the incentives to use swaps when their underlying attributes would make them economically desirable.

*Catastrophe Bonds*
Regulatory and Tax Treatment

Historically, US regulators had made "onshore" issuances of catastrophe bonds difficult because of the lack of an accepted regulatory framework that would govern and provide insurers accounting credit for such transactions, as well as permit favorable tax treatment.[27] Starting in the late 1990s, a number of US insurers and some reinsurers sought to make the use of onshore cat bonds easier under an acceptable and uniform set of rules and favorable federal tax treatment.[28] Due to these efforts, in 1999, the NAIC adopted a model act for a Protected Cell (PC) and in 2001 it adopted a model act for Special Purpose Reinsurance Vehicles (SPRV) to facilitate "onshore" or US-regulated issuances of cat bond or other catastrophe securities. From a statutory accounting perspective, cat bond transactions using US-regulated entities (i.e., protected cells or

---

[27] "Onshore" securitization refers to transactions that would be accomplished through a US-regulated entity or mechanism. "Offshore" securitizations refer to transactions that are conducted using non-US entities or mechanisms.
[28] While offshore SPRVs were readily available, promoters of onshore SPRVs contended that they would be advantageous to some insurers and perhaps viewed more favorably by regulators and other stakeholders in an insurer.

36

onshore SPRVs) would be treated essentially like reinsurance transactions with US reinsurers.

SAP accounting rules have been developed for PC securitizations.[29] These rules allow insurers to reduce their written and earned premiums by the amount paid to the PC to underwrite the risk that has been securitized. Hence, for accounting purposes, these payments would be treated like premiums ceded in authorized reinsurance transactions which would reduce an insurer's net premiums as a proxy measure for its potential liabilities. Further, any "recoverables" from the PC as the result of an indemnity-based securitized event are recognized as a reduction of the insurer's gross incurred losses and loss adjustment expense incurred. Consequently, securitizations through a PC would be treated in a manner very similar to conventional authorized reinsurance transactions. Unfortunately, despite favorable regulatory accounting treatment of onshore securitizations, unfavorable tax treatment and other factors have discouraged the use of these onshore vehicles – to our knowledge there have been no onshore securitizations since these models were adopted.

Interestingly, many US insurers issuing cat bonds through offshore SPRVs have the trust funds associated with these instruments hold their deposits in US certified institutions. This effectively provides the collateral required for the "reinsurer" (i.e., the SPRV) to be treated as authorized under US regulations without the SPRV actually being located and regulated in the US. Consequently, regulatory accounting rules have not been an issue for US insurers that have issued cat bonds through offshore vehicles.

---

[29] See NAIC, "Statement of Statutory Accounting Principles No. 74: Accounting for the Issuance of Insurance Linked Securities Issued by a Property and Casualty Insurers through a Protected Cell," January 1, 2001.

Hence, that the principal inhibitor to onshore SPRVs appears be their tax treatment. This factor, combined with the regulatory requirements for these entities, probably explains why the desired onshore securitizations have not occurred.[30] Currently, profits earned by offshore reinsurer affiliates of US insurers are not taxed in the calculation of the consolidated profits of US insurers.[31] However, premiums paid to an offshore reinsurer (affiliated or not) are subject to an excise tax based on the gross premiums paid "regardless of the eventual outcome of the coverage". Offshore SPVs also have much lighter regulatory burdens and the transactions can be completed more quickly. The boom of SPV facilities in Bermuda and Cayman Islands has promoted the establishment of specialized law firms and professional services for such facilities.

<u>Illustration of Taxation for Onshore versus Offshore Securitizations</u>

Below we illustrate the tax implications of an onshore versus an offshore cat bond issuance using a hypothetical example.[32] There are three parties involved in the cat bond: The Sponsor, Investors, and the Issuer (SPV).

---

[30] Cummins (2006b) observes that the NAIC model act still impose a number of regulatory hurdles in forming and using onshore SPRVs.
[31] The tax treatment of offshore reinsurance (and by implication offshore SPRVs) has attracted the attention of the IRS and the Congress at the urging of US reinsurers.
[32] We wish to thank Mike Remmes and Mark Cavanaugh for their advice which helped us in developing this tax illustration. However, any omissions remain the responsibility of the authors.



In our illustrative example, we assume that the cat bond has a $200 million face value covering US hurricane losses and there is a 1 percent probability of loss to the cat bond. The cat bond has a 1-year maturity and offers investors a 12 percent yield (i.e., a 7 percent yield spread over the 5 percent LIBOR rate). At time t=0, investors contribute $200 million in principal to the SPV Trust Fund, which will grow at the LIBOR rate of 5 percent per annum.[33] We first consider the case of a US domestic onshore SPV facility (see Table 1). We assume that there is no loss to the cat bond over the year. At t=1, the Sponsor contributes the 7 percent yield spread to the SPV Trust Fund and the SPV pays investors the full principal plus 12 percent interest.


[Insert Table 1]


According to IRS rules, part of the SPV Trust Fund must be treated as equity. The IRS rationale is that "equity investments" are more likely to suffer a loss than "debt". The

---

[33] The Sponsor does not contribute to the Trust Fund at time t=0.

more remote is the likelihood of loss to the cat bond, the larger the portion of the Trust Fund that is treated as debt. To minimize the portion of "equity" treatment, it is common for the issuer to divide the cat bond into a series of tranches so that the higher-rated tranches can be qualified mostly as debt.

For the cat bond in this illustrative example, a simple rule of thumb used by tax professionals is that 20 percent of the Trust Fund is treated as equity and the other 80 percent of Trust Fund is treated as debt. Over the course of one year, the initial $200 million SPV Trust Fund receives a total of $24 million in income (reflecting the total 12 percent yield). With 20 percent of the SPV Trust Fund being treated as equity, $4.8 million (20 percent of $24 million) of income is subject to corporate taxation. At a corporate tax rate of 35 percent, the tax on $4.8 million income is $1,680,000, which has to be covered by the Sponsor. Thus, the total cost to the Sponsor has increased from $14,000,000 to $15,680,000.

Now consider the case of an offshore SPV facility (as shown in Table 2). There is no corporate tax liability incurred by the SPV. For an offshore SPV facility, in most cases there is no flow-through income to the cat bond issuer. The facility is not owned or controlled by the sponsor; instead, the Trust Fund owns the offshore facility and has its own board of directors. However, the US sponsor will need to pay a 1 percent excise tax to the IRS. The total cost to the Sponsor will be $14,140,000 ($14,000,000 plus the 1 percent excise tax). When we compare the total cost to the Sponsor, the onshore SPV would incur a total tax liability of $15,680,000, which is 10.9 percent more than the tax liability $14,140,000 for an offshore SPV.

40

[Insert Table 2]

For US corporate investors, investing in an onshore SPV would have some tax advantages due to dividend deductions on the equity portion of the SPV. However, for tax-exempt investors (such as pension funds), there is no difference between an onshore and an offshore SPV. Given the diversity of investors with different tax situations, we focus our comparison on the tax liability of the Sponsor, rather than investors. In Table 3, we summarize the different tax rates for domestic versus foreign investors, and for onshore versus offshore SPVs. In our illustration we assume that investors are US domestic taxable corporations.

[Insert Table 3]

*Regulation and Government Insurance/Reinsurance Programs*

Many aspects of primary insurers' market activities related to the underwriting, financing and management of catastrophe risk are regulated by the states. These activities include pricing, selection/rejection of insureds, policy terminations, policy provisions, and claims settlement, among others. Various government insurance/reinsurance schemes further undermine private risk financing. A detailed discussion of the exercise and implications of this kind of regulation is beyond the scope of this paper, but some discussion of the most important issues and problems in this area is warranted.

The severity of regulatory constraints in a given state tends to vary directly with the severity or cost of catastrophe risk. There is no question that Florida tops the list in this respect and it has resulted in many unwise government actions. Florida experienced a

41

wave of rate increases and other changes following Hurricane Andrew which was followed by a second wave of rate increases and other market adjustments after the 2004-2005 storm seasons. Towards the end of 2006, a considerable public backlash had developed which played a prominent role in state legislative and gubernatorial elections.

By the end of 2006, Florida insurance regulators began disapproving or shaving rate increases filed by insurers, but bigger changes were in store for 2007 (Grace and Klein, 2007). In its 2007 session, the Florida legislature, with their governor leading the way, greatly expanded the state's assumption of catastrophe risk exposure (Chernick and Appel, 2007). The state's residual market mechanism for property insurance was modified to compete with private insurers with a lower rate structure that is virtually guaranteed to swallow a large portion of the highest-risk exposures. The Florida Hurricane Catastrophe Fund (FHCF) also expanded its reinsurance coverage for primary insurers with rates set below those charged by private reinsurers.[34] The objective of both actions was to significantly lower the price of insurance for property-owners in high risk areas. These measures also will tend to crowd out private financing of catastrophe risk and any funding shortfalls of these mechanisms will be covered by assessments on other insurance buyers and potentially state general fund appropriations. The ultimate consequence could be large subsidies paid by other insurance buyers and taxpayers if a large hurricane or a series of hurricanes hit the state.

---

[34] The FHCF is a state-sponsored mechanism that offers catastrophe reinsurance at a lower effective price than private reinsurance markets. Two cost advantages of such government mechanisms are their tax-exempt status and the fact that they do not charge for their implicit cost of capital. Also, these mechanisms typically have authority to issue bonds to cover losses that exceed their assets. The FHCF is the only state-sponsored reinsurance mechanism of its kind. The California Earthquake Authority (CEA) is the only other state-sponsored catastrophe insurance mechanism but it provides earthquake coverage at a primary level rather than operating as a reinsurance mechanism.

To date, other coastal states have not yet followed Florida's lead but there is the possibility that some may do so. California, for example, has almost destroyed residential purchase of earthquake insurance coverage. Prior to the Northridge Earthquake in 1994, more than 30 percent of California homes had earthquake insurance. Northridge destabilized the private earthquake insurance market which was hampered by various regulatory constraints. Consequently, the state established a government earthquake insurer, the California Earthquake Authority (CEA), in 1996. Unfortunately, its poor design coupled with other government policies caused the purchase of earthquake insurance to plunge to 12 percent of residential properties (Insurance Information Institute, 2007). Hence, most of the residential earthquake exposure in California is uninsured which, in turn, has significantly reduced the demand for earthquake risk financing by primary insurers and reinsurers. This means that when the next severe earthquake strikes California there will strong demands for large amounts of state and federal disaster aid.

Catastrophe-prone states and groups with interests in lowering the price of insurance are also pushing the establishment of a federal catastrophe reinsurance fund.[35] Some large writers of property insurance also support this proposal but many other insurers and reinsurers oppose it. The most prominent overall plan has three elements:

1. The establishment of state/regional catastrophe funds would cover lower layers of risks.

2. A national (federal) backstop mechanism would provide reinsurance for higher layers of risk above that covered by state/regional funds (and private reinsurance).

---

[35] See Watkins, et. al. (2007) for one evaluation of a national catastrophe program that concludes that it could produce significant costs savings for insureds. It is important to stress that there are different views on merits of such a plan and experts that might take issue with the conclusions of the cited study.

3. Various provisions for education, financial assistance, and other measures to mitigate catastrophe risk and improve disaster recovery.

Other proposed national catastrophe insurance/reinsurance plans with differing characteristics have been placed on the legislative table. The different plans and the varying opinions on their merits will likely continue to generate considerable debate and preclude any action in the near term.

These proposals would be on top of the US National Flood Insurance Program (NFIP) in which a federal entity covers residential and commercial property up to certain limits. The NFIP has been plagued by inadequate rates and lax underwriting which has required large bailouts from federal taxpayers. These bailouts will likely increase as flood losses associated with hurricanes and other storms continue to rise.

Finally, there is the problem associated with the demand for large amounts of federal disaster aid following catastrophes because of the lack of pre-event insurance and other financing by those affected. Government insurance/reinsurance schemes are often sold with the fiction that they will reduce the amount of federal disaster aid. Hurricane Katrina resulted in more than $100 billion disaster aid payments to affected areas.[36] However, the unfortunate reality is that increased subsidization of government insurance has been accompanied by rising amounts of disaster aid, i.e., the worst of all possible worlds. A recent working paper by Cummins, Suher and Zanjani (2007) conservatively estimates that the net present value of the federal government's liability for disaster aid for natural catastrophes (over a 75-year period) is between $1.2 and $7.1 trillion.

---

[36] It should be noted that a large portion of disaster aid payments to local and state governments to assist them in repairing damages to their infrastructure, but anticipation of these payments discourages government entities to insure or set aside funds to cover natural disasters.

In sum, the current US government posture toward catastrophe risk and its financing is a growing disaster in itself. There is essentially little support for and encouragement of conventional or alternative private catastrophe risk financing. Further, state regulatory policies and management of special catastrophe funds as well as residual market mechanisms further depress the demand for and supply of private capital and have increased government underwriting of catastrophe risk at inadequate prices. The proposal for a national cat fund would likely exacerbate under-pricing and government absorption of catastrophe risk. Together, these policies and proposals are moving in the wrong direction – they are discouraging efficient risk management by property owners and other stakeholders.

EU Regulatory Approaches

*Overview*

EU regulatory treatment of catastrophe risk and its financing, particularly in the context of Solvency II, has not yet been fully specified. This lack of specificity is, in part, due to its principles-based approach that tends to shy away from setting detailed rules which would establish regulatory treatment of a particular risk financing device ex ante. Another factor is that Solvency II is still taking shape and some of its more detailed elements have not been developed. Ultimately, the treatment of cat risk financing devices will unfold as various transactions are reviewed by regulators. Despite these generalities and uncertainties, it is possible to discuss certain established or likely regulatory policies and speculate on others that will affect catastrophe risk financing.[37]

---

[37] See Butt (2007) and De Mey (2007) for further discussion of the implications of Solvency II for insurer risk financing and their use of capital markets.

*Securitization and Cat Bonds*

While risk transfer through securitization has not yet received extensive policy development, the issue has received attention. For example, the EU Reinsurance Directive allows member states to establish Special Purpose Vehicles (Evans, 2007). The EU Reinsurance Directive recognizes that an SPV can "assume risks from insurance or reinsurance undertakings and which fully funds its exposure to such risks through the proceeds of a debt issuance or some other financing mechanism where the repayment rights of the providers of such debt or other financing mechanism are subordinated to the reinsurance obligations of such a vehicle." This will also be possible under Solvency II. Further, the movement to a risk-sensitive solvency system across the EU that recognizes economic reality should mean that firms will have even a greater motivation to securitize, use SPVs and purchase reinsurance by getting appropriate credit for it.

It should be noted that the Solvency II Directive will consider all risk mitigation schemes without limits and collateralization obligations but will include credit risk. Hence, the Directive could be viewed as more "liberal" than the Reinsurance Directive which could still allow national constraints.

As we discuss, while the directive tends to provide insurers with greater flexibility and greater recognition of alternative risk transfer, greater specification of EU policies will likely take several steps. After the most recent Solvency II directive distribution and approval, further development will occur in terms of calibration, implementation measures, and the actual enforcement of the new standards by EU regulators. Finally, some discretion will be left to EU members in terms of specific regulatory requirements governing SPVs and cat bonds.

Some clues as to how EU policies will be further developed might be gleaned from the positions taken by its members. For example, in the UK, the FSA has specified the regulatory treatment of securitization as part of its national implementation of the Reinsurance Directive. Currently, an insurance special purpose vehicle (ISPV) in the UK would be treated the same way as reinsurance in terms of recognizing its risk transfer although an ISPV would not be regulated like a reinsurer. An ISPV needs to be authorized, supervised, and taxed, and maintain a regulatory capital surplus level as would be required of an insurance company At the same time, the FSA recognizes that there is a relatively lower level of risk associated with the structure of ISPV transactions than certain other securitization transactions.

FSA supervision will take place through the oversight of the ceding company, rather than separate supervision of the ISPV. In his speech in late 2006, the FSA regulator Julian Adams stated that:

> It is often said that reinsurance is insurance between consenting adults, and we believe that our approach to ISPVs is an extension of this general principle. By placing the onus for risk identification and mitigation on firms' senior management, and deliberately not prescribing in advance structures that we will and will not accept, we hope to encourage innovation in the market, and we believe that we are creating the opportunity for a significant new market here in the UK.

The FSA will examine to what extent risks are mitigated or transferred from the ceding company to the ISPV. This reflects a principles-based approach that will assess ISPV arrangements on a case-by-case basis and the appropriate credit will depend on how risks are managed. This approach is based on the FSA principle of senior management responsibility.

47

The FSA is concerned that some ISPVs might be established merely to achieve a form of regulatory arbitrage. For all ISPV transactions, the FSA will assess whether there is sufficient and genuine risk transfer. The FSA is conscious that for intra-group ISPVs risk transfer may not be the only driver – achieving a particular tax outcome or a desired corporate structure may be factors behind the transactions. For such intra-group ISPVs, the FSA will look at how the proposed risk transfer takes effect both at an entity and group level. While the assessment of risk transfer will need some risk modeling demonstration associated with coverage attachments and limits, there are other important considerations. Other considerations include whether the ISPV contracts specify forced commutation clauses and whether ISPV transactions are unwound in exactly the same way as established in the contract.

For an ISPV, like a reinsurance contract and over-the-counter derivatives, the specific contract terms are fundamentally important for assessing whether there is a real risk transfer. In addition to coverage limits, it is important to determine how triggers will function in stressed circumstances and how the indemnity coverage will operate in response to differing events. The precise nature of the contracts involved will influence what we will see and this is another rationale for the FSA's non-prescriptive, case-by-case approach. However, a case by case approach, at least early on, could create some uncertainty among insurers as to how a specific transaction will be treated by regulators. Over time, the precedents set in terms of the regulatory treatment of past transactions may provide greater guidance to insurers as to what they might expect in terms of future transactions.

France offers another example of an EU country that has established policies on the issuance of cat bonds. Based on communications with French industry experts, it is our understanding that cat bonds can cover risks either through a derivative mechanism or through a reinsurance contract between the SPV and the reinsured. If a French insurer uses the reinsurance approach, the legal structure of the SPV and the reinsurance contract with the SPV must be recognized under French law.

The adoption of the EU directive will establish the principles for the SPV in French law but its supervisory authority will still be responsible for determining certain regulatory standards for SPVs. For example, in France, it is not yet clear how the French supervisory authority will treat SPVs and their insurance-linked securities, particularly concerning their solvency requirements. Further, for a cat bond issued through an SPV to be accepted as reinsurance, the arrangement must be "indemnity-based". This can raise issues with respect to cat bonds with parametric or other triggers not based solely on the issuing insurer's actual losses. The concern arises with bonds that would pay an insurer more than its actual losses. This may require greater use of "ultimate net loss" clauses which limit the payment to the issuing insurer to no more than its actual losses.

*Capital Standards and Catastrophe Risk*

The discussion of capital standards in the proposed Solvency II directive does contain some elements related to catastrophe risk that will undergo further development in the next stage of the Solvency II process. The directive states that the SCR should contain a catastrophe risk component. The directive also appears to indicate that the use of various "loss-absorbing" instruments will be considered in determining an insurer's SCR and whether it meets this requirement. The specification of these provisions, of

course, will occur in the further delineation of Solvency II policies and their implementation. We should note that the proposed directive sets a 0.5 percent default probability (equivalent to a one-in-200-years probable maximum loss) as the standard or goal in determining an insurer's SCR.

*Harmonization of the Treatment of Hybrid Capital and Securitization*

Banks and insurance companies have shown substantial interest in the broader hybrid category (including securitization), which can count toward their capital-reserve requirements with minimal damage to their credit ratings or equity base. This kind of debt or equity financing boosts the financial capacity of an insurer in a manner that significantly subordinates the claims of these lenders and equity investors to other claims against a bank or insurer. Currently EU regulatory treatment of contingent capital is still evolving.[38] Indeed, the EU is undergoing a process of consultations with the industry and member states with the main goal of harmonization across sectors and member states. The recent Solvency II directive should provide further insights as to how alternative risk financing will be treated, but hopefully experience as well as further articulation of policies in this area will provide additional guidance to insurers.

In the current Solvency II initiative, there has been a debate as to how to count certain types of loan capital in determining regulatory solvency capital. Certain types of loan capital have the characteristics of equity and have the capacity to absorb losses, which are commonly referred to as Deeply Subordinated Debt (DSD) and are not

---

[38] Note, catastrophe risk financing devices, broadly defined, may or may not involve risk transfer. There are some potential financing mechanisms such as finite risk/reinsurance arrangements and letters of credit that provide liquidity to an insurer suffering a catastrophe loss shock but ultimately provide little or no risk transfer -- funds obtained must ultimately be paid back. The issues for regulators are proper disclosure and transparency and the long-term implications of how much risk is actually transferred versus just purely financed under favorable terms but no actual risk transfer.

currently covered by any EU Directive. The Directive fully recognized subordinated debt in Tiers 1-3. Discussion has ceased on this policy and only the limits for Tier 1 remain a matter of contention. Some EU states (e.g., France) argue that DSDs are adequate for solvency purposes and should be counted toward part of the Tier 1 capital. The French delegation states in their letter to the Committee of European Insurance and Occupational Pensions Supervisors (CEIOPS):

> From an economic point of view, hybrid capital can, under certain conditions, offer guarantees very close to those of own funds and, in any case, much higher guarantees than those provided by subordinated debt. Thus, the insurance directives could be adapted, through the comity procedure, to better take into account hybrid capital for the constitution of the solvency margin and thus reconcile both regulatory and economic demands.

In response to the French delegation proposal, CEIOPS is openly asking for public advice on this issue. CEIOPS is seeking stakeholders' views on cross-sector alignment, the need for changing the definition of eligible elements of capital and potential quantitative impacts.

Although Solvency II has not made any new rules on the treatment of hybrid capital, one development seems to be clear - regulators are moving toward a principles-based approach. The principles-based approach can help facilitate greater harmony and improvement. This should be beneficial to insurers' and reinsurers' use of alternative methods to financing catastrophe risk as well as other types of financial/underwriting risk.

In a letter submitted by the European Securitization Forum (ESF) to the CEIOPS regarding securitization and Solvency II, the ESF recommends that securitization, reinsurance and credit derivatives be treated in a similar way from a capital relief

51

perspective, irrespective of the legal form of transfer. The ESF contends that this will help harmonize regulatory treatment across different financial sectors.

Some insurers believe that one of the greatest benefits that Solvency II could offer would be greater clarity that would allow them to establish structures more easily and a framework for buyers to work within. This could allow additional countries to enter the securitization markets, which has been dominated by the UK and the Netherlands, and further increase the supply of such instruments (see Watson, 2007).

As a final observation, it is important to stress that under the EU system, the specific accounting treatment of risk financing devices is not as critical as it is under the US system. In the US system, accounting treatment is important because it significantly affects all aspects of the financial assessment of insurers and directly affects the US formula-based approach to measuring capital adequacy. In the EU system, accounting treatment directly affects the MCR component of capital requirements but accounting values are not the only input in the internal modeling approach to determining the SCR component. In other words, in determining whether an insurer meets its SCR requirement, whether a particular instrument is reflected in an insurer's capital or alternatively determined to reduce the potential demands on an insurer's capital, the ultimate effect is essentially the same. The standard model may ply some middle ground in terms of reliance on accounting values versus other measures of an insurer's financial risk.

*Government Insurance and Catastrophe Reserves*

The U.S. General Accountability Office (GAO) reviewed six European countries – France, Germany, Italy, Spain, Switzerland and the UK – to examine their approaches

to managing and financing catastrophe risk (see U.S. GAO, 2005). The GAO found that all six countries have developed and employed a combination of public and private approaches to deal with catastrophes but only three impose government-mandated insurance that cover disaster risk.[39] The perils covered differ by country and typically include flood coverage but the coverage of other perils, e.g., earthquakes, windstorms, etc., vary. The differences presumably reflect the nature of the perils to which each country is most exposed.

France and Spain have national programs that require property owners to purchase catastrophe coverage that are backed with unlimited government guarantees. Switzerland mandates natural catastrophe coverage but does not provide any explicit government financial guaranty. The other countries rely on optional private insurance to cover natural disasters. In the UK, flood coverage is typically included in private property insurance policies.

All six countries allow the use of catastrophe or equalization reserves for natural disaster risks. However, equalization reserves are no longer allowed at the consolidated level. The specific policies in each country are summarized in Table 4. All six countries allow for some form of tax deductibility for these reserves. However, it should be noted that international GAAP standards do not currently recognize equalization reserves which is an issue that will need to be addressed.

[Insert Table 4]

Opportunities for Greater Harmony and Improvement

---

[39] Freeman (2004) also reviews government catastrophe insurance programs in EU countries.

Given current limits aggregate capacity of the insurance/reinsurance industry, the remaining uncovered exposure to large catastrophes requires other financing vehicles. While additional capital has flowed to conventional reinsurers, it is inefficient to finance the higher layers of catastrophe risk using the equity held within reinsurers. Indeed, both insurers and reinsurers have increased their use of alternative risk financing to augment their capacity. The use of such vehicles could be facilitated and encouraged by appropriate regulatory policies, especially in the US, which is lagging behind the EU in terms of moving towards a principles-based approach to solvency regulation and a more supportive environment for alternative risk financing. Further, greater use of alternative risk financing could increase the supply of catastrophe insurance and lower its price.

In the US, several constraints and other policies retard the more extensive use of alternative catastrophe risk financing. Currently, regulators only allow accounting credit for transactions with authorized reinsurers which precludes recognition of offshore reinsurance transactions (unless trust funds are held in the US as collateral) or any other alternative form of risk transfer. Broadening acceptance of reinsurance transactions in jurisdictions with good regulatory frameworks could substantially encourage US insurers' use of reinsurance, especially for insurers who presently have insufficient capacity to withstand their potential catastrophe losses.

Further expansion of the recognition of alternative risk transfers could encourage insurers of sufficient size to transfer catastrophe risk at higher layers and increase their level of protection. The NAIC has adopted model acts that would regulate and recognize onshore securitizations but the lack of favorable tax treatment (among other factors) for these arrangements has stymied their utilization. Regulatory recognition of offshore

securitizations could further encourage insurers to use this approach to better manage their catastrophe risk. The same could be said for other devices such as the use of cat options and swaps. Regulatory reforms in these areas would prove to be beneficial when the US is struck by a large catastrophe. They could also help to improve the affordability and availability of property insurance at a primary level if insurers can utilize and achieve credit for these transfers due to their lower cost.

Finally, if insurers were allowed to demonstrate their capital adequacy and proper risk management through approved internal risk models (and/or more sophisticated standard models), in lieu of other regulatory requirements or constraints, it could encourage both broader use of this approach as well as risk financing devices that would affect it. This should be an ultimate goal of US regulators and its adoption would avoid industry opposition if it was an option for insurers rather than a requirement. The replacement of arbitrary, prescriptive rules in favor of a principles-based, risk-focused regulatory approach could be an attractive tradeoff to many insurers and increase their national and international competitiveness.

The EU has progressed much farther in developing such an approach to solvency regulation which should help to encourage EU insurers to efficiently manage their catastrophe risk. The main issue for EU insurers may be how specific risk transfer transactions (and potentially different contract structures) will be viewed by regulators in their application of EU policies. This issue is coupled with broader issues to be resolved which also could affect cat risk financing, directly or indirectly. To some degree, uncertainty about how specific transactions will be treated inherently arises from the superior principles-based approach. EU regulators may understandably be reluctant to

"approve" transactions in advance, but as their experience develops they may be able to develop guidelines for various instruments and transfer/financing structures. Ultimately, over time, insurers will be able to see how previous transactions have been treated that will help them in considering new transactions or instruments with "new" features.

All of this said, the public, legislators and even some insurers may perceive that there are limits to the amount of protection that can achieved through private markets alone or harbor concerns about the cost of that protection. This is a particular issue in the US where property owners in high-risk areas are vociferous in their criticism of insurance rate increases. The principle motivation for political support of government insurance/reinsurance mechanisms in the US is lower insurance rates, not protection against large catastrophes.

Insurers who support government reinsurance programs express concerns about the uncertainty associated with pricing and managing catastrophe risk. They may also have concerns that state legislators/regulators will not allow them to charge what they believe to be adequate rates. This, of course, has become a reality in Florida and a possibility in other states.

Regardless of whether there is a true or a perceived gap in private financing of catastrophes, government catastrophe insurance/reinsurance may become a more pervasive phenomenon in the US and continue in the EU in those countries that already have such institutions.[40] Political pressures for such policies could rise in EU countries in the face of increased catastrophe risk and losses, although favorable treatment of

---

[40] In our view, it would be desirable to maximize reliance on private market capital before government insurance/reinsurance is contemplated. However, the "availability" of capital is probably not the driving motivation of advocates of government programs. The perceived lower cost of government reinsurance (whether legitimate or "manufactured") is the principal concern of coastal politicians and their constituents.

alternative cat risk financing should reduce such pressures. The danger associated with such schemes is that government entities are subject to political pressure to charge inadequate premiums to cover the risk they are assuming. The ultimate consequence of such practices could be substantial taxpayer subsidies when the catastrophes hit. Hence, stakeholders in both the US and the EU must be attentive to the lure of subsidized catastrophe insurance/reinsurance schemes.

In terms of public solutions, for those committed to the idea of government reinsurers, one might propose that they issue pre-event cat bonds rather than engage in post-event borrowing and assessments that run a greater risk of taxpayer subsidies. For example, pre-event financing is being used by the recently-established, multi-country Caribbean Catastrophe Risk Insurance Facility (CCRIF). Government purchase of catastrophe options also might be more feasible given that its portfolio of exposures would be aligned with the parametric triggers that would be used for such options. Private insurers and reinsurers could help to facilitate the aggregation of policies (by providing fronting, pricing and claims handling services as well as underwriting lower layers of risk) and cede higher risk layers through excess of loss reinsurance with a government reinsurer. The primary advantage of this approach would be that the government would pay for the cost of issuing of catastrophe bonds (and/or options) up front, which in turn, should be reflected in the premiums paid by those (property-owners) who are ultimately receiving the protection. The emergence of some alternative proposals that utilize this kind of approach in the US is a positive development.

**Conclusions**

57

Natural disasters present a substantial and growing threat to many countries and warrant efficient risk management. The financing of catastrophe risks requires an economically-sound and collaborative approach among private insurers/reinsurers, capital markets and governments. In our opinion, private-sector solutions should be fully utilized to their maximum capability before government mechanisms play a role. Obviously, there are different opinions and preferences on the dimensions of the appropriate private-public partnership. The removal of unnecessary and welfare-diminishing regulatory and tax constraints could substantially boost the capacity of the private capital markets to assume more catastrophe risk. The US regulatory and tax framework currently inhibits the development of the markets for catastrophe bonds and other alternative financial instruments. Further, the government absorption of catastrophe exposures in the US unnecessarily reduces the demand for private risk financing. EU regulatory and tax policies appear to be more favorable to catastrophe risk financing although further regulatory guidance in this area could be helpful to insurers and reinsurers.

Movement to a principles-based regulatory approach – as reflected in the evolving EU system – would be a substantial and beneficial advance in the US. The EU does face regulatory issues that will need to be addressed and some EU countries have opted for government solutions to catastrophe risk financing. Hence, there is room for improvement in both jurisdictions. Unfortunately, as demonstrated in the US, there is the danger for politicians to court public favor with short-sighted measures that distort incentives and encourage excessive risk-taking rather than optimal risk mitigation. The counter-strategy is public education of those who stand to lose from unwise government policies. This is an enormous challenge but a better strategy is not obvious. "Small"

catastrophes could ultimately be beneficial by revealing the deficiencies in unsound policies and help to vaccinate the public against political imprudence. Hopefully, wisdom will prevail before the US or other exposed countries suffer a mega-disaster.

At the same time, in writing this paper, we became impressed with the lack of government attention to role of alternative mechanisms in financing catastrophe risk in both the US and to a lesser extent in the EU. For both systems, it is difficult to find documents that provide clear and thorough discussion of how regulation and other government policies should accommodate and promote the use of private financial markets in catastrophe risk management and financing. In the US, most of the attention has been focused on alleged gaps in the supply of catastrophe insurance and reinsurance and the need for government mechanisms to fill the gap. In the EU, the supply of catastrophe insurance appears to be less of an issue but discussions of how Solvency II should influence catastrophe risk financing are more scarce than we had expected. Greater public attention to this matter is needed to in order to promote and fully realize the potential role of financial markets in managing catastrophe risk.

## References

Adam, Julian, 2006, Capital efficiency, reinsurance and risk securitisations: new structures and the changing regulatory scene, speech transcript, The Geneva Association International Insurance and Finance Seminar, December.

A.M. Best, 2006, Catastrophe Risk Management Incorporated Within the Rating Analysis, Oldwick, NJ, May.

Butt, Michael, 2007, Insurance, Finance, Solvency II and Financial Market Interaction, *The Geneva Papers on Risk and Insurance – Issues and Practice*, 32: 42-45.

Carty, L. V. and Lieberman, D., 1996, Defaulted bank loan recoveries, Global Credit Research, Special Report, Moody's Investors Service.

Chernick, David R. and David Appel, 2007, Report on the Impacts on Consumers From Potential State & National Legislation Designed to Prepare and Protect Citizens From Natural Catastrophes, (Brookfield, W.I.: Milliman, Inc.) May 14.

Commission of the European Communities, 2007, Proposal for a Directive of the European Parliament of the Council on the Taking-Up and Pursuit of the Business of Insurance and Reinsurance: Solvency II, Brussels, July 10.

Cummins, J. David, Scott E. Harrington, and Robert W. Klein, 1995, Insolvency Experience, Risk-Based Capital, and Prompt Corrective Action in Property-Liability Insurance, *Journal of Banking and Finance*, 19: 511-530.

Cummins, J. David, 2006a, Should the Government Provide Insurance for Catastrophes, *Review – Federal Reserve Bank of St. Louis*, 88(4): 337-79.

Cummins, J. David, 2006b, CAT Bonds and Other Risk-Linked Securities: Current State of the Market and Regulatory Reforms, working paper, University of Pennsylvania, September 1.

Cummins, J. David, 2007, Reinsurance for Natural and Man-Made Catastrophes in the United States: Current State of the Market and Regulatory Reforms, *Risk Management and Insurance Review*, 10: 179-220.

Davidson, Ross J. Jr., 1996, Tax-Deductible, Pre-Event Catastrophe Reserves, *Journal of Insurance Regulation*, 15/2: 175-190.

Davidson, Ross J. Jr., 1998, Working Toward a Comprehensive National Strategy for Funding Catastrophe Exposures, *Journal of Insurance Regulation*, 17/2: 134-169.

De Mey, Josef, 2007, Insurance and the Capital Markets, *The Geneva Papers on Risk and Insurance – Issues and Practice*, 32: 35-41.

Eling, Martin, Hato Schmeiser, and Joan T. Schmit, 2007, The Solvency II Process: Overview and Critical Analysis, *Risk Management and Insurance Review*, 10(1): 69-85.

European Securitisation News, September 2006, http://www.europeansecuritisation.com/ESFBlurbForESFSolvencyIICEIOPSletter%20.html

Evans, Alastair M., 2007, The EU Reinsurance Directive, *The Geneva Papers on Risk and Insurance – Issues and Practice*, 32: 95-104.

Freeman, Paul K., 2004, Government Natural Catastrophe Insurance Programs, Presentation at the OECD Conference on Catastrophic Risks and Insurance, Paris, November.

French Delegation (to the European Insurance and Occupational Pension Committee), Prudential Treatment Of "Deeply Subordinated Debt", June 2005, http://ec.europa.eu/internal_market/insurance/docs/2005-markt-docs/2517-05-fragenda_en.pdf

FSA Handbook Development, No 33, November 2002, http://www.fsa.gov.uk/pubs/handbook/HB33.pdf

Grace, Martin F. and Harold D. Skipper, 1998, International Trade in Insurance: Economics and Policy, in Harold D. Skipper, ed., *International Risk and Insurance: An Environmental-Managerial Approach* (Boston: Irwin McGraw-Hill).

Grace, Martin F., Robert W. Klein, and Richard D. Phillips, 2001, An Economic Appraisal of Securitizing Insurance Risk via Onshore Special Purpose Vehicles, *Risk Management and Insurance Review*, 4: 7-33

Grace, Martin F., Robert W. Klein and Zhiyong Liu, 2005, Increased Hurricane Risk and Insurance Market Responses, *Journal of Insurance Regulation*, 24: 2-32.

Grace, Martin F. and Robert W. Klein, 2007, Facing Mother Nature, *Regulation*, Fall 2007: 28-34.

Harrington, Scott E. and Greg Niehaus, 2001, Government Insurance, Tax Policy, and the Affordability and Availability of Catastrophe Insurance, *Journal of Insurance Regulation*, 19/4: 591-612.

HM Treasury and FSA, 2006, Supervising Insurance Groups Under Solvency II: A Discussion Paper, November.

Insurance Information Institute, 2007, Earthquakes: Risk and Insurance Issues, October.

International Actuarial Association, 2004, *A Global Framework for Insurer Solvency Assessment*, Ottawa, Ontario.

International Association of Insurance Supervisors, 2007, The IAIS Common Structure for the Assessment of Insurer Solvency, February 14.

International Accounting Standards Board, 2007, Preliminary Views on Insurance Contracts, discussion paper, London, May.

Klein, Robert W., 1995, Insurance Regulation in Transition, *Journal of Risk and Insurance*, 62: 263-404

Klein, Robert W., 2005, *A Regulator's Introduction to the Insurance Industry* (Kansas City, MO: National Association of Insurance Regulators).

Klein, Robert W., 2007, Catastrophe Risk and the Regulation of Property Insurance Markets: A Comparative Analysis of Five States, unpublished working paper, Georgia State University.

Klein, Robert W. and Shaun Wang, 2007, Catastrophe Risk Financing and Regulation, working paper, Georgia State University.

KPMG, 2002, *Study into the Methodologies to Assess the Overall Financial Position of an Insurance Undertaking From the Perspectives of Prudential Supervision*, Brussels.

Lane, Morton N. and Roger G. Beckwith, 2007, The 2007 Review of the Insurance Securitization Market, *Trade Notes* (Lane Financial LLC), April 20.

Liebwein, Peter, 2006, Risk Models for Capital Adequacy: Applications in the Context of Solvency II and Beyond, *The Geneva Papers on Risk and Insurance – Issues and Practice*, 31: 528-550.

Litan, Robert E., 2006, Sharing and Reducing the Financial Risks of Future "Mega-Catastrophes", *Issues in Economic Policy* (Brooking Institution), 4: 1-39.

National Association of Insurance Commissioners, 2006, *Proposal to Grant Credit for Ceded Reinsurance* (Kansas City, MO) October, 31.

Schubert, Thomas and Gundula GrieBmann, 2007, German Proposal for a Standard Approach to Solvency II, *The Geneva Papers on Risk and Insurance – Issues and Practice*, 32: 133-150.

Skipper, Harold D., ed. 1998, *International Risk and Insurance: An Environmental-Managerial Approach* (Boston: Irwin McGraw-Hill).

Swiss Re, 2007, Natural Catastrophes and Man-Made Disasters in 2006, *Sigma*, No. 2.

Tillinghast Towers Perrin, 2006, Solvency II: The Framework Directive Approaches (New York, NY).

Tillinghast Towers Perrin, 2007, Solvency II: The Pace Quickens (New York, NY).

Trainar, Phillipe, 2006, The Challenge of Solvency Reform for European Insurers, *The Geneva Papers on Risk and Insurance – Issues and Practice*, 31: 169-185.

US Government Accountability Office, 2005, *Catastrophe Risk: U.S. and European Approaches to Insure Natural Catastrophe and Terrorism Risks* (Washington, D.C.).

Watkins, Nancy P., David R. Chernick, David Appel and Paul D. Anderson, 2007, *Analysis of Florida Legislative Reform: Special Session, January 2007* (Brookfield, W.I.: Milliman, Inc.) April 30.

Watson, Rick, 2007, ESF Talks With Regulators on Insurance Securitization, *Securitization News* (New York), February 19.

# EXHIBIT 41



## Statement of Statutory Accounting Principles No. 62 - Revised

## Property and Casualty Reinsurance

**STATUS**

| | |
|---|---|
| Type of Issue: | Common Area |
| Issued: | Finalized March 13, 2000; Substantively revised December 5, 2009 |
| Effective Date: | January 1, 2001, Substantive revisions in paragraphs 31.e., 68-71 and 86 are effective January 1, 2010 |
| Affects: | No other pronouncements |
| Affected by: | Paragraph 35 superseded by SSAP No. 75; Substantively revised in December 2009 (Detail of revisions are included within Issue Paper No. 137) |
| Interpreted by: | INT 01-33, INT 02-01, INT 02-06, INT 02-09, INT 02-22, INT 03-02 |

STATUS ..................................................................................................................... 1

SCOPE OF STATEMENT ........................................................................................... 3

SUMMARY CONCLUSION.......................................................................................... 3

General ........................................................................................................................ 3
Characteristics of Reinsurance Agreements ................................................................. 4
Required Terms for Reinsurance Agreements ............................................................... 4
Reinsurance Agreements with Multiple Cedents........................................................... 5
Reinsurance Contracts Must Include Transfer of Risk .................................................. 5
Accounting for Reinsurance .......................................................................................... 7
Accounting for Prospective Reinsurance Agreements ................................................... 8
Accounting for Retroactive Reinsurance Agreements ................................................... 8
Deposit Accounting ...................................................................................................... 11
Assumed Reinsurance ................................................................................................... 11
Ceded Reinsurance ....................................................................................................... 12
Adjustable Features/Retrospective Rating.................................................................... 13
Commissions ................................................................................................................ 14
Provision for Reinsurance ............................................................................................ 14
Disputed Items.............................................................................................................. 14
Uncollectible Reinsurance ........................................................................................... 14
Commutations .............................................................................................................. 15
National Flood Insurance Program............................................................................... 15
Accounting for the Transfer of Property and Casualty Run-off Agreements ............... 15
Criteria ......................................................................................................................... 15
Statutory Schedules and Exhibits ................................................................................ 16
Disclosures ................................................................................................................... 17
Relevant Literature ...................................................................................................... 20
Effective Date and Transition....................................................................................... 21

AUTHORITATIVE LITERATURE .............................................................................. 21

Generally Accepted Accounting Principles .................................................................. 21

RELEVANT ISSUE PAPERS........................................................................................ 21

CLASSIFYING REINSURANCE CONTRACTS.......................................................... 22

SSAP No. 62R                    Statement of Statutory Accounting Principles

SSAP NO. 62R—EXHIBIT A .................................................................................................23
Implementation Questions and Answers ...........................................................................23
SSAP NO. 62R—EXHIBIT B .................................................................................................35
P&C Runoff Reinsurance Transactions .............................................................................35

**Property and Casualty Reinsurance**

## SCOPE OF STATEMENT

1.     This statement establishes statutory accounting principles for property and casualty reinsurance. A wide range of methods for structuring reinsurance arrangements can be employed depending on the requirements of individual companies. This statement deals with the more commonly employed methods.

## SUMMARY CONCLUSION

**General**

2.     Reinsurance is the assumption by an insurer of all or part of a risk undertaken originally by another insurer. The transaction whereby a reinsurer cedes all or part of the reinsurance it has assumed to another reinsurer is known as a *retrocession.*

3.     Reinsurance has many beneficial purposes. Among them are that it enables an insurance entity to (a) expand its capacity, (b) share large risks with other insurers, (c) spread the risk of potential catastrophes and stabilize its underwriting results, (d) finance expanding volume by sharing the financial burden of reserves, (e) withdraw from a line or class of business, and (f) reduce its net liability to amounts appropriate to its financial resources.

4.     Reinsurance agreements are generally classified as treaty or facultative. Treaty reinsurance refers to an arrangement involving a class or type of business written, while facultative reinsurance involves individual risks offered and accepted.

5.     Reinsurance coverage can be pro rata (i.e., proportional reinsurance) where the reinsurer shares a pro rata portion of the losses and premium of the ceding entity or excess of loss (i.e., non-proportional) where the reinsurer, subject to a specified limit, indemnifies the ceding entity against the amount of loss in excess of a specified retention. Most reinsurance agreements fall into one of the following categories:

     I.    Treaty Reinsurance Contracts—Pro Rata:

          A.    Quota Share Reinsurance—The ceding entity is indemnified against a fixed percentage of loss on each risk covered in the agreement;

          B.    Surplus Share Reinsurance—The ceding entity establishes a retention or "line" on the risks to be covered and cedes a fraction or a multiple of that line on each policy subject to a specified maximum cession;

     II.    Treaty Reinsurance Contracts—Excess of Loss:

          A.    Excess Per Risk Reinsurance—The ceding entity is indemnified, subject to a specified limit, against the amount of loss in excess of a specified retention with respect to each risk covered by a treaty;

          B.    `Aggregate Excess of Loss Reinsurance—The ceding entity is indemnified against the amount by which the ceding entity's net retained losses incurred during a specific period exceed either a predetermined dollar amount or a percentage of the entity's subject premiums for the specific period subject to a specified limit;

SSAP No. 62R                    Statement of Statutory Accounting Principles

    III.    Treaty Reinsurance Contracts—Catastrophe: The ceding entity is indemnified, subject to a specified limit, against the amount of loss in excess of a specified retention with respect to an accumulation of losses resulting from a catastrophic event or series of events;

    IV.    Facultative Reinsurance Contracts—Pro Rata: The ceding entity is indemnified for a specified percentage of losses and loss expenses arising under a specific insurance policy in exchange for that percentage of the policy's premium;

    V.    Facultative Reinsurance Contracts—Excess of Loss: The ceding entity is indemnified, subject to a specified limit, for losses in excess of its retention with respect to a particular risk.

**Characteristics of Reinsurance Agreements**

6.    Common contract provisions that may affect accounting practices include:

    a.    Reporting responsibility of the ceding entity—Details required and time schedules shall be established;

    b.    Payment terms—Time schedules, currencies intended, and the rights of the parties to withhold funds shall be established;

    c.    Payment of premium taxes—Customarily the responsibility of the ceding entity, a recital of nonliability of the reinsurer may be found;

    d.    Termination—May be on a cut-off or run-off basis. A cut-off provision stipulates that the reinsurer shall not be liable for loss as a result of occurrences taking place after the date of termination. A run-off provision stipulates that the reinsurer shall remain liable for loss under reinsured policies in force at the date of termination as a result of occurrences taking place after the date of termination until such time as the policies expire or are canceled; and

    e.    Insolvency clause—Provides for the survival of the reinsurer's obligations in the event of insolvency of the ceding entity, without diminution because of the insolvency.

7.    Reinsurance contracts shall not permit entry of an order of rehabilitation or liquidation to constitute an anticipatory breach by the reporting entity, nor grounds for retroactive revocation or retroactive cancellation of any contracts of the reporting entity.

**Required Terms for Reinsurance Agreements**

8.    In addition to credit for reinsurance requirements applicable to reinsurance transactions generally, no credit or deduction from liabilities shall be allowed by the ceding entity for reinsurance recoverable where the agreement was entered into after the effective date of these requirements (see paragraphs 90 and 91) unless each of the following conditions is satisfied:

    a.    The agreement must contain an acceptable insolvency clause;

    b.    Recoveries due the ceding entity must be available without delay for payment of losses and claim obligations incurred under the agreement, in a manner consistent with orderly payment of incurred policy obligations by the ceding entity;

© 1999-2010 National Association of Insurance Commissioners    

c.  The agreement shall constitute the entire contract between the parties and must provide no guarantee of profit, directly or indirectly, from the reinsurer to the ceding entity or from the ceding entity to the reinsurer;

d.  The agreement must provide for reports of premiums and losses, and payment of losses, no less frequently than on a quarterly basis, unless there is no activity during the period. The report of premiums and losses shall set forth the ceding entity's total loss and loss expense reserves on the policy obligations subject to the agreement, so that the respective obligations of the ceding entity and reinsurer will be recorded and reported on a basis consistent with this statement; and

e.  With respect to retroactive reinsurance agreements, the following additional conditions apply:

    i.  The consideration to be paid by the ceding entity for the retroactive reinsurance must be a sum certain stated in the agreement;

    ii.  Direct or indirect compensation to the ceding entity or reinsurer is prohibited;

    iii.  Any provision for subsequent adjustment on the basis of actual experience in regard to policy obligations transferred, or on the basis of any other formula, is prohibited in connection with a retroactive reinsurance transaction, except that provision may be made for the ceding entity's participation in the reinsurer's ultimate profit, if any, under the agreement;

    iv.  A retroactive reinsurance agreement shall not be canceled or rescinded without the approval of the commissioner of the domiciliary state of the ceding entity.

**Reinsurance Agreements with Multiple Cedents**

9.  Reinsurance agreements with multiple cedents require allocation agreements. The allocation agreement can be part of the reinsurance agreement or a separate agreement. If the agreement has multiple cedents:

    a.  The allocation must be in writing and

    b.  The terms of the allocation agreement must be fair and equitable.

***Reinsurance Contracts Must Include Transfer of Risk***

10.  The essential ingredient of a reinsurance contract is the transfer of risk. The essential element of every true reinsurance agreement is the undertaking by the reinsurer to indemnify the ceding entity, i.e., reinsured entity, not only in form but in fact, against loss or liability by reason of the original insurance. Unless the agreement contains this essential element of risk transfer, no credit shall be recorded.

11.  Insurance risk involves uncertainties about both (a) the ultimate amount of net cash flows from premiums, commissions, claims, and claims settlement expenses (underwriting risk) and (b) the timing of the receipt and payment of those cash flows (timing risk). Actual or imputed investment returns are not an element of insurance risk. Insurance risk is fortuitous—the possibility of adverse events occurring is outside the control of the insured.

12.  Determining whether an agreement with a reinsurer provides indemnification against loss or liability (transfer of risk) relating to insurance risk requires a complete understanding of that contract and

other contracts or agreements between the ceding entity and related reinsurers. A complete understanding includes an evaluation of all contractual features that (a) limit the amount of insurance risk to which the reinsurer is subject (e.g., experience refunds, cancellation provisions, adjustable features, or additions of profitable lines of business to the reinsurance contract) or (b) delay the timely reimbursement of claims by the reinsurer (e.g., payment schedules or accumulating retentions from multiple years).

13.     Indemnification of the ceding entity against loss or liability relating to insurance risk in reinsurance requires both of the following:

   a.     The reinsurer assumes significant-insurance risk under the reinsured portions of the underlying insurance agreements; and

   b.     It is reasonably possible that the reinsurer may realize a significant loss from the transaction.

14.     A reinsurer shall not have assumed significant insurance risk under the reinsured contracts if the probability of a significant variation in either the amount or timing of payments by the reinsurer is remote. Implicit in this condition is the requirement that both the amount and timing of the reinsurer's payments depend on and directly vary with the amount and timing of claims settled by the ceding entity. Contractual provisions that delay timely reimbursement to the ceding entity prevent this condition from being met.

15.     The ceding entity's evaluation of whether it is reasonably possible for a reinsurer to realize a significant loss from the transaction shall be based on the present value of all cash flows between the ceding and assuming companies under reasonably possible outcomes, without regard to how the individual cash flows are described or characterized. An outcome is reasonably possible if its probability is more than remote. The same interest rate shall be used to compute the present value of cash flows for each reasonably possible outcome tested. A constant interest rate shall be used in determining those present values because the possibility of investment income varying from expectations is not an element of insurance risk. Judgment is required to identify a reasonable and appropriate interest rate.

16.     Significance of loss shall be evaluated by comparing the present value of all cash flows, determined as described in paragraph 15, with the present value of the amounts paid or deemed to have been paid to the reinsurer. If, based on this comparison, the reinsurer is not exposed to the reasonable possibility of significant loss, the ceding entity shall be considered indemnified against loss or liability relating to insurance risk only if substantially all of the insurance risk relating to the reinsured portions of the underlying insurance agreements has been assumed by the reinsurer. In this narrow circumstance, the reinsurer's economic position is virtually equivalent to having written the insurance contract directly. This condition is met only if insignificant insurance risk is retained by the ceding entity on the retained portions of the underlying insurance contracts, so that the reinsurer's exposure to loss is essentially the same as the reporting entity's.

17.     Payment schedules and accumulating retentions from multiple years are contractual features inherently designed to delay the timing of reimbursement to the ceding entity. Regardless of what a particular feature might be called, any feature that can delay timely reimbursement violates the conditions for reinsurance accounting. Transfer of insurance risk requires that the reinsurer's payment to the ceding entity depend on and directly vary with the amount and timing of claims settled under the reinsured contracts. Contractual features that can delay timely reimbursement prevent this condition from being met. Therefore, any feature that may affect the timing of the reinsurer's reimbursement to the ceding entity shall be closely scrutinized.

Property and Casualty Reinsurance                    SSAP No. 62R

### Accounting for Reinsurance

18.     Reinsurance recoverables shall be recognized in a manner consistent with the liabilities (including estimated amounts for claims incurred but not reported) relating to the underlying reinsured contracts. Assumptions used in estimating reinsurance recoverables shall be consistent with those used in estimating the related liabilities. Certain assets and liabilities are created by entities when they engage in reinsurance contracts. Reinsurance assets meet the definition of assets as defined by *SSAP No. 4—Assets and Nonadmitted Assets* and are admitted to the extent they conform to the requirements of this statement.

19.     Accounting for members of a reinsurance pool shall follow the accounting for the pool member which issued the underlying policy. Specific accounting rules for underwriting pools and associations are addressed in *SSAP No. 63—Underwriting Pools and Associations Including Intercompany Pools* (SSAP No. 63).

20.     Reinsurance recoverable on loss payments is an admitted asset. Notwithstanding the fact that reinsurance recoverables on paid losses may meet the criteria for offsetting under the provisions of *SSAP No. 64—Offsetting and Netting of Assets and Liabilities* (SSAP No. 64), reinsurance recoverables on paid losses shall be reported as an asset without any available offset. Unauthorized reinsurance is included in this asset and reflected separately as a liability to the extent required. Penalty for overdue authorized reinsurance shall be reflected as a liability.

21.     Funds held or deposited with reinsured companies, whether premiums withheld as security for unearned premium and outstanding loss reserves or advances for loss payments, are admitted assets provided they do not exceed the liabilities they secure and provided the reinsured is solvent. Those funds which are in excess of the liabilities, and any funds held by an insolvent reinsured shall be nonadmitted.

22.     Prospective reinsurance is defined as reinsurance in which a reinsurer agrees to reimburse a ceding entity for losses that may be incurred as a result of future insurable events covered under contracts subject to the reinsurance. Retroactive reinsurance is defined as reinsurance in which a reinsurer agrees to reimburse a ceding entity for liabilities incurred as a result of past insurable events covered under contracts subject to the reinsurance. A reinsurance agreement may include both prospective and retroactive reinsurance provisions.

23.     The distinction between prospective and retroactive reinsurance agreements is based on whether the agreement reinsures future or past insured events covered by the underlying insurance policies. For example, in occurrence-based insurance, the insured event is the occurrence of a loss covered by the insurance contract. In claims-made insurance, the insured event is the reporting to the insurer, within the period specified by the policy, of a claim for a loss covered by the insurance agreement. A claims-made reinsurance contract that reinsures claims asserted to the reinsurer in a future period as a result of insured events that occurred prior to entering into the reinsurance agreement is a retroactive agreement. (However, a reinsurance agreement that reinsures claims reported to an insurer that are covered under currently effective claims-made insurance policies is a prospective reinsurance agreement.)

24.     It is not uncommon for a reinsurance arrangement to be initiated before the beginning of a policy period but not finalized until after the policy period begins. Whether there was agreement in principle at the beginning of the policy period and, therefore, the agreement is substantively prospective shall be determined based on the facts and circumstances. However, except as respects business assumed by a U.S. reinsurer from ceding companies domiciled outside the U.S. and not affiliated with such reinsurer, or business assumed by a U.S. reinsurer where either the lead reinsurer or a majority of the capacity on the agreement is domiciled outside the U.S. and is not affiliated with such reinsurer, if an agreement entered into, renewed or amended on or after January 1, 1994 has not been finalized, reduced to a written form and signed by the parties within nine months after the commencement of the policy period covered by the

SSAP No. 62R                      Statement of Statutory Accounting Principles

reinsurance arrangement, then the arrangement is presumed to be retroactive and shall be accounted for as a retroactive reinsurance agreement. This presumption shall not apply to: (a) facultative reinsurance contracts, nor to (b) reinsurance agreements with more than one reinsurer which are signed by the lead reinsurer (i.e., the reinsurer setting the terms of the agreement for the reinsurers) within nine months after the commencement of the policy period covered by the reinsurance agreement, nor to (c) reinsurance agreements with more than one reinsurer (whether signed by the lead reinsurer or not) which were entered into, renewed or amended on or before December 31, 1996, (and which were not renewed or amended after that date) if reinsurers representing more than 50% of the capacity on the agreement have signed cover notes, placement slips or similar documents describing the essential terms of coverage and exclusions within nine months after the commencement of the policy period covered by the reinsurance arrangement. Also exempt from this presumption are reinsurance agreements where one of the parties is in conservation, rehabilitation, receivership or liquidation proceedings.

25.     Prospective and retroactive provisions included within a single agreement shall be accounted for separately. If separate accounting for prospective and retroactive provisions included within a single agreement is impracticable, the agreement shall be accounted for as a retroactive agreement provided the conditions for reinsurance accounting are met.

**Accounting for Prospective Reinsurance Agreements**

26.     Amounts paid for prospective reinsurance that meet the conditions for reinsurance accounting shall be reported as a reduction of written and earned premiums by the ceding entity and shall be earned over the remaining contract period in proportion to the amount of reinsurance protection provided or, if applicable, until the reinsurer's maximum liability under the agreement has been exhausted. If the amounts paid are subject to adjustment and can be reasonably estimated, the basis for amortization shall be the estimated ultimate amount to be paid. Reinstatement premium, if any, shall be earned over the period from the reinstatement of the limit to the expiration of the agreement.

27.     Changes in amounts of estimated reinsurance recoverables shall be recognized as a reduction of gross losses and loss expenses incurred in the current period statement of income. Reinsurance recoverables on paid losses shall be reported as an asset, reinsurance recoverables on loss and loss adjustment expense payments, in the balance sheet. Reinsurance recoverables on unpaid case-basis and incurred but not reported losses and loss adjustment expenses shall be netted against the liability for gross losses and loss adjustment expenses.

**Accounting for Retroactive Reinsurance Agreements**

28.     Certain reinsurance agreements which transfer both components of insurance risk cover liabilities which occurred prior to the effective date of the agreement. Due to potential abuses involving the creation of surplus to policyholders and the distortion of underwriting results, special accounting treatment for these agreements is warranted.

29.     All retroactive reinsurance agreements entered into, renewed or amended on or after January 1, 1994 (including subsequent development of such transactions) shall be accounted for and reported in the following manner:

        a.     The ceding entity shall record, without recognition of the retroactive reinsurance, loss and loss expense reserves on a gross basis on the balance sheet and in all schedules and exhibits;

        b.     The assuming entity shall exclude the retroactive reinsurance from loss and loss expense reserves and from all schedules and exhibits;

**Property and Casualty Reinsurance**                                      **SSAP No. 62R**

c.   The ceding entity and the assuming entity shall report by write-in item on the balance sheet, *the total amount of all retroactive reinsurance, identified as retroactive reinsurance* reserve ceded or assumed, recorded as a contra-liability by the ceding entity and as a liability by the assuming entity;

d.   The ceding entity shall, by write-in item on the balance sheet, restrict surplus resulting from any retroactive reinsurance as a special surplus fund, designated as special surplus from retroactive reinsurance account;

e.   The surplus gain from any retroactive reinsurance shall not be classified as unassigned funds (surplus) until the actual retroactive reinsurance recovered exceeds the consideration paid;

f.   The special surplus from retroactive reinsurance account for each respective retroactive reinsurance agreement shall be reduced at the time the ceding entity begins to recover funds from the assuming entity in amounts exceeding the consideration paid by the ceding entity under such agreement, or adjusted as provided in subparagraph 29.j.;

g.   For each agreement, the reduction in the special surplus from retroactive reinsurance account shall be limited to the lesser of (i) the actual amount recovered in excess of consideration paid or (ii) the initial surplus gain resulting from the respective retroactive reinsurance agreement. Any remaining balance in the special surplus from retroactive reinsurance account derived from any such agreement shall be returned to unassigned funds (surplus) upon elimination of all policy obligations subject to the retroactive reinsurance agreement;

h.   The ceding entity shall report the initial gain arising from a retroactive reinsurance transaction (i.e., the difference between the consideration paid to the reinsurer and the total reserves ceded to the reinsurer) as a write-in item on the statement of income, to be identified as Retroactive Reinsurance Gain and included under Other Income;

i.   The assuming entity shall report the initial loss arising from a retroactive reinsurance transaction, as defined in the preceding subparagraph 29.g., as a write-in item on the statement of income, to be identified as Retroactive Reinsurance Loss and included under Other Income;

j.   Any subsequent increase or reduction in the total reserves ceded under a retroactive reinsurance agreement shall be reported in the manner described in the preceding subparagraphs 29.h. and 29.i., in order to recognize the gain or loss arising from such increase or reduction in reserves ceded. The Special Surplus from Retroactive Reinsurance Account write-in entry on the balance sheet shall be adjusted, upward or downward, to reflect such increase or reduction in reserves ceded. The Special Surplus from Retroactive Reinsurance Account write-in entry shall be equal to or less than the total ceded reserves under all retroactive reinsurance agreements in-force as of the date of the financial statement. Special surplus arising from a retroactive reinsurance transaction shall be considered to be earned surplus (i.e., transferred to unassigned funds (surplus)) only when cash recoveries from the assuming entity exceed the consideration paid by the ceding entity as respects such retroactive reinsurance transaction; and

k.   The consideration paid for a retroactive reinsurance agreement shall be reported as a decrease in ledger assets by the ceding entity and as an increase in ledger assets by the assuming entity.

SSAP No. 62R                    Statement of Statutory Accounting Principles

(For an illustration of ceding entity accounting entries see Question 33 in Exhibit A.)

30.     Portfolio reinsurance is the transfer of an insurer's entire liability for in force policies or outstanding losses, or both, of a segment of the insurer's business. Loss portfolio transactions are to be accounted for as retroactive reinsurance.

31.     The accounting principles for retroactive reinsurance agreements in paragraph 29 shall not apply to the following types of agreements (which shall be accounted for as prospective reinsurance agreements unless otherwise provided in this statement):

    a.     Structured settlement annuities for individual claims purchased to implement settlements of policy obligations;

    b.     Novations, (I.e., (i) transactions in which the original direct insurer's obligations are completely extinguished, resulting in no further exposure to loss arising on the business novated or (ii) transactions in which the original assuming entity's obligations are completely extinguished) resulting in no further exposure to loss arising on the business novated, provided that (1) the parties to the transaction are not affiliates (or if affiliates, that the transaction has the prior approval of the domiciliary regulators of the parties) and (2) the accounting for the original reinsurance agreement will not be altered from retroactive to prospective;

    c.     The termination of, or reduction in participation in, reinsurance treaties entered into in the ordinary course of business;

    d.     Intercompany reinsurance agreements, and any amendments thereto, among companies 100% owned by a common parent or ultimate controlling person provided there is no gain in surplus as a result of the transaction; or

    e.     Reinsurance/retrocession agreements that meet the criteria of property/casualty run-off agreements described in paragraphs 68-71.

32.     Retroactive reinsurance agreements resulting in surplus gain to the ceding entity (with or without risk transfer) entered into between affiliates or between insurers under common control (as those terms are defined in Appendix A-440) shall be reported as follows:

    a.     The consideration paid by the ceding entity shall be recorded as a deposit and reported as a nonadmitted asset; and

    b.     No deduction shall be made from loss and loss adjustment expense reserves on the ceding entity's balance sheet, schedules, and exhibits.

33.     The accounting and reporting provisions applicable to retroactive reinsurance apply to all transactions transferring liabilities in connection with a court-ordered rehabilitation, liquidation, or receivership. The requirement to include stipulated contract provisions in the reinsurance agreements shall not apply to these transactions, with written approval of the ceding entity's domiciliary commissioner.

34.     Novations meeting the requirements of subparagraph 31.b. shall be accounted for as prospective reinsurance agreements. The original direct insurer, or the original assuming insurer, shall report amounts paid as a reduction of written and earned premiums, and unearned premiums to the extent that premiums have not been earned. Novated balances (e.g., loss and loss adjustment expense reserves) shall be written off through the accounts, exhibits, and schedules in which they were originally recorded. The assuming

Property and Casualty Reinsurance                                      SSAP No. 62R

insurer shall report amounts received as written and earned premiums, and obligations assumed as incurred losses in the statement of income.

**Deposit Accounting**

35. To the extent that a reinsurance agreement does not, despite its form, transfer both components of insurance risk, all or part of the agreement shall be accounted for and reported as deposits in the following manner:

At the onset of the reinsurance agreement the net consideration paid by the ceding entity (premiums less commissions or other allowances) shall be recorded as a deposit by the ceding entity and as a liability by the assuming entity. The deposit shall be reported as an admitted asset by the ceding entity if (i) the assuming entity is licensed or otherwise qualified as described in the ceding entity's state of domicile as described in Appendix A-785, or (ii) there are funds held by or on behalf of the ceding entity as described in Appendix A-785.

Throughout the life of the agreement, receipts and disbursements shall be recorded through the deposit/liability account.

When individual case reserves are the basis for the deposit and the assuming entity pays in excess of the amount transferred to the ceding entity, the amount paid in excess of the deposit received shall be recorded as a loss by the assuming entity and as a gain by the ceding entity as Other Income in the statement of income.

When the agreement is completed or when there is a loss payment in excess of the deposit, any difference between consideration and recoveries shall be recorded in the Other Income or Loss account as a loss to the reinsurer and as a gain in the Other Income or Loss account by the reinsured.

With regard to bulk reserves (i.e., IBNR), it shall be assumed that any cash transactions for the settlement of losses will reduce the asset/liability account by the amount of the cash transferred. Where the remaining losses are revalued upward or are increased, the liability shall be recorded as a loss recognized by the assuming entity. Conversely the ceding entity shall increase its deposit asset and outstanding loss liability.

No deduction shall be made from the loss and loss adjustment expense reserves on the ceding entity's balance sheet, schedules and exhibits; and

The assuming entity shall record net consideration to be retained as the ceding entity's liability.

**Assumed Reinsurance**

36. Reinsurance premiums receivable at the end of the accounting period are combined with direct business receivables and reported as agents' balances or uncollected premiums. Where the ceding entity withholds premium funds pursuant to the terms of the reinsurance agreement, such assets shall be shown by the assuming entity as funds held by or deposited with reinsured companies. Reporting entities shall record any interest earned or receivable on the funds withheld as a component of aggregate write-ins for miscellaneous income.

37. If the assuming entity receives reinsurance premium prior to the effective date of the reinsurance contract, consistent with *SSAP No. 53—Property Casualty Contracts-Premiums*, paragraph 13, advance

SSAP No. 62R                         Statement of Statutory Accounting Principles

premiums shall be reported as a liability in the statutory financial statement and not considered income until the effective date of the coverage. Such amounts are not included in written premium or the unearned premium reserve. If the assuming entity receives reinsurance premium after the effective date of the reinsurance contract but prior to the due date, the amount received shall be reported as a reduction of the asset for deferred but not yet due (earned but unbilled premiums).

38.     Reinsurance premiums more than 90 days overdue shall be nonadmitted except (a) to the extent the assuming entity maintains unearned premium and loss reserves as to the ceding entity, under principles of offset accounting as discussed in SSAP No. 64, or (b) where the ceding entity is licensed and in good standing in assuming entity's state of domicile. Reinsurance premiums are due pursuant to the original contract terms (as the agreement stood on the date of execution). In the absence of a specific contract date, reinsurance premiums will be deemed due thirty (30) days after the date on which (i) notice or demand of premium due is provided to the ceding entity or (ii) the assuming entity books the premium (see SSAP No. 6—Uncollected Premium Balances, Bills Receivable for Premiums, and Amounts Due From Agents and Brokers).

39.     A lag will develop between the time of the entry of the underlying policy transaction on the books of the ceding entity and the transmittal of information and entry on the books of the assuming entity. Assuming companies shall estimate unreported premiums and related costs to the extent necessary to prevent material distortions in the loss development contained in the assuming entity's annual statement schedules where calendar year premiums are compared to accident year losses.

40.     Proportional reinsurance (i.e., first dollar pro rata reinsurance) premiums shall be allocated to the appropriate annual statement lines of business in the Underwriting and Investment exhibits. Non-proportional assumed reinsurance premiums shall be classified as reinsurance under the appropriate subcategories.

41.     Assumed retroactive reinsurance premiums shall be excluded from all schedules and exhibits as addressed in subparagraph 29.k.

42.     Amounts payable by reinsurers on losses shall be classified as unpaid losses. Assumed reinsurance payable on paid losses shall be classified as a separate liability item on the balance sheet. IBNR losses on assumed reinsurance business shall be netted with ceded losses on the balance sheet and listed separately by annual statement line of business in the Underwriting and Investment exhibits.

Ceded Reinsurance

43.     Ceded reinsurance premiums payable (net of ceding commission) shall be classified as a liability. Consistent with SSAP No. 64, ceded reinsurance premiums payable may be deducted from amounts due from the reinsurer, such as amounts due on assumed reinsurance, when a legal right of offset exists.

44.     With regard to reinsurance premium paid prior to the effective date of the contract, the ceding entity shall reflect the prepaid item as a write-in admitted asset and it should not be recognized in the income statement until the effective date of the coverage. Such amounts are not included in written premiums or ceded unearned premium but should be subject to impairment analysis. With regard to reinsurance premium paid by ceding entity after the reinsurance contract is in effect but prior to the due date, the ceding entity shall treat this item as a reduction to the liability for ceded reinsurance premiums payable. That liability reflects not only premiums unpaid but also amounts booked but deferred and not yet due.

45.     Amounts withheld by the ceding entity that would otherwise be payable under the reinsurance agreement shall be reported as funds held by entity under reinsurance treaties. Reporting entities shall

record any interest due or payable on the amounts withheld as a component of aggregate write-ins for miscellaneous income.

46.     Ceded reinsurance transactions shall be classified in the annual statement line of business which relates to the direct or assumed transactions creating the cession or retrocession.

47.     Ceded retroactive reinsurance premiums shall be excluded from all schedules and exhibits as addressed in subparagraph 29.k.

**Adjustable Features/Retrospective Rating**

48.     Reinsurance treaties may provide for adjustment of commission, premium, or amount of coverage, based on loss experience. The accounting for common examples is outlined in the following paragraphs:

Commission Adjustments

49.     An accrual shall be maintained for the following adjustable features based upon the experience recorded for the accounting period:

      a.     Contingent or Straight Profit—The reinsurer returns to the ceding entity a stipulated percentage of the profit produced by the business assumed from the ceding entity. Profit may be calculated for any specified period of time, but the calculation is often based on an average over a period of years; and

      b.     Sliding Scale—A provisional rate of commission is paid over the course of the agreement, with a final adjustment based on the experience of the business ceded under the agreement.

Premium Adjustments

50.     If the reinsurance agreement incorporates an obligation on the part of the ceding entity to pay additional premium to the assuming entity based upon loss experience under the agreement, a liability in the amount of such additional premium shall be recognized by the ceding entity during the accounting period in which the loss event(s) giving rise to the obligation to pay such additional premium occur(s). The assuming entity shall recognize an asset in a consistent manner. If the reinsurance agreement incorporates an obligation on the part of the assuming entity to refund to the ceding entity any portion of the consideration received by the assuming entity based upon loss experience under the agreement, an asset in the amount of any such refund shall be recognized by the ceding entity during the accounting period in which the loss event(s) giving rise to the obligation to make such refund occur(s). The initial provisional or deposit premium is recalculated retrospectively, based on loss experience under the agreement during a specified period of time; the calculation is often based on an average over a period of years. The assuming entity shall recognize a liability in a consistent manner.

Adjustments in the Amount of Coverage

51.     The amount of coverage available for future periods is adjusted, upward or downward, based on loss experience under the agreement during a specified period of time. If the reinsurance agreement incorporates a provision under which the reinsurance coverage afforded to the ceding entity may be increased or reduced based upon loss experience under the agreement, an asset or a liability shall be recognized by the ceding entity in an amount equal to that percentage of the consideration received by the assuming entity which the increase or reduction in coverage represents of the amount of coverage originally afforded. The asset or liability shall be recognized during the accounting period in which the

loss event(s) (or absence thereof) giving rise to the increase or decrease in reinsurance coverage occur(s), and shall be amortized over all accounting periods for which the increased or reduced coverage is applicable. The term "consideration" shall mean, for this purpose, the annualized deposit premium for the period used as the basis for calculating the adjustment in the amount of coverage to be afforded thereafter under the agreement.

Impairment

52.     Include as a nonadmitted asset, amounts accrued for premium adjustments on retrospectively rated reinsurance agreements with respect to which all uncollected balances due from the ceding company have been classified as nonadmitted.

**Commissions**

53.     Commissions payable on reinsurance assumed business shall be included as an offset to Agents' Balances or Uncollected Premiums. Commissions receivable on reinsurance ceded business shall be included as an offset to Ceded Reinsurance Balances Payable.

54.     If the ceding commission paid under a reinsurance agreement exceeds the anticipated acquisition cost of the business ceded, the ceding entity shall establish a liability, equal to the difference between the anticipated acquisition cost and the reinsurance commissions received, to be amortized pro rata over the effective period of the reinsurance agreement in proportion to the amount of coverage provided under the reinsurance contract.

**Provision for Reinsurance**

55.     The NAIC Annual Statement Instructions for Property and Casualty Companies for Schedule F—Provision for Overdue Reinsurance, provide for a minimum reserve for uncollectible reinsurance with an additional reserve required if an entity's experience indicates that a higher amount should be provided. The minimum reserve Provision for Reinsurance is recorded as a liability and the change between years is recorded as a gain or loss directly to unassigned funds (surplus). Any reserve over the minimum amount shall be recorded on the statement of income by reversing the accounts previously utilized to establish the reinsurance recoverable.

56.     The provision for reinsurance is calculated separately for unauthorized and authorized companies. An authorized reinsurer is licensed, accredited or approved by the ceding entity's state of domicile; an unauthorized reinsurer is not so licensed, accredited or approved.

**Disputed Items**

57.     Occasionally a reinsurer will question whether an individual claim is covered under a reinsurance agreement or may even attempt to nullify an entire agreement. A ceding entity, depending upon the individual facts, may or may not choose to continue to take credit for such disputed balances. A ceding entity shall take no credit whatsoever for reinsurance recoverables in dispute with an affiliate.

58.     Items in dispute are those claims with respect to which the ceding entity has received formal written communication from the reinsurer denying the validity of coverage.

**Uncollectible Reinsurance**

59.     Uncollectible reinsurance balances shall be written off through the accounts, exhibits, and schedules in which they were originally recorded.

© 1999-2010 National Association of Insurance Commissioners

## Commutations

60.     *A commutation of a reinsurance agreement, or any portion thereof, is a transaction which results in the complete and final settlement and discharge of all, or the commuted portion thereof, present and future obligations between the parties arising out of the reinsurance agreement.*

61.     In commutation agreements, an agreed upon amount determined by the parties is paid by the reinsurer to the ceding entity. The ceding entity immediately eliminates the reinsurance recoverable recorded against the ultimate loss reserve and records the cash received as a negative paid loss. Any net gain or loss shall be reported in underwriting income in the statement of income.

62.     The reinsurer eliminates a loss reserve carried at ultimate cost for a cash payout calculated at present value. Any net gain or loss shall be reported in underwriting income in the statement of income.

63.     Commuted balances shall be written off through the accounts, exhibits, and schedules in which they were originally recorded.

## National Flood Insurance Program

64.     The National Flood Insurance Program was created by the Federal Emergency Management Agency (FEMA) and is designed to involve private insurers in a write-your-own (WYO) flood insurance program financially backed by FEMA at no risk to the insurer. To become a participating WYO entity, the entity signs a document with the Federal Insurance Administration (FIA) of the Federal Emergency Management Agency known as the Financial Assistance/Subsidy Arrangement.

65.     Premium rates are set by FEMA. The WYO participating companies write the flood insurance coverage qualifying for the program on their own policies, perform their own underwriting, premium collections, claim payments, administration, and premium tax payments for policies written under the program.

66.     Monthly accountings are made to FIA and participants draw upon FEMA letters of credit for deficiencies of losses, loss expenses, and administrative expenses in excess of premiums, subject to certain percentage limitations on expenses.

67.     Balances due from or to FEMA shall be reported as ceded reinsurance balances receivable or payable.

## Accounting for the Transfer of Property and Casualty Run-off Agreements

68.     Property and casualty run-off agreements are reinsurance or retrocession agreements that are intended to transfer essentially all of the risks and benefits of a specific line of business or market segment that is no longer actively marketed by the transferring insurer or reinsurer. A property and casualty run-off agreement is not a novation as the transferring insurer or reinsurer remains primarily liable to the policyholder or ceding entity under the original contracts of insurance or reinsurance. Reinsurance agreements between affiliates or between insurers under common control (as those terms are defined in Appendix A-440) are not eligible for the exception for property and casualty run-off agreements in subparagraph 31.e. of SSAP No. 62R.

## Criteria

69.     The accounting treatment for property and casualty run-off agreements must be approved by the domiciliary regulators of the transferring entity (either the original direct insurer in the case of a reinsurance agreement or the original assuming reinsurer in the case of a retrocession agreement) and the assuming entity. If the transferring entity and assuming entity are domiciled in the same state, then the

regulator of the state where the majority of the transferred liabilities is located shall be asked to approve the accounting treatment. In determining whether to approve an agreement for this accounting treatment, the regulators shall require the following:

a.   Assuming Entity Properly Licensed – The entity assuming the run-off agreement must have the appropriate authority or license to write the business being assumed.

b.   Limits and Coverages – the reinsurance or retrocession agreement shall provide the same limits and coverages that were afforded in the original insurance or reinsurance agreement.

c.   Non-recourse – The reinsurance or retrocession agreement shall not contain any adjustable features or profit share or retrospective rating, and there shall be no recourse (other than normal representations and warranties that would be associated with a purchase and sale agreement) directly or indirectly against the transferring entity.

d.   Risk Transfer – the reinsurance or retrocession agreement must meet the requirements of risk transfer as described in this statement.

e.   Financial Strength of Reinsurer – the assuming reinsurer shall have a financial strength rating from at least two independent rating agencies (from NAIC acceptable rating agencies) which is equal to or greater than the current ratings of the transferring entity. The lowest financial strength rating received from an NAIC acceptable rating organization rating agency will be used to compare the financial strength ratings of the transferring and assuming entities.

f.   Assessments – the assuming reinsurer or retrocessionaire (if required in the original reinsurance contract) shall be financially responsible for any and all assessments, including guaranty fund assessments, that are assessed against the transferring entity related to the insurance business being assumed.

g.   Applicable Only to "Run-off" Business – the reinsurance or retrocession agreement shall only cover liabilities relating to a line(s) of business or specific market segments no longer actively marketed by the transferring entity.

h.   Non-cancelable Reinsurance – the reinsurance or retrocession agreement shall provide that the reinsurance or retrocessional coverage provided by the proposed agreement cannot be cancelable by either party for any reason. (However, this provision will not override standard contracts law and principles and will not prevent any remedies, including rescission or termination that might be available for breach, misrepresentation, etc.)

**Statutory Schedules and Exhibits**

70.   At the inception of the transaction, the transferring entity shall record the consideration paid to the assuming entity as a paid loss. If the consideration paid by the transferring entity is less than the loss reserves transferred, the difference shall be recorded by the ceding entity as a decrease in losses incurred. The assuming entity shall record the consideration received as a negative paid loss. In addition, the transferring entity shall record an increase to ceded reinsurance recoverable for the amount of the transferred reserve. Journal entries illustrating these transactions, including situations in which the transaction includes an unearned premium reserve, are included in Exhibit B of this Statement.

**Property and Casualty Reinsurance**                              **SSAP No. 62R**

71.    The assuming entity will report the business in the same line of business as reported by the original insurer or reinsurer. The assuming entity will report the business at the same level of detail using the appropriate statutory schedules and exhibits.

**Disclosures**

72.    Unsecured Reinsurance Recoverables:

     a.    If the entity has with any individual reinsurers, authorized or unauthorized, an unsecured aggregate recoverable for losses, paid and unpaid including IBNR, loss adjustment expenses, and unearned premium, that exceeds 3% of the entity's policyholder surplus, list each individual reinsurer and the unsecured aggregate recoverable pertaining to that reinsurer; and

     b.    If the individual reinsurer is part of a group, list the individual reinsurers, each of its related group members having reinsurance with the reporting entity, and the total unsecured aggregate recoverables for the entire group.

73.    Reinsurance Recoverables in Dispute—Reinsurance recoverable on paid and unpaid (including IBNR) losses in dispute by reason of notification, arbitration or litigation shall be identified if the amounts in dispute from any entity (and/or affiliate) exceed 5% of the ceding entity's policyholders surplus or if the aggregate of all disputed items exceeds 10% of the ceding entity's policyholders surplus. Notification means a formal written communication from a reinsurer denying the validity of coverage.

74.    Uncollectible Reinsurance—Describe uncollectible reinsurance written off during the year reported in the following annual statement classifications, including the name(s) of the reinsurer(s):

     a.    Losses incurred;

     b.    Loss adjustment expenses incurred;

     c.    Premiums earned; and

     d.    Other.

75.    Commutation of Ceded Reinsurance—Describe commutation of ceded reinsurance during the year reported in the following annual statement classifications, including the name(s) of the reinsurer(s):

     a.    Losses incurred;

     b.    Loss adjustment expenses incurred;

     c.    Premiums earned; and

     d.    Other.

76.    Retroactive Reinsurance—The table illustrated in the NAIC Annual Statement Instructions for Property and Casualty Companies under Retroactive Reinsurance in the Notes to Financial Statements section shall be completed for all retroactive reinsurance agreements that transfer liabilities for losses that have already occurred and that will generate special surplus transactions. The insurer (assuming or ceding) shall assign a unique number to each retroactive reinsurance agreement and shall utilize this number for as long as the agreement exists. Transactions utilizing deposit accounting shall not be reported in this note.

SSAP No. 62R                    Statement of Statutory Accounting Principles

77.    Reinsurance Assumed and Ceded—The tables illustrated in the NAIC Annual Statement Instructions for Property and Casualty Companies under "Reinsurance Assumed and Ceded in the Notes to Financial Statements" section shall be completed as follows:

    a.    The financial statements shall disclose the maximum amount of return commission which would have been due reinsurers if all reinsurance were canceled with the return of the unearned premium reserve; and

    b.    The financial statements shall disclose the accrual of additional or return commission, predicated on loss experience or on any other form of profit sharing arrangements as a result of existing contractual arrangements.

78.    A specific interrogatory requires information on reinsurance of risk accompanied by an agreement to release the reinsurer from liability, in whole or in part, from any loss that may occur on the risk or portion thereof.

79.    Disclosures for paragraphs 80-85 represent annual statement interrogatories, which are required to be included with the annual audit report beginning with audit reports on financial statements as of and for the period ended December 31, 2006. The disclosures required within paragraphs 80-85 shall be included in accompanying supplemental schedules of the annual audit report beginning in year-end 2006. These disclosures shall be limited to reinsurance contracts entered into, renewed or amended on or after January 1, 1994. This limitation applies to the annual audit report only and does not apply to the statutory annual statement interrogatories and the reinsurance summary supplemental filing.

80.    Disclose if any risks are reinsured under a quota share reinsurance contract with any other entity that includes a provision that would limit the reinsurer's losses below the stated quota share percentage (e.g. a deductible, a loss ratio corridor, a loss cap, an aggregate limit or any similar provisions)? If yes, indicate the number of reinsurance contracts containing such provisions and if the amount of reinsurance credit taken reflects the reduction in quota share coverage caused by any applicable limiting provision(s).

81.    Disclose if the reporting entity ceded any risk under any reinsurance contract (or under multiple contracts with the same reinsurer or its affiliates) for which during the period covered by the statement: (i) it recorded a positive or negative underwriting result greater than 5% of prior year-end surplus as regards policyholders or it reported calendar year written premium ceded or year-end loss and loss expense reserves ceded greater than 5% of prior year-end surplus as regards policyholders; (ii) it accounted for that contract as reinsurance and not as a deposit; and (iii) the contract(s) contain one or more of the following features or other features that would have similar results:

    a.    A contract term longer than two years and the contract is noncancellable by the reporting entity during the contract term;

    b.    A limited or conditional cancellation provision under which cancellation triggers an obligation by the reporting entity, or an affiliate of the reporting entity, to enter into a new reinsurance contract with the reinsurer, or an affiliate of the reinsurer;

    c.    Aggregate stop loss reinsurance coverage;

    d.    A unilateral right by either party (or both parties) to commute the reinsurance contract, whether conditional or not, except for such provisions which are only triggered by a decline in the credit status of the other party;

    e.    A provision permitting reporting of losses, or payment of losses, less frequently than on a quarterly basis (unless there is no activity during the period); or

    f.       Payment schedule, accumulating retentions from multiple years or any features inherently designed to delay timing of the reimbursement to the ceding entity.

82.     Disclose if the reporting entity during the period covered by the statement ceded any risk under any reinsurance contract (or under multiple contracts with the same reinsurer or its affiliates) for which during the period covered by the statement it recorded a positive or negative underwriting result greater than 5% of prior year-end surplus as regards policyholders or it reported calendar year written premium ceded or year-end loss and loss expense reserves ceded greater than 5% of prior year-end surplus as regards policyholders; excluding cessions to approved pooling arrangements or to captive insurance companies that are directly or indirectly controlling, controlled by, or under common control with (i) one or more unaffiliated policyholders of the reporting entity, or (ii) an association of which one or more unaffiliated policyholders of the reporting entity is a member, where:

    a.      The written premium ceded to the reinsurer by the reporting entity or its affiliates represents fifty percent (50%) or more of the entire direct and assumed premium written by the reinsurer based on its most recently available financial statement; or

    b.      Twenty-five percent (25%) or more of the written premium ceded to the reinsurer has been retroceded back to the reporting entity or its affiliates in separate reinsurance contract.

83.     If affirmative disclosure is required for paragraph 81 or 82, provide the following information:

    a.      A summary of the reinsurance contract terms and indicate whether it applies to the contracts meeting paragraph 81 or 82;

    b.      A brief discussion of management's principal objectives in entering into the reinsurance contract including the economic purpose to be achieved; and

    c.      The aggregate financial statement impact gross of all such ceded reinsurance contracts on the balance sheet and statement of income.

84.     Except for transactions meeting the requirements of paragraph 31 of *SSAP No. 62R—Property and Casualty Reinsurance*, disclose if the reporting entity ceded any risk under any reinsurance contract (or multiple contracts with the same reinsurer or its affiliates) during the period covered by the financial statement, and either:

    a.      Accounted for that contract as reinsurance (either prospective or retroactive) under statutory accounting principles (SAP) and as a deposit under generally accepted accounting principles (GAAP); or

    b.      Accounted for that contract as reinsurance under GAAP and as a deposit under SAP.

85.     If affirmative disclosure is required for paragraph 84, explain in a supplemental filing why the contract(s) is treated differently for GAAP and SAP.

86.     Disclosures for the Transfer of Property and Casualty Run-off Agreements

    a.      Disclose if the reporting entity has entered into any agreements which have been approved by their domiciliary regulator and have qualified pursuant to SSAP No. 62R, subparagraph 31.e.,—Accounting for the Transfer of Property and Casualty Run-off Agreements.

     b.     If affirmative, provide a description of the agreement and the amount of consideration paid and liabilities transferred.

87.     Refer to the preamble for further discussion regarding disclosure requirements.

**Relevant Literature**

88.     This statement adopts *FASB Statement No. 113, Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts* (FAS 113) with modification and FASB *Emerging Issues Task Force No. 93-6, Accounting for Multiple-Year Retrospectively Rated Contracts by Ceding and Assuming Enterprises* with modification for the following:

     a.     Reinsurance recoverables on unpaid case-basis and incurred but not reported losses and loss adjustment expenses shall be reported as a contra-liability netted against the liability for gross losses and loss adjustment expenses;

     b.     Amounts paid for prospective reinsurance that meet the conditions for reinsurance accounting shall be reported as a reduction of unearned premiums;

     c.     The gain created by a retroactive reinsurance agreement because the amount paid to the reinsurer is less than the gross liabilities for losses and loss adjustment expenses ceded to the reinsurer is reported in the statement of income as a write-in gain in other income by the ceding entity and a write-in loss by the assuming entity. The gain created by a retroactive reinsurance agreement is restricted as a special surplus account until the actual retroactive reinsurance recovered is in excess of the consideration paid;

     d.     This statement requires that a liability be established through a provision reducing unassigned funds (surplus) for unsecured reinsurance recoverables from unauthorized reinsurers and for certain overdue balances due from authorized reinsurers;

     e.     Some reinsurance agreements contain adjustable features that provide for adjustment of commission, premium or amount of coverage, based on loss experience. This statement requires that the asset or liability arising from the adjustable feature be computed based on experience to date under the agreement, and the impact of early termination may only be considered at the time the agreement has actually been terminated;

     f.     Structured settlements are addressed in *SSAP No. 65—Property and Casualty Contracts.* Statutory accounting and FAS 113 are consistent in accounting for structured settlement annuities where the reporting entity is the owner and payee and where the claimant is the payee and the reporting entity has been released from its obligation. FAS 113 distinguishes structured settlement annuities where the claimant is the payee and a legally enforceable release from the reporting entity's liability is obtained from those where the claimant is the payee but the reporting entity has not been released from its obligation. GAAP requires the deferral of any gain resulting from the purchase of a structured settlement annuity where the reporting entity has not been released from its obligation; and

     g.     This statement requires that reinsurance recoverables on unpaid losses and loss adjustment expenses be presented as a contra-liability. Requirements for offsetting and netting are addressed in SSAP No. 64.

89.     This statement rejects AICPA *Statement of Position No. 92-5, Accounting for Foreign Property and Liability Reinsurance.* This statement incorporates Appendix A-785 as applicable.

© 1999-2010 National Association of Insurance Commissioners     

Property and Casualty Reinsurance                    SSAP No. 62R

**Effective Date and Transition**

90.    This statement shall apply to:

a.    Reinsurance agreements entered into, renewed, or amended on or after January 1, 1994. An amendment is any revision or adjustment of contractual terms. The payment of premiums or reimbursement of losses recoverable under the agreement shall not constitute an amendment; and

b.    Reinsurance agreements in force on January 1, 1995, which cover losses occurring or claims made on or after that date on policies reinsured under such agreements.

91.    The guidance shall not apply to:

a.    Reinsurance agreements which cover only losses occurring or claims made before January 1, 1994, and which were entered into before January 1, 1994, and were not subsequently *renewed or amended*; and

b.    Reinsurance agreements that expired before and were not renewed or amended after January 1, 1995.

92.    The guidance in paragraphs 48 through 52 shall be effective for all accounting periods beginning on or after January 1, 1996, and shall apply to reinsurance agreements entered into, renewed or amended on or after January 1, 1994.

93.    This statement is effective for years beginning January 1, 2001. Changes resulting from the adoption of this statement shall be accounted for as a change in accounting principle in accordance with *SSAP No. 3—Accounting Changes and Corrections of Errors*. Revisions to subparagraph 31.e., related paragraphs 68-71, and new disclosures in paragraph 86 documented in *Issue Paper No. 137—Transfer of Property and Casualty Reinsurance Run-off Agreements* are effective for contracts entered on or after January 1, 2010.

**AUTHORITATIVE LITERATURE**

**Generally Accepted Accounting Principles**

- *FASB Statement No. 113, 'Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts*

- *FASB Emerging Issues Task Force Issue No. 93-6, Accounting for Multiple-Year Retrospectively Rated Contracts by Ceding and Assuming Enterprises*

**RELEVANT ISSUE PAPERS**

- Issue Paper No. 75—Property and Casualty Reinsurance

- Issue Paper No. 137—Transfer of Property and Casualty Reinsurance Run-off Agreements

SSAP No. 62R                    Statement of Statutory Accounting Principles

### CLASSIFYING REINSURANCE CONTRACTS



© 1999-2010 National Association of Insurance Commissioners                    62R-22

Property and Casualty Reinsurance                    SSAP No. 62R

# SSAP NO. 62R—EXHIBIT A

**Implementation Questions and Answers**

Applicability

1.  Q:  The accounting practices in SSAP No. 62R specify the accounting and reporting for reinsurance contracts. What contracts are considered reinsurance contracts for purposes of applying these accounting practices?

    A:  Any transaction that indemnifies an insurer against loss or liability relating to insurance risk shall be accounted for in accordance with the accounting practices included in SSAP No. 62R. Therefore, all contracts, including contracts that may not be structured or described as reinsurance, shall be accounted for as reinsurance when those conditions are met.

2.  Q:  The provisions of this statement will apply to (a) reinsurance contracts entered into, renewed or amended on or after January 1, 1994, and (b) any other reinsurance contracts that are in force on January 1, 1995 and cover insurable events on the underlying insurance policies that occur on or after that date. What contracts would be exempt from the new accounting rules included in SSAP No. 62R?

    A:  The only exempt contracts are:

    1)  Purely retroactive reinsurance contracts that cover only insured events occurring before January 1, 1994, provided those contracts were entered into before that date and are not subsequently amended and

    2)  Contracts that expired before January 1, 1995 and are not amended after that date.

3.  Q:  This statement is to be applied to contracts which are amended on or after January 1, 1994. What if the change in terms is not significant, or the terms changed have no financial effect on the contract?

    A:  In general, the term amendment should be viewed broadly to include all but the most trivial changes. Examples of amendments include, but are not limited to, replacing one assuming entity with another (including an affiliated entity), or modifying the contract's limit, coverage, premiums, commissions, or experience-related adjustable features. No distinction is made between financial and non-financial terms.

4.  Q:  Must the accounting provisions of SSAP No. 62R be applied to an *otherwise exempt* contract if the ceding entity pays additional premiums under the contract on or after January 1, 1994?

    A:  The answer depends on why the additional premiums are paid. If the additional premiums are the result of a renegotiation, adjustment, or extension of terms, the contract is subject to the accounting provisions of SSAP No. 62R. However, additional premiums paid without renegotiation, adjustment, or extension of terms would not make an otherwise exempt contract subject to those provisions.

5.  Q:  Prospective and retroactive portions of a reinsurance contract are allowed to be accounted for separately, if practicable. Can the retroactive portion of an existing contract be segregated and, therefore, exempted with other retroactive contracts covering insured events occurring prior to January 1, 1994?

© 1999-2010 National Association of Insurance Commissioners                    62R-23

A: No. The transition provisions apply to an entire contract, which is either subject to or exempt from the revised provisions of SSAP No. 62R. A ceding entity may bifurcate a contract already subject to the new accounting rules in SSAP No. 62R and then account for both the prospective and retroactive portions in accordance with the new accounting standard.

Risk Transfer

6.  Q:  Do the new risk transfer provisions apply to existing contracts?

A:  Yes, the new risk transfer provisions apply to some existing contracts. SSAP No. 62R applies in its entirety only to existing contracts which were renewed or amended on or after January 1, 1994, or which cover losses occurring or claims made after that date. Therefore, those contracts must be evaluated to determine whether they transfer risk and qualify for reinsurance accounting. For accounting periods commencing on or after January 1, 1995, balances relating to such contracts which do not transfer insurance risk shall be reclassified as deposits and shall be accounted for and reported in the manner described under the caption Reinsurance Contracts Must Include Transfer of Risk.

SSAP No. 62R does not apply to existing contracts which were entered into before, and were not renewed or amended on or after, January 1, 1994, and which cover only losses occurring or claims made before that date, nor to contracts which expired before, and were not renewed or amended on or after, January 1, 1995. Those contracts will continue to be accounted for in the manner provided by SSAP No. 62R before these revisions.

7.  Q:  How does the effective date affect the assessment of whether a significant loss to the reinsurer was reasonably possible?

A:  The risk transfer assessment is made at contract inception, based on facts and circumstances known at the time. Because that point in time has passed for existing contracts, some have suggested that the risk transfer provisions be applied as of the effective date. However, that approach to the risk transfer assessment would violate the requirement to consider all cash flows from the contract. Therefore, the test must be applied from contract inception, considering the effect of any subsequent contract amendments. Careful evaluation and considered judgment will be required to determine whether a significant loss to the reinsurer was reasonably possible at inception.

8.  Q:  Should risk transfer be reassessed if contractual terms are subsequently amended?

A:  Yes. When contractual terms are amended, risk transfer should be reassessed. For example, a contract that upon inception met the conditions for reinsurance accounting could later be amended so that it no longer meets those conditions. The contract should then be reclassified and accounted for as a deposit.

9.  Q:  How should the risk transfer assessment be made when a contract has been amended?

A:  No particular method is prescribed for assessing risk transfer in light of a contract amendment. Whether an amended contract in substance transfers risk must be determined considering all of the facts and circumstances in light of the risk transfer requirements. Judgment also will be required to determine whether an amendment in effect creates a new contract.

10. Q:  For purposes of evaluating whether a contract with a reinsurer transfers risk, what constitutes a contract?

A: A contract is not defined, but is essentially a question of substance. It may be difficult in some circumstances to determine the boundaries of a contract. For example, the profit-sharing provisions of one contract may refer to experience on other contracts and, therefore, raise the question of whether, in substance, one contract rather than several contracts exist.

The inconsistency that could result from varying interpretations of the term *contract* is limited by requiring that features of the contract or other contracts or agreements that directly or indirectly compensate the reinsurer or related reinsurers for losses be considered in evaluating whether a particular contract transfers risk. Therefore, if agreements with the reinsurer or related reinsurers, in the aggregate, do not transfer risk, the individual contracts that make up those agreements also would not be considered to transfer risk, regardless of how they are structured.

11. Q: If the assessment of risk transfer changes after the initial assessment at contract inception, how should the ceding entity account for the change?

A: The status of a contract should be determinable at inception and, absent amendment, subsequent changes should be very rare. If the risk of significant loss was not deemed reasonably possible at inception, and a significant loss subsequently occurred, the initial assessment was not necessarily wrong, because remote events do occur. Likewise, once a reasonable possibility of significant loss has been established, such loss need not occur in order to maintain the contract's status as reinsurance.

12. Q: SSAP No. 62R requires that reasonably possible outcomes be evaluated to determine the reinsurer's exposure to significant loss. What factors should be considered in determining whether a scenario being evaluated is reasonably possible?

A: The term *reasonably possible* means that the probability is more than remote. The test is applied to a particular scenario, not to the individual assumptions used in the scenario. Therefore, a scenario is not reasonably possible unless the likelihood of the entire set of assumptions used in the scenario occurring together is reasonably possible.

13. Q: In determining the amount of the reinsurer's loss under reasonably possible outcomes, may cash flows directly related to the contract other than those between the ceding and assuming companies, such as taxes and operating expenses of the reinsurer, be considered in the calculation?

A: No. The evaluation is based on the present value of all cash flows *between the ceding and assuming enterprises* under reasonably possible outcomes and, therefore, precludes considering other expenses of the reinsurer in the calculation.

14. Q: In evaluating the significance of a reasonably possible loss, should the reasonably possible loss be compared to gross or net premiums?

A: Gross premiums should be used.

15. Q: How does a commutation clause affect the period of time over which cash flows are evaluated for reasonable possibility of significant loss to the reinsurer?

A: All cash flows are to be assessed under reasonably possible outcomes. Therefore, unless commutation is expected in the scenario being evaluated, it should not be assumed in the calculation. Further, the assumptions used in a scenario must be internally consistent and economically rational in order for that scenario's outcome to be considered reasonably possible.

16. Q:  What interest rate should be used in each evaluated scenario to make the present value calculation?

A:  A reasonable and appropriate rate is required, which generally would reflect the expected timing of payments to the reinsurer and the duration over which those cash flows are expected to be invested by the reinsurer.

17. Q:  SSAP No. 62R refers to payment schedules and accumulating retentions from multiple years as features that delay timely reimbursement of claims. Does the presence of those features generally prevent a contract from meeting the conditions for reinsurance accounting?

A:  Yes. Payment schedules and accumulating retentions from multiple years are contractual features inherently designed to delay the timing of reimbursement to the ceding entity. Regardless of what a particular feature might be called, any feature that can delay timely reimbursement violates the conditions for reinsurance accounting. Transfer of insurance risk requires that the reinsurer's payments to the ceding entity depend on and directly vary with the amount and timing of claims settled under the reinsured contracts. Contractual features that can delay timely reimbursement prevent this condition from being met. Therefore, any feature that may affect the timing of the reinsurer's reimbursement to the ceding entity should be closely scrutinized.

18. Q:  What if a contract contains a feature such as a payment schedule or accumulating retention but could still result in the reasonable possibility of significant loss to the reinsurer?

A:  Both of the following conditions are required for reinsurance accounting:

   a.   Transfer of significant risk arising from uncertainties about both (i) the ultimate amount of net cash flows from premiums, commission, claims, and claim settlement expenses paid under a contract (underwriting risk) and (ii) the timing of the receipt and payment of those cash flows (timing risk); and

   b.   Reasonable possibility of significant loss to the reinsurer.

   Because both condition (a) and condition (b) must be met, failure to transfer significant timing and underwriting risk is not overcome by the possibility of significant loss to the reinsurer.

19. Q:  Is it permissible to evaluate timely reimbursement on a present value basis?

A:  No. The word timely is used in the ordinary temporal sense to refer to the length of time between payment of the underlying reinsured claims and reimbursement by the reinsurer.

   While the test for reasonable possibility of significant loss to the reinsurer provides for a present value-based assessment of the economic characteristics of the reinsurance contract, the concept of timely reimbursement relates to the transfer of insurance risk (condition a above), not the reasonable possibility of significant loss (condition b above). Accordingly, timely reimbursement should be evaluated based solely on the length of time between payment of the underlying reinsured losses and reimbursement by the reinsurer.

20. Q:  Are there any circumstances under which the conditions for risk transfer need not be met?

A:  Yes. An extremely narrow and limited exemption is provided for contracts that reinsure either an individual risk or an underlying book of business that is inherently profitable. When substantially all of the insurance risk relating to the reinsured portions of the underlying insurance contracts has been assumed by the reinsurer, the contract meets the conditions for reinsurance accounting. To qualify under this exception, no more than trivial insurance risk on the reinsured portions of

the underlying insurance contracts may be retained by the ceding entity. The reinsurer's economic position must be virtually equivalent to having written the relevant portions of the reinsured contracts directly.

21. Q:  In determining whether a reinsurance contract qualifies under the exception referred to in the preceding question, how should the economic position of the reinsurer be assessed in relation to that of the ceding entity?

    A:  The assessment should be made by comparing the net cash flows of the reinsurer under the reinsurance contract with the net cash flows of ceding entity on the reinsured portions of the underlying insurance contracts. This may be relatively easy for reinsurance of individual risks or for unlimited-risk quota-share reinsurance, because the premiums and losses on these types of reinsurance generally are the same as the premiums and losses on the reinsured portions of the underlying insurance policies.

    In other types of reinsurance, determining the reinsurer's net cash flows relative to the insurer is likely to be substantially more difficult. For example, it generally would be difficult to demonstrate that the ceding entity's premiums and losses for a particular layer of insurance are the same as the reinsurer's premiums and losses related to that layer. If the economic position of the reinsurer relative to the insurer cannot be determined, the contract would not qualify under the exception.

Accounting Provisions

22. Q:  An existing contract that was accounted for as reinsurance no longer qualifies for reinsurance accounting under the new accounting rules included in SSAP No. 62R. How should the ceding and assuming companies account for the contract in future periods?

    A:  Because the statement of income cannot be restated, previously recognized gains and losses are not revised. If the contract was entered into before, and not renewed or amended on or after, January 1, 1994 and covers only losses occurring or claims made before that date, or the contract expired before January 1, 1995 and was not renewed or amended on or after that date, it would continue to be accounted for in the manner provided before these revisions.

    For accounting periods commencing on or after January 1, 1995, existing balances relating to contracts which do not transfer insurance risk and which were entered into on or after January 1, 1994 (covering losses occurring or claims made after that date) would be reclassified as deposits.

    Premium payments to a reinsurer would be recorded as deposits. Likewise, losses recoverable from a reinsurer would not be recognized as receivables. Rather, any reimbursement for losses would be accounted for upon receipt as a refund of a deposit.

23. Q:  What is the definition of past insurable events that governs whether reinsurance coverage is prospective or retroactive? For example, could a reinsurance contract that covers losses from asbestos and pollution claims on occurrence-based insurance policies effective during previous periods be considered prospective if the reinsurance coverage is triggered by a court interpretation that a loss is covered within the terms of the underlying insurance policies?

    A:  The distinction between prospective and retroactive reinsurance is based on whether a contract reinsures future or past insured events covered by the underlying reinsurance contracts. In the example above, the insured event is the occurrence of loss within the coverage of the underlying insurance contracts, not the finding of a court. Therefore, the fact that the asbestos exposure or

pollution is covered under insurance policies effective during prior periods makes the reinsurance coverage in this example retroactive.

24. Q: Would the answer to the above question change if the reinsurance were written on a claims-made basis?

   A: No. The form of the reinsurance—whether claims-made or occurrence-based—does not determine whether the reinsurance is prospective or retroactive. A claims-made reinsurance contract that reinsures claims asserted to the reinsurer in a future period as a result of insured events that occurred prior to entering into the reinsurance contract is a retroactive contract.

25. Q: What is the effect of adjustments to future premiums or coverage in determining whether reinsurance is prospective or retroactive?

   A: Adjustments to future premiums or coverage may affect the accounting for a reinsurance contract. Whenever an adjustment results in a reinsurer providing new or additional coverage for past insurable events, that coverage is retroactive. For example, if subsequent years' premiums under a multiple accident year contract create additional coverage for previous accident years, the additional coverage is retroactive, even if the original coverage provided in the contract for those accident years was prospective. Likewise, if current losses under a multiple-year contract eliminate coverage in future periods, some or all of the premiums to be paid in those future periods should be charged to the current period.

26. Q: A reinsurance contract is entered into after the contract's effective date. Is the coverage between the contract's effective date and the date the contract was entered into prospective or retroactive?

   A: The portion of the contract related to the period of time between the effective date of the contract and the date the contract was entered into is retroactive because it covers insured events that occurred prior to entering into the reinsurance contract.

27. Q: How is the date the reinsurance contract was entered into determined?

   A: It is not uncommon for a reinsurance arrangement to be initiated before the beginning of a policy period but not finalized until after the policy period begins. Whether there was agreement in principle at the beginning of the policy period and, therefore, the contract is substantively prospective must be determined based on the facts and circumstances. For example, a contract may be considered to have been substantively entered into even though regulatory approval of that contract has not taken place.

   The absence of agreement on significant terms, or the intention to establish or amend those terms at a later date based on experience or other factors, generally indicates that the parties to the contract have not entered into a reinsurance contact, but rather have agreed to enter into a reinsurance contract at a future date. If contractual provisions under a contract substantively entered into at a future date covered insurable events prior to that date, that coverage is retroactive.

   In any event, SSAP No. 62R provides that if a contract (except facultative contracts and contracts signed by the lead reinsurer and certain cover notes or similar documents signed by reinsurers representing more than 50% of the capacity on the contract) has not been finalized, reduced to written form and signed by the parties within 9 months after its effective date, it is presumed to be retroactive.

28. Q: Are contracts to reinsure calendar-year incurred losses considered blended contracts that have both prospective and retroactive elements?

A: Yes. Most reinsurance contracts covering calendar-year incurred losses combine coverage for insured events that occurred prior to entering into the reinsurance contract with coverage for future insured events and, therefore, include both prospective and retroactive elements.

In any event, SSAP No. 62R provides that if a contract (except facultative contracts, contracts signed by the lead reinsurer and certain cover notes or similar documents signed by reinsurers representing more than 50% of the capacity on the contract) has not been finalized, reduced to written form and signed by the parties within 9 months after its effective date it is presumed retroactive.

29. Q: When the prospective and retroactive portions of a contract are being accounted for separately, how should premiums be allocated to each portion of the contract?

A: No specific method for allocating the reinsurance premiums to the risks covered by the prospective and retroactive portions of a contract is required. However, separate accounting for the prospective and retroactive portions of a contract may take place only when an allocation is practicable.

Practicability requires a reasonable basis for allocating the reinsurance premiums to the risks covered by the prospective and retroactive portions of the contract, considering all amounts paid or deemed to have been paid regardless of the timing of payment. If a reasonable basis for allocating the premiums between the prospective and retroactive coverage does not exist, the entire contract must be accounted for as a retroactive contract.

30. Q: A retroactive reinsurance contract contains a cut-through provision that provides the ceding entity's policyholders and claimants with the right to recover their claims directly from the reinsurer. May the ceding entity immediately recognize earned surplus associated with this type of contract?

A: No. SSAP No. 62R states that earned surplus may not be recognized "until the actual retroactive reinsurance recovered exceeds the consideration paid."

31. Q: A ceding entity enters into a retroactive reinsurance agreement that gives rise to segregated surplus. If the reinsurer prepays its obligation under the contract, may the ceding entity recognize earned surplus at the time the prepayment is received?

A: Segregated surplus arising from retroactive reinsurance transactions is earned as actual liabilities that have been transferred are recovered or terminated. Therefore, earned surplus is based on when the reinsurer settles its obligations to the ceding entity, and it may be appropriate to recognize earned surplus at the time the prepayment is received.

However, all of the facts and circumstances must be considered to determine whether the ceding entity has substantively recovered the liabilities transferred to the reinsurer. For example, if the ceding entity agrees to compensate the reinsurer for the prepayment, such as by crediting the reinsurer with investment income on prepaid amounts or balances held, the ceding entity has not, in substance, recovered its transferred liabilities but rather has received a deposit from the reinsurer that should be accounted for accordingly.

32. Q: If the ceding entity does not expect to receive any recoveries because the reinsurer has agreed to reimburse claimants under the reinsured contracts directly, would the ceding entity be considered to have recovered or terminated its transferred liabilities?

SSAP No. 62R                        Statement of Statutory Accounting Principles

A:  No. In the example given, the reinsurer is substantively acting as disbursing agent for the ceding entity. Therefore, the ceding entity cannot be said to have recovered amounts due from the reinsurer before payment is made to the claimant.

33. Q:  What accounting entries would a ceding entity make to report a retroactive reinsurance contract?

A:  Accounting Entries for a Ceding Entity to Report a Retroactive Reinsurance Contract:

Entry 1

| | | |
|---|---|---|
| Retroactive Reinsurance Reserves | | |
| Ceded or Assumed (B/S) | 10,000 | |
| Retroactive Reinsurance Gain (I/S) | | 2,000 |
| Cash | | 8,000 |

To record initial portfolio transfer see items #3 and #8. The ceding entity must establish the segregated surplus per item #4.

Entry 1A

| | | |
|---|---|---|
| Retro. Reins. Gain | 2,000 | |
| Profit/Loss Account | | 2,000 |

To close gain from retroactive transaction.

Entry 1B

| | | |
|---|---|---|
| Profit/Loss Account | 2,000 | |
| Special Surplus from Retro. Reins. | | 2,000 |

To close profit from retroactive reinsurance to special surplus.

Entry 2

| | | |
|---|---|---|
| Cash | 2,000 | |
| Retroactive Reinsurance Reserves | | 2,000 |
| Ceded or Assumed (B/S) | | |

To record recovery of paid losses from the reinsurer. Outstanding ceded reserves after this recovery equals $8,000, and special surplus from retroactive reinsurance account equals $2,000; therefore, segregated surplus account is not changed per item #10.

Entry 3

| | | |
|---|---|---|
| Retroactive Reinsurance Reserves | | |
| Ceded or Assumed (B/S) | 3,000 | |
| Retroactive Reinsurance Gain (I/S) | | 3,000 |

To record subsequent revision of the initial reserves ceded per item #10. The segregated surplus account is increased to $5,000 as a result of this upward development.

Entry 3A

| | | |
|---|---|---|
| Retro. Reinsurance Gain | 3,000 | |
| Profit/Loss Account | | 3,000 |

To close profit from retroactive reinsurance.

Entry 3B

**Property and Casualty Reinsurance**                                              SSAP No. 62R

| | | |
|---|---|---|
| Profit/Loss (I/S) | 3,000 | |
| Special Surplus from Retro. Reins. | | 3,000 |

To close profit and loss account to special surplus. (Retroactive reinsurance reserves ceded or assumed account balance equals $11,000. Special Surplus from retroactive reinsurance balance equals $5,000.)

Entry 4

| | | |
|---|---|---|
| Cash | 4,000 | |
| Retroactive Reinsurance Reserves Ceded or Assumed (B/S) | | 4,000 |

To record recovery of paid losses from the reinsurer. Outstanding ceded reserves after this recovery equals $7,000, therefore segregated surplus account is not changed per item #10.

Entry 5

| | | |
|---|---|---|
| Cash | 3,000 | |
| Retroactive Reinsurance Reserves Ceded or Assumed (B/S) | | 3,000 |

To record recovery of paid losses from reinsurer. Outstanding ceded reserves after recovery equals $4,000, therefore the following entry is needed per items #6 and #10.

Entry 5A

| | | |
|---|---|---|
| Special Surplus—Retro. Reins. | 1,000 | |
| Unassigned Funds | | 1,000 |

Retroactive Reinsurance reserves ceded or assumed after this entry equals $4,000.

Entry 6

| | | |
|---|---|---|
| Retroactive Reinsurance Loss (I/S) | 1,000 | |
| Retroactive Reinsurance Reserves Ceded or Assumed (B/S) | | 1,000 |

To record subsequent revision of the initial reserves ceded per item #10. The segregated surplus account is decreased as a result of this downward development to $3,000. The following entry is needed per items #6 and #10.

Entry 6A

| | | |
|---|---|---|
| Profit/Loss Account | 1,000 | |
| Retro. Reins. Loss | | 1,000 |

To close loss to profit and loss account.

Entry 6B

| | | |
|---|---|---|
| Special Surplus from Retro. Reins. | 1,000 | |
| Profit/Loss Account | | 1,000 |

SSAP No. 62R                    *Statement of Statutory Accounting Principles*

To close profit and loss account to special surplus. (Remaining balance of retroactive reinsurance reserve ceded or assumed account equals $3,000.) (Special surplus from retro. reins. account balance equals $3,000.)

Entry 7

| | | |
|---|---|---|
| Cash | 2,500 | |
| Retroactive Reinsurance Gain (I/S) | 500 | |
| Retroactive Reinsurance Reserves | | |
| Ceded or Assumed (B/S) | | 3,000 |

Entry 7A

| | | |
|---|---|---|
| Profit and Loss Account | 500 | |
| Retro. Reins. Gain | | 500 |

To close other income to profit and loss account.

Entry 7B

| | | |
|---|---|---|
| Special Surplus from Retro. Reins. | 500 | |
| Profit/Loss Account | | 500 |

To close profit and loss account to special surplus. (Remaining balance of special surplus from retro. reins. account equals $2,500.) (Remaining balance of retroactive reinsurance reserve ceded or assumed account -0-.)

Entry 7C

| | | |
|---|---|---|
| Special Surplus from Retro. Reins. | 2,500 | |
| Unassigned Funds | | 2,500 |

To close remaining special surplus account to unassigned surplus.

34. Q: How should the parties account for an adverse loss development reinsurance contract where, as of the statement date, the attachment level of the contract exceeds the ceding company's current case and IBNR reserves for the covered accident years (i.e. no surplus gain and no reinsurance recoverable as of the statement date), and the ceding company transferred cash to the reinsurer at the inception of the contract?

A: An adverse loss development reinsurance contract covering prior accident years meets the definition of "retroactive reinsurance" set forth in paragraph 22 of SSAP No. 62R:

....reinsurance in which a reinsurer agrees to reimburse a ceding entity for liabilities incurred as a result of past insurable events covered under contracts subject to the reinsurance....

Subparagraph 29.k. of SSAP No. 62R specifically provides that the consideration paid for a retroactive reinsurance contract is to be recorded as a decrease in ledger assets by the ceding entity and an increase in ledger assets by the assuming entity.

Question 33 illustrates the accounting entries for retroactive reinsurance contracts.

If the retroactive reinsurance contract transfers both components of insurance risk then, pursuant to paragraph 29 of SSAP No. 62R, the ceding company would record the consideration paid as a

© 1999-2010 National Association of Insurance Commissioners         62R-32

decrease in ledger assets, recognize an expense for the reinsurance ceded through Other Income or Loss accounts as a write-in item identified as "Retroactive Reinsurance Ceded", and record the recoverable from the reinsurer as a contra liability.

No contra liability is established until and unless (and then only to the extent that) the ceding company establishes reserves which exceed the attachment point.

For the contract described, at inception no contra liability is recorded to offset current liability for the business ceded, since the ceded retroactive reinsurance premium relates to coverage in excess of the current liabilities recorded by the ceding company.

Once the ceding company's recorded liabilities exceed the attachment point of the adverse loss development reinsurance contract and triggers reinsurance recoverable from the reinsurer, a contra liability is established by the ceding company for the amount of the reinsurance recoverable. Any surplus resulting from the retroactive reinsurance is carried as a write-in item on the balance sheet designated as "Special Surplus from Retroactive Reinsurance Account." The surplus gain may not be classified as unassigned funds (surplus) until the actual retroactive reinsurance recovered exceeds the consideration paid.

If any portion of a retroactive reinsurance contract does not transfer insurance risk, then the portion which does not transfer risk is accounted for as a deposit pursuant to paragraph 35 of SSAP No. 62R. The deposit is reported as an admitted asset of the ceding company if the reinsurer is licensed, accredited or otherwise qualified in the ceding company's state of domicile as described in Appendix A-785, or if there are funds held by or on behalf of the ceding company as described in that appendix. Receipts and disbursements under the contract are recorded through the deposit/liability accounts. Amounts received in excess of the deposit made are recognized as a gain in the Other Income or Loss account.

Accounting entries for a ceding entity to report a retroactive reinsurance contract at the inception of which the cedent's reserves are lower than the attachment point of the reinsurance coverage:

Assume the company pays $16m to purchase adverse development coverage of $50m, above an attachment point.

Entry 1:  Payment of Retrospective Reinsurance Premium

| | | |
|---|---|---|
| Retrospective Reinsurance Expense* | $16m | |
| Cash | | $16m |

The company pays $16m premium for the retrospective reinsurance contract.
*This is an Other Expense item, it does not flow through Schedule F or Schedule P.

Entry 2: Adverse Development Reaches the Attachment Point

| | | |
|---|---|---|
| Losses Incurred | $25m | |
| Gross Loss Reserve | | $25m |
| Recoverable on Retro Reinsurance Contract** | $25m | |
| Other Income* | | $9m |
| Contra – Retro Reinsurance Expense* | | $16m |
| Surplus*** | $9m | |
| Segregated Surplus*** | | $9m |

The company incurs $25m development on reserves related to the contract.
*These are Other Income/Expense items do not flow through Schedule F or Schedule P.
**A contra-liability write-in item, not netted against loss reserves.
***Surplus is segregated in the amount of [$25m - $16m = $9m] recoverables less consideration paid.

Entry 3: Cash is Recovered on Paid Losses

| | | |
|---|---|---|
| Cash | $20m | |
| Recoverable on Retrospective Reinsurance Contract | | $20m |
| Segregated Surplus | $4m | |
| Surplus | | $4m |

The company recovers $20m cash from reinsurer on this retro contract. Segregated Surplus decreases in the amount of [$20m - $16m = $4m] (decreases for amount recovered in excess of consideration paid).

35. Q:  How should a ceding company account for payment of the premium for a retroactive reinsurance contract by the ceding company's parent company or some other person not a party to the reinsurance contract (for example, adverse loss development reinsurance contracts purchased by the parent company in the context of the purchase or sale of the ceding company)?

A:  If the reinsurance premium is not paid directly by the ceding company but is instead paid on behalf of the ceding company by the ceding company's parent company or some other entity not a party to the reinsurance contract, then the ceding company should (1) record an increase in gross paid in and contributed surplus in the amount of the reinsurance premium to reflect the contribution to surplus by the parent or third party payor, and (2) record an expense in the amount of the reinsurance premium and account for the contract as provided in Questions 33 and 34.

Property and Casualty Reinsurance                              SSAP No. 62R

**SSAP NO. 62R—EXHIBIT B**

**P&C Runoff Reinsurance Transactions**

The following provides illustrative journal entries for P&C Runoff Reinsurance Transactions.

Example 1: Transfer of existing block of runoff business with no residual UPR on books of Transferor

| Cedent/Transferor | | DR | CR |
|---|---|---|---|
| **Day 1 - Cedent transfers 50,000 in reserves for 50,000** | | | |
| Ceded Reinsurance Recoverable (U&I 2A & Sch. F) | Contra Liab ↑ | 50,000 | |
| Cash | Asset ↓ | | 50,000 |
| Losses Paid (U/W Part 2 & Sch. P) | I/S ↓ | 50,000 | |
| Change in Reserves – Incurred Losses (U&I Part 2) | I/S ↑ | | 50,000 |
| *Unlike novation –gross reserves stay on books of transferor* | | | |
| | | | |
| **Day 360 - Negative Development on Transferred Business - 3,000** | | | |
| Reinsurance Recoverable on Unpaid Losses (Sch. F) | Contra Liab ↑ | 3,000 | |
| Reserves for Unpaid Losses (U&I Part 2A & Sch. P) | Liab ↑ | | 3,000 |
| | | | |
| **Day 540 – Reinsurer Pays the Loss @ Reported Reserve** | | | |
| Reserves for Unpaid Losses (U&I Part 2A & Sch. P) | Liab ↓ | 53,000 | |
| Ceded Reinsurance Recoverable (U&I Part 2A & Sch. F) | Contra Liab ↓ | | 53,000 |
| | | | |
| **Reinsurer/ Transferee** | | | |
| **Day 1 - Cedent transfers 50,000 in reserves for 50,000** | | | |
| Cash | Asset ↑ | 50,000 | |
| Reported Losses on Reins. Assumed (U&I Part 2A & Sch. P) | Liab ↑ | | 50,000 |
| Change in Reserves – Incurred Losses (U&I Part 2) | I/S ↓ | 50,000 | |
| Losses Paid or Incurred (negative) (U&I Part 2 &Sch. P) | I/S ↑ | | 50,000 |
| | | | |
| **Day 360 - Negative Development on Transferred Business - 3,000:** | | | |
| Change in Reserves – Incurred Losses (U&I Part 2) | I/S↓ | 3,000 | |
| Reserves for Unpaid Losses (U&I Part 2A & Sch. P) | Liab ↑ | | 3,000 |
| | | | |
| **Day 540 – Reinsurer Pays the Loss** | | | |
| Reserves for Unpaid Losses (U&I Part 2A & Sch. P) | Liab ↓ | 53,000 | |
| Cash | Asset ↓ | | 53,000 |

Comments:
Since the Transferor is ceding incurred losses neither party should have premium impacted. To do that
would distort many financial ratios.

© 1999-2010 National Association of Insurance Commissioners                    62R-35

SSAP No. 62R                    Statement of Statutory Accounting Principles

**Example 2:** Transfer of existing block of runoff business with some residual UPR of 10,000 on books of Transferor (this should be less common).

| Cedent/Transferor | | DR | CR |
|---|---|---|---|
| | | | |
| Day 1 - Cedent transfers 50k in reserves & 10k UPR for 60,000 | | | |
| Ceded Reinsurance Recoverable  (U&I Part 2A & Sch. F) | Contra Liab ↑ | 50,000 | |
| Unearned Premium Reserve  (U&I Part 1& 1A) | Liab ↓ | 10,000 | |
| Cash | Asset ↓ | | 60,000 |
| Ceded Premium Written  (U&I Part 1B) | I/S ↓ | 10,000 | |
| Losses Paid  (U&I Part 2 & Sch. P) | I/S ↓ | 50,000 | |
| Change in Reserves - Incurred Losses  (U&I Part 2) | I/S ↑ | | 50,000 |
| Change in UPR  (U&I Part 1& 1A) | I/S ↑ | | 10,000 |
| *Unlike novation –gross  reserves stay on books of transferor* | | | |
| | | | |
| Day 180 – Premium is Fully Earned (Assumes 80% Loss Ratio) | | | |
| Ceded Reinsurance Recoverable  (U&I Part 2A & Sch. F) | Contra Liab ↑ | 8,000 | |
| Reserves for Unpaid Losses  (U&I Part 2A & Sch. P) | Liab ↑ | | 8,000 |
| *To mirror the increase in unpaid losses by the transferee* | | | |
| | | | |
| Day 360 - Negative Development on Transferred Business -3,000: | | | |
| Reinsurance Recoverable on Unpaid Losses  (Sch. F) | Contra Liab ↑ | 3,000 | |
| Reserves for Unpaid Losses  (U&I Part 2A & Sch. P) | Liab ↑ | | 3,000 |
| | | | |
| Day 540 – Reinsurer Pays the Loss @ Reported Reserves (50+8+3) | | | |
| Reserves for Unpaid Losses  (U&I Part 2A & Sch. P) | Liab ↓ | 61,000 | |
| Ceded Reinsurance Recoverable  (U&I Part 2A & Sch. F) | Contra Liab ↓ | | 61,000 |

© 1999-2010 National Association of Insurance Commissioners

Property and Casualty Reinsurance                                    SSAP No. 62R

| Reinsurer/ Transferee | | | |
|---|---|---|---|
| Day 1 - Cedent transfers 50k in reserves & 10k UPR for 60,000 | | | |
| Cash | Asset ↑ | 60,000 | |
| Reported Losses on Reins. Assumed  (U&I Part 2A & Sch. P) | Liab ↑ | | 50,000 |
| Unearned Premium Reserve  (U&I Part 1& 1A) | Liab ↑ | | 10,000 |
| Assumed Premium Written  (U&I Part 1B) | I/S ↑ | | 10,000 |
| Change In Reserves – Incurred Losses  (U&I Part 2) | I/S ↓ | 50,000 | |
| Change in UPR  (U&I Part 1& 1A) | I/S ↓ | 10,000 | |
| Losses Paid or Incurred (negative) (U&I Part 2 &Sch. P) | I/S ↑ | | 50,000 |
| | | | |
| Day 180 – Premium is Fully Earned (Assumes 80% Loss Ratio) | | | |
| Unearned Premium Reserve  (U&I Part 1& 1A) | Liab ↓ | 10,000 | |
| Reserves for Unpaid Losses  (U&I Part 2A & Sch. P) | Liab ↑ | | 8,000 |
| Change In Reserves – Incurred Losses  (U&I Part 2) | I/S↓ | 8,000 | |
| Change in UPR  (U&I Part 1& 1A) | I/S ↑ | | 10,000 |
| *To record the increase In unpaid losses by the transferee* | | | |
| | | | |
| Day 360 - Negative Development on Transferred Business -3,000: | | | |
| Change In Reserves – Incurred Losses  (U&I Part 2) | I/S↓ | 3,000 | |
| Reserves for Unpaid Losses  (U&I Part 2A & Sch. P) | Liab ↑ | | 3,000 |
| | | | |
| Day 540 – Reinsurer Pays the Loss @ Reported Reserves (50+8+3) | · | | |
| Reserves for Unpaid Losses  (U&I Part 2A & Sch. P) | Liab ↓ | 61,000 | |
| Cash | Asset ↓ | | 61,000 |

Comments:
In this second example, the portion of the runoff business that has an UPR associated with it is essentially booked as prospective reinsurance. Other elements of the example are the same except that we assumed an 80% loss ratio on the unearned portion of the business.